# EXHIBIT 2

Redacted Public Version

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0468-JRS
As of June 26, 2020

### INDEX OF PLEADINGS

| No. | D.I. | Date | Title | Confidential |
|---|---|---|---|---|
| 2A | | 06/15/20 | *Verified Complaint for Injunctive Relief* | *Confidential* |
| 2B | | 06/15/20 | *Exhibits A-C to Verified Complaint for Injunctive Relief* | *Confidential* |
| 1A | | 06/15/20 | Verification (Declaration of Mark Marshall to Verified Complaint) | |
| 1B | | 06/15/20 | Letter to Register in Chancery from Steven L. Caponi Providing Summons Instructions | |
| 1C | | 06/15/20 | Rule 5.1 Certification | |
| 1D | | 06/15/20 | Supplemental Information Sheet with Statement of Good Cause | |
| 1E | | 06/18/20 | [Public Version] Verified Complaint | |
| 1F | | 06/23/20 | Issued 1 Summons 1 copy to Counsel via US Mail 06.23.2020 | |
| 1G | | 06/23/20 | Plaintiff's Motion for Confidential Treatment | |
| 1H | | 06/23/20 | [Proposed] Order Granting Motion for Confidential Treatment | |
| 1I | | 06/24/20 | Granted [Proposed] Order Granting Motion for Confidential Treatment | |
| 2C | | 06/25/20 | *Plaintiff's Motion to Expedite* | *Confidential* |
| 1J | | 06/25/20 | [Proposed] Order Granting Plaintiff's Motion to Expedite | |

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*

Court of Chancery of the State of Delaware
C.A. No. 2020-0468-JRS

2A
Verified Complaint for Injunctive Relief

06/15/20

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

               Plaintiff,

     v.

GRANITE TELECOMMUNICATIONS, LLC,

          Defendant.

C.A. No.  2020-0468-JRS

### VERIFIED COMPLAINT

Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel" or "Plaintiff"), by way of its Complaint against Defendant Granite Telecommunications, LLC ("Granite" or "Defendant"), alleges as follows:

### NATURE OF ACTION

1.     It is often said that a crisis will bring out the best and the worst in people.  Defendant Granite falls decidedly into the latter category.

2.     During these unprecedented times, when Americans are being exhorted to join together, to use their resources to help one another and defeat a common enemy, Granite has taken the lowest of roads.  It is taking advantage of the legitimate fear and uncertainty gripping the nation by spreading even more fear and uncertainty

via completely false information about a competitor, MetTel, so it can steal MetTel's current and potential clients and thereby increase its own profits.

3.      MetTel discovered that Granite has undertaken a coordinated effort, which appears to stretch from entry level sales personnel all the way to the CEO, to contact current and potential MetTel clients and tell them that ███████████ ████████████████████████████████████ These statements are completely false without any basis in fact, and Granite either knows they are false or is recklessly indifferent to whether they are true or false.  Granite is making these false statements to sow doubt with MetTel's existing and potential clients about ████ ██ ██ ███ ██ ██ ██ █ ██ ███ ████████████████████████

4.      Granite's conduct is even more despicable because many of MetTel's clients are in healthcare, public service, public safety, and federal, state and local governments.  MetTel provides essential services for its clients—a service all the more essential under the current circumstances, when the majority of employees in the U.S. who are able to do so are working solely by telecommuting, and telecommunications is the only practical way to remain connected to patients, customers and the public.  Even more so during these times, clients need to know they are partnered with ████████████████████████████ ████████████████████ which they are with MetTel.  False word of

MetTel's ██████████████████████████ is the kind of rumor that will spread throughout the market and poison MetTel's prospects, particularly among those for whom an interruption in telecommunications services would be the most devastating at this time: healthcare and government operations on the front lines of the pandemic.

5.     Without this Court's prompt intervention, there is a high probability that Granite's malicious campaign will succeed, and MetTel's business and its reputation will be irreparably damaged.

## PARTIES

6.     Plaintiff MetTel is a privately-held corporation organized under the laws of Delaware, with its principal place of business in New York, New York. MetTel's registered agent for service of process is: Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

7.     Defendant Granite is a limited liability company organized under the laws of Delaware, with its principal place of business in Quincy, Massachusetts.  Its registered agent for service of process is Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE, 19810.

