# EXHIBIT 1

EFiled: May 27 2020 04:47PM EDT
Transaction ID 65660504
Case No. 2020-0380-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, <br><br> Plaintiff, <br><br> v. <br><br> GRANITE TELECOMMUNICATIONS, LLC, <br><br> Defendant. | C.A. No. <br><br><br> **PUBLIC VERSION** <br> **FILED MAY 27, 2020** |

## VERIFIED COMPLAINT

Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel" or "Plaintiff"), by way of its Complaint against Defendant Granite Telecommunications, LLC ("Granite" or "Defendant"), alleges as follows:

## NATURE OF ACTION

1. It is often said that a crisis will bring out the best and the worst in people. Defendant Granite falls decidedly into the latter category.

2. During these unprecedented times, when Americans are being exhorted to join together, to use their resources to help one another and defeat a common enemy, Granite has taken the lowest of roads. It is taking advantage of the legitimate fear and uncertainty gripping the nation by using an ongoing campaign to spread

*even more—but completely false—fear and uncertainty* about a competitor, MetTel, so it can steal MetTel's current and potential clients and thereby increase its own profits.

3.  MetTel discovered that Granite has undertaken a coordinated effort, which appears to stretch from entry level sales personnel all the way to the CEO, to contact current and potential MetTel clients and tell them that ▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ These statements are completely false without any basis in fact, and Granite either knows they are false or is recklessly indifferent to whether they are true or false. Granite is making these false statements to sow doubt with MetTel's existing and potential clients about ▅▅ ▅ ▅▅ ▅▅ ▅▅ ▅ ▅ ▅▅ ▅▅ ▅▅▅▅▅▅▅▅▅▅▅▅▅▅

4.  Granite's conduct is even more despicable because many of MetTel's clients are in healthcare, public service, public safety, and federal, state and local governments. MetTel provides essential services for its clients—a service all the more essential under the current circumstances, when the majority of employees in the U.S. who are able to do so are working solely by telecommuting, and telecommunications is the only practical way to remain connected to patients, customers and the public. Even more so during these times, clients need to know they are partnered with ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

███████████████████████████ which they are with MetTel. False word of MetTel's ███████████████████ is the kind of rumor that will spread throughout the market and poison MetTel's prospects, particularly among those for whom an interruption in telecommunications services would be the most devastating at this time: healthcare and government operations on the front lines of the pandemic.

5. Without this Court's immediate intervention, there is a high probability that Granite's malicious campaign will succeed, and MetTel's business and its reputation will be irreparably damaged.

## PARTIES

6. Plaintiff MetTel is a privately-held corporation organized under the laws of Delaware, with its principal place of business in New York, New York. MetTel's registered agent for service of process is: Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

7. Defendant Granite is a limited liability company organized under the laws of Delaware, with its principal place of business in Quincy, Massachusetts. Its registered agent for service of process is Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE, 19810.

## JURISDICTION

8.  This Court has subject matter jurisdiction in accordance with 10 *Del. C.* § 341.

9.  This Court has jurisdiction to award injunctive relief in accordance with Ct. Ch. R. 65.

## FACTS

10. MetTel provides customized, integrated and managed communications solutions for enterprise clients. By converging all communications over a proprietary network, MetTel enables clients to deploy and manage technology-driven voice, data, wireless, and cloud solutions globally. Its MetTel Portal® enables clients to manage their inventory, usage, spend, and repairs from one simple, user-friendly interface.

11. Granite describes itself as one of the premier telecommunications solutions providers for businesses across the United States and Canada, and the leading corporate phone service provider to multi-location companies.

12. MetTel has spent more than twenty years building a reputation for reliability among its clients and in the marketplace. Reliability is a critical characteristic for telecommunications companies. One key to reliability is ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ That, in turn, makes ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ critically important to its clients.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

The Pandemic

13. The global crisis caused by the COVID-19 pandemic is without parallel since the Spanish Flu pandemic of a century ago. To date, approximately 1.5 million people in the United States have contracted the virus and approximately 90,000 have died. Of those numbers, approximately 153,000 nursing home residents and workers have been infected and approximately 28,100 have died.