## JURISDICTION

8.      This Court has subject matter jurisdiction in accordance with 10 *Del. C.* § 341.

9.      This Court has jurisdiction to award injunctive relief in accordance with Ct. Ch. R. 65.

## FACTS

10.     MetTel provides customized, integrated and managed communications solutions for enterprise clients.  By converging all communications over a proprietary network, MetTel enables clients to deploy and manage technology-driven voice, data, wireless, and cloud solutions globally.  Its MetTel Portal® enables clients to manage their inventory, usage, spend, and repairs from one simple, user-friendly interface.

11.     Granite describes itself as one of the premier telecommunications solutions providers for businesses across the United States and Canada, and the leading corporate phone service provider to multi-location companies.

12.     MetTel has spent more than twenty years building a reputation for reliability among its clients and in the marketplace.  Reliability is a critical characteristic for telecommunications companies.  One key to reliability is ███ ██████████████████████████  That, in turn, makes ████████████████████ critically important to its clients.

The Pandemic

13.     The global crisis caused by the COVID-19 pandemic is without parallel since the Spanish Flu pandemic of a century ago.  To date, approximately 2 million people in the United States have contracted the virus and approximately 116,000 have died.  Of those numbers, more than 150,000 nursing home residents and workers have been infected and approximately 30,000 have died.

14.     The COVID-19 pandemic has had a devastating economic impact as well.  The U.S. economy is in the midst of the worst recession in several decades.  To date, more than 38 million American workers have filed for unemployment benefits since the pandemic took hold and the national unemployment rate is nearly 16 percent. .

15.     COVID-19 has also caused unprecedented disruptions in the daily lives of all Americans, resulting in major changes in behavioral patterns that have put  the usual day-to-day functioning on hold for an indefinite period.  Not surprisingly, experts have reported a significant increase in depression, post-traumatic stress disorder, substance abuse, domestic violence, and child abuse.

16.     It is this grim reality that Granite saw as a shameful opportunity to enrich itself by capitalizing on the public's fears.  Not content to simply capitalize on the public's existing, well-founded fears, Granite took an even lower step by generating *new* fears with misinformation about MetTel.

5

Granite's Ongoing Campaign of Lies

17.    Granite has begun telling MetTel's current and potential clients—falsely ████████████████████████████████████████

████████████████████   The purpose of these lies is to convince MetTel's clients and potential clients that MetTel is ████████████████████████████████

████████████████████████████████████████████████

18.    Granite has spread these lies via e-mails, voice mail messages, and telephone conversations with MetTel clients for the specific purpose of damaging MetTel's business and harming its reputation.

19.    In late April 2020, MetTel learned for the first time that Granite might be spreading false information about MetTel.  MetTel received an email from one of its clients that was concerned and confused about a voice mail it received on April 24, 2020, from a client relations professional at Granite.  The caller indicated he had some unsettling information about MetTel that he would share when the client returned the call. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████Exhibit A.

20.    On May 12, 2020, MetTel learned that Granite had contacted another MetTel client, this one an operator of assisted living and memory care retirement communities.  The client forwarded to MetTel an email by the Senior Director of

6

Healthcare at Granite, who was attempting to schedule a call between Granite's Chief Executive Officer and the Chairman of the Board and CEO of the client.  In a follow-up email of the same date explaining the purpose for the call, the Senior Director made it clear that Granite wanted to take the client's business away from MetTel.  As a rationale for why the client would be interested in leaving MetTel and taking its business to Granite, he said that ██████████████████████████ ████████████████████████████████████████████████ Exhibit B.

21.     The client was understandably confused and concerned about this information and sought reassurances from MetTel.

22.     On June 2, 2020, MetTel received a call from the head of procurement of one of its largest customers, asking if MetTel is ████████████████████████ █████████████ This was a very unusual and disconcerting inquiry, inconsistent with MetTel's longstanding relationship with this customer.  Personnel from the customer have since confirmed that Granite had contacted it and made the same assertion that MetTel is █████████████████████████████

23.     The statements made by Granite about MetTel are blatantly false. ████████████████████████████████████████████████ ██████████████████████████████████████

24.     Moreover, there is no legitimate way that Granite had ██████████████ ████ upon which to base these statements. ████████████████████████████

7

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ MetTel has never shared ██████████████ with Granite.  Nor could

Granite be basing its statements on information provided by MetTel as part of the

parties' business dealings, because that information is protected by a confidentiality

agreement.  As such, this was not a case where Granite's statements were based in

███████████████████████████████████████████████ Granite

was spreading harmful "facts" about MetTel with a gross indifference to whether

those "facts" were true or false.  Obviously, the truth or falsity of these statements

did not matter to Granite because the statements benefitted Granite.