14. The COVID-19 pandemic has had a devastating economic impact as well. The U.S. economy suffered its most severe contraction in more than a decade in the first quarter of the year. To date, more than 36 million American workers have filed for unemployment benefits since the pandemic took hold and the national unemployment rate is nearly 15 percent. The Dow Jones Industrial Average is down approximately 17% year to date.

15. COVID-19 has also caused unprecedented disruptions in the daily lives of all Americans, resulting in major changes in behavioral patterns with the usual day-to-day functioning being put on hold for an indefinite period. Not surprisingly, experts have reported a significant increase in depression, post-traumatic stress disorder, substance abuse, domestic violence, and child abuse.

16. It is this grim reality that Granite saw as a shameful opportunity to enrich itself by capitalizing on the public's fears. Not content to simply capitalize

on the public's existing, well-founded fears, Granite took an even lower step by generating *new* fears with misinformation about MetTel.

### Granite's Ongoing Campaign of Lies

17.    Granite has begun telling MetTel's current and potential clients—falsely ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ The purpose of the campaign is to convince MetTel's clients and potential clients that MetTel is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18.    Granite has executed this ongoing campaign via e-mails, voice mail messages, and telephone conversations with MetTel clients for the specific purpose of damaging MetTel's business and harming its reputation.

19.    In late April 2020, MetTel learned for the first time that Granite might be spreading false information about MetTel. MetTel received an email from one of its clients that was concerned and confused about a voice mail it received on April 24, 2020, from a client relations professional at Granite. The caller indicated he had some unsettling information about MetTel that he would share when the client returned the call. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exhibit A.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20. On May 12, 2020, MetTel learned that Granite had contacted another MetTel client, this one an operator of assisted living and memory care retirement communities. The client forwarded to MetTel an email by the Senior Director of Healthcare at Granite, who was attempting to schedule a call between Granite's Chief Executive Officer and the Chairman of the Board and CEO of the client. In a follow-up email of the same date explaining the purpose for the call, the Senior Director made it clear that Granite wanted to take the client's business away from MetTel. As a rationale for why the client would be interested in leaving MetTel and taking its business to Granite, he said that █████████████████████ ███████████████████████████████████████████████ Exhibit B.

21. The client was understandably confused and concerned about this information and sought reassurances from MetTel.

22. These statements were blatantly false. MetTel is not ███████ ████████████████████████████████████████████████ ██████████████████████

23. Moreover, there is no legitimate way that Granite had ████████ ████ upon which to base these statements. ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

████████████████████████████████████████████████

■■■

Granite was spreading harmful "facts" about MetTel with a gross indifference to whether those "facts" were true or false. Obviously, the truth or falsity of these statements did not matter to Granite because the statements benefitted Granite.

24. The Chief Information Officer of the same client that was contacted on May 12, 2020, informed MetTel that around the same time as the Granite Senior Director's email, Granite personnel called the client's CEO's assistant with the message that MetTel was ■■■. Exhibit C. The client's CIO reported that the CEO was *very* concerned by this information and that the news had spread very quickly within the client's organization. *Id.*

25. Again, this information was false. ■■■. And Granite was not privy to any valid information that would have allowed it to reach that conclusion legitimately.

26. Finally, in his May 11, 2020, email, the Granite Senior Director stated that Granite had made presentations to some of MetTel's other clients, all of whom were in the healthcare field. Upon information and belief, Granite made the same misrepresentations about ■■■

27. One of these clients has not returned MetTel's calls and has rejected efforts to set up a meeting with MetTel since being contacted by Granite. Met Tel

■■■

has concluded that it most likely lost that client's future business due to Granite's campaign.

28.   Granite's campaign of misinformation against MetTel cannot be excused as the actions of one or two rogue employees. The Granite Senior Director was attempting to set up a call between the client's CEO *and the CEO of Granite*. Thus, the campaign apparently is being orchestrated with the knowledge, approval, and participation of the highest level executives at Granite.

The Harm to MetTel

29.   MetTel believes that Granite personnel have contacted many, if not all, of MetTel's other current clients, as well as its prospective clients, and disseminated the same or similar false, misleading, and defamatory statements about MetTel. This belief is based on the fact that: (i) MetTel has received these reports from two different clients, who have no relationship to one another; (ii) one of the emails from Granite reveals that it has met with several MetTel customers; (iii) the apparent involvement of Granite's CEO indicates that this was not a one-off incident; and (iv) the messages to MetTel's clients involved different Granite personnel in different geographic regions.