25.    The Chief Information Officer of the same client that was contacted on

May 12, 2020, informed MetTel that around the same time as the Granite Senior

Director's email, Granite personnel called the client's CEO's assistant with the

message that MetTel was ███████████████ client's CIO

reported that the CEO was *very* concerned by this information and that the news had

spread very quickly within the client's organization.  *Id.*

26.    Again, this information was false. ██████████████████████

And Granite was not privy to any valid information that would have allowed it to

reach that conclusion legitimately.

8

27.    Finally, in his May 11, 2020, email, the Granite Senior Director stated that Granite had made presentations to some of MetTel's other clients, all of whom were in the healthcare field.  Upon information and belief, Granite made the same misrepresentations about ████████████████████████████

28.    One of these clients has not returned MetTel's calls and has rejected efforts to set up a meeting with MetTel since being contacted by Granite.  Met Tel has concluded that it most likely lost that client's future business due to Granite's campaign of misinformation.

29.    These incidents cannot be excused as the actions of one or two rogue employees.  The Granite Senior Director was attempting to set up a call between the client's CEO *and the CEO of Granite*.  Thus, the ongoing attack against MetTel apparently is being orchestrated with the knowledge, approval, and participation of the highest level executives at Granite.

<u>The Harm to MetTel</u>

30.    MetTel does not know how many of its customers and potential customers Granite personnel have contacted with the same or similar false, misleading, and defamatory statements about MetTel.  It has hard evidence of only three customers, but MetTel has a reasonable basis to believe that Granite's efforts have extended, or will extend, beyond these customers.  This belief is based on the fact that: (i) MetTel has received these reports from three different clients who have

9

no relationship to one another; (ii one of the emails from Granite reveals that it has

met with several MetTel customers; (iii the apparent involvement of Granite's CEO

indicates that this was not a one-off incident; and (iv the messages to MetTel's

clients involved different Granite personnel in different geographic regions.

31.     Given the critical nature of telecommunications services, once a doubt

has  been  raised  abou███████████████████duty-bound  to

investigate; it could not ignore an assertion of risk to its critical infrastructure.  Once

that seed has been planted, the client will undertake a critical look at a provider with

which it had been perfectly happy.  The client may terminate the contract based on

a pretext when the termination is actually caused by unresolved doubts about the

provider's viability.

32.     Given the importance of ████████████████████████████

telecommunications provider, there is a real risk that MetTel will be asked to bid on

fewer and fewer contracts going forward as Granite's lies circulate throughout the

marketplace.

33.     Granite is  fully  aware  that  MetTel's customers specifically, and the

industry  in  general,  place  great  importance  on  ████████████████████

communication providers.  Once confidence ████████████████████████is

called into question, customers and potential customers can simply choose the non-

confrontational option of selecting a different vendor, never telling the slandered

provider of their concerns.  As a result, the provider that was the subject of the defamatory lies is not afforded the opportunity to repair its reputation, set the record straight or reclaim its customer—never knowing which customers or opportunities were lost as a result of the lies.

34.     Granite is counting on customers taking the path of least resistance and MetTel never knowing with certainty which customers and business opportunities were lost.  Because it is so difficult to quantify the harm suffered by companies who are the target of an insidious rumor campaign, the need for injunctive relief is heightened and is often the only viable form of justice.

35.     The irreparable harm to MetTel's reputation and business will continue if Granite is not brought to task and ordered to terminate its campaign against MetTel immediately.

36.     Moreover, MetTel's reputation and goodwill in the industry has already been harmed.  MetTel may have already lost clients or potential clients because of Granite's lies.  Granite must be held liable to compensate MetTel for these losses.

37.     Based on information currently available to MetTel, the combined value of the monetary and reputational harm it has suffered in connection with Counts One through Five below does not exceed $75,000.

## COUNT ONE

### Defamation

38.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

39.     Granite published and continues to publish to third persons false and defamatory statements about MetTel, as detailed above.

40.     These third parties have understood the nature of these statements, that they referred to MetTel, and that they were damaging to MetTel's reputation.