30.   Given the critical nature of telecommunications services, once a doubt has been raised about ███████████████, a client would be duty-bound to investigate; it could not ignore an assertion of risk to its critical infrastructure. Once

that seed has been planted, the client will undertake a critical look at a provider with which it had been perfectly happy. The client may terminate the contract based on a pretext when the termination is actually caused by unresolved doubts about ▇▇▇▇▇▇▇▇▇▇▇▇▇.

31. Given the importance of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ of a telecommunications provider, there is a real risk that MetTel will be asked to bid on fewer and fewer contracts going forward as Granite's lies circulate throughout the marketplace.

32. Thus, the irreparable harm to MetTel's reputation and business will continue, most likely increasing substantially, if Granite is not brought to task and ordered to terminate its campaign immediately.

33. Moreover, MetTel's reputation and goodwill in the industry has already been harmed. It appears likely that it has already lost clients or potential clients. Granite must be held liable to compensate MetTel for these losses.

## COUNT ONE
### Defamation

34. All paragraphs set forth above are incorporated by reference as if fully set forth herein.

35. Granite published and continues to publish to third persons false and defamatory statements about MetTel, as detailed above.

36. These third parties have understood the nature of these statements, that they referred to MetTel, and that they were damaging to MetTel's reputation.

37. These statements also constitute defamation *per se* in that they were and are made with actual malice, attempting to take advantage of the fear and uncertainty of a global catastrophe, and contain false and defamatory information about MetTel's business.

38. As a direct and proximate result of Granite's defamation and defamation *per se*, MetTel has suffered damages, including general (presumed) damages, actual damages (e.g., loss of future or continued business from current clients and prospective clients) and irreparable to its business reputation and goodwill, and will continue to suffer such harm in the future.

## COUNT TWO
### Tortious Interference with Prospective Economic Advantage

39. All paragraphs set forth above are incorporated by reference as if fully set forth herein.

40. The false and misleading statements by Granite interfered with MetTel's prospective economic advantage. Upon information and belief, one or more clients were prepared to enter into a business relationship with MetTel, but were persuaded not to do so by Granite's dissemination of false information.

41. The false and misleading statements by Granite interfered with MetTel's prospective economic advantage by also inducing a currently unknown

number of prospective clients to not enter into business relationships with MetTel. The number and identities of these additional prospective clients are known only to Granite and will be revealed in discovery.

42. Granite's actions were intentional and without justification, leveraging a national emergency for personal gain.

43. As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

44. MetTel has no adequate remedy at law.

## COUNT THREE
### Tortious Interference with Contractual Relations

45. All paragraphs set forth above are incorporated by reference as if fully set forth herein.

46. Granite was, and is, aware of the business and contractual relationships between MetTel and its clients.

47. MetTel has a reasonable expectation that its business and contractual relationships with its clients will continue.

48. As described in detail herein, Granite's intentional interference with MetTel's rights has deprived, and continues to deprive, MetTel of the benefit of its bargains, and impaired the value of its contractual relationships with its clients.

49. Granite's ongoing campaign to interfere with MetTel's business and contractual relationships with its clients is designed for an improper purpose, uses improper means, and is not legally justified.

50. Granite's ongoing interference with MetTel's business and contractual relationships has directly and proximately caused, and will in the future directly and proximately cause, significant harm to MetTel, including monetary damages.

51. As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

52. MetTel has no adequate remedy at law.

## COUNT FOUR
### Trade Libel

53. All paragraphs set forth above are incorporated by reference as if fully set forth herein.

54. Granite has made, published, and transmitted statements directed to MetTel's *existing* clients that Granite knows are false or were made with reckless disregard for the truth or falsity of the statements, and that were intended to result in harm to MetTel, and Granite continues to do so.

55. Upon information and belief, Granite has made, published, and transmitted statements directed to MetTel's *prospective* clients that Granite knows are false, that were made with reckless disregard for the truth or falsity of the

statements, and that were intended to result in harm to MetTel, and Granite continues to do so.

56. Granite's conduct exploits a national crisis with the specific intent of prejudicing MetTel in the conduct of its business and causing it monetary and reputational harm.