41.     These statements also constitute defamation *per se* in that they were and are made with actual malice, attempting to take advantage of the fear and uncertainty of a global catastrophe, and contain false and defamatory information about MetTel's business.

42.     As a direct and proximate result of Granite's defamation and defamation *per se*, MetTel has suffered damages, including general (presumed) damages, actual damages (e.g., loss of future or continued business from current clients and prospective clients) and irreparable harm to its business reputation and goodwill, and will continue to suffer such harm in the future.

43.     Based on Granite's actions MetTel has suffered harm and is entitled to injunctive and other relief.

## COUNT TWO

**Tortious Interference with Prospective Economic Advantage**

44.    All paragraphs set forth above are incorporated by reference as if fully set forth herein.

45.    The false and misleading statements by Granite interfered with MetTel's prospective economic advantage.  Upon information and belief, one or more clients were prepared to enter into a business relationship with MetTel, but were persuaded not to do so by Granite's dissemination of false information.

46.    The false and misleading statements by Granite interfered with MetTel's prospective economic advantage by also inducing a currently unknown number of prospective clients to not enter into business relationships with MetTel. The number and identities of these additional prospective clients are unknown to MetTel; but they are known to Granite and will be revealed in discovery.

47.    Granite's actions were intentional and without justification, leveraging a national emergency for personal gain.

48.    As a direct and proximate result of Granite's actions, MetTel has suffered harm and will continue to suffer harm in the future, which may not be adequately compensable with monetary damages.  Based on Granite's actions MetTel has suffered harm and is entitled to injunctive and other relief. MetTel has no adequate remedy at law.

13

## COUNT THREE

### Tortious Interference with Contractual Relations

49.    All paragraphs set forth above are incorporated by reference as if fully set forth herein.

50.    Granite was, and is, aware of the business and contractual relationships between MetTel and its clients.

51.    MetTel has a reasonable expectation that its business and contractual relationships with its clients will continue.

52.    As described in detail herein, Granite's intentional interference with MetTel's rights has deprived, and continues to deprive, MetTel of the benefit of its bargains, and impaired the value of its contractual relationships with its clients.

53.    Granite's ongoing effort to interfere with MetTel's business and contractual relationships with its clients is designed for an improper purpose, uses improper means, and is not legally justified.

54.    Granite's ongoing interference with MetTel's business and contractual relationships has directly and proximately caused, and will in the future directly and proximately cause, harm to MetTel, including monetary damages.

55.    As a direct and proximate result of Granite's actions, MetTel has suffered harm and will continue to suffer harm in the future, which may not be adequately compensable with monetary damages.  Based on Granite's actions

14

MetTel has suffered harm and is entitled to injunctive and other relief. MetTel has no adequate remedy at law.

## COUNT FOUR
### Trade Libel

56.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

57.     Granite has made, published, and transmitted statements directed to existing clients of MetTel, and upon information and belief, to prospective clients of MetTel, that Granite knows are false or were made with reckless disregard for the truth or falsity of the statements, and that were intended to result in harm to MetTel, and Granite continues to do so.

58.     Granite's conduct exploits a national crisis with the specific intent of prejudicing MetTel in the conduct of its business and causing it monetary and reputational harm.

59.     Granite does not enjoy any privilege to make false, misleading and/or disparaging statements about MetTel.

60.     As a direct and proximate result of Granite's actions, MetTel has suffered harm and will continue to suffer harm in the future, which may not be adequately compensable with monetary damages.

61.     Without judicial intervention, Granite will continue to falsely disparage MetTel.

62.     Based on Granite's actions MetTel has suffered harm and is entitled to injunctive and other relief. MetTel has no adequate remedy at law.

## COUNT FIVE
### Deceptive Trade Practices, 6 Del. C. § 2532

63.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

64.     Delaware Statute 6 *Del. C.* § 2532, which prohibits deceptive trade practices, provides in relevant part:

> (a)   A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:
>
> \*   \*   \*
>
> (8)   Disparages the goods, services, or business of another by false or misleading representation of fact;
> \*   \*   \*
>
> (12)  Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

65.     Granite and MetTel are in commercial competition in the market for telecommunications solutions.

66.     As part of an ongoing effort to influence clients to purchase Granite's services, Granite has engaged in a pattern of deceptive conduct by disparaging MetTel via false and misleading statements in emails, voice mails, and in telephone calls to existing clients of MetTel, and upon information and belief, to prospective clients of MetTel,  regarding MetTel's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████

████████████████████████

67.     Granite's pattern of false and misleading statements has violated 6 *Del. C.* §§ 2532(a)(8) and (a)(12) by misrepresenting and disparaging MetTel's business operations.