57. Granite does not enjoy any privilege to make false, misleading and/or disparaging statements about MetTel.

58. As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

59. Without judicial intervention, Granite will continue to falsely disparage MetTel.

60. MetTel has no adequate remedy at law.

## COUNT FIVE
### Deceptive Trade Practices, 6 Del. C. § 2532

61. All paragraphs set forth above are incorporated by reference as if fully set forth herein.

62. Delaware Statute 6 *Del. C.* § 2532, which prohibits deceptive trade practices, provides in relevant part:

> (a) A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:

\* \* \*

  (8) Disparages the goods, services, or business of another by false or misleading representation of fact;

\* \* \*

  (12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

63. Granite and MetTel are in commercial competition in the market for telecommunications solutions.

64. As part of an ongoing campaign to influence clients to purchase Granite's services, Granite has disparaged MetTel through false and misleading statements in emails, voice mails, and in telephone calls to MetTel's *existing* clients regarding MetTel's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

65. Upon information and belief, as part of an ongoing campaign to influence clients to purchase Granite's services, Granite has disparaged MetTel through false and misleading statements in emails, voice mails, and in telephone calls to MetTel's *prospective* clients regarding MetTel's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

66. Granite's false and misleading statements have violated 6 *Del. C.* §§ 2532(a)(8) and (a)(12) by misrepresenting and disparaging MetTel's business operations.

67. Granite's false and misleading statements have deceived and/or have the tendency to deceive MetTel's clients and potential clients and the public in general regarding the characteristics and qualities of MetTel's services and commercial activities.

68. Granite's false and misleading statements are material because they are likely to influence the decisions of clients and potential clients of MetTel's services, and/or have the tendency to deceive MetTel's clients and potential clients and the public in general regarding the critical issue of ███████████████████████
███████████████████████

69. Granite's actions have been intentionally and deliberately undertaken during a global pandemic for the purposes of causing confusion, mistake and deception and for the purpose of enabling Granite to profit unfairly and at the expense of MetTel.

70. As a direct and proximate result of Granite's actions, MetTel has suffered significant harm to date, including monetary damages, and will continue to cause significant harm in the future.

## **REQUEST FOR RELIEF**

WHEREFORE, MetTel requests judgment against Granite as follows:

A. Preliminarily enjoining Granite from making any statements about MetTel or its business operations to any current MetTel client;

B. Preliminarily and permanently enjoining Granite from making any false or misleading statements about MetTel or its business operations;

C. Finding that Granite defamed MetTel;

D. Finding that Granite tortiously interfered with MetTel's contractual rights;

E. Finding that Granite tortiously interfered with MetTel's prospective economic advantage;

F. Finding that Granite committed trade libel;

G. Finding that Granite violated Delaware Statute 6 *Del. C.* § 2532;

H. Awarding damages to compensate MetTel for harm it has sustained in consequence of Granite's actions, including prejudgment and post-judgment interest;

I. Awarding MetTel permissible statutory damages pursuant to Delaware Statute 6 *Del. C.* § 2532, including but not limited to treble damages and attorneys' fees;

J.      Referring this matter to the Delaware Attorney General upon finding of Granite's willful violation of Delaware Statute 6 *Del. C.* § 2532 for possible imposition of a civil fine pursuant to 6 *Del. C.* § 2533(e);

K.      Awarding MetTel its costs and attorneys' fees; and

L.      Granting other and further relief as this Court deems just and proper.

Dated: May 19, 2020　　　　　　　　　　**K&L GATES LLP**

　　　　　　　　　　　　　　　　　　*/s/ Steven L. Caponi*
　　　　　　　　　　　　　　　　　　Steven L. Caponi (No. 3484)
　　　　　　　　　　　　　　　　　　Matthew B. Goeller (No. 6283)
　　　　　　　　　　　　　　　　　　600 King Street, Suite 901
　　　　　　　　　　　　　　　　　　Wilmington, DE 19801
　　　　　　　　　　　　　　　　　　Phone: (302) 416-7000
　　　　　　　　　　　　　　　　　　steve.caponi@klgates.com
　　　　　　　　　　　　　　　　　　matthew.goeller@klgates.com

　　　　　　　　　　　　　　　　　　*Counsel for Plaintiff Manhattan Telecommunications Corp.*