68.     Granite's pattern of false and misleading statements has deceived, and/or has the tendency to deceive, MetTel's clients and potential clients and the public in general regarding the characteristics and qualities of MetTel's services and commercial activities.

69.     Granite's pattern of false and misleading statements is material because it is likely to influence the decisions of clients and potential clients of MetTel's services, and/or has the tendency to deceive MetTel's clients and potential clients and the public in general regarding the critical issue of ████████████████████

████████████████████████████████████

70.     Granite's actions have been intentionally and deliberately undertaken during a global pandemic for the purposes of causing confusion, mistake and deception and for the purpose of enabling Granite to profit unfairly and at the expense of MetTel.

17

71.    As a direct and proximate result of Granite's actions, MetTel has suffered harm to date, including monetary damages, and will continue to cause harm in the future.

## REQUEST FOR RELIEF

WHEREFORE, MetTel requests judgment against Granite as follows:

A.    Permanently enjoining Granite from making any false or misleading statements about MetTel's ███████████████████████ ██████████████████

B.    Finding that Granite defamed MetTel;

C.    Finding that Granite tortiously interfered with MetTel's contractual rights;

D.    Finding that Granite tortiously interfered with MetTel's prospective economic advantage;

E.    Finding that Granite committed trade libel;

F.    Finding that Granite violated Delaware Statute 6 *Del. C.* § 2532;

G.    Awarding damages to compensate MetTel not to exceed $75,000;

H.    Referring this matter to the Delaware Attorney General upon finding of Granite's willful violation of Delaware Statute 6 *Del. C.* § 2532 for possible imposition of a civil fine pursuant to 6 *Del. C.* § 2533(e); and

18

I.      Granting other and further relief as this Court deems just and proper.


Dated: June 15, 2020                     **K&L GATES LLP**

                                         _/s/ Steven L. Caponi_
                                         Steven L. Caponi (No. 3484)
                                         Matthew B. Goeller (No. 6283)
                                         600 King Street, Suite 901
                                         Wilmington, DE 19801
                                         Phone: (302) 416-7000
                                         steve.caponi@klgates.com
                                         matthew.goeller@klgates.com

                                         _Counsel for Plaintiff Manhattan_
                                         _Telecommunications Corp_.

19

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0468-JRS


2B
Exhibits A-C to Verified Complaint for Injunctive Relief

06/15/20

Exhibits A-C
Redacted In Their Entirety

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0468-JRS


2C
Plaintiff's Motion to Expedite with Certificate of Service

06/25/20


THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

             Plaintiff,

      v.

GRANITE TELECOMMUNICATIONS, LLC,

         Defendant.

C.A. No. 2020-0468-JRS

**PLAINTIFF'S MOTION TO EXPEDITE**

Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel") respectfully moves this Court for an Order: (1) shortening the time for Defendant Granite Telecommunications, LLC ("Granite") to answer the Verified Complaint; (2) ordering expedited discovery; and (3) scheduling a trial for October 2020, or at the earliest time available for the Court. In support of this Motion, MetTel states as follows:

1.     In MetTel's previous case against Granite, this Court denied MetTel's Motion for a Temporary Restraining Order and attendant Motion to Expedite. In so doing, however, the Court noted that the dispute should nonetheless be resolved in

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

an expeditious manner. *See* June 3, 2020, Hr'g Tr. 69:7–12. The Court scheduled a trial for October 2020.

2.     Since the Court's ruling, Granite removed that case to federal court on the basis of diversity. MetTel voluntarily dismissed the district court case and filed a new Complaint with this Court. MetTel's new Complaint makes clear that MetTel's monetary damages do not exceed $75,000, and that the primary relief sought is an injunction to stop Granite from continuing to spread false and defamatory statements about MetTel in an effort to tortiously interfere with MetTel's business operations. For the reasons set forth below, MetTel respectfully requests this Court enter an Order expediting these proceedings and setting a trial date for October 2020.

## I.     Background

3.     Granite has used the ongoing COVID-19 pandemic to enrich itself by capitalizing on the public's existing fears and generating new fears with misinformation about MetTel.

4.     As explained in the Complaint, Granite has begun telling MetTel's current and potential clients— ███████████████████████████████████████ ███████████████████████████████████. The purpose of these lies is to convince MetTel's clients and potential clients that MetTel is ████████████ ███████████████████████████████████████████████████████

2

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

████ Granite has spread these lies via e-mails, voice mail messages, and telephone conversations with MetTel clients for the specific purpose of damaging MetTel's business and harming its reputation.

5.      In late April 2020, MetTel received an email from a concerned and confused client about a voice mail it received from a client relations professional at Granite on April 24, 2020.  The caller indicated he had some unsettling information about MetTel that he would share when the client returned the call. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ *See* Compl. Ex. A.

6.      On May 12, 2020, MetTel learned that Granite had contacted another MetTel client that operated assisted living and memory care retirement communities. That client forwarded to MetTel an email by the Senior Director of Healthcare at Granite, who was attempting to schedule a call between Granite's CEO and the Chairman of the Board and CEO of the client.  In a follow-up email of the same date explaining the purpose for the call, the Senior Director made it clear that Granite wanted to take the client's business away from MetTel.  As a rationale for why the client would be interested in leaving MetTel, he said that ████████████

████████████████████████████████████████████████████████████████

3

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

███████ *See* Compl. Ex. B.  The client was understandably confused and concerned about this information and sought reassurances from MetTel.

7.     On June 2, 2020, MetTel received a call from the head of procurement of one of its largest customers, asking if MetTel ████████████████████ ███████████.  Personnel from the customer have since confirmed that Granite had contacted it and claimed that ██████████████████████████████.

8.     The statements made by Granite about MetTel are blatantly false. ████████████████████████████████████████████████ ███████████████████████████████████████

9.     Moreover, there is no legitimate way that Granite had ████████████ ██████ upon which to base these statements.  ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████.

10.    Granite is spreading harmful "facts" about MetTel with a gross indifference to whether those "facts" are true or false.

4

11.     The Chief Information Officer of the same client that was contacted on May 12, 2020, informed MetTel that around the same time as the Granite Senior Director's email, Granite personnel called the client's CEO's assistant with the message that MetTel ███████████████████. *See* Compl. Ex. C.  The client's CIO reported that the CEO was very concerned by this information and that the news had spread very quickly within the client's organization. *Id.*  Again, this information was false. ████████████████████

12.     Finally, in his May 11, 2020, email, the Granite Senior Director stated that Granite had made presentations to some of MetTel's other clients, all of whom were in the healthcare field.  Upon information and belief, Granite made the same misrepresentations about ██████████████████████. One of these clients has ceased returning MetTel's calls and has rejected efforts to set up a meeting with MetTel since being contacted by Granite. MetTel has concluded that it most likely lost that client's future business due to Granite's campaign of misinformation.

13.     Moreover, these incidents cannot be excused as the actions of one or two rogue employees. The Granite Senior Director was attempting to set up a call between the client's CEO and the CEO of Granite. Thus, the ongoing attack against MetTel apparently is being orchestrated with the knowledge, approval, and participation of the highest level executives at Granite.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## II.    ARGUMENT

### A.    Legal Standard

14.    This Court has broad power to expedite proceedings. Delaware courts are "always receptive to expediting any type of litigation in the interests of affording justice to the parties." *Box v. Box*, 697 A.2d 395, 399 (Del. 1997).  The threshold for obtaining expedited proceedings is low—plaintiffs seeking expedited proceedings need only show that their claims are "sufficiently colorable" and that "there is the possibility of a threatened irreparable injury." *Allen v. News Corp*., 2005 WL 415095, at *1 (Del. Ch. Feb. 3, 2005).  Whether that showing is met is assessed on the face of the pleadings—when considering whether to grant expedition, the Court does not judge the merits of the case or "even the legal sufficiency of the pleadings." *Morton v. Am. Mktg. Indus. Holdings, Inc*., 1995 WL 1791090, at *2 (Del. Ch. Oct. 5, 1995).

15.    "The burden on a plaintiff in seeking an expedited proceeding is not high. 'A party's request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted. Exceptions to that norm are rare.'" *Renco Grp., Inc. v. MacAndrews AMG Holdings*, 2013 WL 209124, at *1 (Del. Ch. Jan. 18, 2013) (quoting *In re Ness Technologies, Inc.*, 2011 WL 3444573, at *2 (Del. Ch. Aug. 3, 2011)).

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

16.     With respect to the dispute in this case, this Court previously noted that it would be appropriate to address the merits of MetTel's claims promptly, given that the Court was "troubled by the allegations that have been made here."  *See* June 3, 2020, Hr'g Tr. 68:17-20.  The Court asked that the parties confer on a schedule "that moves the matter along" toward a trial date in "late October-ish, November-ish."  *Id.* at 70:10–14.

17.     With regard to Granite's anticipated motion to dismiss the Complaint, the Court directed that the motion should be "teed up right away. I don't think there's any need to do a standard 30-30-15 briefing schedule. I think it can be submitted to the Court much more quickly than that so that we can determine what claims will remain in this court, what claims are viable, and then go from there."  *Id.* at 70:15-22.

**B.     MetTel has asserted colorable claims.**

**1.     Defamation**

18.     "Defamation is generally understood as 'a false publication calculated to bring one into disrepute.' Ordinarily, the elements of defamation are: (1) defamatory communication; (2) publication; (3) reference to the plaintiff; (4) third party's understanding of the communication's defamatory character; and (5) injury." *Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1, 9 (Del. Ch. 2019) (internal citations omitted). As MetTel explains in its Complaint, Granite published and

7

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

continues to publish false and defamatory statements about MetTel to third persons. These third persons have understood that these statements referred to MetTel, and that they were damaging to MetTel's reputation. These statements also constitute defamation *per se* in that they were and are made with actual malice and contain false and defamatory information about MetTel's business.

19.    As a direct and proximate result of Granite's defamation and defamation *per se*, MetTel has suffered damages, including the loss of future business from current clients and prospective clients, and irreparable harm to its business reputation and goodwill.

## 2.    Tortious Interference with Prospective Economic Advantage

20.    A claim for tortious interference with prospective economic advantage requires "(a) the reasonable probability of a business opportunity, (b) the intentional interference by the defendant with that opportunity, (c) proximate causation, and (d) damages." *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017).

21.    As explained in the Complaint, Granite's false and misleading statements have interfered with MetTel's prospective economic advantage. Upon information and belief, one or more current clients and prospective clients were prepared to enter into business relationships with MetTel, but were persuaded not to do so by Granite's dissemination of false information.  Expedited proceedings are

8

necessary to discover the number and identities of these current and prospective clients. Granite's actions were intentional and without justification, leveraging a national emergency for personal gain.

### 3.    Tortious Interference with Contractual Relations

22.    A claim for tortious interference with contractual relations requires proof that: "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in causing the breach of contract, (4) the act was without justification, and (5) it caused injury." *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).

23.    MetTel has existing contractual relations with its customers and clients. Granite was, and is, aware of these contractual relationships.  MetTel has a reasonable expectation that its business and contractual relationships with its clients will continue.  As described in the Complaint, Granite's intentional interference with MetTel's rights has deprived, and continues to deprive, MetTel of the benefit of its bargains, and impaired the value of its contractual relationships with its clients. Granite's ongoing campaign is designed for an improper purpose, uses improper means, and is not legally justified. Granite's ongoing interference with MetTel's business and contractual relationships has directly and proximately caused, and will in the future directly and proximately cause, significant harm to MetTel.

9

### 4.     Trade Libel

24.     Trade libel is "a libelous statement to consumers that falsely disparages a plaintiff's goods or services." *Preston Hollow Capital LLC*, 216 A.3d at 13. Plaintiffs are entitled to relief under the concept of trade libel for "any injury to economic advantage arising from false derogatory statements." *Organovo Holdings, Inc.*, 162 A.3d at 120.

25.     As explained in the Complaint, Granite has made, published, and transmitted statements directed to existing clients of MetTel, and upon information and belief, to prospective clients of MetTel, that Granite knows are false or were made with reckless disregard for the truth or falsity of the statements, and that were intended to result in harm to MetTel, and Granite continues to do so.

26.     Granite's conduct was undertaken with the specific intent of prejudicing MetTel in the conduct of its business, disparaging its goods and services, and causing it monetary and reputational harm.  Granite does not enjoy any privilege to make false, misleading and/or disparaging statements about MetTel.  As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

### 5.     Deceptive Trade Practices

27.     Under Delaware's Uniform Deceptive Trade Practices Act, 6 *Del. C.* §

2531 *et seq.*,

> (a) A person engages in a deceptive trade practice when,
> in the course of a business, vocation, or occupation, that
> person:
>
> * * *
>
> (8) Disparages the goods, services, or business of another
> by false or misleading representation of fact;
>
> * * *
>
> (12) Engages in any other conduct which similarly creates
> a likelihood of confusion or of misunderstanding.

6 *Del. C.* § 2532(a).

28.     Granite and MetTel are in commercial competition in the market for

telecommunications solutions.   As part of an ongoing campaign to influence

MetTel's clients to purchase Granite's services, Granite has disparaged MetTel

through false and misleading statements in emails, voice mails, and in telephone

calls to MetTel's existing clients, and upon information and belief, to its prospective

clients, ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████.

29.     Granite's false and misleading statements have violated 6 *Del. C.* §§

2532(a)(8) and (a)(12) by misrepresenting and disparaging MetTel's business

operations.

11

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

30.    Granite's false and misleading statements have deceived and/or have the tendency to deceive MetTel's clients and prospective clients and the public in general  regarding  ████████████████████████████████

████████████████  Granite's  false  and  misleading  statements  are  material because they are likely to influence the decisions of clients and potential clients of MetTel's  services,  and/or  have  the  tendency  to  deceive  MetTel's  clients  and prospective clients and the public in general regarding the critical issue of the ███████████████████████████████. Granite's actions  have  been  intentionally  and  deliberately  undertaken  for  the  purposes  of causing confusion, mistake and deception and for the purpose of enabling Granite to profit unfairly at the expense of MetTel.

31.    As  a  direct  and  proximate  result  of  Granite's  actions,  MetTel  has suffered significant harm to date, including monetary damages, and will continue to cause significant harm in the future.

**C.    MetTel continues to suffer irreparable injuries.**

32.    This  Court  will  grant  expedition  where  "there  is  the  possibility  of  a threatened irreparable injury." *Allen v. News Corp*., 2005 WL 415095, at *1 (Del. Ch. Feb. 3, 2005).  Here, there is more than just the mere "possibility" of irreparable harm.  MetTel has suffered—and continues to suffer—actual irreparable harm as a result of Granite's misconduct.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

33.     MetTel does not know how many of its customers and potential customers Granite personnel have contacted with the same or similar false, misleading, and defamatory statements about MetTel.  It has hard evidence of only three customers, but MetTel has a reasonable basis to believe that Granite's efforts have extended, or will extend, beyond these customers.  This belief is based on the fact that: (i) MetTel has received these reports from three different clients who have no relationship to one another; (ii) one of the emails from Granite reveals that it has met with several MetTel customers; (iii) the apparent involvement of Granite's CEO indicates that this was not a one-off incident; and (iv) the messages to MetTel's clients involved different Granite personnel in different geographic regions.

34.     Given the critical nature of telecommunications services, once a doubt has been raised about a ███████████████ a client would be duty-bound to investigate ████████████████████████, even from a provider with which it had been perfectly happy.  The client may terminate the contract based on a pretext even though the termination is actually caused by unresolved doubts about the ████████████████████████████████████████ ████████████████████████, there is a real risk that MetTel will be asked to bid on fewer and fewer contracts going forward as Granite's lies circulate throughout the marketplace.

13

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

35.    Granite is fully aware that the industry in general, and MetTel's customers specifically, ███████████████████████████████████ ████████████████████████ Once confidence ████████████████████████ is called into question, customers and potential customers may simply choose the nonconfrontational option of selecting a different vendor, never telling the defamed provider of their concerns.  As a result, the provider is not afforded the opportunity to repair its reputation, set the record straight or reclaim its customer—never knowing which customers or opportunities were lost as a result of the lies.

36.    Granite is counting on customers taking the path of least resistance and MetTel never knowing with certainty which customers and business opportunities were lost.

37.    The irreparable harm to MetTel's reputation and business will continue if Granite is not brought to task and ordered to terminate its campaign against MetTel immediately.  Moreover, MetTel's reputation and goodwill in the industry have already been harmed. MetTel may have already lost clients or potential clients because of Granite's lies.  Granite must be held liable to compensate MetTel for these losses.

## III.    CONCLUSION

38.    For the foregoing reasons, MetTel respectfully requests this Court expedite these proceedings and set a trial date for October 2020.

14

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Dated: June 25, 2020

**K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Plaintiff Manhattan
Telecommunications Corp.*

Words: 2,927

15
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.