IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL | : : : : : : | |
| | : | C.A. 1:20-cv-00857-CFC |
| Plaintiff, | : : | |
| v. | : : | |
| GRANITE TELECOMMUNICATIONS, LLC, | : : : | |
| Defendant. | : : | |

## <u>APPENDIX TO BRIEF IN SUPPORT OF MOTION TO DISMISS</u>

OF COUNSEL:

DONNELLY, CONROY &
GELHAAR, LLP
T. Christopher Donnelly (admitted
*pro hac vice*)
Joshua N. Ruby (admitted *pro hac
vice*)
260 Franklin Street, Suite 1600
Boston, MA 02110
(617) 720-2880

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
R. Judson Scaggs (#2676)
Barnaby Grzaslewicz (#6037)
A. Gage Whirley (#6707)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200

*Counsel for Defendant Granite
Telecommunications, LLC*

Dated:       July 15, 2020

# Table of Contents

**Document(s)**                                                             **Page**

In re Registration of Security Certificate of Metropolitan Telecommunications
Corp. d/b/a MetTel,
  Docket No. S-2017-2589999 (Pa. Pub. Utility Comm'n, 2017) .....................A001

In re Registration of Security Certificate of Metropolitan Telecommunications
Corp. d/b/a MetTel,
  Docket No. S-2019-3013208 (Pa. Pub. Utility Comm'n, 2019) .....................A029

GTT Communications, Inc.,
  Form 10-Q (May 8, 2020)................................................................................A061

DiLorenzo v. Edgar,
  2004 WL 609374 (D. Del. Mar. 24, 2004) .......................................................A106

EDIX Media Grp., Inc. v. Mahani,
  2006 WL 3742595 (Del. Ch. Dec. 12, 2006) ...................................................A109

Ninespots, Inc. v. Jupai Holdings, Ltd.,
  2018 WL 3626325 (D. Del. July 30, 2018) ...................................................... A125

UbiquiTel Inc. v. Sprint Corp.,
  2005 WL 3533697 (Del. Ch. Dec. 14, 2005) ...................................................A136

Sturgeon v. PharMerica Corp.
  2020 WL 586978 (E.D. Pa. Feb. 5, 2020)…………………………………... A147

Before the
Pennsylvannia Public Utility Commission

| | |
|---|---|
| In the Matter of Registration of | ) |
| | ) |
| Sercurity Certificate of | )   Docket No. S-2017-_____ |
| | ) |
| **Metropolitan Telecommunications Corporation** | ) |
| **of PA d/b/a MetTel** | ) |

<u>**Securities Certificate**</u>

     Metropolitan Telecommunications Corporation of PA d/b/a MetTel ("MetTel"), by undersigned counsel and pursuant to Section 1901 of the Public Utility Code, 66 Pa. C.S. § 1901, and Section 3.601 of the Pennsylvania Public Utility Commission's ("Commission") regulations, 52 Pa. Code § 3.601, hereby requests the Commission register this Securities Certificate describing MetTel's participation in a financing transaction whereby it will pledge its assets, including the Certificate of Public Convenience and Necessity currently held by MetTel for services offered in the Commonwealth of Pennsylvania, to guarantee and secure debt in an amount of up to approximately $95 million (the "Proposed Transaction").[1]

     MetTel's participation in the financing transaction is conditioned on receiving the applicable regulatory approvals, including the grant of the instant request.  MetTel respectfully requests that the Commission expeditiously grant the requested Securities Certificate no later than its scheduled Public Meeting on **March 2, 2017**, so that the financing transaction may proceed on a timely basis.

     In support of this Securities Certificate, MetTel provides the following information:

**I.**      <u>**DESCRIPTION OF THE REGISTRANT**</u>

     MetTel is a privately held corporation organized pursuant to the laws of Delaware whose principal business is telecommunications.  MetTel is a wholly owned subsidiary of Manhattan

---

[1] On January 24, 2017, the Delaware Public Service Commission took no action on a similar application filed by MetTel's Delaware affiliate, allowing the application to be approved by operation of law.  *See In the Matter of the Application of Metropolitan Telecommunications of Delaware Inc. for the Approval of Participation in Financing Arrangement Pursuant to Del. C. §215*, Docket No. 16-1163.

Telecommunications Corporation and indirect subsidiary of Metropolitan Telecommunications Holding Company ("MetTel Holding"), a privately held Delaware holding company.

MetTel Holding, through its subsidiaries, is a strategic partner providing a comprehensive suite of voice and data solutions as well as telecommunications consulting services to leading businesses nationwide.  From traditional voice services to MPLS networks and Voice over IP technologies, MetTel Holding offers a complete portfolio of products.  MetTel was authorized by the Commission to provide local and interexchange telecommunications services in Docket Nos.A-310933 and A-310933F0002 on August 17, 2000 and expanded local exchange service in Docket Nos. A-2010-2161948, *et al.*, on May 10, 2010 and Docket Nos. A-2011-2269103, *et al.*, on December 16, 2011 (the "PA CPCN").

In addition to the services provided by MetTel to Pennsylvania customers, MetTel's affiliates are authorized by the various state public service commissions to provide facilities-based and/or resold interexchange telecommunications services, and competitive local exchange services in 49 other states, the District of Columbia, Puerto Rico, and Canada, pursuant to certification, registration or tariff requirements, or on a deregulated basis.

Further information regarding MetTel's legal, technical, financial and managerial qualifications to provide telecommunications service to customers in Pennsylvania may be found in MetTel's initial application for the PA CPCN as a matter of public record.  MetTel respectfully requests that the Commission take official notice of the information contained in the Pennsylvania application and incorporate it herein for reference.

## II.    <u>Designated Contacts</u>

Questions, correspondence or other communications concerning this filing should be directed to:

Karl C. Helgerson
Kutak Rock LLP
Two Liberty Place, Suite 28B
Philadelphia, PA 19102
Tel: (215) 299-4384
Fax: (215) 981-0719
Email: Karl.Helgerson@KutakRock.com

2

With a copy for MetTel to:                    And:

Joseph Farano                                 Michael P. Donahue
General Counsel                               Nathaniel J. Hardy
MetTel                                        Marashlian & Donahue, PLLC
BellWorks 101 Crawfords Corner Road,          1420 Spring Hill Road, Suite 401
#4-202                                        McLean, VA 22102
Holmdel, NJ 07733                             Tel: (703) 714-1319
Tel: 212-359-5037                             Fax: (703) 563-6222
E-mail: jfarano@mettel.net                    Email: mpd@commlawgroup.com
                                                     njh@commlawgroup.com

### III.  SECURITIES CERTIFICATE

Pursuant to Section 3.601 of the Commission's regulations, 52 Pa. Code § 3.601, MetTel submits the following information in support of its request:

### A.  Name and Address of Utility

Metropolitan Telecommunications Corporation of PA d/b/a MetTel
BellWorks 101 Crawfords Corner Road,
#4-202
Holmdel, NJ 07733

### B.  Name and Address of Utility's Attorney

Inquires and copies of any correspondence, orders, or other materials pertaining to this Securities Certificate should be directed to the contacts provided in Section II, above.

### C.  History and Description of Pennsylvania Services

MetTel obtained the PA CPCN on August 7, 2000, and expanded the scope of its authority on May 10, 2010 and December 16, 2011.  MetTel currently provides competitive resold local exchange and interexchange telecommunications services in Pennsylvania pursuant to the PA CPCN.

### D.  Corporate Structure

As mentioned above, MetTel is a wholly owned subsidiary of Manhattan Telecommunications Corporation and indirect subsidiary of MetTel Holding, a privately held Delaware holding company.  A chart depicting the corporate organizational structure of MetTel Holding is attached hereto as Exhibit A.

### E.    Description of the Proposed Transaction

MetTel Holding, and all of its direct and indirect subsidiaries, including MetTel, will enter into a Second Amended and Restated Credit Agreement and related Security Agreement with JP Morgan Chase Bank, N.A. (the "Agreement").  JP Morgan Chase Bank, N.A. ("JP Morgan") shall serve as the Administrative Agent under the Agreement for a series of lenders.  MetTel Holding chose JP Morgan as Administrative Agent due to the company's well known and longstanding reputation and ability to provide favorable terms to MetTel.  Pursuant to the Agreement, MetTel Holding will receive a revolving credit facility and additional term loan capacity.  Specifically, MetTel Holding will receive a revolving credit facility of $15,000,000 and additional term loan capacity of (a) up to $50,000,000 under a Senior Secured Term Loan and (b) up to $30,000,000 for an acquisition basket.

The obligations of the revolving credit facility and the additional term loan capacity shall be secured by a security interest in all of the assets of MetTel Holding and its subsidiaries, including MetTel.  The proceeds of the revolving credit facility will be used for general corporate purposes of MetTel Holdings, while the proceeds of the additional term loan capacity will be used for dividends and/or acquisitions.

MetTel's assets, including the PA CPCN, will not be collateralized to secure the debt until the Commission authorizes the Proposed Transaction.

The Agreement is intended to sustain MetTel's provisioning of competitive services and to enable MetTel and its owners to improve the operational and cost efficiencies of its business.  The transaction will directly benefit Pennsylvania customers by facilitating the continued provision of innovative, high-quality telecommunications services to the public and thereby promoting competition in the Pennsylvania telecommunications market.

MetTel therefore requests Commission authorization, to the extent necessary, for MetTel to pledge its assets as security for the Proposed Transaction in an aggregate amount of up to $95 million consistent with the parameters outlined above.

As specifically requested in Section 3.601(5)(iv) of the Commission's rules, MetTel provides the following:

### (1)    Nominal date of issue

MetTel and its lenders desire to consummate the proposed Transaction as quickly as possible after they receive the applicable regulatory approvals.  They will notify the Commission once the Proposed Transaction has been consummated.

### (2)    Date of maturity

Except for the revolving credit facility, the specific maturity date of the debt instruments comprising the Proposed Transaction will be subject to negotiations between MetTel and its lenders and will be subject to credit conditions at the time they are negotiated and issued.  The revolving credit facility will not have a maturity date.  MetTel expects that the debt instruments will mature within five (5) years of issuance, subject to any acceleration clauses that may be negotiated between MetTel and its lenders.  To maintain flexibility in its negotiations, MetTel requests Commission approval to participate in debt instruments with a maturity date of up to ten (10) years after issuance.

### (3)    Interest rate and payment dates

The interest rates will reflect market rates for similar financing and will not be determined until the various debt instruments are finalized.  MetTel foresees that the interest rates could be fixed rates based on a currently recognized rate index such as LIBOR or the Federal Funds Rate with potential additional margin rates, a floating rate consisting of a base rate with a float rate based on a currently recognized rate index in addition to any applicable margin rate, or a combination of fixed and floating rates.  To maintain flexibility in its negotiations, MetTel requests Commission approval to participate in debt instruments with interest rates that reflect current market conditions for similar types of instruments.

### (4)    Extent to which taxes on securities are assumed by the issuer

Not applicable.

5

**(5)      Callability and conversion provisions**

Not applicable.

**(6)      Maintenance**

MetTel will maintain its debt pursuant to the terms negotiated with its lenders.   MetTel does not foresee that there will be any non-standard debt maintenance requirements placed on it by the lenders.   MetTel can notify the Commission of the maintenance terms post-consummation of the Proposed Transaction.

**(7)      Depreciation and sinking or other fund provision**

Not applicable.

**(8)      Name and address of trustee and whether affiliated with the public utility**

There is no trustee in the proposed transaction.   JP Morgan shall serve as Administrative Agent for the Proposed Transactions.   JP Morgan's address is as follows:

> JP Morgan Chase Bank, N.A.
> 270 Park Avenue, 42nd Floor
> New York, New York 10017-2014

**F.      Use of the Proceeds**

The proceeds of the revolving credit facility will be used for working capital purposes of MetTel Holdings, while the proceeds of the additional term loan capacity will be used for dividends and/or acquisitions.   Potential acquisitions have yet to be identified, but MetTel can update the Commission when and if plans for future acquisitions become more concrete.

**G.      Filings with the Securities and Exchange Commission**

As MetTel Holding is a private company and this transaction is not subject to the registration requirements of the Securities Act of 1933, as amended, there will not be any filings made with the Securities and Exchange Commission related to this transaction.

6

## H.    Section 3.601(c)(9) Requirements

In accordance with 52 Pa. Code § 3.601(c)(9), MetTel respectfully attaches hereto and makes part hereof the following exhibits:

Exhibit A        **CONFIDENTIAL & PROPRIETARY** - Metropolitan Telecommunications Holding Company Organizational Chart

Exhibit B        **CONFIDENTIAL & PROPRIETARY** - Balance sheet of MetTel as of December 16, 2016 (the most recent balance sheets available).

Exhibit C        **CONFIDENTIAL & PROPRIETARY** - Income statement of MetTel as of December 16, 2016 (the most recent income statements available).

Exhibit D        A statement with respect to the plant accounts appearing on the balance sheets referred to in Exhibit B.

Exhibit E        A statement of securities of other corporations and entities owned by MetTel.

Exhibit F        A statement showing the status of MetTel's funded debt outstanding as of December 16, 2016.  (No material changes in the funded debt outstanding have taken place since December 16, 2016.)

Exhibit G        A statement showing the status of MetTel's Capital Stock as of December 16, 2016.  (No material changes in the Capital Stock have taken place since December 16, 2016.)

Exhibit H        A statement that no registration statement has been filed with the Securities and Exchange Commission under the Securities Act of 1933 with respect to the Second Amended and Restated Credit Agreement and related Security Agreement.

Exhibit I        A statement that no applications or declarations have been filed with the Securities and Exchange Commission with respect to the Second Amended and Restated Credit Agreement and related Security Agreement pursuant to the Public Utility Holding Company Act of 1935.

Exhibit J        A copy of the resolutions of the officers of MetTel authorizing the inclusion of MetTel as an additional borrower under the Second Amended and Restated Credit Agreement and related Security Agreement.

Exhibit K        A statement that no journal entry will be made on the books of account of MetTel as a result of the Second Amended and Restated Credit Agreement and related Security Agreement.

Exhibit L        Affidavit of an Officer of MetTel in the form prescribed by 52 Pa. Code §§ 1.35 and 1.36.

MetTel notes that copies of the Second Amended and Restated Credit Agreement and related Security Agreement are not provided with this Security Certificate as they have not been

7

**A007**

finalized as of the date of submission.  MetTel will provide the Commission with copies of these agreements upon request as soon as they are completed.

## IV.    **PUBLIC INTEREST CONSIDERATIONS**

Consummation of the Proposed Transaction will serve the public interest in promoting competition among telecommunications carriers by providing MetTel with the opportunity to strengthen its competitive position by providing additional working capital and the ability to finance acquisitions to enhance the company's services.  The financing arrangements are necessary and appropriate, will not impair MetTel's ability to perform such services to the public, and will promote the corporate purposes of MetTel.  The Proposed Transaction will not involve an assignment of the PA CPCN or a change in the day-to-day operations of the certificated company.  In addition, there will be no change in the services offered to MetTel's customers or the rates for MetTel's regulated services.  The transaction will be completely transparent to MetTel's customers.

WHEREFORE, MetTel respectfully requests that the Commission promptly approve the above-referenced financing arrangement, register this Abbreviated Securities Certificate, and issue a Notice of Registration, pursuant to Sections 1901 of the Public Utility Code, 66 Pa. C.S. § 1901, and Section 3.602(c) of the Commission's regulations, 52 Pa. Code § 3.602(c), and the interrelated affiliate transaction, if necessary, under Section 2102 of the Public Utility Code, 66 Pa. C.S. § 2102, as soon as possible authorizing MetTel to participate in the financing arrangements described herein.

As required by the Commission's rules, a filing fee in the amount of $25.00 is being paid by credit card through the Commission's eFiling system.  Please acknowledge receipt and acceptance of this filing.  Please do not hesitate to contact us if you have any questions.

Respectfully submitted,


   */s/ Karl C. Helgerson*
Karl C. Helgerson
Kutak Rock LLP
Two Liberty Place, Suite 28B
Philadelphia, PA 19102


8

**A008**

Tel: (215) 299-4384
Fax: (215) 981-0719
Email: Karl.Helgerson@KutakRock.com

9

## EXHIBIT A

**CONFIDENTIAL & PROPRIETARY**

Metropolitan Telecommunications Holding Company Organizational Chart

## PUBLIC VERSION

**[REDACTED]**

**EXHIBIT B**

**CONFIDENTIAL & PROPRIETARY**

**Balance sheet of**
**Metropolitan Communications of PA d/b/a/ MetTel**
**as of December 31, 2016.**

**There have not been any transactions which occurred between the date of the balance sheet and the submission date and there are no major contingent liabilities faced by the MetTel at the time of submission.**

**PUBLIC VERSION**

**A012**

**[REDACTED]**

**EXHIBIT C**

**CONFIDENTIAL & PROPRIETARY**

**Income Statement of**
**Metropolitan Communications of PA d/b/a/ MetTel**
**for the twelve months ending December 31, 2016**

**PUBLIC VERSION**

**[REDACTED]**

## **EXHIBIT D**

The Plant of MetTel is carried on the books of account at its original cost as required by the FCC Part 32 Uniform System of Accounts.  (Please see Exhibit B for further details).

**<u>EXHIBIT E</u>**

**<u>Other Securities</u>**

MetTel does not own any securities in any other corporation.

**EXHIBIT F**

**Statement showing status of MetTel's funded debt outstanding as of December 31, 2016.**

MetTel does not carry any funded debt.

**Exhibit G**

**Capital Stock of MetTel as of December 31, 2016.**

There are 200 shares of capital stock of MetTel authorized for issuance, of which 100 have been issued and remain outstanding. There have been no changes in the capital stock of the company since the date above.

**Exhibit H**

**Registration Statement with SEC**

No registration statement has been filed with the Securities and Exchange Commission under the Securities Act of 1933 with respect to the Second Amended and Restated Credit Agreement and related Security Agreement.

**<u>Exhibit I</u>**

**<u>Applications or Declarations filed with the SEC</u>**

      No applications or declarations have been filed with the Securities and Exchange Commission with respect to the Second Amended and Restated Credit Agreement and related Security Agreement under the Public Utility Holding Company Act of 1935.

**Exhibit J**

**Corporate Consent**

Unanimous Written Consent of MetTel, authorizing the inclusion of MetTel as an additional borrower under the Second Amended and Restated Credit Agreement and related Security Agreement.

**METROPOLITAN TELECOMMUNICATIONS CORPORATION OF PA d/b/a METTEL**

**Unanimous Written Consent of the Directors**

**February 2, 2017**

Metropolitan Telecommunications Corporation of PA d/b/a MetTel ("MetTel") is a privately held corporation organized pursuant to the laws of Delaware whose principal business is telecommunications.

The undersigned directors, constituting the entire Board of Directors (the "Board") of MetTel, acting without a meeting pursuant to Section 141(f) of the Delaware General Corporation Law, as amended, do hereby waive all call and notice requirements and consent to, and adopt the following resolutions by unanimous written consent.

WHEREAS, MetTel is a wholly owned subsidiary of Manhattan Telecommunications Corporation and indirect subsidiary of Metropolitan Telecommunications Holding Company ("MetTel Holding"), a privately held Delaware holding company.

WHEREAS, MetTel Holding will enter into a Second Amended and Restated Credit Agreement with JP Morgan Chase serving as Administrative Agent for several financial institutions ("Further Amended Credit Agreement") amending and restating their credit agreement as amended with JP Morgan Chase, et al. ("Prior Credit Agreement") and the related Security Agreement (with the Further Amended Credit Agreement, the "Agreements");

WHEREAS, the Further Amended Credit Agreement consists of a $15,000,000 revolving credit facility and additional term loan capacity ("Term Loan") of (a) up to $50,000,000 under a Senior Secured Term Loan and (b) up to $30,000,000 for an acquisition basket.  The Further Amended Credit Agreement is secured by substantially all of the assets of MetTel Holding and its subsidiaries; and

WHEREAS, the Board has determined that it is in the best interest of MetTel for it to be a borrower under the Agreements.

NOW, THEREFORE, BE IT RESOLVED that MetTel is hereby authorized to join the Agreements as an additional borrower;

FURTHER RESOLVED, that any one or more of the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President (however designated), the Treasurer or the Secretary (each, an "Authorized Officer" and collectively, the "Authorized Officers") are, and each of them is, hereby authorized to execute, and deliver, for, in the name and on behalf of MetTel, the Agreements in each case in such form and with such terms and provisions as may be approved by such officer, such approval to be conclusively evidenced by such officer's execution thereof;

FURTHER RESOLVED, that the Authorized Officers are, and each of them is, hereby authorized and directed to file with the Pennsylvania Public Utility Commission such Securities Certificate as counsel deems appropriate under the Pennsylvania Public Utility Code to register MetTel's assumption of its obligations under the Agreements, effective upon registration of MetTel's Securities Certificate;

FURTHER RESOLVED, that consummation of all transactions contemplated by, and performance by MetTel of all of its obligations under, the Agreements be and hereby are, deemed by the Board to be advisable and in the best interest of the MetTel and are approved in all respects;

FURTHER RESOLVED, that the Board hereby approves and authorizes MetTel to enter into all arrangements, agreements, certificates, instruments, notices, documents or other writings to be executed

**A023**

and delivered by MetTel in connection with the transactions contemplated by the Agreements and the execution, delivery and performance by MetTel of any and all such arrangements, agreements, certificates, instruments, notices, documents or other writings;

FURTHER RESOLVED, that any Authorized Officer be, and each of them hereby is, authorized, directed and empowered in the name and on behalf of MetTel to negotiate, enter into, execute, deliver and perform the documents and obligations necessary to complete the Agreements;

FURTHER RESOLVED, that any Authorized Officer be, and each of them hereby is, authorized, directed and empowered in the name and on behalf of MetTel to do or to cause to be done all further acts and things, in the name and on behalf of the MetTel, as any such officer deems necessary or appropriate to effect the Agreements;

FURTHER RESOLVED, that any Authorized Officer be, and hereby is, authorized and empowered for and in the name of MetTel to amend, supplement or otherwise modify the terms of any document, filing or agreement authorized pursuant to the foregoing resolutions on any terms and subject to any conditions not inconsistent with these resolutions;

FURTHER RESOLVED, that all acts and deeds heretofore done or actions taken by any director, officer or agent of MetTel, for and on behalf of MetTel in entering into, executing, acknowledging or attesting any arrangements, agreements, certificates, instruments, notices or documents in carrying out the terms and intentions of the foregoing recitals and resolutions and each of them are hereby in all respects ratified, approved and confirmed;

FURTHER RESOLVED, that no Authorized Officer shall cause MetTel Holding or MetTel to draw upon the Term Loan without further Board approval, except at closing in connection with refinancing the existing facilities;

FURTHER RESOLVED, that in connection with the transactions contemplated in the preceding resolutions, each Authorized Officer be, and hereby is, authorized in the name and on behalf of the MetTel, to certify any more formal or detailed resolutions as such Authorized Officer may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions; and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Board as if set forth at length herein;

FURTHER RESOLVED, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the agreements or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirements of any of the agreements or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Officer to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions;

FURTHER RESOLVED, that the officers of MetTel are, and each of them is, hereby authorized and directed to do and perform, or cause to be done and performed, all such acts and deeds and to make, executive and deliver, or cause to be made, executed and delivered, all such agreements, undertakings, documents, instruments, waivers, amendments or certificates in the name and on behalf of MetTel or otherwise as each such officer may deem necessary or appropriate to effectuate and carry out fully the purpose and intent of the foregoing resolutions and to cause MetTel to perform its obligations under any agreements or other instruments authorized by these resolutions.

[SIGNATURE PAGE FOLLOWS]

**A024**

IN WITNESS WHEREOF, the undersigned has executed and delivered this Written Consent of the Directors in lieu of meeting as of the date first above written.

_____
Marshall Aronow

_____
Andoni Economou

_____
David Aronow

_____
Joseph Aronow

**Exhibit K**

**Journal Entry**

     No journal entry will be made on the books of accounts of MetTel as a result of the Second Amended and Restated Credit Agreement and related Security Agreement.

**Exhibit L**

**<u>Verification</u>**

STATE OF NEW JERSEY                §
                                   §
COUNTY OF MONMOUTH                 §

## VERIFICATION

    I, Joseph Farano, state that I am the General Counsel of Metropolitan Telecommunications Corporation of PA ("MetTel"); that I am authorized to make this Verification on behalf of MetTel; that the foregoing filing was prepared under my direction and supervision; and that the contents are true and correct to the best of my knowledge, information, and belief.

_____
Joseph Farano
General Counsel
Metropolitan Telecommunications Corporation of PA
d/b/a MetTel

SWORN TO AND SUBSCRIBED before me on the 2nd day of February, 2017.

_____
Notary Public

My commission expires: _Jan 2nd 2018_

**A028**

**PUBLIC VERSION**

Before the
Pennsylvania Public Utility Commission

In the Matter of Registration of        )
                                         )
Security Certificate of                  )          Docket No. S-2019-_____
                                         )
**Metropolitan Telecommunications Corporation** )
   **of PA d/b/a MetTel**                )

### Securities Certificate

Metropolitan Telecommunications Corporation of PA d/b/a MetTel ("MetTel"), by undersigned counsel and pursuant to Section 1901 of the Public Utility Code, 66 Pa. C.S. § 1901, and Section 3.601 of the Pennsylvania Public Utility Commission's ("Commission") regulations, 52 Pa. Code § 3.601, hereby request the Commission register this Securities Certificate describing MetTel's participation in a financing transaction whereby it will pledge its assets, including the Certificate of Public Convenience and Necessity currently held by MetTel for services offered in the Commonwealth of Pennsylvania, to guarantee and secure debt in an amount of up to approximately $130 million (the "Proposed Transaction"). The Commission approved a similar MetTel financing transaction in 2017 in Docket No. S-2017-2589999.

MetTel's participation in the financing transaction is conditioned on receiving the applicable regulatory approvals, including the grant of the instant request.  MetTel respectfully requests that the Commission expeditiously grant the requested Securities Certificate no later than its scheduled Public Meeting on October 3, 2019 or October 24, 2019, so that the financing transaction may proceed on a timely basis.

In support of this Securities Certificate, MetTel provides the following information:

### I.      DESCRIPTION OF THE REGISTRANT

MetTel is a privately held corporation organized pursuant to the laws of Delaware whose principal business is telecommunications.  MetTel is a wholly owned subsidiary of Manhattan

**PUBLIC VERSION**

Telecommunications Corporation and indirect subsidiary of Metropolitan Telecommunications Holding Company ("MetTel Holding"), a privately held Delaware holding company.

MetTel Holding, through its subsidiaries, is a strategic partner providing a comprehensive suite of voice and data solutions as well as telecommunications consulting services to leading businesses nationwide.  From traditional voice services to MPLS networks and Voice over IP technologies, MetTel Holding offers a complete portfolio of products.  MetTel was authorized by the Commission to provide local and interexchange telecommunications services in Docket Nos.A-310933 and A-310933F0002 on August 17, 2000 and expanded local exchange service in Docket No. A-2010-2161948, *et al.*, on May 10, 2010 and Docket Nos. A-2011-2269103, *et al.*, on December 16, 2011 (the "PA CPCN").

In addition to the services provided by MetTel to Pennsylvania customers, MetTel's affiliates are authorized by the various state public service commissions to provide facilities-based and/or resold interexchange telecommunications services, and competitive local exchange services in 49 other states, the District of Columbia, Puerto Rico, and Canada, pursuant to certification, registration or tariff requirements, or on a deregulated basis.

Further information regarding MetTel's legal, technical, financial and managerial qualifications to provide telecommunications service to customers in Pennsylvania may be found in MetTel's initial application for the PA CPCN as a matter of public record.  MetTel respectfully requests that the Commission take official notice of the information contained in the Pennsylvania application and incorporate it herein for reference.

## II.   **Designated Contacts**

Questions, correspondence or other communications concerning this filing should be directed to:

2

**PUBLIC VERSION**

Amy Blumenthal
Kutak Rock LLP
1760 Market Street, Suite 1100
Philadelphia, PA 19103-4104
Phone: (215) 586-4188
Fax:    (215) 981-0719
Email:  amy.blumenthal@kutakrock.com

With a copy for MetTel to:

Joseph Farano
General Counsel
MetTel
BellWorks 101 Crawfords Corner Road, #311
Holmdel, NJ 07733
Tel: 212-359-5037
E-mail: jfarano@mettel.net

And:

Michael P. Donahue
Marashlian & Donahue, PLLC
1420 Spring Hill Road, Suite 401
McLean, VA 22102
Tel: (703) 714-1319
Fax: (703) 563-6222
Email: mpd@commlawgroup.com

## III.   SECURITIES CERTIFICATE

Pursuant to Section 3.601 of the Commission's regulations, 52 Pa. Code § 3.601, MetTel

submits the following information in support of its request:

### A.    Name and Address of Utility

Metropolitan Telecommunications Corporation of PA d/b/a MetTel
BellWorks 101 Crawfords Corner Road, #311
Holmdel, NJ 07733

### B.    Name and Address of Utility's Attorney

Inquires and copies of any correspondence, orders, or other materials pertaining to this

Securities Certificate should be directed to the contacts provided in Section II, above.

### C.    History and Description of Pennsylvania Services

PUBLIC VERSION

MetTel obtained the PA CPCN on August 7, 2000, and expanded the scope of its authority on May 10, 2010 and December 16, 2011.  MetTel currently provides competitive resold local exchange and interexchange telecommunications services in Pennsylvania pursuant to the PA CPCN.

### D.      Corporate Structure

As mentioned above, MetTel is a wholly owned subsidiary of Manhattan Telecommunications Corporation and indirect subsidiary of MetTel Holding, a privately held Delaware holding company.  A chart depicting the corporate organizational structure of MetTel Holding is attached hereto as Exhibit A.

### E.      Description of the Proposed Transaction

MetTel Holding, and all of its direct and indirect subsidiaries, including MetTel, will enter into a Third Amended and Restated Credit Agreement ("Agreement") with certain of such subsidiaries (other than MetTel) (collectively, the "Borrowers") also entering into a related Security Agreement with JPMorgan Chase Bank, N.A. ("JP Morgan"). JP Morgan shall serve as the Administrative Agent under the Agreement for a series of lenders. MetTel Holding chose JP Morgan as Administrative Agent due to the company's well known and longstanding reputation and ability to provide favorable terms to MetTel.  Pursuant to the Agreement, MetTel Holding will receive a revolving credit facility of $60,000,000 (with the ability to increase by up to an additional $30,000,000, to $90,000,000) and additional term loan capacity of up to $40,000,000 under a Senior Secured Term Loan.

The obligations of the revolving credit facility and the additional term loan capacity shall be secured by a security interest in all of the assets of the Borrowers.  While MetTel is not a Borrower under the Agreement, it will act it will act as a Guarantor of MetTel Holding and the other Borrowers.  As such, Manhattan Telecommunications will be jointly and severally liable for

4

**PUBLIC VERSION**

the full amount of the proceeds of the credit facility and term loan.  The proceeds of the credit facility will be used for general corporate purposes, dividends and/or acquisitions.

MetTel's assets, including the PA CPCN, will not be collateralized to secure the additional debt until the Commission authorizes the Proposed Transaction.

The Agreement is intended to sustain MetTel's provisioning of competitive services and to enable MetTel and its owners to improve the operational and cost efficiencies of its business.  The transaction will directly benefit Pennsylvania customers by facilitating the continued provision of innovative, high-quality telecommunications services to the public and thereby promoting competition in the Pennsylvania telecommunications market.

MetTel therefore requests Commission authorization, to the extent necessary, for MetTel to pledge its assets as security for the Proposed Transaction in an aggregate amount of up to $130 million consistent with the parameters outlined above.

As specifically requested in Section 3.601(5)(iv) of the Commission's rules, MetTel provides the following:

> **(1)   Nominal date of issue**

MetTel and its lenders desire to consummate the proposed Transaction as quickly as possible after they receive the applicable regulatory approvals.  They will notify the Commission once the Proposed Transaction has been consummated and MetTel has been added as a guarantor.

> **(2)   Date of maturity**

Except for the revolving credit facility, the specific maturity date of the debt instruments comprising the Proposed Transaction will be subject to negotiations between MetTel and its lenders and will be subject to credit conditions at the time they are negotiated and issued.  The revolving credit facility will not have a maturity date.  MetTel expects that the debt instruments will mature within five (5) years of issuance, subject to any acceleration clauses that may be

5

**A033**

**PUBLIC VERSION**

negotiated between MetTel and its lenders.  To maintain flexibility in its negotiations, MetTel requests Commission approval to participate in debt instruments with a maturity date of up to ten (10) years after issuance.

### (3)    Interest rate and payment dates

The interest rates will reflect market rates for similar financing and will not be determined until the various debt instruments are finalized.  MetTel foresees that the interest rates could be fixed rates based on a currently recognized rate index such as LIBOR of the Federal Funds Rate with potential additional margin rates, a floating rate consisting of a base rate with a float rate based on a currently recognized rate index in addition to any applicable margin rate, or a combination of fixed and floating rates.  To maintain flexibility in its negotiations, MetTel requests Commission approval to participate in debt instruments with interest rates that reflect current market conditions for similar types of instruments.

### (4)    Extent to which taxes on securities are assumed by the issuer

Not applicable.

### (5)    Callability and conversion provisions

Not applicable.

### (6)    Maintenance

MetTel will maintain its debt pursuant to the terms negotiated with its lenders.  MetTel does not foresee that there will be any non-standard debt maintenance requirements placed on it by the lenders.  MetTel can notify the Commission of the maintenance terms post-consummation of the Proposed Transaction.

### (7)    Depreciation and sinking or other fund provision

Not applicable.

### (8)    Name and address of trustee and whether affiliated with the public utility

6

**A034**

**PUBLIC VERSION**

There is no trustee in the proposed transaction. JP Morgan shall serve as Administrative Agent for the Proposed Transactions. JP Morgan's address is as follows:

> JP Morgan Chase Bank, N.A.
> 270 Park Avenue, 42nd Floor
> New York, New York 10017-2014

**F.      Use of the Proceeds**

The proceeds of the revolving credit facility will be used for general corporate purposes of MetTel Holdings and its affiliates, including MetTel, while the proceeds of the additional term loan capacity will be used for dividends and/or acquisitions. Potential acquisitions have yet to be identified, but MetTel can update the Commission when and if plans for future acquisitions become more concrete.

**G.      Filings with the Securities and Exchange Commission**

As MetTel Holding is a private company and this transaction is not subject to the registration requirements of the Securities Act of 1933, as amended, there will not be any filings made with the Securities and Exchange Commission related to this transaction.

**H.      Section 3.601(c)(9) Requirements**

In accordance with 52 Pa. Code § 3.601(c)(9), MetTel respectfully attaches hereto and makes part hereof the following exhibits:

| | |
|---|---|
| Exhibit A | **CONFIDENTIAL & PROPRIETARY** - Metropolitan Telecommunications Holding Company Organizational Chart |
| Exhibit B | **CONFIDENTIAL & PROPRIETARY** - Balance sheet of MetTel as of December 31, 2018 (the most recent balance sheets available). |
| Exhibit C | **CONFIDENTIAL & PROPRIETARY** - Income statement of MetTel as of December 31, 2018 (the most recent income statements available). |
| Exhibit D | A statement with respect to the plant accounts appearing on the balance sheets referred to in Exhibit B. |
| Exhibit E | A statement of securities of other corporations and entities owned by MetTel. |

7

**A035**

**PUBLIC VERSION**

Exhibit F        **CONFIDENTIAL & PROPRIETARY** - A statement showing the status of MetTel's funded debt outstanding as of December 31, 2018. (No material changes in the funded debt outstanding have taken place since December 31, 2018.)

Exhibit G        A statement showing the status of MetTel's Capital Stock as of December 31, 2018. (No material changes in the Capital Stock have taken place since December 16, 2018.)

Exhibit H        A statement that no registration statement has been filed with the Securities and Exchange Commission under the Securities Act of 1933 with respect to the Second Amended and Restated Credit Agreement and related Security Agreement.

Exhibit I        A statement that no applications or declarations have been filed with the Securities and Exchange Commission with respect to the Second Amended and Restated Credit Agreement and related Security Agreement pursuant to the Public Utility Holding Company Act of 1935.

Exhibit J        A copy of the resolutions of the officers of MetTel authorizing the inclusion of MetTel as a Guarantor under the Third Amended and Restated Credit Agreement and related Security Agreement.

Exhibit K        A statement that no journal entry will be made on the books of account of MetTel as a result of the Third Amended and Restated Credit Agreement and related Security Agreement.

Exhibit L        Affidavit of an Officer of MetTel in the form prescribed by 52 Pa. Code §§ 1.35 and 1.36.

MetTel notes that copies of the Third Amended and Restated Credit Agreement and related Security Agreement are not provided with this Security Certificate as they have not been finalized as of the date of submission. MetTel will provide the Commission with copies of these agreements upon request as soon as they are completed.

## IV.    <u>PUBLIC INTEREST CONSIDERATIONS</u>

Consummation of the Proposed Transaction will serve the public interest in promoting competition among telecommunications carriers by providing MetTel with the opportunity to strengthen its competitive position by providing additional working capital and the ability to finance acquisitions to enhance the company's services. The financing arrangements are necessary and appropriate, will not impair MetTel's ability to perform such services to the public, and will promote

8

**PUBLIC VERSION**

the corporate purposes of MetTel. The Proposed Transaction will not involve an assignment of the PA CPCN or a change in the day-to-day operations of the certificated company. In addition, there will be no change in the services offered to MetTel's customers or the rates for MetTel's regulated services. The transaction will be completely transparent to MetTel's customers.

WHEREFORE, MetTel respectfully requests that the Commission promptly approve the above-referenced financing arrangement, register this Abbreviated Securities Certificate, and issue a Notice of Registration, pursuant to Sections 1901 of the Public Utility Code, 66 Pa. C.S. § 1901, and Section 3.602(c) of the Commission's regulations, 52 Pa. Code § 3.602(c), and the interrelated affiliate transaction, if necessary, under Section 2102 of the Public Utility Code, 66 Pa. C.S. § 2102, as soon as possible authorizing MetTel to participate in the financing arrangements described herein.

As required by the Commission's rules, a filing fee in the amount of $25.00 is being paid by credit card through the Commission's eFiling system. Please acknowledge receipt and acceptance of this filing. Please do not hesitate to contact us if you have any questions.

Respectfully submitted,


    /s/ Amy Blumenthal
Amy Blumenthal
Kutak Rock LLP
Two Liberty Place
1760 Market Street, Suite 1100
Philadelphia, PA 19103-4104
Phone: (215) 586-4188
Fax:     (215) 981-0719
Email:   amy.blumenthal@kutakrock.com

Dated: September 30, 2019

9

**PUBLIC VERSION**

**EXHIBIT A**

**CONFIDENTIAL & PROPRIETARY**

**Metropolitan Telecommunications Holding Company Organizational Chart**

PUBLIC VERSION

**[REDACTED]**

**PUBLIC VERSION**

**<u>EXHIBIT B</u>**

**CONFIDENTIAL & PROPRIETARY**

**Balance sheet of**
**Metropolitan Communications of PA d/b/a/ MetTel**
**<u>as of December 31, 2018.</u>**

PUBLIC VERSION

**[<u>REDACTED</u>]**

PUBLIC VERSION

**EXHIBIT C**

**CONFIDENTIAL & PROPRIETARY**

**Income Statement of
Metropolitan Communications of PA d/b/a/ MetTel
for the twelve months ending December 31, 2018**

PUBLIC VERSION

**[REDACTED]**

**PUBLIC VERSION**

**EXHIBIT D**

The Plant of MetTel is carried on the books of account at its original cost as required by the FCC Part 32 Uniform System of Accounts.  (Please see Exhibit B for further details).

**PUBLIC VERSION**

**<u>EXHIBIT E</u>**

**<u>Other Securities</u>**

MetTel does not own any securities in any other corporation.

**PUBLIC VERSION**

**EXHIBIT F**

**CONFIDENTIAL & PROPRIETARY**

**Statement showing status of MetTel's funded debt outstanding as of December 31, 2018.**

**[REDACTED]**

**PUBLIC VERSION**

**Exhibit G**


**Capital Stock of MetTel as of December 31, 2018.**


There are 200 shares of capital stock of MetTel authorized for issuance, of which 100 have been issued and remain outstanding. There have been no changes in the capital stock of the company since the date above.

**PUBLIC VERSION**

**<u>Exhibit H</u>**


**<u>Registration Statement with SEC</u>**

     No registration statement has been filed with the Securities and Exchange Commission under the Securities Act of 1933 with respect to the Second Amended and Restated Credit Agreement and related Security Agreement.

**PUBLIC VERSION**

**<u>Exhibit I</u>**


**<u>Applications or Declarations filed with the SEC</u>**

No applications or declarations have been filed with the Securities and Exchange Commission with respect to the Second Amended and Restated Credit Agreement and related Security Agreement under the Public Utility Holding Company Act of 1935.

**PUBLIC VERSION**

## <u>Exhibit I</u>

### <u>Applications or Declarations filed with the SEC</u>

No applications or declarations have been filed with the Securities and Exchange Commission with respect to the Second Amended and Restated Credit Agreement and related Security Agreement under the Public Utility Holding Company Act of 1935.

**PUBLIC VERSION**

**<u>Exhibit J</u>**

**<u>Corporate Consent</u>**

Unanimous Written Consent of MetTel, authorizing the inclusion of MetTel as a Guarantor under the Third Amended and Restated Credit Agreement and related Security Agreement.

**CONSOLIDATED UNANIMOUS WRITTEN CONSENT OF
THE SOLE EQUITY HOLDER AND THE BOARDS OF DIRECTORS OF
SUBSIDIARIES OF METROPOLITAN TELECOMMUNICATIONS HOLDING COMPANY**

The undersigned, being the sole equity holder (whether as a stockholder, shareholder, or otherwise) (the "Sole Equity Holder"), and all of the members of the Boards of Directors (each, a "Board"; together with the Sole Equity Holder, the "Undersigned"), of certain direct or indirect subsidiaries (each such subsidiary referred to as a "Company" and listed on Schedule 1 hereto) of Metropolitan Telecommunications Holding Company, a Delaware corporation ("MetTel Holding Company") who are a party to that certain Third Amended and Restated Credit Agreement (as hereinafter defined), acting by written consent without a meeting, do hereby consent to and approve, effective as of the 26 day of September 2019, the following resolutions and each and every action effected thereby:

**WHEREAS**, certain Companies have previously entered into an Amended and Restated Credit Agreement dated as of October 3, 2013, by and among MetTel Holding Company, certain direct and indirect subsidiaries of MetTel Holding Company (collectively, the "Initial Borrowers"), Metropolitan Telecommunications of Colorado, Inc. ("MetTel Colorado"), Metropolitan Telecommunications of Indiana, Inc. ("MetTel Indiana"), and JPMorgan Chase Bank, N.A. ("JPM") as the Administrative Agent and a Lender (as amended by the First Amendment dated as of December 19, 2013, the Second Amendment dated as of February 7, 2014, the Third Amendment and Waiver dated as of June 20, 2014, the Fourth Amendment dated as of October 14, 2014, the Fifth Amendment dated as of December 19, 2014, the Sixth Amendment dated as of August 13, 2015, the Seventh Amendment dated as of September 2, 2015, the Eighth Amendment dated as of December 21, 2016, the Ninth Amendment dated as of September 1, 2017 (as so amended, the "First Amended and Restated Credit Agreement"); and

**WHEREAS**, the First Amended and Restated Credit Agreement was further amended and restated by that certain Second Amended and Restated Credit Agreement dated as of September 29, 2017, as amended by the First Amendment dated as of March 26, 2018, the Second Amendment dated as of September 28, 2018, and the Third Amendment and Waiver dated as of June 20, 2019 (as so amended, the "Existing Credit Agreement"); and

**WHEREAS**, each Board has determined that it is desirable and in the best interest of its respective Company to (i) further amend and restate the Existing Credit Agreement in the form of the Third Amended and Restated Credit Agreement (as hereinafter defined), (ii) further amend and restate the Amended and Restated Pledge and Security Agreement, dated as of September 29, 2017, among the Initial Borrowers, certain other direct and indirect subsidiaries of MetTel Holding Company (each such subsidiary, together with the Initial Borrowers, the "Applicable Subsidiaries"), MetTel Colorado, MetTel Indiana, and the Administrative Agent in the form of the Second Amended and Restated Pledge and Security Agreement, (iii) remove certain Applicable Subsidiaries as Borrowers (as defined in the Existing Credit Agreement) under the Existing Credit Agreement and reinstate such subsidiaries as Guarantors under and as defined in the Third Amended and Restated Credit Agreement, (iv) make certain other modifications to the credit arrangement under the Existing Credit Agreement and the "Loan Documents" referred to therein, and (v) do all other transactions related thereto or contemplated thereby as hereinafter set forth in these resolutions.

<u>CREDIT FACILITY RESOLUTIONS</u>

**WHEREAS,** each Board has determined that it is desirable and in the best interest of its respective Company to enter into the following agreements (collectively referred to as the "Transaction

1

Agreements"):

    (i)   Third Amended and Restated Credit Agreement (the "<u>Third Amended and Restated Credit Agreement</u>"), by and among MetTel Holding Company and each of its Applicable Subsidiaries that are Borrowers as identified therein (collectively, "Borrowers"), any additional entity that from time to time becomes a "Borrower" thereunder, the Applicable Subsidiaries that are Guarantors as identified therein ("Guarantors"), any additional entity that from time to time becomes a "Guarantor" thereunder, each financial institution that from time to time is a "Lender" thereunder, JPM, in its capacity as Administrative Agent for the Lenders, Sole Bookrunner and Sole Lead Arranger, and Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>"), as Syndication Agent, providing for (a) a term loan in the aggregate amount of $40,000,000, and (b) revolving loans in the initial aggregate amount of $60,000,000;

    (ii)   Fourth Amended and Restated Revolving Loan Promissory Note, in the amount of $27,000,000, made by the Borrowers in favor of JPM (the "<u>JPMorgan Revolving Note</u>");

    (iii)   Amended and Restated Revolving Loan Promissory Note, in the amount of $18,000,000, made by the Borrowers in favor of Wells Fargo (the "<u>Wells Fargo Revolving Note</u>");

    (iv)   Revolving Loan Promissory Note, in the amount of $15,000,000, made by the Borrowers in favor of Citizens Bank, N.A. ("<u>Citizen's Bank</u>") (the "<u>Citizen's Bank Revolving Note</u>");

    (v)   Amended and Restated Term Loan Promissory Note, in the amount of $18,000,000, made by the Borrowers in favor of JPM (the "<u>JPMorgan Term Note</u>");

    (vi)   Amended and Restated Term Loan Promissory Note, in the amount of $12,000,000, made by the Borrowers in favor of Wells Fargo (the "<u>Wells Fargo Term Note</u>");

    (vii)   Term Loan Promissory Note, in the amount of $10,000,000, made by the Borrowers in favor of Citizen's Bank (the "<u>Citizen's Bank Term Note</u>");

    (viii)   Second Amended and Restated Pledge and Security Agreement among the Borrowers and the Administrative Agent (the "<u>Second Amended and Restated Security Agreement</u>"); and

    **WHEREAS**, the latest drafts of the Transaction Agreements have been presented to, reviewed by and approved by, each Board.

    **NOW, THEREFORE, BE IT RESOLVED**, that each Company is hereby authorized, empowered and directed by its respective Board and Sole Equity Holder to (i) to enter into the Transaction Agreements, substantially in the form presented to each Company's respective Board with such changes, additions and modifications thereto as each respective Company's Chief Executive Officer, President, Executive Vice President, Chief Operating Officer, Treasurer, or Secretary (each an "<u>Authorized Officer</u>" and collectively, the "<u>Authorized Officers</u>"), acting singly, may approve (the "<u>Approved Changes</u>"), such approval to be conclusively evidenced by the execution thereof by such Authorized Officer, and (ii) perform its respective obligations under the Transaction Agreements; and it is further

    **RESOLVED**, that the forms, terms, and provisions of the Transaction Agreements, each

substantially in the form presented to each Board, together with any Approved Changes, be, and they hereby are, authorized and approved in all respects; and it is further

**RESOLVED**, that the Authorized Officers be, and each hereby is, acting singly, authorized and directed to execute and deliver the Transaction Agreements, in the name of and on behalf of each Company; and it is further

**RESOLVED**, that the Authorized Officers be, and each hereby is, acting singly, authorized and empowered and directed, in the name of and on behalf of each Company, to negotiate, execute, deliver, record and/or file all documents, agreements and instruments (including, without limitation, (i) Uniform Commercial Code financing statements or termination statements, as applicable, in the name and on behalf of each Company relating to any collateral in possession of each Company, as applicable, and (ii) any notices or other filings required by the FCC, any State Public Utility Commissions or similar governing entities), and to do any and all other acts as may be required or as they, or any of them, may deem necessary or appropriate to carry out and perform, to give effect to, or to cause each Company, as applicable, to enter in to and comply with, the terms of, or the transactions contemplated by, the Third Amended and Restated Credit Agreement, the other Transaction Agreements and any other related agreement or document that any Authorized Officer may deem necessary or advisable to consummate the transactions contemplated by the foregoing and to honor and discharge its obligations thereunder; and it is further

**RESOLVED**, that the form, terms and provisions of and the transactions contemplated by the various agreements, instruments and documents referred to in or contemplated by the Transaction Agreements be and hereby are authorized and approved in all respects.

## GENERAL RESOLUTIONS

**RESOLVED**, that the Authorized Officers be, and each hereby is, acting singly, authorized, empowered and directed, for and on behalf of each respective Company, to take any and all actions, to negotiate for and enter into agreements and amendments or waivers to agreements, to perform all such acts and things, to execute, file, deliver or record in the name and on behalf of each Company, all such certificates, instruments, agreements or other documents, to engage such advisors, and to make all such payments as they, in their judgment, or in the judgment of any one or more of them, may deem necessary, advisable or appropriate in order to carry out the purpose and intent of, or consummate the transactions contemplated by, the foregoing resolutions and/or all of the transactions contemplated therein or thereby, the authorization therefor to be conclusively evidenced by the taking of such action or the execution and delivery of such certificates, instruments, agreements or documents; and it is further

**RESOLVED**, that the omission from these resolutions of any agreement, document or other arrangement contemplated by any of the agreements, documents or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirement of any of the agreements, documents or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Officers to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by, and the intent and purposes of, the foregoing resolutions; and be it further

**RESOLVED**, that all actions heretofore taken by any Authorized Officer, director, employee or agent of each Company in connection with the foregoing transactions contemplated by the foregoing resolutions be, and they hereby are, authorized, ratified and approved in all respects; and be it further

**RESOLVED**, that these resolutions of each Board may be delivered by facsimile or other electronically transmitted means in any number of counterparts, all of which shall be valid as originals

3

and deemed to be one and the same instrument; and be it further

**RESOLVED**, that the Secretary of each Company is hereby authorized to certify and deliver, to any person to whom such certification and delivery may be deemed necessary or appropriate in the opinion of such Secretary, a true copy of the foregoing resolutions.

[Signature Page to Follow]

4

**A055**

**IN WITNESS WHEREOF**, the Undersigned, being the Sole Equity Holder and all of the members of each Board, have executed this consent as of the first date set forth above.

Metropolitan Telecommunications Holding Company, a Delaware corporation

By: _____
Name:  Andoni Economou
Title:  COO/EVP

_____
Marshall Aronow

_____
Andoni Economou

_____
Joseph Aronow

_____
David Aronow

[SIGNATURE PAGE TO UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS OF METROPOLITAN TELECOMMUNICATIONS HOLDING COMPANY]

**IN WITNESS WHEREOF**, the Undersigned, being the Sole Equity Holder and all of the members of each Board, have executed this consent as of the first date set forth above.

Metropolitan Telecommunications Holding
Company, a Delaware corporation

By: _____
Name:
Title:

_____
Marshall Aronow

_____
Andoni Economou

_____
Joseph Aronow

_____
David Aronow

[SIGNATURE PAGE TO UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS
OF METROPOLITAN TELECOMMUNICATIONS HOLDING COMPANY]

**PUBLIC VERSION**

**Exhibit K**

**Journal Entry**

No journal entry will be made on the books of accounts of MetTel as a result of the Third Amended and Restated Credit Agreement and related Security Agreement.

**PUBLIC VERSION**

**Exhibit L**

**<u>Verification</u>**

STATE OF NEW JERSEY     §
             §
COUNTY OF MONMOUTH    §

### VERIFICATION

   I, Joseph Farano, state that I am the General Counsel of Metropolitan Telecommunications Corporation of PA ("MetTel"); that I am authorized to make this Verification on behalf of MetTel; that the foregoing filing was prepared under my direction and supervision; and that the contents are true and correct to the best of my knowledge, information, and belief.

            Joseph Farano
            General Counsel
            Metropolitan Telecommunications Corporation of PA
            d/b/a MetTel

SWORN TO AND SUBSCRIBED before me on the ___9th___ day of September, 2019.

            _Mariya Gelfond_
            Notary Public

My commission expires: _____ NJ attorney ID: 122522014
               Mariya Gelfond, Esq.
               Admission Date: 11/19/2014

**A060**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

☑      Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

For the quarterly period ended March 31, 2020

or

☐      Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

For the transition period from _____ to _____

**Commission File Number 001-35965**

# GTT Communications, Inc.

(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **20-2096338** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **7900 Tysons One Place** | |
| **Suite 1450** | |
| **McLean Virginia** | **22102** |
| (Address of principal executive offices) | (Zip code) |

(703) 442-5500

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $.0001 per share | GTT | The New York Stock Exchange |
| Series A Junior Participating Cumulative Preferred Stock Purchase Rights | | |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☑ | Accelerated Filer | ☐ |
| Non-Accelerated Filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

As of May 6, 2020, 58,819,538 shares of common stock, par value $.0001 per share, of the registrant were outstanding.

| | Page |
|---|---|
| **PART I — FINANCIAL INFORMATION** | 4 |
| Item 1. Financial Statements | 4 |
| Condensed Consolidated Balance Sheets | 4 |
| Condensed Consolidated Statements of Operations | 5 |
| Condensed Consolidated Statements of Comprehensive Loss | 6 |
| Condensed Consolidated Statements of Stockholders' Equity | 7 |
| Condensed Consolidated Statements of Cash Flows | 8 |
| Notes to Condensed Consolidated Financial Statements | 10 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 28 |
| Item 3. Quantitative and Qualitative Disclosures about Market Risk | 39 |
| Item 4. Controls and Procedures | 40 |
| **PART II — OTHER INFORMATION** | 42 |
| Item 1. Legal Proceedings | 42 |
| Item 1A. Risk Factors | 42 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 42 |
| Item 3. Defaults Upon Senior Securities | 42 |
| Item 4. Mine Safety Disclosures | 43 |
| Item 5. Other Information | 43 |
| Item 6. Exhibits | 44 |
| **SIGNATURES** | 45 |
| **CERTIFICATIONS** | |

3

PART I – FINANCIAL INFORMATION

ITEM 1. *FINANCIAL STATEMENTS*

**GTT Communications, Inc.**
**Condensed Consolidated Balance Sheets**
(Unaudited)
(Amounts in millions, except for share and per share data)

| | March 31, 2020 | | December 31, 2019 | |
|---|---:|---|---:|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 106.4 | $ | 41.8 |
| Accounts receivable, net of allowances of $23.0 and $14.3, respectively | | 149.9 | | 162.1 |
| Prepaid expenses and other current assets | | 82.1 | | 50.4 |
| **Total current assets** | | 338.4 | | 254.3 |
| Property and equipment, net | | 1,765.4 | | 1,817.4 |
| Operating lease right of use assets | | 335.9 | | 357.5 |
| Intangible assets, net | | 465.4 | | 490.7 |
| Goodwill | | 1,763.7 | | 1,768.6 |
| Other long-term assets | | 70.2 | | 69.2 |
| **Total assets** | $ | 4,739.0 | $ | 4,757.7 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 101.4 | $ | 69.4 |
| Accrued expenses and other current liabilities | | 273.4 | | 240.8 |
| Operating lease liabilities | | 72.6 | | 74.9 |
| Finance lease liabilities | | 5.4 | | 4.6 |
| Long-term debt, current portion | | 29.6 | | 30.2 |
| Deferred revenue | | 83.8 | | 67.0 |
| **Total current liabilities** | | 566.2 | | 486.9 |
| Operating lease liabilities, long-term portion | | 254.7 | | 272.9 |
| Finance lease liabilities, long-term portion | | 36.4 | | 37.3 |
| Long-term debt, long-term portion | | 3,228.4 | | 3,192.6 |
| Deferred revenue, long-term portion | | 255.2 | | 266.5 |
| Deferred tax liabilities | | 167.7 | | 171.3 |
| Other long-term liabilities | | 33.6 | | 39.1 |
| **Total liabilities** | | 4,542.2 | | 4,466.6 |
| **Commitments and contingencies** | | | | |
| **Stockholders' equity:** | | | | |
| Common stock, par value $.0001 per share, 80,000,000 shares authorized, 58,451,083 and 56,686,459 shares issued and outstanding as of March 31, 2020 and December 31, 2019, respectively | | — | | — |
| Additional paid-in capital | | 850.4 | | 842.4 |
| Accumulated deficit | | (566.6) | | (474.2) |
| Accumulated other comprehensive loss | | (87.0) | | (77.1) |
| **Total stockholders' equity** | | 196.8 | | 291.1 |
| **Total liabilities and stockholders' equity** | $ | 4,739.0 | $ | 4,757.7 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

4

**A064**

**GTT Communications, Inc.**
**Condensed Consolidated Statements of Operations**
(Unaudited)
(Amounts in millions, except for share and per share data)

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| **Revenue:** | | |
| Telecommunications services | $ 424.7 | $ 450.2 |
|  | | |
| **Operating expenses:** | | |
| Cost of telecommunications services | 237.7 | 241.8 |
| Selling, general and administrative expenses | 108.2 | 104.1 |
| Severance, restructuring and other exit costs | 2.1 | 2.8 |
| Depreciation and amortization | 67.5 | 62.8 |
| Total operating expenses | 415.5 | 411.5 |
| Operating income | 9.2 | 38.7 |
|  | | |
| **Other expenses:** | | |
| Interest expense, net | (48.8) | (48.2) |
| Loss on debt extinguishment | (2.3) | — |
| Other expenses, net | (43.3) | (16.0) |
| Total other expenses | (94.4) | (64.2) |
| Loss before income taxes | (85.2) | (25.5) |
| (Benefit from) provision for income taxes | (1.9) | 1.8 |
| **Net loss** | $ (83.3) | $ (27.3) |
| Loss per share: | | |
| Basic | $ (1.45) | $ (0.49) |
| Diluted | $ (1.45) | $ (0.49) |
|  | | |
| Weighted average shares: | | |
| Basic | 57,259,699 | 55,839,212 |
| Diluted | 57,259,699 | 55,839,212 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

5

**GTT Communications, Inc.**
**Condensed Consolidated Statements of Comprehensive Loss**
(Unaudited)
(Amounts in millions)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Net loss | $ (83.3) | $ (27.3) |
| | | |
| Other comprehensive loss: | | |
| Foreign currency translation adjustment | (9.9) | (35.9) |
| Comprehensive loss | $ (93.2) | $ (63.2) |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

6

**A066**

**GTT Communications, Inc.**
**Condensed Consolidated Statements of Stockholders' Equity**
(Unaudited)
(Amounts in millions, except for share data)

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance, December 31, 2019** | 56,686,459 | $ — | $ 842.4 | $ (474.2) | $ (77.1) | $ 291.1 |
| Adoption of ASU 2016-13 | — | — | — | (9.1) | — | (9.1) |
| Share-based compensation for restricted stock issued | 1,764,788 | — | 8.2 | — | — | 8.2 |
| Tax withholding related to the vesting of restricted stock | (23,783) | — | (0.3) | — | — | (0.3) |
| Stock issued in connection with employee stock purchase plan | 23,619 | — | 0.1 | — | — | 0.1 |
| Net loss | — | — | — | (83.3) | — | (83.3) |
| Foreign currency translation | — | — | — | — | (9.9) | (9.9) |
| **Balance, March 31, 2020** | 58,451,083 | $ — | $ 850.4 | $ (566.6) | $ (87.0) | $ 196.8 |

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance, December 31, 2018** | 55,625,149 | $ — | $ 809.9 | $ (368.3) | $ (26.9) | $ 414.7 |
| Share-based compensation for options issued | — | — | 0.2 | — | — | 0.2 |
| Share-based compensation for restricted stock issued | 562,385 | — | 8.5 | — | — | 8.5 |
| Tax withholding related to the vesting of restricted stock | (9,307) | — | (0.3) | — | — | (0.3) |
| Stock issued in connection with employee stock purchase plan | 14,061 | — | 0.1 | — | — | 0.1 |
| Stock issued in connection with acquisitions | (6,954) | — | (0.3) | — | — | (0.3) |
| Stock options exercised | 41,704 | — | 0.4 | — | — | 0.4 |
| Net loss | — | — | — | (27.3) | — | (27.3) |
| Foreign currency translation | — | — | — | — | (35.9) | (35.9) |
| **Balance, March 31, 2019** | 56,227,038 | $ — | $ 818.5 | $ (395.6) | $ (62.8) | $ 360.1 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

7

**A067**

**GTT Communications, Inc.**
**Condensed Consolidated Statements of Cash Flows**
(Unaudited)
(Amounts in millions)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Cash flows from operating activities: | | |
| Net loss | $ (83.3) | $ (27.3) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation and amortization | 67.5 | 62.8 |
| Share-based compensation | 8.3 | 8.7 |
| Debt discount amortization | 1.8 | 1.9 |
| Loss on debt extinguishment | 2.3 | — |
| Amortization of debt issuance costs | 1.4 | 1.2 |
| Change in fair value of derivative financial liability | 33.5 | 15.3 |
| Excess tax benefit from stock-based compensation | 1.0 | 0.3 |
| Deferred income taxes | (4.5) | 1.0 |
| Changes in operating assets and liabilities, net of acquisitions: | | |
| Accounts receivable, net | 0.2 | (53.7) |
| Prepaid expenses and other current assets | (32.5) | (5.4) |
| Other long-term assets | 9.7 | 1.8 |
| Accounts payable | 26.2 | 12.1 |
| Accrued expenses and other current liabilities | 3.0 | (12.1) |
| Operating lease liabilities | 2.1 | — |
| Deferred revenue | 9.7 | 2.6 |
| Other long-term liabilities | (4.9) | 6.9 |
| Net cash provided by operating activities | 41.5 | 16.1 |
| | | |
| Cash flows from investing activities: | | |
| Acquisition of businesses, net of cash acquired | — | (0.5) |
| Purchases of property and equipment | (22.0) | (32.1) |
| **Net cash used in investing activities** | (22.0) | (32.6) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from revolving line of credit | 55.0 | 26.0 |
| Repayment of revolving line of credit | (130.0) | — |
| Proceeds from term loans, net of original issuance discount and costs paid to lenders | 131.0 | — |
| Repayment of term loans | (6.5) | (6.5) |
| Repayment of other secured borrowings | (2.3) | (5.1) |
| Payment of holdbacks | — | (3.3) |
| Debt issuance costs paid to third parties | (2.3) | — |
| Repayment of finance leases | (2.1) | (0.6) |
| Proceeds from issuance of common stock under employee stock purchase plan | 0.4 | 0.1 |
| Tax withholding related to the vesting of restricted stock | (0.3) | (0.3) |
| Exercise of stock options | — | 0.4 |
| Net cash provided by financing activities | 42.9 | 10.7 |
| | | |
| Effect of exchange rate changes on cash | 2.2 | 1.2 |
| | | |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | 64.6 | (4.6) |
| | | |
| Cash, cash equivalents, and restricted cash at beginning of period | 41.8 | 55.3 |
| | | |
| Cash, cash equivalents, and restricted cash at end of period | $ 106.4 | $ 50.7 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid for interest | $ 32.0 | $ 32.0 |
| Cash paid for income taxes, net | — | (0.1) |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

9

**GTT Communications, Inc.**
**Notes to Condensed Consolidated Financial Statements**
(Unaudited)

## NOTE 1 — ORGANIZATION AND BUSINESS

*Organization and Business*

GTT Communications, Inc. ("GTT" or the "Company") serves large enterprise and carrier clients with complex national and global networking needs, and differentiates itself from the competition by providing an outstanding service experience built on its core values of simplicity, speed and agility. The Company operates a global Tier 1 internet network ranked among the largest in the industry, and owns a fiber network that includes an expansive pan-European footprint and subsea cables. The Company's global network includes over 600 points of presence ("PoPs") spanning six continents, and the Company provides services in more than 140 countries.

*Basis of Presentation*

The accompanying unaudited condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC") and should be read in conjunction with the Company's audited financial statements and footnotes thereto for the fiscal year ended December 31, 2019, included in the Company's Annual Report on Form 10-K filed on March 2, 2020. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") have been omitted pursuant to such rules and regulations.

The condensed consolidated financial statements reflect all adjustments (consisting of normal recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of the Company's consolidated financial position and its results of operations. The operating results for the three months ended March 31, 2020 are not necessarily indicative of the results to be expected for the full fiscal year 2020 or for any other interim period. The December 31, 2019 consolidated balance sheet is condensed from the audited financial statements as of that date.

*Use of Estimates and Assumptions*

The preparation of financial statements in accordance with GAAP requires management to make estimates and assumptions that affect certain reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Significant estimates are used when establishing allowances for doubtful accounts, accruals for billing disputes and exit activities, determining useful lives for depreciation and amortization, assessing the need for impairment charges (including those related to intangible assets and goodwill), determining the fair values of assets acquired and liabilities assumed in business combinations, assessing the fair value of derivative financial instruments, accounting for income taxes and related valuation allowances against deferred tax assets, and estimating the grant date fair values used to compute the share-based compensation expense. Management evaluates these estimates and judgments on an ongoing basis and makes estimates based on historical experience, current conditions, and various other assumptions that are believed to be reasonable under the circumstances. The results of these estimates form the basis for making judgments about the carrying values of assets and liabilities as well as identifying and assessing the accounting treatment with respect to commitments and contingencies. Actual results may differ from these estimates under different assumptions or conditions, including but not limited to assumptions or conditions due to uncertainty of the magnitude and duration of the impacts of the COVID-19 pandemic in the current economic environment.

*Revenue Recognition*

The Company's revenue is derived primarily from telecommunications services, which includes both revenue from contracts with customers and lease revenues. Lease revenue services include dark fiber, duct, and colocation services. All other services are considered revenue from contracts with customers. Revenue from contracts with customers is recognized when services are provided to the customer, in an amount that reflects the consideration the Company expects to receive in exchange for those services. Lease revenue represents an arrangement where the customer has the right to use an identified asset for a specified term and such revenue is recognized over the term the customer is given exclusive access to the asset.

*Primary geographical market.* The Company's operations are located primarily in the United States and Europe. The nature and timing of revenue from contracts with customers across geographic markets is similar. The following table presents the

10

Company's revenue from contracts with customers disaggregated by primary geographic market based on legal entities (in millions):

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| Primary geographic market: | | | | |
| United States | $ | 171.7 | $ | 204.2 |
| Europe | | 205.3 | | 196.5 |
| Other | | 9.0 | | 11.9 |
| Total revenue from contracts with customers | | 386.0 | | 412.6 |
| Lease revenue | | 38.7 | | 37.6 |
| Total telecommunications services revenue | $ | 424.7 | $ | 450.2 |

*Universal Service Fund ("USF"), Gross Receipts Taxes and Other Surcharges.* USF fees and other surcharges billed to customers and recorded on a gross basis (as service telecommunications services revenue and cost of telecommunications services) were $5.6 million and $5.9 million for the three months ended March 31, 2020 and 2019, respectively.

*Contract balances.* Contract assets consist of conditional or unconditional rights to consideration. Accounts receivable represent amounts billed to customers where the Company has an enforceable right to payment for performance completed to date (i.e., unconditional rights to consideration). The Company does not have contract assets that represent conditional rights to consideration. The Company's accounts receivable balance at March 31, 2020 and December 31, 2019 includes $134.4 million and $145.9 million, respectively, related to contracts with customers. There were no other contract assets as of March 31, 2020 or December 31, 2019.

Contract liabilities are generally limited to deferred revenue. Deferred revenue is a contract liability, representing advance consideration received from customers primarily related to the pre-paid capacity sales, where transfer of control occurs over time, and therefore revenue is recognized over the related contractual service period. The Company's contract liabilities were $82.0 million and $76.0 million as of March 31, 2020 and December 31, 2019, respectively. The change in contract liabilities during the three months ended March 31, 2020 included $3.8 million for revenue recognized that was included in the contract liability balance as of January 1, 2020 and $10.7 million for new contract liabilities net of amounts recognized as revenue during the three months ended March 31, 2020.

The following table includes estimated revenue from contracts with customers expected to be recognized for each of the years subsequent to March 31, 2020 related to performance obligations that are unsatisfied (or partially unsatisfied) at March 31, 2020 and have an original expected duration of greater than one year (amounts in millions):

| | | |
| --- | --- | --- |
| 2020 remaining | $ | 13.7 |
| 2021 | | 15.2 |
| 2022 | | 14.4 |
| 2023 | | 12.8 |
| 2024 | | 8.0 |
| 2025 and beyond | | 17.9 |
| | $ | 82.0 |

For a table of estimated revenue to be recognized for consolidated deferred revenue for each of the years subsequent to March 31, 2020 refer to Note 6 - Deferred revenue.

*Deferred costs to obtain a contract.* Deferred sales commissions were $24.7 million and $23.0 million as of March 31, 2020 and December 31, 2019, respectively. There were no other significant amounts of assets recorded related to contract costs as of March 31, 2020 or December 31, 2019.

**Property and Equipment**

11

**A071**

Depreciation expense associated with property and equipment, including amortization of finance lease assets, was $46.4 million and $40.7 million for the three months ended March 31, 2020 and 2019, respectively.

The Company capitalized labor costs, including indirect and overhead costs, of $3.8 million and $4.2 million for the three months ended March 31, 2020 and 2019, respectively. The Company capitalized software costs of $1.1 million and $1.1 million for the three months ended March 31, 2020 and 2019, respectively.

The Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. If the carrying amount of an asset were to exceed its estimated future undiscounted cash flows, the asset would be considered to be impaired. Impairment losses would then be measured as the amount by which the carrying amount of the asset exceeds the fair value of the asset. Assets to be disposed of, if any, are reported at the lower of the carrying amount or fair value less costs to sell.

*Disputed Supplier Expenses*

In the normal course of business, the Company identifies errors by suppliers with respect to the billing of services. The Company performs bill verification procedures to ensure that errors in the Company's suppliers' billed invoices are identified and resolved. If the Company concludes that a vendor has billed inaccurately, the Company will record a liability only for the amount that it believes is owed. As of March 31, 2020 and December 31, 2019, the Company had open disputes not accrued for of $28.8 million and $12.2 million, respectively, and open paid disputes in the form of receivables from suppliers of $36.0 million and $10.7 million, respectively.

*Newly Adopted Accounting Principles*

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments - Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, and subsequent amendment to the initial guidance, ASU 2018-19, in November 2018. The updated guidance introduces a new forward-looking approach, based on expected losses, to estimate credit losses on certain types of financial instruments, including trade receivables. The new guidance is effective for interim and annual reporting periods beginning after December 15, 2019. The standard requires a modified retrospective approach through a cumulative-effect adjustment to retained earnings as of the beginning of the first reporting period in which the guidance is effective. The Company adopted ASU 2016-13 as of January 1, 2020 using the modified retrospective approach related to its accounts receivables, resulting in a cumulative adjustment to retained earnings of approximately $9.1 million.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework - Changes to the Disclosure Requirements for Fair Value Measurement*, which modifies the disclosure requirements for fair value measurements by removing, modifying, or adding certain disclosures. The new guidance is effective for interim and annual reporting periods beginning after December 15, 2019. The removed and modified disclosures are adopted on a retrospective basis and the new disclosures are adopted on a prospective basis. The Company adopted the guidance as of January 1, 2020. The adoption of the new standard did not have a material impact on the Company's condensed consolidated financial statements.

*Recent Accounting Pronouncements*

Other recent accounting pronouncements issued by the FASB during 2020 and through the filing date did not and are not believed by management to have a material impact on the Company's present or historical consolidated financial statements.

**NOTE 2 — BUSINESS ACQUISITIONS**

Since its formation, the Company has consummated a number of transactions accounted for as business combinations as part of its growth strategy. The acquisitions of these businesses, which are in addition to periodic purchases of client contracts, have allowed the Company to increase the scale at which it operates, which in turn affords the Company the ability to increase its operating leverage, extend its network, and broaden its client base.

The accompanying condensed consolidated financial statements include the operations of the acquired entities from their respective acquisition dates. All of the acquisitions have been accounted for as a business combination. Accordingly, consideration paid by the Company to complete the acquisitions is initially allocated to the acquired assets and liabilities based upon their estimated acquisition date fair values. The recorded amounts for assets acquired and liabilities assumed are provisional and subject to change during the measurement period, which is up to 12 months from the acquisition date.

12

There were no acquisitions completed during the three months ended March 31, 2020.

For material acquisitions completed during 2019, 2018, and 2017, refer to Note 3 - Business Acquisitions to the consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019. During the three months ended March 31, 2020, certain immaterial measurement period adjustments were recorded to adjust provisional amounts for acquisitions completed during 2019.

**Acquisition Method Accounting Estimates**

The Company initially recognizes the assets and liabilities acquired from the acquisitions based on its preliminary estimates of their acquisition date fair values. As additional information becomes known concerning the acquired assets and assumed liabilities, management may make adjustments to the opening balance sheet of the acquired company up to the end of the measurement period, which is a period of no longer than one year following the acquisition date. The determination of the fair values of the acquired assets and liabilities assumed (and the related determination of estimated lives of depreciable tangible and identifiable intangible assets) requires significant judgment.

**Transaction Costs**

Transaction costs describe the broad category of costs the Company incurs in connection with signed and/or closed acquisitions. There are two types of costs that the Company accounts for:

- Severance, restructuring and other exit costs
- Transaction and integration costs

Severance, restructuring and other exit costs include severance and other one-time benefits for terminated employees, termination charges for leases and supplier contracts, and other costs incurred associated with an exit activity. These costs are reported separately in the condensed consolidated statements of operations during the three months ended March 31, 2020 and 2019. Refer to Note 12 - Severance, Restructuring, and Other Exit Costs of these condensed consolidated financial statements for further information.

Transaction and integration costs include expenses associated with legal, accounting, regulatory, and other transition services rendered in connection with acquisition, travel expense, and other non-recurring direct expenses associated with acquisitions. Transaction and integration costs are expensed as incurred in support of the integration. The Company incurred transaction and integration costs of $2.2 million and $9.2 million during the three months ended March 31, 2020 and 2019, respectively. Transaction and integration costs have been included in selling, general and administrative expenses in the condensed consolidated statements of operations and in cash flows from operating activities in the condensed consolidated statements of cash flows.

**NOTE 3 — GOODWILL AND INTANGIBLE ASSETS**

The goodwill balance was $1,763.7 million and $1,768.6 million as of March 31, 2020 and December 31, 2019, respectively. Additionally, the Company's intangible asset balance was $465.4 million and $490.7 million as of March 31, 2020 and December 31, 2019, respectively.

The change in the carrying amount of goodwill for the three months ended March 31, 2020 was as follows (amounts in millions):

| | | |
|---|---|---|
| **Goodwill - December 31, 2019** | $ | 1,768.6 |
| Adjustments to 2019 business combinations | | (0.6) |
| Foreign currency translation adjustments | | (4.3) |
| **Goodwill - March 31, 2020** | $ | 1,763.7 |

Goodwill is reviewed for impairment at least annually, in October, or more frequently if a triggering event occurs between impairment testing dates. There were no triggering events or goodwill impairments identified for the three months ended March 31, 2020 and 2019.

13

The following table summarizes the Company's intangible assets as of March 31, 2020 and December 31, 2019 (amounts in millions):

| | Amortization Period | Gross Asset Cost | | Accumulated Amortization | | Net Book Value | | Gross Asset Cost | | Accumulated Amortization | | Net Book Value | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **March 31, 2020** | | | | | | **December 31, 2019** | | | | | |
| Customer lists | 3-20 years | $ | 775.2 | $ | 331.7 | $ | 443.5 | $ | 781.1 | $ | 313.7 | $ | 467.4 |
| Non-compete agreements | 3-5 years | | 4.7 | | 4.7 | | — | | 4.7 | | 4.6 | | 0.1 |
| Intellectual property | 10 years | | 38.0 | | 16.3 | | 21.7 | | 38.3 | | 15.4 | | 22.9 |
| Tradename | 1-3 years | | 6.1 | | 5.9 | | 0.2 | | 6.2 | | 5.9 | | 0.3 |
| | | $ | 824.0 | $ | 358.6 | $ | 465.4 | $ | 830.3 | $ | 339.6 | $ | 490.7 |

Amortization expense was $21.1 million and $22.1 million for the three months ended March 31, 2020 and 2019, respectively.

Estimated amortization expense related to intangible assets subject to amortization at March 31, 2020 in each of the years subsequent to March 31, 2020 is as follows (amounts in millions):

| | | |
|---|---|---|
| 2020 remaining | $ | 63.3 |
| 2021 | | 82.6 |
| 2022 | | 69.5 |
| 2023 | | 57.0 |
| 2024 | | 51.5 |
| 2025 and beyond | | 141.5 |
| Total | $ | 465.4 |

The Company reviews its intangible assets for impairment whenever events or circumstances indicate that the carrying amount of an asset may not be fully recoverable. There were no triggering events or intangible asset impairments recognized for the three months ended March 31, 2020 and 2019.

**NOTE 4 — PREPAID EXPENSES AND OTHER CURRENT ASSETS**

The following table summarizes the Company's prepaid expenses and other current assets as of March 31, 2020 and December 31, 2019 (amounts in millions):

| | March 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Receivables from suppliers | $ | 36.0 | $ | 10.7 |
| Prepaid cost of telecommunications services | | 19.4 | | 11.8 |
| Prepaid selling, general and administrative | | 12.6 | | 13.1 |
| Deferred commissions | | 11.3 | | 9.8 |
| Other | | 2.8 | | 5.0 |
| | $ | 82.1 | $ | 50.4 |

14

**A074**

**NOTE 5 — ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

The following table summarizes the Company's accrued expenses and other current liabilities as of March 31, 2020 and December 31, 2019 (amounts in millions):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Cost of telecommunications services | $ 91.7 | $ 105.3 |
| Interest rate swaps | 86.7 | 53.5 |
| Compensation and benefits | 25.6 | 24.4 |
| Taxes payable | 26.2 | 28.3 |
| Selling, general and administrative | 19.4 | 18.1 |
| Interest | 11.8 | 0.4 |
| Restructuring, current portion | 6.7 | 6.4 |
| Other | 5.3 | 4.4 |
|  | $ 273.4 | $ 240.8 |

**NOTE 6 — DEFERRED REVENUE**

Total deferred revenue as of March 31, 2020 and December 31, 2019 was $339.0 million and $333.5 million, respectively, consisting of unamortized prepaid services, IRUs, and deferred non-recurring revenue. Deferred revenue is recognized as current and long-term deferred revenue on the condensed consolidated balance sheets.

Significant changes in deferred revenue balances during the period are as follows (amounts in millions):

|  | Three Months Ended March 31, 2020 | | |
|---|---|---|---|
|  | Contract Term | | |
|  | Less than 1 Year | Greater than 1 Year | Total |
| Balance, December 31, 2019 | $ 22.5 | $ 311.0 | $ 333.5 |
| Revenue recognized from beginning balance | (17.9) | (10.3) | (28.2) |
| Increase in deferred revenue (gross) | 49.2 | 10.9 | 60.1 |
| Revenue recognized on increase in deferred revenue | (22.0) | (0.2) | (22.2) |
| Foreign currency translation adjustments | (0.1) | (4.1) | (4.2) |
| Balance, March 31, 2020 | $ 31.7 | $ 307.3 | $ 339.0 |

Remaining amortization at March 31, 2020 and in each of the years subsequent to March 31, 2020 is as follows (amounts in millions):

|  | Contract Term | | |
|---|---|---|---|
|  | Less than 1 Year | Greater than 1 Year | Total |
| 2020 remaining | $ 31.6 | $ 32.7 | $ 64.3 |
| 2021 | 0.1 | 41.3 | 41.4 |
| 2022 | — | 37.8 | 37.8 |
| 2023 | — | 36.0 | 36.0 |
| 2024 | — | 28.2 | 28.2 |
| 2025 and beyond | — | 131.3 | 131.3 |
|  | $ 31.7 | $ 307.3 | $ 339.0 |

15

**A075**

**NOTE 7 — DEBT**

As of March 31, 2020 and December 31, 2019, long-term debt was as follows (amounts in millions):

| | March 31, 2020 | | December 31, 2019 |
|---|---|---|---|
| US Term loan due 2025 | $ 1,739.0 | $ | 1,743.5 |
| EMEA Term loan due 2025 | 951.5 | | 828.8 |
| 7.875% Senior unsecured notes due 2024 | 575.0 | | 575.0 |
| Revolving line of credit due 2023 | 65.0 | | 140.0 |
| Other secured loans | 2.1 | | 4.3 |
| Total debt obligations | 3,332.6 | | 3,291.6 |
| Unamortized debt issuance costs | (26.6) | | (28.0) |
| Unamortized original issuance discount, net | (48.0) | | (40.8) |
| Carrying value of debt | 3,258.0 | | 3,222.8 |
| Less current portion | (29.6) | | (30.2) |
| Long-term debt less current portion | $ 3,228.4 | $ | 3,192.6 |

*2018 Credit Agreement*

On May 31, 2018, the Company entered into a credit agreement (the "2018 Credit Agreement") that provides for (1) a $1,770.0 million term loan B facility (the "US Term Loan Facility"), (2) a €750.0 million term loan B facility (the "EMEA Term Loan Facility"), and (3) a $200.0 million revolving credit facility (the "Revolving Line of Credit Facility") (which includes a $50.0 million letter of credit facility). The US Term Loan Facility was issued at an original issuance discount of $8.9 million and the EMEA Term Loan Facility was issued at an original issuance discount of €3.8 million. The Company is the borrower under the U.S. Term Loan Facility and the Revolving Line of Credit Facility. The Company's wholly-owned subsidiary GTT Communications B.V. is the borrower under the EMEA Term Loan Facility (the "EMEA Borrower").

The maturity date of the US Term Loan Facility and the EMEA Term Loan Facility (collectively the "Term Loan Facilities") is May 31, 2025 and the maturity date of the Revolving Line of Credit Facility is May 31, 2023. Each maturity date may be extended per the terms of the 2018 Credit Agreement.

The principal amounts of the US Term Loan Facility and EMEA Term Loan Facility are payable in equal quarterly installments of $4.425 million and €1.875 million, respectively, commencing on September 30, 2018 and continuing thereafter until the maturity date when the remaining balances of outstanding principal amount is payable in full.

The Company may prepay loans under the 2018 Credit Agreement at any time, subject to certain notice requirements, LIBOR breakage costs, and prepayment fees noted above.

At the Company's election, the US Term Loan Facility may be made as either Base Rate Loans or Eurocurrency Loans. The EMEA Term Loan Facility will bear interest at the European Money Markets Institute EURIBOR plus the applicable margin. The applicable margin for the US Term Loan Facility is 1.75% for Base Rate Loans and 2.75% for Eurocurrency Loans, subject to a "LIBOR floor" of 0.00%. The applicable margin for the EMEA Term Loan Facility is 3.25%, subject to a "EURIBOR floor" of 0.00%. The applicable margin for revolving loans under the Revolving Line of Credit Facility is 1.75% for Base Rate Loans, 2.75% for Eurocurrency Loans denominated in U.S. Dollars and certain other approved currencies other than Euros, and 3.25% for revolving loans denominated in Euros.

The proceeds from the US Term Loan Facility and EMEA Term Loan Facility were used to finance the acquisition of Interoute Communications Holdings S.A., to repay amounts outstanding under the Company's prior term loan facility, and to pay costs associated with such transactions.

On June 5, 2019, the Company entered into an Incremental Revolving Credit Assumption Agreement ("Incremental Agreement") to the 2018 Credit Agreement. The Incremental Agreement establishes $50.0 million in new revolving credit commitments, bringing the total sum of revolving credit commitments under the 2018 Credit Agreement, as modified by the Incremental Agreement, to $250.0 million. The revolving credit commitments made pursuant to the Incremental Agreement have terms and conditions identical to the existing revolving credit commitments under the 2018 Credit Agreement.

16

On February 28, 2020, the Company entered into an amendment to the 2018 Credit Agreement ("Amendment No. 2"), which established incremental term loan commitments for $140 million of EMEA term loans (the "2020 EMEA Term Loan Facility"), bringing the total amounts of EMEA term loans outstanding under the 2018 Credit Agreement, as modified by Amendment No. 2, to €750 million in Euro-denominated loans and $140 million in US Dollar-denominated loans. The EMEA term loans under the 2020 EMEA Term Loan Facility were incurred with an original issue discount of $5.6 million.

The 2020 EMEA Term Loan Facility has terms substantially identical to the existing EMEA Term Loan Facility, except that: (1) each quarterly amortization payment on the 2020 EMEA Term Loan Facility will be $350,000; (2) the EMEA Term Loan Facility has a prepayment penalty of 2.0% for certain mandatory and voluntary prepayments occurring on or prior to the one year anniversary of the effective date of the EMEA Term Loan Facility and 1.0% for certain mandatory and voluntary prepayments occurring following the one year anniversary of the effective date of the EMEA Term Loan Facility and until the second year anniversary thereof; (3) Amendment No. 2 added, for the benefit of the lenders under the 2020 EMEA Term Loan Facility, the same covenant restrictions contained in Amendment No. 1, except that (a) the amount of secured debt that can be incurred on a pari passu basis with the 2020 EMEA Term Loan Facility and certain types of debt incurred by non-credit parties is limited to $50 million in the aggregate and (b) certain excess asset sale proceeds will be required to prepay outstanding EMEA term loans or reinvest in long-term assets useful in the business within 30 days following receipt of such proceeds, which covenant restrictions will remain in place for so long as the existing Revolving Line of Credit Facility and the 2020 EMEA Term Loan Facility remain in effect; and (4) the applicable margin for the 2020 EMEA Term Loan Facility is (a) 3.25% for Base Rate Loans and 4.25% for Eurocurrency Loans for the first two years following the effective date of the 2020 EMEA Term Loan Facility and (b) 3.75% for Base Rate Loans and 4.75% for Eurocurrency Loans on and following the second anniversary of the effective date of the 2020 EMEA Term Loan Facility.

The proceeds of the 2020 EMEA Term Loan Facility were used to repay amounts outstanding under the Revolving Line of Credit Facility and for general corporate purposes.

The unused and available amount of the Revolving Line of Credit Facility at March 31, 2020 was as follows (amounts in millions):

| | | |
|---|---|---|
| Committed capacity | $ | 250.0 |
| Borrowings outstanding | | (65.0) |
| Letters of credit issued | | (10.9) |
| Unused and available | $ | 174.1 |

The obligations of the Company under the 2018 Credit Agreement are secured by the substantial majority of the tangible and intangible assets of the Company. The obligations of the Company under the U.S. Term Loan Facility and the Revolving Line of Credit Facility are guaranteed by certain of its domestic subsidiaries, but not by any of the Company's foreign subsidiaries. The obligations of the EMEA Borrower under the EMEA Term Loan Facility are guaranteed by the Company and certain of its domestic and foreign subsidiaries. None of the foreign subsidiary guarantors of the EMEA Term Loan Facility provide cross-guarantees of the guarantees of the EMEA Term Loan Facility provided by the Company and its domestic subsidiaries.

The 2018 Credit Agreement does not contain a financial covenant for the US Term Loan Facility or the EMEA Term Loan Facility, but it does include a maximum Consolidated Net Secured Leverage Ratio applicable to the Revolving Line of Credit Facility in the event that utilization exceeds 30% of the revolving loan facility commitment. At March 31, 2020, the Company's utilization (as defined) of the Revolving Line of Credit Facility commitment was approximately 26%. On August 8, 2019, the Company entered into Amendment No. 1 to the 2018 Credit Agreement, which amends the Consolidated Net Secured Leverage Ratio applicable to the Revolving Line of Credit Facility for each fiscal quarter ending September 30, 2019 through December 31, 2020. If triggered, the covenant, as amended, requires the Company to maintain a Consolidated Net Secured Leverage Ratio, on a Pro Forma Basis, below the maximum ratio specified as follows:

17

| Fiscal Quarter Ending | Maximum Ratio |
|---|---|
| March 31, 2020 | 6.50:1 |
| June 30, 2020 | 6.50:1 |
| September 30, 2020 | 6.25:1 |
| December 31, 2020 | 6.25:1 |
| March 31, 2021 | 5.50:1 |
| June 30, 2021 | 5.00:1 |
| September 30, 2021 | 5.00:1 |
| December 31, 2021 | 4.50:1 |
| March 31, 2022 | 4.50:1 |
| June 30, 2022 and thereafter | 4.25:1 |

While the financial covenant was not required to be measured as a result of the utilization level of the Revolving Line of Credit Facility as of March 31, 2020, the Company's Consolidated Net Secured Leverage Ratio, as defined in the 2018 Credit Agreement, was approximately 6.53:1.

In addition, Amendment No. 1 to the 2018 Credit Agreement added certain restrictions, which remain in place from the effective date of the Amendment No. 1 until the delivery of the compliance certificate for the quarter ending March 31, 2021, demonstrating compliance with the Consolidated Net Secured Leverage Ratio for that quarter, including without limitation the following: the Company and its restricted subsidiaries (as defined in the 2018 Credit Agreement) may not make certain dividends, distributions and other restricted payments (as defined in the 2018 Credit Agreement), including that the Company may not pay dividends; the Company and its restricted subsidiaries may not designate any subsidiary an "Unrestricted Subsidiary" (which would effectively remove such subsidiary from the restrictions of the 2018 Credit Agreement); the Company and its restricted subsidiaries may not make "permitted acquisitions" (as defined in the 2018 Credit Agreement) or certain other investments, unless the Company and its restricted subsidiaries have liquidity (i.e., unrestricted cash and cash equivalents and availability under the revolving credit facility under the 2018 Credit Agreement) of at least $250 million (other than the acquisition of KPN Eurorings B.V., a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands with respect to which this liquidity requirement is not applicable); and the amount of incremental borrowings under the 2018 Credit Agreement that the Company and its subsidiaries may request when the Consolidated Net Secured Leverage Ratio is above 4.40 to 1.00 the Company and its subsidiaries was reduced to $300 million minus amounts previously requested (which amount is $50 million requested under the Incremental Agreement described above).

*Interest Rate Swaps*

In April and May 2018, the Company entered into the following interest rate swap arrangements to partially mitigate the variability of cash flows due to changes in the Eurodollar rate, specifically related to interest payments on our term loans under the 2018 Credit Agreement:

| Trade date | | April 6, 2018 | | May 17, 2018 | | May 17, 2018 | | May 17, 2018 |
|---|---|---|---|---|---|---|---|---|
| Notional amount (in millions) | $ | 500.0 | $ | 200.0 | $ | 300.0 | € | 317.0 |
| Term (years) | | 5 | | 7 | | 3 | | 7 |
| Effective date | | 4/30/2018 | | 6/29/2018 | | 6/29/2018 | | 6/29/2018 |
| Termination date | | 4/30/2023 | | 5/31/2025 | | 6/30/2021 | | 5/31/2025 |
| Fixed rate | | 2.6430 % | | 3.0370 % | | 2.8235 % | | 0.8900 % |
| Floating rate | | 1-month LIBOR | | 1-month LIBOR | | 1-month LIBOR | | 1-month EURIBOR |

The interest rate swaps do not qualify for hedge accounting.

18

The fair value of the interest rate swaps at March 31, 2020 and December 31, 2019 was as follows (in millions):

| | | | | Fair Value | | | |
|---|---|---|---|---|---|---|---|
| | | | | March 31, 2020 | | December 31, 2019 | |
| Derivative Instrument | Aggregate Notional Amount | Effective Date | Maturity Date | Asset Derivatives | Liability Derivatives | Asset Derivatives | Liability Derivatives |
| Interest rate swap | $ 500.0 | 4/30/2018 | 4/30/2023 | $ — | $ (36.1) | $ — | $ (18.2) |
| Interest rate swap | $ 200.0 | 6/29/2018 | 5/31/2025 | — | (27.1) | — | (15.3) |
| Interest rate swap | $ 300.0 | 6/29/2018 | 6/30/2021 | — | (9.5) | — | (5.8) |
| Interest rate swap | € 317.0 | 6/29/2018 | 5/31/2025 | — | (14.0) | — | (14.2) |
| | | | | $ — | $ (86.7) | $ — | $ (53.5) |

The Company records the fair value of interest rate swaps in its condensed consolidated balance sheets within prepaid expenses and other current assets when in an asset position and within accrued expenses and other current liabilities when in a liability position. Due to the change in fair value of its interest rate swaps, the Company recognized a loss of $33.5 million and $15.3 million in other expense, net for the three months ended March 31, 2020 and 2019, respectively.

*7.875% Senior Unsecured Notes*

During 2016 and 2017, the Company completed three private offerings for $575.0 million aggregate principal amount of its 7.875% senior unsecured notes due in 2024 (collectively the "7.875% Senior Unsecured Notes"). Each offering was treated as a single series of debt securities. The 7.875% Senior Unsecured Notes have identical terms other than the issuance date and offering price. The 7.875% Senior Unsecured Notes were issued at a combined premium of $16.5 million.

The 7.875% Senior Unsecured Notes are guaranteed by the Company's domestic subsidiaries that guarantee the Company's obligations under the U.S. Term Loan Facility and the Revolving Line of Credit Facility, but not by any of the Company's foreign subsidiaries. We are in compliance with the subsidiary guarantee requirements for the 7.875% Senior Unsecured Notes.

*Other Secured Loans*

In connection with the Interoute acquisition in May 2018, the Company acquired other loans secured by certain network assets. The balance of other secured loans at March 31, 2020 and December 31, 2019 was $2.1 million and $4.3 million, respectively.

*Effective Interest Rate*

The effective interest rate on the Company's long-term debt at March 31, 2020 and December 31, 2019 was 5.2% and 5.2%, respectively. The effective interest rate considers the impact of the interest rate swaps.

*Long-term Debt Contractual Maturities*

The aggregate contractual maturities of long-term debt (excluding unamortized debt issuance costs and unamortized original issuance discounts and premiums) were as follows as of March 31, 2020 (amounts in millions):

| | Total Debt |
|---|---|
| 2020 remaining | $ 22.9 |
| 2021 | 27.3 |
| 2022 | 27.5 |
| 2023 | 92.5 |
| 2024 | 602.4 |
| 2025 and beyond | 2,560.0 |
| | $ 3,332.6 |

19

*Debt Issuance Costs and Original Issuance Discounts and Premiums*

The following table summarizes the debt issuance costs activity for the three months ended March 31, 2020 (amounts in millions):

| | US Term Loan | EMEA Term Loan | 7.875% Senior Unsecured Notes | Revolving Line of Credit | Total |
|---|---|---|---|---|---|
| Balance, December 31, 2019 | $ (9.9) | $ (2.7) | $ (12.3) | $ (3.1) | $ (28.0) |
| Debt issuance costs incurred | — | (2.3) | — | — | (2.3) |
| Amortization | 0.4 | 0.3 | 0.5 | 0.2 | 1.4 |
| Loss on debt extinguishment | — | 2.3 | — | — | 2.3 |
| Balance, March 31, 2020 | $ (9.5) | $ (2.4) | $ (11.8) | $ (2.9) | $ (26.6) |

Debt issuance costs are presented in the condensed consolidated balance sheets as a reduction to long-term debt. Interest expense associated with the amortization of debt issuance costs was $1.4 million and $1.2 million for the three months ended March 31, 2020 and 2019, respectively.

The following table summarizes the original issuance (discount) and premium activity for the three months ended March 31, 2020 (amounts in millions):

| | US Term Loan | EMEA Term Loan | 7.875% Senior Unsecured Notes | Total |
|---|---|---|---|---|
| Balance, December 31, 2019 | $ (34.2) | $ (18.7) | $ 12.1 | $ (40.8) |
| New Original Issuance Discount | — | (5.6) | — | (5.6) |
| Fees paid to lenders | — | (3.4) | — | (3.4) |
| Amortization | 1.4 | 0.9 | (0.5) | 1.8 |
| Balance, March 31, 2020 | $ (32.8) | $ (26.8) | $ 11.6 | $ (48.0) |

Original issuance discounts and premiums are presented in the condensed consolidated balance sheets as a reduction to long-term debt. Amortization of original issuance discounts and premiums was $1.8 million and $1.9 million for the three months ended March 31, 2020 and 2019, respectively.

## NOTE 8 — FAIR VALUE MEASUREMENTS

The Company measures certain financial assets and liabilities at fair value on a recurring basis. For additional information on the Company's fair value policies refer to Note 2 - Significant Accounting Policies to the consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019.

*Recurring Fair Value Measurements*

The following table presents the Company's financial assets and liabilities that are required to be measured and recognized at fair value on a recurring basis classified under the appropriate level of the fair value hierarchy as of March 31, 2020 and December 31, 2019. There were no transfers between Level 1 and Level 2 during the three months ended March 31, 2020 and 2019.

20

**A080**

|  | | **March 31, 2020** | | |
|  | Total | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Interest rate swap agreements | $ — | $ — | $ — | $ — |
| | | | | |
| **Liabilities:** | | | | |
| Interest rate swap agreements | $ (86.7) | $ — | $ (86.7) | $ — |

|  | | **December 31, 2019** | | |
|  | Total | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Interest rate swap agreements | $ — | $ — | $ — | $ — |
| | | | | |
| **Liabilities:** | | | | |
| Interest rate swap agreements | $ (53.5) | $ — | $ (53.5) | $ — |

*Non-recurring Fair Value Measurements*

In addition to assets and liabilities that are recorded at fair value on a recurring basis, the Company records assets and liabilities at fair value on a non-recurring basis as required by GAAP.

Assets measured at fair value on a non-recurring basis include goodwill, tangible assets, and intangible assets. Such assets are reviewed quarterly for impairment indicators. If a triggering event has occurred, the assets are re-measured when the estimated fair value of the corresponding asset group is less than the carrying value. The fair value measurements, in such instances, are based on significant unobservable inputs (Level 3).

*Other Fair Value Measurements*

As of March 31, 2020 and December 31, 2019, the carrying amounts reflected in the accompanying consolidated balance sheets for cash and cash equivalents, accounts receivable, accounts payable, accrued expenses and other current liabilities approximated fair value due to the short-term nature of these instruments.

The table below presents the fair values for the Company's long-term debt as well as the input level used to determine these fair values as of March 31, 2020 and December 31, 2019. The carrying amounts exclude any debt issuance costs or original issuance discount (amounts in millions):

21

**A081**

| | Total Carrying Value in Consolidated Balance Sheet | | Fair Value Measurement Using Unadjusted Quoted Prices in Active Markets for Identical Assets or Liabilities [1] (Level 1) | |
|---|---|---|---|---|
| | **March 31, 2020** | **December 31, 2019** | **March 31, 2020** | **December 31, 2019** |
| *Liabilities not recorded at fair value in the Financial Statements:* | | | | |
| Long-term debt, including the current portion: | | | | |
| US Term loan due 2025 | $ 1,739.0 | $ 1,743.5 | $ 1,208.6 | $ 1,464.5 |
| EMEA Term loan due 2025 | 951.5 | 828.8 | 777.9 | 787.9 |
| 7.875% Senior unsecured notes due 2024 | 575.0 | 575.0 | 370.9 | 435.6 |
| Revolving line of credit due 2023 | 65.0 | 140.0 | 65.0 | 140.0 |
| Other secured loans | 2.1 | 4.3 | 2.1 | 4.3 |
| Total long-term debt, including current portion | $ 3,332.6 | $ 3,291.6 | $ 2,424.5 | $ 2,832.3 |

[1] Fair value based on the bid quoted price, except for the revolving line of credit and other secured loans for which carrying value approximates fair value.

## NOTE 9 — SHARE-BASED COMPENSATION

### *Share-Based Compensation Plan*

The Company grants share-based equity awards, including stock options and restricted stock, under the GTT Communications, Inc. 2018 Stock Option and Incentive Plan (the "GTT Stock Plan"). The GTT Stock Plan is limited to an aggregate 14,250,000 shares of which 12,622,117 have been issued and are outstanding as of March 31, 2020.

The GTT Stock Plan permits the granting of time-based stock options, time-based restricted stock, and performance-based restricted stock to employees and consultants of the Company, and non-employee directors of the Company.

Time-based options granted under the GTT Stock Plan have an exercise price of at least 100% of the fair market value of the underlying stock on the grant date and expire no later than 10 years from the grant date. The Company uses the Black-Scholes option-pricing model to determine the fair value of its stock option awards at the time of grant. The stock options generally vest over four years with 25% of the options becoming exercisable one year from the date of grant and the remaining vesting annually or quarterly over the following three years.

Time-based restricted stock granted under the GTT Stock Plan is valued at the share price of our common stock as reported on the NYSE on the date of grant. Time-based restricted stock generally vests over four years with 25% of the shares becoming unrestricted one year from the date of grant and the remaining vesting 75% annually or quarterly over the following three years.

Performance-based restricted stock is granted under the GTT Stock Plan subject to the achievement of certain performance measures. Once achievement of these performance measures is considered probable, the Company starts to expense the fair value of the grant over the vesting period. The performance-based restricted stock is valued at the share price of our common stock as reported on the NYSE on the date of grant. The performance grant vests quarterly over the vesting period once achievement of the performance measure has been met and approved by the Compensation Committee, typically one to two years.

The Compensation Committee of the Board of Directors, as administrator of the GTT Stock Plan, has the discretion to authorize a different vesting schedule for any awards.

In 2019, the Company implemented a sell-to-cover program for employees who elect to sell shares to cover any withholding taxes due upon vesting. Previously the Company netted shares upon vesting and paid the withholding taxes directly.

### *Share-Based Compensation Expense*

The following tables summarize the share-based compensation expense recognized as a component of selling, general and administrative expenses in the condensed consolidated statements of operations (amounts in millions):

22

**A082**

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2020** | **2019** |
| Stock options | $ — | $ 0.2 |
| Restricted stock | 8.2 | 8.3 |
| ESPP | 0.1 | 0.2 |
| Total | $ 8.3 | $ 8.7 |

As of March 31, 2020, there was $50.1 million of total unrecognized compensation cost related to unvested share-based compensation awards. The following table summarizes the unrecognized compensation cost and the weighted average period over which the cost is expected to be amortized (amounts in millions):

|  | March 31, 2020 | |
|---|---|---|
|  | **Unrecognized Compensation Cost** | **Weighted Average Remaining Period to be Recognized (Years)** |
| Time-based stock options | $ — | 0.25 |
| Time-based restricted stock | 48.1 | 2.64 |
| Performance-based restricted stock [(1)] | 2.0 | 0.25 |
| Total | $ 50.1 | 2.54 |

[(1)] Excludes $8.1 million, $25.1 million, and $12.1 million of unrecognized compensation cost related to the 2020 Performance Awards, 2018 Performance Awards, and 2017 Performance Awards, respectively, where achievement of the performance criteria was not probable as of March 31, 2020.

The following table summarizes the restricted stock granted during the three months ended March 31, 2020 and 2019 (amounts in millions, except shares data):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2020** | **2019** |
| Time-based restricted stock granted | 1,183,525 | 598,141 |
| Fair value of time-based restricted stock granted | $ 14.6 | $ 19.3 |
|  |  |  |
| Performance-based restricted stock granted | 651,350 | 24,000 |
| Fair value of performance-based restricted stock granted | $ 8.1 | $ 0.8 |

No stock options were issued in any period presented.

*Performance-based Restricted Stock*

The Company granted $17.4 million of restricted stock during 2015 and 2017 contingent upon the achievement of certain performance criteria (the "2015 Performance Awards"). The fair value of the 2015 Performance Awards was calculated using the value of GTT common stock on the respective grant dates. Upon announcement of the Hibernia acquisition in November 2016, the achievement of two of the four performance criteria became probable and the Company started recognizing share-based compensation expense for these grants. Expense recognition concluded during the first quarter of 2019. Additionally, upon announcement of the Global Capacity acquisition in June 2017, the achievement of the final two performance criteria became probable and the Company started recognizing share-based compensation expense for these grants. The Company did not recognize share-based compensation expense related to the 2015 Performance awards during the three months ended March 31, 2020 as the awards were fully vested. The Company recognized share-based compensation expense related to the 2015 Performance Awards of $1.1 million for the three months ended March 31, 2019. As of December 31, 2019, the 2015 Performance Awards were fully vested, and accordingly, the Company recognized no share-based compensation expense for the three months ended March 31, 2020.

The Company granted $32.6 million of restricted stock during 2017 and 2018 contingent upon the achievement of certain performance criteria (the "2017 Performance Awards"). The fair value of the 2017 Performance Awards was calculated using the value of GTT common stock on the grant date. Upon the closing of the Interoute acquisition in May 2018, the achievement of two

23

**A083**

of the four performance criteria became probable and the Company started recognizing share-based compensation expense for these grants. Expense recognition is expected to continue through the second quarter of 2020. The Company recognized share-based compensation expense related to the 2017 Performance Awards of $1.0 million and $1.8 million for the three months ended March 31, 2020 and 2019, respectively. As of March 31, 2020, $5.4 million of unvested 2017 Performance Awards had been forfeited due to departures and remaining unrecognized compensation cost related to the unvested 2017 Performance Awards was $13.8 million, inclusive of unrecognized compensation cost where achievement of the performance criteria was not probable as of March 31, 2020.

The Company granted $31.2 million of restricted stock during 2018 and 2019 contingent upon the achievement of certain performance criteria (the "2018 Performance Awards"). The fair value of the 2018 Performance Awards was calculated using the value of GTT common stock on the grant date. As of March 31, 2020, achievement of the performance criteria was not probable. Accordingly, the Company recognized no share-based compensation expense for the three months ended March 31, 2020. As of March 31, 2020, $6.1 million of unvested 2018 Performance Awards had been forfeited due to departures and remaining unrecognized compensation cost related to the unvested 2018 Performance Awards was $25.1 million.

The Company granted $8.1 million of restricted stock during the three months ended March 31, 2020 contingent upon the achievement of certain performance criteria ("the 2020 Performance Awards"). The fair value of the 2020 Performance Awards was calculated using the value of GTT common stock on the grant date. As of March 31, 2020, achievement of the performance criteria was not probable. Accordingly, the Company recognized no share-based compensation expense for the three months ended March 31, 2020.

*Employee Stock Purchase Plan*

The Company has an Employee Stock Purchase Plan ("ESPP") that permits eligible employees to purchase common stock through payroll deductions at the lesser of the opening stock price or 85% of the closing stock price of the common stock during each of the three-month offering periods. The Company expenses the discount offered as additional share-based compensation expense. The offering periods generally commence on the first day and the last day of each quarter. At March 31, 2020, 241,902 shares were available for issuance under the ESPP.

## NOTE 10 — LOSS PER SHARE

Basic loss per share is computed by dividing net loss available to common stockholders by the weighted average number of common shares outstanding. Diluted loss per share reflects, in periods with earnings and in which it has a dilutive effect, the effect of common shares issuable upon exercise of stock options and warrants.

The table below details the calculations of loss per share (in millions, except for share and per share amounts):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Numerator for basic and diluted EPS – net loss available to common stockholders | $ (83.3) | $ (27.3) |
| Denominator for basic EPS – weighted average shares | 57,259,699 | 55,839,212 |
| Effect of dilutive securities | — | — |
| Denominator for diluted EPS – weighted average shares | 57,259,699 | 55,839,212 |
| | | |
| Loss per share: | | |
| Basic | $ (1.45) | $ (0.49) |
| Diluted | $ (1.45) | $ (0.49) |

All outstanding stock options were anti-dilutive as of March 31, 2020 and 2019 due to the net loss incurred during the periods. There were approximately 376,960 and 474,880 outstanding stock options as of March 31, 2020 and 2019, respectively.

## NOTE 11 — INCOME TAXES

The Company's provision for income taxes is determined using an estimate of its annual effective tax rate, adjusted for the effect of discrete items arising in the quarter. Each quarter the Company updates its estimate of the annual effective tax rate.

The quarterly tax provision and the quarterly estimate of the Company's annual effective tax rate is subject to significant variation due to several factors, including variability in accurately predicting pre-tax and taxable income (loss) and the mix of jurisdictions to which they relate, effects of acquisitions and integrations, audit-related developments, changes in the Company's stock price, foreign currency gains (losses), and tax law developments. Additionally, the Company's effective tax rate may be more or less volatile based on the amount of pre-tax income or loss and impact of discrete items.

The Company recorded a (benefit from) provision for income taxes of $(1.9) million and $1.8 million for the three months ended March 31, 2020 and 2019, respectively.

The Company assesses the available positive and negative evidence to estimate whether sufficient future taxable income will be generated to permit use of the Company's existing deferred tax assets. A significant piece of objective negative evidence identified during the Company's evaluation was the cumulative loss incurred over the three year period ended December 31, 2019. Such objective evidence limits the ability to consider other subjective evidence, such as the Company's forecasts of future taxable income and tax planning strategies. On the basis of this evaluation as of March 31, 2020 and December 31, 2019, the Company recognized a valuation allowance against its net U.S. deferred tax assets under the criteria of ASC 740 of $100.7 million and $100.7 million, respectively, and the Company recognized a valuation allowance against its net foreign deferred tax assets under the criteria of ASC 740 of $111.3 million and $110.6 million, respectively. The amount of U.S. deferred tax asset considered realizable, has been recorded to recognize only the portion of the deferred tax asset that is more likely than not to be realized. The amount of the deferred tax asset considered realizable, however, could be adjusted if objective negative evidence in the form of cumulative losses is no longer present and additional weight is given to subjective evidence such as forecasted taxable income. The Company will continue to evaluate the need to record valuation allowances against deferred tax assets and will make adjustments in accordance with ASC 740.

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") was signed into law in response to the COVID-19 pandemic. The CARES Act provides numerous tax provisions and stimulus measures, including temporary changes regarding the prior and future utilization of net operating losses, temporary changes to the prior and future limitations on interest deductions, and technical corrections from prior tax legislation for tax depreciation of certain qualified improvement property. The Company has evaluated the provisions of the CARES Act relating to income taxes which will result in adjustments to certain deferred tax assets and liabilities. Due to the Company's U.S. valuation allowance, the Company does not expect the provisions of the CARES Act to have a material impact on its consolidated financial statements.

## NOTE 12 — SEVERANCE, RESTRUCTURING, AND OTHER EXIT COSTS

The Company incurred severance, restructuring and other exit costs associated with 2019 and 2018 acquisitions and in connection with the termination of certain facility leases. These costs include employee severance costs, termination costs associated with facility leases and network agreements, and other exit costs related to the transactions. The Company records the current portion of severance, restructuring and other exit costs as a component of accrued expenses and other current liabilities and the long-term portion of severance, restructuring and other exit costs as a component of other long-term liabilities.

The exit costs recorded and paid are summarized as follows for the three months ended March 31, 2020 (amounts in millions):

| | Balance, December 31, 2019 | | Charges | | Payments | | Balance, March 31, 2020 |
|---|---|---|---|---|---|---|---|
| Employee termination benefits | $ | 2.7 | $ | 0.1 | $ | (0.6) | $ | 2.2 |
| Lease terminations | | 7.6 | | 2.0 | | (0.8) | | 8.8 |
| Other contract terminations | | 3.6 | | — | | (0.4) | | 3.2 |
| | $ | 13.9 | $ | 2.1 | $ | (1.8) | $ | 14.2 |

During the three months ended March 31, 2019, the Company incurred severance, restructuring and other exit costs of $2.8 million and made payments of $8.4 million.

## NOTE 13 — LEASES

The Company enters into contracts to lease real estate, equipment, and vehicles, and has identified embedded leases within its colocation, dark fiber, and duct supplier contracts. The lease contracts have remaining lease terms up to 31 years and certain leases include options to extend the lease term. The Company is not party to any lease contracts with related parties. The Company's lease agreements do not contain any residual value guarantees or restrictive covenants.

The Company's lease expense is split between cost of telecommunications services and selling, general and administrative expenses in the condensed consolidated statement of operations based on the use of the asset for which lease expense is being paid. The components of lease expense for the period were as follows (amounts in millions):

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| Operating lease expense | $ | 23.8 | $ | 28.6 |
| Finance lease expense: | | | | |
| Amortization of right of use assets | | 0.5 | | 0.6 |
| Interest on lease liabilities | | 1.3 | | 1.1 |
| Total finance lease expense | | 1.8 | | 1.7 |
| Short-term lease expense | | 5.0 | | 6.2 |
| Variable lease expense | | 5.6 | | 7.7 |
| Total lease expense | $ | 36.2 | $ | 44.2 |

Supplemental cash flow information related to leases for the period was as follows (amounts in millions):

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| Cash paid for amounts included in the measurement of lease liabilities: | | | | |
| Operating cash flows from operating leases | $ | 21.7 | $ | 34.0 |
| Operating cash flows from finance leases | | 1.3 | | 1.1 |
| Financing cash flows from finance leases | | 2.1 | | 0.6 |
| | | | | |
| Right of use assets obtained in exchange for new operating lease liabilities | | 2.4 | | 8.0 |
| Right of use assets obtained in exchange for new finance lease liabilities | | 1.0 | | — |

Supplemental balance sheet information related to leases for the period was as follows:

| | March 31, 2020 |
|---|---|
| Weighted average remaining lease term (amounts in years) | |
| Operating leases | 6.25 |
| Finance leases | 22.82 |
| | |
| Weighted average discount rate | |
| Operating leases | 5.6 % |
| Finance leases | 13.0 % |

Maturities of lease liabilities were as follows (amounts in millions):

26

**A086**

| | Operating Leases | | Finance Leases | |
|---|---|---|---|---|
| 2020 remaining | $ | 68.0 | $ | 5.1 |
| 2021 | | 81.5 | | 5.1 |
| 2022 | | 63.5 | | 5.2 |
| 2023 | | 48.0 | | 5.2 |
| 2024 | | 34.3 | | 5.3 |
| 2025 and beyond | | 95.3 | | 111.2 |
| Total lease payments | | 390.6 | | 137.1 |
| Less: Present value discount | | (63.3) | | (95.3) |
| Present value of lease obligations | $ | 327.3 | $ | 41.8 |

## NOTE 14 — COMMITMENTS AND CONTINGENCIES

Estimated annual commitments under contractual obligations, excluding those related to long-term debt and operating and finance leases, are as follows at March 31, 2020 (amounts in millions):

| | Network Supply | | Other | |
|---|---|---|---|---|
| 2020 remaining | $ | 369.1 | $ | 12.1 |
| 2021 | | 367.1 | | 6.6 |
| 2022 | | 272.5 | | 3.7 |
| 2023 | | 85.0 | | 2.8 |
| 2024 | | 26.6 | | 2.4 |
| 2025 and beyond | | 65.6 | | 7.2 |
| | $ | 1,185.9 | $ | 34.8 |

Refer to Note 7 - Debt for the aggregate contractual maturities of long-term debt (excluding unamortized debt issuance costs and unamortized original issuance discounts and premiums) at March 31, 2020 and refer to Note 13 - Leases for the aggregate contractual maturities of operating leases and finance leases at March 31, 2020.

*Network Supply Agreements*

As of March 31, 2020, the Company had purchase obligations of $1,185.9 million associated with the telecommunications services that the Company has contracted to purchase from its suppliers that are not accounted for as operating leases. The Company's supplier agreements fall into two key categories, the Company's core IP backbone and client specific locations (also referred to as "last mile" locations). Supplier agreements associated with the Company's core IP backbone are typically contracted on a one year term and do not relate to any specific underlying client commitments. The short-term duration allows the Company to take advantage of favorable pricing trends.

Supplier agreements associated with the Company's client specific locations, which represent the substantial majority of the Company's network spending, are typically contracted so the terms and conditions in both the vendor and client contracts are substantially the same in terms of duration and capacity. The back-to-back nature of the Company's contracts means that its network supplier obligations are generally mirrored by its clients' commitments to purchase the services associated with those obligations.

*Legal Proceedings*

From time to time, the Company is a party to legal proceedings arising in the normal course of its business. Except as disclosed below, the Company does not believe that it is a party to any current or pending legal action that could reasonably be expected to have a material adverse effect on its financial condition or results of operations and cash flow.

On July 30, 2019, a purported class action complaint was filed against the Company and certain of its current and former officers and directors in the U.S District Court for the Eastern District of Virginia (Case No. 1:19-cv-00982) on behalf of certain GTT stockholders. The complaint alleges that defendants made false or misleading statements and omissions of purportedly material

27

fact, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, in connection with disclosures relating to GTT's acquisition and integration of Interoute Communications Holdings S.A. The complaint seeks unspecified damages. The Company believes that the claims in this lawsuit are without merit and intends to defend against them vigorously. At this time, no assessment can be made as to its likely outcome or whether the outcome will be material to the Company.

### ITEM 2. *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

*The following discussion and analysis of our financial condition and results of operations should be read together with our condensed consolidated financial statements and the related notes and the other financial information included elsewhere in this Quarterly Report on Form 10-Q, as well as the consolidated financial statements and Management's Discussion and Analysis ("MD&A") in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019. In addition to historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates and beliefs.*

*We have attempted to identify these forward-looking statements by the use of words such as "may," "will," "seek," "expects," "anticipates," "believes," "targets," "intends," "should," "estimates," "could," "continue," "assume," "projects," "plans" or similar expressions. Our actual results, performance or achievements could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to:*

- *We are subject to risks associated with the actions of network providers and a concentrated number of vendors and clients.*
- *We could be subject to cyber-attacks and other security breaches.*
- *Our network could suffer serious disruption if certain locations experience damage or as we add features and update our network.*
- *We are subject to risks associated with purchase commitments to vendors for longer terms or in excess of the volumes committed by our underlying clients, or sales commitments to clients that extend beyond our commitments from our underlying suppliers.*
- *We may be unable to establish and maintain peering relationships with other providers or agreements with carrier neutral data center operators.*
- *Our business, results of operation and financial condition are subject to the impacts of the COVID-19 pandemic and related market and economic conditions.*
- *We may be affected by information systems that do not perform as expected or by consolidation, competition, regulation, or a downturn in our industry.*
- *We may be liable for the material that content providers distribute over our network.*
- *We have generated net losses historically and may continue to do so.*
- *We may fail to successfully integrate any future acquisitions or to efficiently manage our growth.*
- *We may be unable to retain or hire key employees.*
- *We are subject to risks relating to the international operations of our business.*
- *We may be affected by future increased levels of taxation.*
- *We have substantial indebtedness, which could prevent us from fulfilling our obligations under our debt agreements or subject us to interest rate risk.*

*For a more complete description of the risks noted above and other risks that could cause our actual results to materially differ from our current expectations, please see Part I, Item 1A "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019, which we refer to as our Annual Report and Part II, Item 1A "Risk Factors" in this Quarterly Report on Form 10-Q. We assume no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, unless required by law.*

*Unless otherwise indicated or unless the context requires otherwise, all references in this report to "we," "us," "our," "GTT," or the "Company" mean GTT Communications, Inc. together with its consolidated subsidiaries.*

#### *Executive Summary*

GTT Communications, Inc. serves large enterprise and carrier clients with complex national and global networking needs, and differentiates itself from the competition by providing an outstanding service experience built on our core values of simplicity, speed and agility. We operate a Tier 1 internet network ranked among the largest in the industry, and own a fiber network that includes an expansive pan-European footprint and subsea cables. Our global network includes over 600 unique points of presence (PoPs) spanning six continents, and we provide services in more than 140 countries. Our comprehensive portfolio of cloud networking services includes:

- Wide area networking, including software-defined wide area networking ("SD-WAN"), multiprotocol label switching ("MPLS"), and virtual private LAN service ("VPLS");
- Internet, including IP transit, dedicated internet access, and broadband internet;
- Transport, including dedicated Ethernet and video transport;
- Infrastructure, including wavelength, colocation, and dark fiber;
- Unified Communication ("UC"), including Session Initiation Protocol ("SIP") trunking, cloud unified communication service, and traditional analog voice (POTS);
- Managed network services, including managed equipment and managed security; and
- Advanced solutions, including premium security services, hybrid cloud services, database and application management.

*Impact of the COVID-19 Pandemic*

In March 2020, the World Health Organization declared the outbreak of COVID-19 to be a pandemic, which continues to be spread throughout the U.S. and the world. The impact from the rapidly changing market and economic conditions due to the COVID-19 outbreak is uncertain. It has disrupted the business of our clients and suppliers, will impact our business and consolidated results of operations and could impact our financial condition in the future. While we have not incurred significant disruptions thus far from the COVID-19 outbreak, we are unable to accurately predict the full impact that COVID-19 will have due to numerous uncertainties, including the severity of the disease, the duration of the outbreak, actions that may be taken by governmental authorities, the impact to the business of our customers and partners and other factors identified in Part II, Item 1A "Risk Factors" in this Form 10-Q. We believe that our financial resources will allow us to manage the impact of COVID-19 on our business operations for the foreseeable future, but we are continuing to actively monitor the situation and are developing plans should we begin to experience material impacts.

During the three months ended March 31, 2020, the pandemic did not have a material impact on our financial results.

With respect to the remainder of 2020, the negative impact COVID-19 may have on the broader global economy and the pace of the economic recovery is unknown. Given the unknown magnitude of the depth and duration of this crisis, we anticipate a more challenging macroeconomic environment in the remainder of the year.

In March 2020, we directed our workforce to work from home and severely limited all international and domestic travel.

Cash from operations could also be affected by various risks and uncertainties, including, but not limited to, the effects of the COVID-19 pandemic and other risks detailed in Part II, Item 1A titled "Risk Factors" of this Quarterly Report on Form 10-Q. However, based on our current revenue outlook, we believe that existing cash balances, together with funds generated from operations and amounts available under our credit facility, will be sufficient to finance our operations and meet our foreseeable cash requirements through at least the next 12 months from the date of this filing.

*Wide Area Networking*

We provide a variety of wide area networking solutions to meet the growing needs of our clients, including SD-WAN, MPLS, and VPLS. Our wide area networking solutions are positioned to provide the highest network quality and value with global reach, offering bandwidth speeds from 10 Mbps to 100 Gbps per port with burstable and aggregate bandwidth capabilities. Our VPLS service provides an any-to-any Layer 2 Virtual Private Network ("VPN") service in a fully meshed configuration with multiple classes of service for prioritization of traffic types. Our MPLS service is an any-to-any Layer 3 IP VPN service with the option of full management in a meshed configuration, providing a private IP network based on the client's routing plan.

SD-WAN is an enterprise networking technology in the stage of accelerated market adoption with projected high growth based on industry forecasts. The software-based network intelligence in SD-WAN enables more efficient delivery of traffic across a mix of access types, accelerates the speed of service deployments, and improves application visibility and performance. GTT's SD-WAN delivers managed global connectivity, enhanced application performance and control, and secure access to cloud-based services and applications. Our service leverages GTT's global, Tier 1 IP network, securely connecting client locations to any destination on the internet or to any cloud service provider. We offer the widest range of access options and use multiple network technologies, allowing us to provide tailored solutions to meet the specific requirements of our clients.

Through GTT's wide area networking services, clients can securely connect to cloud service providers in data centers and exchanges around the world. Our Cloud Connect feature provides private, secure, pre-established connectivity to leading cloud

service providers. Using GTT's global network, clients can connect to any office location in the world and to any application in the cloud.

*Internet*

GTT operates one of the largest Tier 1 global IP networks. Utilizing that platform we offer clients scalable, high-bandwidth global internet connectivity and IP transit with guaranteed availability and packet delivery. Over 60 percent of our clients' IP traffic is delivered on-net, utilizing our Tier 1 global IP network that is ranked among the largest in the industry for the breadth of connections to other autonomous systersm ("AS") numbers.*

Our internet services offer flexible connectivity with ports available at up to 100 Gbps. We also offer a wide range of broadband internet and wireless internet access services. We support a dual stack of IPv4 and IPv6 protocols, enabling the delivery of seamless IPv6 services alongside existing IPv4 services.

*\* Based on CAIDA's ranking of AS which approximately map to internet service providers and organizations (which are a collection of one or more ASes). This ranking is derived from topological data collected by CAIDA's Archipelago Measurement Infrastructure and Border Gateway Protocol (BGP) routing data collected by the Route Views Project and RIPE NCC.*

*Transport*

GTT offers transport services, including dedicated ethernet and video transport.

GTT's ethernet service enables clients to design a network environment best suited to their needs, with point-to-point and point-to-multipoint topology options, and dynamic or fixed routing. GTT's ethernet direct service provides enhanced performance capabilities for clients seeking guaranteed routes and latency Service-Level Agreement ("SLAs") between key data centers and carrier hotels over a service-specific platform.

We offer video transport for clients in the media and entertainment industry, designed to support broadcast quality transmission of live events, sports entertainment, and news. We can manage individual services, multicast distribution, and entire client networks, supporting all video formats required for today's media workflow.

*Infrastructure*

We provide a suite of infrastructure services over our fiber network, enabling the transport of high volume data between data centers, large enterprise office locations, and media hubs. Our service is differentiated based on an expansive pan-European fiber footprint and subsea cable infrastructure, network diversity, and low latency connections between major financial and commercial centers in North America and Europe. Our clients for these services include internet-based technology companies and Over-The-Tops, large banks, and other service providers requiring network infrastructure. All services are available on a protected basis with the ability to specify pre-configured alternate routes to minimize the impact of any network disruption.

GTT's wavelength service is designed to deliver scalable high-performance optical connectivity over a state-of-the-art dense wave division multiplexing platform. We offer low latency services between the major financial centers and exchanges, tailored to meet the requirements of proprietary trading firms for the fastest connections. In particular, GTT's Express transatlantic cable offers industry leading lowest latency between North America and Europe. We also offer dark fiber and duct services across our fiber network.

We offer colocation services in over 100 facilities in Europe and North America. The turnkey service offering includes cabinets, racks, suites, and technical support services, providing clients with efficient and secure access to other carrier networks.

*Unified Communication*

We offer unified communications globally including local voice services in over 55 countries around the world, along with global long-distance and toll-free services. Our Session Initiation Protocol trunking service delivers worldwide Public Switched Telephone Network access to client telephony equipment over an integrated data connection, driving efficiency and productivity organization-wide while allowing clients to retain control of their core voice infrastructure. Our Cloud UC service allows clients to eliminate traditional voice infrastructure with communication services delivered through the cloud, based on a soft client, offering a wide array of features and customization choices for each site and user. In the US, we offer traditional analog voice services for clients with legacy or specialized telephony needs.

*Managed Network*

We offer fully managed network services, including managed equipment and security.

GTT's managed equipment provides a turnkey solution for the end-to-end management of customer premise equipment. This includes the design, procurement, implementation, monitoring, and maintenance of equipment including routers, switches, servers, and Wi-Fi access points.

GTT's managed security is available as a cloud-based or premises-based security service and provides a comprehensive, multi-layered security solution that protects the network while meeting the most stringent security standards. Our unified threat management services include advanced firewall, intrusion detection, anti-virus, web filtering, and anti-spam. We offer a full range of compliancy packages, which include developing, deploying, configuring, and monitoring network and security assets, and providing documentation to comply with audits.

*Advanced Solutions*

The advanced solutions portfolio comprises three areas - (i) advanced security, (ii) hybrid cloud, and (iii) advanced and professional services.

GTT's advanced security portfolio provides premium and standard security services including security consulting, Security Information and Event Management/Security Operations Center event monitoring and response and other advanced security options on a customized basis, as well as firewalling, Distributed Denial-of-Service and other services.

GTT's hybrid cloud service provides cloud and compute infrastructure services underpinned by GTT's cloud networking capabilities. We provide managed hybrid compute capabilities utilizing our own global compute platform, Virtual Data Center, as well as public cloud offerings from Amazon Web Services and Microsoft Azure.

GTT's advanced services portfolio provides a broad array of managed services for our clients including tailored SLAs covering networking, compute, and application infrastructure. These services include consultancy and support for database systems - Oracle, Microsoft SQL, MySQL and others - as well as services further up the application stack.

GTT provides an array of professional services to support our clients and augment the standard portfolio services, providing service, technical, and project management, as well as consultancy for our clients across the globe.

*Client and Network Supplier Contracts*

Our client contracts are most commonly two to three years for the initial term but can range from one to five years or sometimes longer. Following the initial term, these agreements typically provide for automatic renewal for specified periods ranging from one month to one year. Our prices are fixed for the duration of the contract, and we typically bill monthly in advance for such services. If a client terminates its agreement, the terms of our client contracts typically require full recovery of any amounts due for the remainder of the term or, at a minimum, our liability to any underlying suppliers.

Our revenue is composed of recurring revenue and non-recurring revenue. Recurring revenue relates to contracted ongoing service that is generally fixed in price and paid by the client on a monthly basis for the contracted term. For the three months ended March 31, 2020, recurring revenue was approximately 94% of our total revenue. Non-recurring revenue primarily includes installation and equipment charges to clients, one-time termination charges for clients who cancel their services prior to the contract termination date, and usage revenue which represents variable revenue based on whether a client exceeds its committed usage threshold as specified in the contract.

Our network supplier contracts do not have any market related net settlement provisions. We have not entered into, and do not plan to enter into, any supplier contracts which involve financial or derivative instruments. The supplier contracts are entered into solely for the direct purchase of telecommunications capacity, which is resold by us in the normal course of business.

Other than cost of telecommunication services provided, our most significant operating expenses are employment costs. As of March 31, 2020, we had approximately 3,100 full-time equivalent employees. For the three months ended March 31, 2020, the total employee cash compensation and benefits represented approximately 14% of total revenue.

*Recent Developments Affecting Our Results*

31

*Business Acquisitions*

Since our formation, we have consummated a number of transactions accounted for as business combinations which were executed as part of our strategy of expanding through acquisitions. These acquisitions, which are in addition to our periodic purchases of client contracts, have allowed us to increase the scale at which we operate which in turn affords us the ability to increase our operating leverage, extend our network, and broaden our client base. The accompanying condensed consolidated financial statements include the operations of the acquired entities from their respective acquisition dates.

There were no acquisitions completed during the three months ended March 31, 2020.

For material acquisitions completed during 2019, 2018, and 2017, refer to Note 3 - Business Acquisitions to the consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019.

*Indebtedness*

As of March 31, 2020 and December 31, 2019, long-term debt was as follows (amounts in millions):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| US Term loan due 2025 | $ 1,739.0 | $ 1,743.5 |
| EMEA Term loan due 2025 | 951.5 | 828.8 |
| 7.875% Senior unsecured notes due 2024 | 575.0 | 575.0 |
| Revolving line of credit due 2023 | 65.0 | 140.0 |
| Other secured loans | 2.1 | 4.3 |
| Total debt obligations | 3,332.6 | 3,291.6 |
| Unamortized debt issuance costs | (26.6) | (28.0) |
| Unamortized original issuance discount, net | (48.0) | (40.8) |
| Carrying value of debt | 3,258.0 | 3,222.8 |
| Less current portion | (29.6) | (30.2) |
| Long-term debt less current portion | $ 3,228.4 | $ 3,192.6 |

On May 31, 2018, the Company entered into a credit agreement (the "2018 Credit Agreement") that provides for (1) a $1,770.0 million term loan B facility (the "US Term Loan Facility"), (2) a €750.0 million term loan B facility (the "EMEA Term Loan Facility"), and (3) a $200.0 million revolving credit facility (the "Revolving Line of Credit Facility") (which includes a $50.0 million letter of credit facility). In addition, we may request incremental term loan commitments and/or incremental revolving loan commitments in an aggregate amount not to exceed the sum of $575.0 million and an unlimited amount that is subject to pro forma compliance with a net secured leverage ratio test. The US Term Loan Facility was issued at an original issuance discount of $8.9 million and the EMEA Term Loan Facility was issued at an original issuance discount of €3.8 million.

On June 5, 2019, we entered into an Incremental Revolving Credit Assumption Agreement ("Incremental Agreement") to the 2018 Credit Agreement. The Incremental Agreement establishes $50.0 million in new revolving credit commitments, bringing the total sum of revolving credit commitments under the 2018 Credit Agreement, as modified by the Incremental Agreement, to $250.0 million. The revolving credit commitments made pursuant to the Incremental Agreement have terms and conditions identical to the existing revolving credit commitments under the 2018 Credit Agreement.

The obligations of the Company under the 2018 Credit Agreement are secured by the substantial majority of the tangible and intangible assets of the Company. The obligations of the Company under the U.S. Term Loan Facility and the Revolving Line of Credit Facility are guaranteed by certain of its domestic subsidiaries, but not by any of the Company's foreign subsidiaries. The obligations of the EMEA Borrower under the EMEA Term Loan Facility are guaranteed by the Company and certain of its domestic and foreign subsidiaries. None of the foreign subsidiary guarantors of the EMEA Term Loan Facility provide cross-guarantees of the guarantees of the EMEA Term Loan Facility provided by the Company and its domestic subsidiaries.

The 2018 Credit Agreement does not contain a financial covenant for the US Term Loan Facility or the EMEA Term Loan Facility, but it does include a maximum Consolidated Net Secured Leverage Ratio applicable to the Revolving Line of Credit Facility in the event that utilization exceeds 30% of the revolving loan facility commitment. At March 31, 2020, our utilization (as

defined) of the Revolving Line of Credit Facility commitment was approximately 26%. On August 8, 2019, we entered into Amendment No. 1 to the 2018 Credit Agreement, which amends the Consolidated Net Secured Leverage Ratio applicable to the Revolving Line of Credit Facility for each fiscal quarter ending September 30, 2019 through December 31, 2020. If triggered, the covenant, as amended, requires us to maintain a Consolidated Net Secured Leverage Ratio, on a Pro Forma Basis, below the maximum ratio specified as follows:

| Fiscal Quarter Ending | Maximum Ratio |
|---|---|
| March 31, 2020 | 6.50:1 |
| June 30, 2020 | 6.50:1 |
| September 30, 2020 | 6.25:1 |
| December 31, 2020 | 6.25:1 |
| March 31, 2021 | 5.50:1 |
| June 30, 2021 | 5.00:1 |
| September 30, 2021 | 5.00:1 |
| December 31, 2021 | 4.50:1 |
| March 31, 2022 | 4.50:1 |
| June 30, 2022 and thereafter | 4.25:1 |

While the financial covenant was not required to be measured as a result of the utilization level of the Revolving Line of Credit Facility as of March 31, 2020, our Consolidated Net Secured Leverage Ratio, as defined in the 2018 Credit Agreement, was 6.53:1.

In addition, Amendment No. 1 to the 2018 Credit Agreement added certain restrictions, which remain in place from the effective date of the Amendment No. 1 until the delivery of the compliance certificate for the quarter ending March 31, 2021, demonstrating compliance with the Consolidated Net Secured Leverage Ratio for that quarter, including without limitation the following: the Company and its restricted subsidiaries (as defined in the 2018 Credit Agreement) may not make certain dividends, distributions and other restricted payments (as defined in the 2018 Credit Agreement), including that the Company may not pay dividends; the Company and its restricted subsidiaries may not designate any subsidiary an "Unrestricted Subsidiary" (which would effectively remove such subsidiary from the restrictions of the 2018 Credit Agreement); the Company and its restricted subsidiaries may not make "permitted acquisitions" (as defined in the 2018 Credit Agreement) or certain other investments, unless the Company and its restricted subsidiaries have liquidity (i.e., unrestricted cash and cash equivalents and availability under the revolving credit facility under the 2018 Credit Agreement) of at least $250 million (other than the acquisition of KPN Eurorings B.V., a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands with respect to which this liquidity requirement is not applicable); and the amount of incremental borrowings under the 2018 Credit Agreement that the Company and its subsidiaries may request when the Consolidated Net Secured Leverage Ratio is above 4.40 to 1.00 the Company and its subsidiaries was reduced to $300 million minus amounts previously requested (which amount is $50 million requested under the Incremental Agreement described above).

On February 28, 2020, the Company entered into an amendment to the 2018 Credit Agreement ("Amendment No. 2"), which established incremental term loan commitments for $140 million of EMEA term loans (the "2020 EMEA Term Loan Facility"), bringing the total amounts of EMEA term loans outstanding under the 2018 Credit Agreement, as modified by Amendment No. 2, to €750 million in Euro-denominated loans and $140 million in US Dollar-denominated loans. The EMEA term loans under the 2020 EMEA Term Loan Facility were incurred with an original issue discount of $5.6 million.

The 2020 EMEA Term Loan Facility has terms substantially identical to the existing EMEA Term Loan Facility, except that: (1) each quarterly amortization payment on the 2020 EMEA Term Loan Facility will be $350,000; (2) the EMEA Term Loan Facility has a prepayment penalty of 2.0% for certain mandatory and voluntary prepayments occurring on or prior to the one year anniversary of the effective date of the EMEA Term Loan Facility and 1.0% for certain mandatory and voluntary prepayments occurring following the one year anniversary of the effective date of the EMEA Term Loan Facility and until the second year anniversary thereof; (3) Amendment No. 2 added, for the benefit of the lenders under the 2020 EMEA Term Loan Facility, the same covenant restrictions contained in Amendment No. 1, except that (a) the amount of secured debt that can be incurred on a pari passu basis with the 2020 EMEA Term Loan Facility and certain types of debt incurred by non-credit parties is limited to $50 million in the aggregate and (b) certain excess asset sale proceeds will be required to prepay outstanding EMEA term loans or reinvest in long-term assets useful in the business within 30 days following receipt of such proceeds, which covenant restrictions will remain in place for so long as the existing Revolving Line of Credit Facility and the 2020 EMEA Term Loan Facility remain

in effect; and (4) the applicable margin for the 2020 EMEA Term Loan Facility is (a) 3.25% for Base Rate Loans and 4.25% for Eurocurrency Loans for the first two years following the effective date of the 2020 EMEA Term Loan Facility and (b) 3.75% for Base Rate Loans and 4.75% for Eurocurrency Loans on and following the second anniversary of the effective date of the 2020 EMEA Term Loan Facility.

The proceeds of the 2020 EMEA Term Loan Facility were used to repay amounts outstanding under the Revolving Line of Credit Facility and for general corporate purposes.

*Critical Accounting Policies and Estimates*

Our consolidated financial statements have been prepared in accordance with GAAP. For information regarding our critical accounting policies and estimates, please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates" contained in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and Note 2 - Significant Accounting Policies to our consolidated financial statements contained therein. There have been no material changes to the critical accounting policies previously disclosed in that report, except as described in Note 1 - Organization and Business to our condensed consolidated financial statements contained herein.

**Results of Operations**

*Three months ended March 31, 2020 compared to three months ended March 31, 2019*

*Overview.* The financial information presented in the tables below is comprised of the unaudited condensed consolidated financial information for the three months ended March 31, 2020 and 2019 (amounts in millions):

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | **2019** | **$ Variance** | **% Change** |
| | | | | |
| **Revenue:** | | | | |
| Telecommunications services | $    424.7 | $    450.2 | $    (25.5) | (5.7)% |
| | | | | |
| **Operating expenses:** | | | | |
| Cost of telecommunications services | 237.7 | 241.8 | (4.1) | (1.7)% |
| Selling, general and administrative expenses | 108.2 | 104.1 | 4.1 | 3.9 % |
| Severance, restructuring and other exit costs | 2.1 | 2.8 | (0.7) | (25.0)% |
| Depreciation and amortization | 67.5 | 62.8 | 4.7 | 7.5 % |
| Total operating expenses | 415.5 | 411.5 | 4.0 | 1.0 % |
| Operating income | 9.2 | 38.7 | (29.5) | (76.2)% |
| | | | | |
| **Other expenses:** | | | | |
| Interest expense, net | (48.8) | (48.2) | (0.6) | 1.2 % |
| Loss on debt extinguishment | (2.3) | — | (2.3) | * |
| Other expenses, net | (43.3) | (16.0) | (27.3) | 170.6 % |
| Total other expenses | (94.4) | (64.2) | (30.2) | 47.0 % |
| Loss before income taxes | (85.2) | (25.5) | (59.7) | 234.1 % |
| (Benefit from) provision for income taxes | (1.9) | 1.8 | (3.7) | (205.6)% |
| **Net loss** | $    (83.3) | $    (27.3) | $    (56.0) | 205.1 % |
| * - Not meaningful | | | | |

*Revenue*

Our revenue decreased by $25.5 million, or 5.7%, from $450.2 million for the three months ended March 31, 2019 to $424.7 million for the three months ended March 31, 2020. Recurring revenue was approximately 94% and 93% of total revenue for the three months ended March 31, 2020 and 2019, respectively. The decrease in revenue was primarily due to negative net installs,

34

non-recurring revenue, and the effects of fluctuating foreign currency exchange rates, partially offset by an increase in revenue from the 2019 acquisition of KPN International ("KPN").

On a constant currency basis using the average exchange rates in effect during the three months ended March 31, 2019, revenue would have been higher by $5.8 million for the three months ended March 31, 2020.

***Cost of Telecommunications Services Provided***

Cost of telecommunications services provided decreased by $4.1 million, or 1.7%, from $241.8 million for the three months ended March 31, 2019 to $237.7 million for the three months ended March 31, 2020. Recurring cost of telecommunications services was approximately 92% and 94% of total cost of telecommunications services for the three months ended March 31, 2020 and 2019, respectively. Consistent with our decrease in revenue, the decrease in cost of telecommunications services provided was principally driven by a corresponding reduction in costs related to negative net installs, cost synergies realized in 2020, and the effects of fluctuating foreign currency exchange rates, partially offset by an increase in cost of telecommunications services from KPN.

On a constant currency basis using the average exchange rates in effect during the three months ended March 31, 2019, cost of telecommunications services provided would have been higher by $3.1 million for the three months ended March 31, 2020.

***Operating Expenses***

*Selling, General and Administrative Expenses.* Selling, general and administrative expenses increased by $4.1 million, or 3.9%, from $104.1 million for the three months ended March 31, 2019 to $108.2 million for the three months ended March 31, 2020. The following table summarizes the major categories of selling, general and administrative expenses for the three months ended March 31, 2020 and 2019 (amounts in millions):

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | **2019** | **$ Variance** | **% Change** |
| Employee related compensation (excluding share-based compensation) | $ 59.6 | $ 53.6 | $ 6.0 | 11.2 % |
| Share-based compensation | 8.3 | 8.7 | (0.4) | (4.6)% |
| Transaction and integration expense | 2.2 | 9.2 | (7.0) | (76.1)% |
| Other SG&A[1] | 38.1 | 32.6 | 5.5 | 16.9 % |
| Total | $ 108.2 | $ 104.1 | $ 4.1 | 3.9 % |

[1] Includes bad debt expense, professional fees, marketing costs, facilities, and other general support costs.

Employee related compensation increased primarily due to an increased investment in headcount. Share-based compensation expense decreases were primarily driven by the 2015 performance awards becoming fully vested in the first quarter of the prior year. Transaction and integration costs decreased as we have not made any acquisitions in 2020 and we continue to move away from the 2018 and 2019 Acquisitions. Other SG&A expense increased due to an increase in bad debt expense.

On a constant currency basis using the average exchange rates in effect during the three months ended March 31, 2019, selling, general and administrative expenses would have been higher by $1.1 million for the three months ended March 31, 2020.

*Severance, Restructuring and Other Exit Costs.* For the three months ended March 31, 2020, we incurred severance, restructuring and other exit costs of $2.1 million primarily costs associated with charges incurred in connection with the termination of certain lease facilities. For the three months ended March 31, 2019, we incurred exit costs of $2.8 million primarily relating to Interoute Communications Holdings S.A ("Interoute").

*Depreciation and Amortization.* Amortization of intangible assets decreased $1.0 million or 5%, from $22.1 million for the three months ended March 31, 2019 to $21.1 million for the three months ended March 31, 2020, primarily due to intangibles from prior year acquisitions becoming fully amortized during the current and prior periods partially offset by the amortization of KPN intangibles. Depreciation expense increased $5.7 million or 14%, from $40.7 million for the three months ended March 31, 2019 to $46.4 million for the three months ended March 31, 2020, primarily due to depreciation on prior year and current year capital expenditures as well as depreciation of KPN assets.

35

**A095**

*Other Expense*. Other expense increased by $30.2 million to $94.4 million for the three months ended March 31, 2020, compared to $64.2 million for the three months ended March 31, 2019. This is primarily due to the three months ended March 31, 2020 including a non-cash mark-to-market loss on derivative financial instruments of $33.5 million whereas the three months ended March 31, 2019 included a non-cash mark-to-market gain on derivative financial instruments of $15.3 million.

## Liquidity and Capital Resources

In March 2020, the World Health Organization declared the outbreak of COVID-19 to be a pandemic. COVID-19 has caused, and could continue to cause, significant disruptions to the U.S. and global economy. The impact from the rapidly changing market and economic conditions due to the COVID-19 outbreak is uncertain and ensuring adequate liquidity is critical. We believe that our financial resources will allow us to manage the anticipated impact of COVID-19 on our business operations for the foreseeable future, but we are continuing to actively monitor the situation and are developing plans should we begin to experience material impacts.

Cash from operations could also be affected by various risks and uncertainties, including, but not limited to, the effects of the COVID-19 pandemic and other risks detailed in Part II, Item 1A "Risk Factors" of this Quarterly Report on Form 10-Q. However, based on our current revenue outlook, we believe that existing cash balances, together with funds generated from operations and amounts available under our credit facility, will be sufficient to finance our operations and meet our foreseeable cash requirements through at least the next 12 months from the date of this filing.

Our primary sources of liquidity have been cash provided by operations, equity offerings, and debt financings. Our principal uses of cash have been acquisitions, working capital, capital expenditures, and debt service requirements. We anticipate that our principal uses of cash in the future will be for acquisitions, capital expenditures, working capital, and debt service.

Management monitors cash flow and liquidity requirements on a regular basis, including an analysis of the anticipated working capital requirements for the next 12 months from the date of this filing. This analysis assumes our ability to manage expenses, capital expenditures, indebtedness, and the anticipated revenue trajectory. If our operating performance differs significantly from our forecasts, we may be required to reduce our operating expenses and curtail capital spending, and we may not remain in compliance with our debt covenants. In addition, if we are unable to fully fund our cash requirements through operations and current cash on hand, we may need to obtain additional financing through a combination of equity and debt financings and/or renegotiation of terms of our existing debt. If any such activities become necessary, there can be no assurance that we would be successful in obtaining additional financing or modifying our existing debt terms.

Our capital expenditures decreased by $10.1 million, or 31.5% from $32.1 million (7.1% of revenue) for the three months ended March 31, 2019 to $22.0 million (5.2% of revenue) for the three months ended March 31, 2020. We anticipate that we will incur capital expenditures of approximately 5-6% of revenue going forward. We continue to expect that our capital expenditures will be primarily success-based, i.e., in support of specific revenue opportunities.

We believe that our cash flows from operating activities, in addition to cash on-hand and undrawn Revolving Line of Credit Facility, will be sufficient to fund our operating activities and capital expenditures for the foreseeable future, and in any event for at least the next 12 to 18 months from the date of this filing. However, no assurance can be given that this will be the case.

The Company may also, from time-to-time, seek to retire or purchase its outstanding debt obligations and/or equity in open market purchases, block trades, privately negotiated purchase transactions, exchange transactions or otherwise and may seek to refinance some or all of its indebtedness based upon market conditions. Any such retirement, purchase or exchange of debt and/or equity may be funded with operating cash flows of the business or other sources and will depend upon prevailing market conditions, liquidity requirements, contractual restrictions and other factors, and the amounts involved may be material.

*Cash Flows*

The following table summarizes the components of our cash flows for the three months ended March 31, 2020 and 2019 (amounts in millions):

| Condensed Consolidated Statements of Cash Flows Data | Three Months Ended March 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **$ Variance** |
| Net cash provided by operating activities | $ 41.5 | $ 16.1 | $ 25.4 |
| Net cash used in investing activities | (22.0) | (32.6) | 10.6 |
| Net cash provided by financing activities | 42.9 | 10.7 | 32.2 |

*Cash Provided by Operating Activities*

Our largest source of cash provided by operating activities is monthly recurring revenue from our clients. Our primary uses of cash are payments to network suppliers, compensation-related costs, interest expense, and third-party vendors such as agents, contractors, and professional service providers.

Net cash flows from operating activities increased by $25.4 million, from $16.1 million for the three months ended March 31, 2019 to $41.5 million for the three months ended March 31, 2020. This increase was primarily due to the three months ended March 31, 2019 being negatively impacted by a use of cash related to an increase in accounts receivable, due to the integration of Interoute's clients into GTT's billing system, which led to delays in invoice deliveries and corresponding client payments, as well as lower non-recurring cash payments for severance and exit costs, and for transaction and integration costs during three months ended March 31, 2020.

*Cash Used in Investing Activities*

Our primary uses of cash include acquisitions, purchases of client contracts, and capital expenditures.

Net cash flows used in investing activities decreased by $10.6 million, from $32.6 million for the three months ended March 31, 2019 to $22.0 million for the three months ended March 31, 2020.

Cash used for the three months ended March 31, 2020 consisted of capital expenditures of approximately $22.0 million. Cash used for the three months ended March 31, 2019 consisted of $0.5 million of additional cash consideration paid for API and capital expenditures of $32.1 million.

*Cash Provided by Financing Activities*

Our primary source of cash from financing activities are proceeds from debt and equity issuances. Our primary use of cash for financing activities is the refinancing of our debt and repayment of principal pursuant to the debt agreements.

Net cash flows provided by financing activities increased by $32.2 million, from $10.7 million for the three months ended March 31, 2019 to $42.9 million for the three months ended March 31, 2020. Cash provided for the three months ended March 31, 2019 consisted primarily of proceeds from the Revolving Line of Credit Facility, partially offset by repayments of principal on term loans and other secured borrowings. Cash provided for the three months ended March 31, 2020 consisted primarily of net proceeds from the 2020 EMEA Term Loan Facility, partially offset by net repayments on the Revolving Line of Credit Facility, payment of debt issuance costs in connection with Amendment No. 2 to the 2018 Credit Agreement, and repayments of principal on term loans and other secured borrowings.

**Contractual Obligations and Commitments**

The following table summarizes our significant contractual obligations as of March 31, 2020 (amounts in millions):

37

**A097**

| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
| Term loans | $ 2,690.5 | $ 27.6 | $ 55.2 | $ 55.2 | $ 2,552.5 |
| 7.875% senior note | 575.0 | — | — | 575.0 | — |
| Other secured loans | 2.1 | 2.1 | — | — | — |
| Revolving line of credit | 65.0 | — | — | 65.0 | — |
| Operating leases | 390.6 | 87.6 | 138.7 | 75.6 | 88.7 |
| Finance leases | 137.2 | 6.4 | 10.3 | 10.6 | 109.9 |
| Network supplier agreements [1] | 1,185.9 | 369.1 | 639.6 | 111.6 | 65.6 |
| Other [2] | 34.8 | 13.3 | 9.7 | 5.2 | 6.6 |
| | $ 5,081.1 | $ 506.1 | $ 853.5 | $ 898.2 | $ 2,823.3 |

[1] Excludes contracts where the initial term has expired and we are currently in month-to-month status.
[2] "Other" consists of vendor contracts associated with network monitoring and maintenance services.

**Off-Balance Sheet Arrangements**

As of March 31, 2020, we did not have any off-balance sheet arrangements, other than the contractual obligations disclosed in the table above, that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources that is material to investors.

**Non-GAAP Financial Measures**

In addition to financial measures prepared in accordance with accounting principles generally accepted in the United States ("GAAP"), from time to time we may use or publicly disclose certain "non-GAAP financial measures" in the course of our financial presentations, earnings releases, earnings conference calls, and otherwise. For these purposes, the U.S. Securities and Exchange Commission ("SEC") defines a "non-GAAP financial measure" as a numerical measure of historical or future financial performance, financial positions, or cash flows that (i) exclude amounts, or is subject to adjustments that effectively exclude amounts, included in the most directly comparable measure calculated and presented in accordance with GAAP in financial statements, and (ii) include amounts, or is subject to adjustments that effectively include amounts, that are excluded from the most directly comparable measure so calculated and presented.

Non-GAAP financial measures are provided as additional information to investors to provide an alternative method for assessing our financial condition and operating results. We believe that these non-GAAP measures, when taken together with our GAAP financial measures, allow us and our investors to better evaluate our performance and profitability. These measures are not in accordance with, or a substitute for, GAAP, and may be different from or inconsistent with non-GAAP financial measures used by other companies. These measures should be used in addition to and in conjunction with results presented in accordance with GAAP and should not be relied upon to the exclusion of GAAP financial measures.

Pursuant to the requirements of Regulation G, whenever we refer to a non-GAAP financial measure we will also generally present the most directly comparable financial measure calculated and presented in accordance with GAAP, along with a reconciliation of the differences between the non-GAAP financial measure we reference with such comparable GAAP financial measure.

*Adjusted Earnings before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA")*

Adjusted EBITDA is defined by us as income/(loss) before interest, income taxes, depreciation and amortization ("EBITDA") adjusted to exclude severance, restructuring and other exit costs, acquisition-related transaction and integration costs, losses on extinguishment of debt, share-based compensation, and from time to time, other non-cash or non-recurring items.

We use Adjusted EBITDA to evaluate operating performance, and this financial measure is among the primary measures we use for planning and forecasting future periods. We further believe that the presentation of Adjusted EBITDA is relevant and useful for investors because it allows investors to view results in a manner similar to the method used by management and makes it easier to compare our results with the results of other companies that have different financing and capital structures. In addition, we have debt covenants that are based on a leverage ratio that utilizes a modified EBITDA calculation, as defined by our Credit

Agreement. The modified EBITDA calculation is similar to our definition of Adjusted EBITDA; however, it includes the pro forma Adjusted EBITDA of and expected cost synergies from the companies acquired by us during the applicable reporting period. Finally, Adjusted EBITDA results, along with other quantitative and qualitative information, are utilized by management and our compensation committee for purposes of determining bonus payouts to our employees.

The following is a reconciliation of Adjusted EBITDA from Net loss (amounts in millions):

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| Net loss | $ | (83.3) | $ | (27.3) |
| Provision for (benefit from) income taxes | | (1.9) | | 1.8 |
| Interest expense, net | | 48.8 | | 48.2 |
| Other expenses (income), net | | 43.3 | | 16.0 |
| Loss on debt extinguishment | | 2.3 | | — |
| Depreciation and amortization | | 67.5 | | 62.8 |
| Severance, restructuring and other exit costs | | 2.1 | | 2.8 |
| Transaction and integration costs | | 2.2 | | 9.2 |
| Share-based compensation | | 8.3 | | 8.7 |
| **Adjusted EBITDA** | $ | 89.3 | $ | 122.2 |

**Free Cash Flow**

Free Cash Flow is defined by us as net cash provided by operating activities less purchases of property and equipment.

We use Free Cash Flow as a measure to evaluate cash generated through normal operating activities. We believe that the presentation of Free Cash Flow is relevant and useful to investors because it provides a measure of cash available to pay the principal on our debt and pursue acquisitions of businesses or other strategic investments or uses of capital.

The following is a reconciliation of Free Cash Flow from Cash provided by operating activities (amounts in millions):

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| Net cash provided by operating activities | $ | 41.5 | $ | 16.1 |
| Purchases of property and equipment | | (22.0) | | (32.1) |
| **Free Cash Flow** | $ | 19.5 | $ | (16.0) |

39

**A099**

**ITEM 3.** *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

We are exposed to certain market risks. These risks, which include interest rate risk and foreign currency exchange risk, arise in the normal course of our business rather than from trading activities.

**Interest Rate Sensitivity**

Our exposure to market risk for changes in interest rates is primarily related to our outstanding term loans and revolving loans. As of March 31, 2020, we had $2,690.5 million in term loans and $65.0 million in revolving loans with variable interest rates. The interest expense associated with our term loan and revolving loan will vary with market rates.

The US Term Loan Facility carries an interest rate equal to either Base Rate Loans with applicable margin at 1.75% or Eurocurrency Loans at 2.75%, subject to a floor of 0.00%. Based on current rates, a hypothetical 100 basis point increase in Eurodollar rate would increase annual interest expense by approximately $7.4 million, which would decrease our income and cash flows by the same amount. This sensitivity analysis takes into account the impact of the LIBOR-based interest rate swaps entered into during 2018.

The EMEA Term Loan Facility carries an interest rate equal to the European Money Markets Institute EURIBOR plus the applicable margin of 3.25%, subject to a EURIBOR floor of 0.00%. Based on current rates, a hypothetical 100 basis point increase in EURIBOR rate would increase annual interest expense by approximately $4.0 million, which would decrease our income and cash flows by the same amount. This sensitivity analysis takes into account the impact of the EURIBOR-based interest rate swap entered into during 2018.

We may enter into additional derivative financial instruments in the future.

**Exchange Rate Sensitivity**

Our exposure to market risk for changes in foreign currency rate relates to our global operations. Our condensed consolidated financial statements are denominated in U.S. Dollars, but a portion of our revenue and expenses are recorded in the local currency of our foreign subsidiaries. Accordingly, changes in exchange rates between the applicable foreign currency and the U.S. Dollar will affect the translation of each foreign subsidiary's financial results into U.S. Dollars for purposes of reporting consolidated financial results.

The following is a summary of our revenues and expenses generated by non-US entities for the three months ended March 31, 2020:

| | Three Months Ended March 31, 2020 | | | | |
|---|---|---|---|---|---|
| | Revenues | Cost of Telecommunication Services | Selling, general and administrative expenses | Depreciation and amortization | Interest expense, net |
| EUR | 39 % | 32 % | 32 % | 39 % | 21 % |
| GBP | 12 % | 22 % | 7 % | 10 % | 1 % |
| Other | 2 % | 3 % | 1 % | 3 % | — % |
| **Total non-US** | 53 % | 57 % | 40 % | 52 % | 22 % |

We did not have any foreign currency derivatives as of March 31, 2020 but we may enter into derivative financial instruments in the future.

**ITEM 4.** *CONTROLS AND PROCEDURES*

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls").

Based on our evaluation, our CEO and CFO concluded that our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of March 31, 2020, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of March 31, 2020, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**A101**

## PART II – OTHER INFORMATION

### ITEM 1. *LEGAL PROCEEDINGS*

From time to time, we are party to legal proceedings arising in the normal course of business. Except as disclosed below, we do not believe that we are party to any current or pending legal action that could reasonably be expected to have a material adverse effect on our financial condition or results of operations and cash flow.

On July 30, 2019, a purported class action complaint was filed against the Company and certain of its current and former officers and directors in the U.S District Court for the Eastern District of Virginia (Case No. 1:19-cv-00982) on behalf of certain GTT stockholders. The complaint alleges that defendants made false or misleading statements and omissions of purportedly material fact, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, in connection with disclosures relating to GTT's acquisition and integration of Interoute Communications Holdings S.A. The complaint seeks unspecified damages. The Company believes that the claims in this lawsuit are without merit and intends to defend against them vigorously. At this time, no assessment can be made as to its likely outcome or whether the outcome will be material to the Company.

### ITEM 1A. *RISK FACTORS*

The following risk factor supplements the risk factors described under Part I, Item 1A. "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2019, and should be read in conjunction with the other risk factors presented in the Annual Report on Form 10-K.

***The COVID-19 pandemic and the resulting macroeconomic disruption have materially affected how we and our customers are operating our businesses, and the duration and extent to which this will impact our future results of operations and overall financial performance remains uncertain.***

In March 2020, the World Health Organization declared the outbreak of COVID-19 to be a global pandemic. COVID-19 has caused, and could continue to cause, significant disruptions to the United States and global economy and has contributed to significant volatility and negative pressure in financial markets. The global impact of the outbreak is continually evolving. Certain states and cities, including those in which our offices are located, have also reacted by instituting quarantines, restrictions on travel, "shelter in place" rules, and restrictions on the types of business that may continue to operate.

As of the date of this Quarterly Report on Form 10-Q, we have temporarily closed our offices (including our corporate headquarters) in the United States and several other impacted locations and implemented certain travel restrictions, both of which have begun to disrupt how we operate our business. In addition, the conditions caused by the COVID-19 pandemic could adversely affect our clients' ability or willingness to purchase our service offerings, delay prospective clients' purchasing decisions, adversely impact our ability to provide or deliver services to our clients, delay the provisioning of our service offerings, or lengthen payment terms, all of which could adversely affect our future sales, operating results and overall financial performance.

While the potential economic impact brought by COVID-19 may be difficult to assess or predict, the pandemic has resulted in significant disruption of global financial markets, and a recession or long-term market correction resulting from the spread of COVID-19 could cause severe disruption and instability in the global financial markets or deteriorations in credit and financing conditions, which could make it difficult for us to access debt and equity capital on attractive terms, or at all, and impact our ability to fund business activities and repay debt on a timely basis.

The duration and extent of the impact from the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, such as the severity and transmission rate of the virus, the extent and effectiveness of containment actions and the impact of these and other factors on our employees, customers, partners and vendors. If we are not able to respond to and manage the impact of such events effectively, our business will be harmed.

### ITEM 2. *UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS*

None.

### ITEM 3. *DEFAULTS UPON SENIOR SECURITIES*

42

**A102**

None.

**ITEM 4.** *MINE SAFETY DISCLOSURES*

None.

**ITEM 5.** *OTHER INFORMATION*

None.

43

**ITEM 6.** *EXHIBITS*

The following exhibits, which are numbered in accordance with Item 601 of Regulation S-K, are filed herewith or, as noted, incorporated by reference herein:

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Second Amended and Restated Certificate of Incorporation, dated October 16, 2006 (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed October 19, 2006). |
| 3.2 | Certificate of Amendment to Second Amended and Restated Certificate of Incorporation, dated December 31, 2013 (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed January 6, 2014). |
| 3.3 | Certificate of Designations (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed with the Commission on August 8, 2019). |
| 3.4 | Amended and Restated By-laws, dated April 16, 2019 (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed April 22, 2019). |
| 3.5 | Amendment No. 1 to Amended and Restated Bylaws of GTT Communications, Inc. (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed February 25, 2020). |
| 10.1* | Amendment No. 2 to Credit Agreement, dated as of February 28, 2020, among GTT Communications, Inc., a Delaware corporation, as the borrower, GTT Communications B.V., KeyBank National Association, as administrative agent, and the lenders party thereto. |
| 10.2+ | Employment Agreement, dated April 6, 2020, between Steven Berns and GTT Communications, Inc. (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed April 6, 2020). |
| 10.3*+ | Employment Agreement, dated March 10, 2014, by and between Global Telecom & Technology Americas, Inc. and Daniel M. Fraser, |
| 10.4*+ | Amendment No. 1 to the Employment Agreement, dated October 17, 2019, by and between GTT Americas, LLC (formerly Global Telecom & Technology Americas, Inc.) for Daniel M. Fraser. |
| 31.1* | Certification of Chief Executive Officer of the Registrant, pursuant to Rules 13a-14(a) of the Securities Exchange Act of 1934. |
| 31.2* | Certification of Chief Financial Officer of the Registrant, pursuant to Rules 13a-14(a) of the Securities Exchange Act of 1934. |
| 32.1** | Certification of Chief Executive Officer of the Registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Chief Financial Officer of the Registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document. |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document. |
| 104* | Cover Page Interactive Data File (formatted as inline XBRL with applicable taxonomy extension information contained in Exhibits 101.*) |

\*       Filed herewith

\*\*      Furnished herewith

\+       Denotes a management or compensatory plan or arrangement

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

GTT Communications, Inc.

By:   /s/ Richard D. Calder, Jr.
      _____
      Richard D. Calder, Jr.
      President, Chief Executive Officer and
      Director (Principal Executive Officer)

By:   /s/ Steven Berns
      _____
      Steven Berns
      Chief Financial Officer
      (Principal Financial Officer)

By:   /s/ Daniel M. Fraser
      _____
      Daniel M. Fraser
      Senior Vice President, Corporate Controller and
       (Principal Accounting Officer)

Date:   May 8, 2020

45

**A105**

DiLorenzo v. Edgar, Not Reported in F.Supp.2d (2004)

2004 WL 609374

2004 WL 609374
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Stephen J. DILORENZO, derivatively on behalf
of dELiA*S Corp. and Alloy, Inc., Plaintiff,
v.
Christopher EDGAR, Geraldine Karestky,
Stephen I. Kahn, Evan Guillemin, dELiA*S
Corp., and Alloy, Inc., Defendants.

No. Civ. 03–841–SLR.
|
March 24, 2004.

**Attorneys and Law Firms**

Theodore J. Tacconelli, Ferry, Joseph & Pearce, P.A.,
Wilmington, DE, for Plaintiff.

Allen M. Terrell, Jr., Richards, Layton & Finger, Jon E.
Abramczyk, Morris, Nichols, Arsht & Tunnell, Wilmington,
DE, for Defendants.

MEMORANDUM ORDER

ROBINSON, J.

*1 At Wilmington, this 24th day of March, 2004, having
reviewed the motions of defendants to dismiss (D.I.10, 13),
and the memoranda submitted therewith;

IT IS ORDERED that defendants' motions (D.I.10, 13) to
dismiss are denied for the reasons that follow:

1. Plaintiff filed this derivative action on August 27, 2003
alleging violations of § 16(b) of the Securities Exchange Act
of 1934, codified at 15 U.S.C. § 78p(b). (D.I.1) The suit
is brought on behalf of dELiA*s Corporation ("dELiA*s")
and Alloy, Inc. ("Alloy"), and seeks to recover short-swing
profits obtained by defendants Christopher Edgar, Geraldine
Karetsky, Stephen Kahn and Evan Guillemin ("Former
Director defendants"). On October 16, 2003, the defendants
filed motions to dismiss pursuant to Fed.R.Civ.P. 12(b) 1 and
12(b)(6). (D.I.10, 13)

2. During the relevant time period, the Former Director
defendants were directors of dELiA*s. Kahn was the Chief

Executive Officer and Chairman of the Board. Edgar was
the Executive Vice President and Vice Chairman. Guillemin
was the Chief Financial Officer and Treasurer. On or about
May 12, 2003, the Former Director defendants purchased in
aggregate 7,297,298 shares of dELiA*s's common stock at a
price of $0.37 per share for a total of $2.7 million. (D.I.1, ¶ 12)
Of this amount Kahn purchased 4,054,054 shares; Karetsky
purchased 2,702,703 shares; Edgar purchased 337,838 shares;
and Guillemin purchased 202,703 shares. Further, dELiA*s
issued to the Former Director defendants a total of 600,000
warrants to purchase shares at $0.37 a share.

3. On July 30, 2003, dELiA*s entered into an agreement
with Alloy to conduct a tender offer for all of the publicly
held shares of dELiA*s. At that time, Karetsky and Kahn
entered into an agreement to support the merger and tender
their shares. Kahn, Edgar and Guillemin each received
employment agreements with Alloy upon the effective date
of the merger. (Id., ¶ 10, 15)

4. On August 6, 2003, Dodger Acquisition Corp., a direct
wholly owned subsidiary of Canal Park Trust and an indirect
wholly owned subsidiary of Alloy, commenced a tender offer
for 100% of dELiA*s's shares at a price of $.0928 per share.
(Id., ¶ 25; D.I. 12, at ex. 1) Plaintiff contends that the Former
Director defendants obtained short-swing profits in violation
of § 16(b) as a result of an August 6, 2003 tender-offer by
Alloy to dELiA*s shareholders for a cash-out merger between
the corporations.

5. During the offer period, plaintiff commenced the present
action but did not tender his shares. On September 7, 2003,
the merger closed and plaintiff, along with other nontendering
shareholders, was cashed-out and his shares canceled. Canal
Park Trust is now the sole shareholder of dELiA*s stock.
(D.I.12)

6. Plaintiff was a dELiA*s shareholder at the time of the filing
of the complaint. Plaintiff also contends that at the time of the
transaction he was an Alloy shareholder and has maintained
that interest. Plaintiff seeks a disgorgement of $4,071,892 in
profits received by the Former Director defendants as a result
of the transaction. Plaintiff also seeks $334,800 related to the
acquisition of the 600,000 warrants.

*2 7. Defendants' motions to dismiss contend that plaintiff's
complaint fails for a lack of standing because he is no longer
a shareholder of dELiA*s and because he failed to make a
demand upon the corporation's board of directors.

A106

DiLorenzo v. Edgar, Not Reported in F.Supp.2d (2004)
2004 WL 609374

8. Standard of Review. In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

9. In considering a motion to dismiss, a court may consider Securities Exchange Commission documents that are expressly relied upon in the complaint. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997); *Indeck Maine Energy, L.L.C. v. ISO New England Inc.,* 167 F.Supp.2d 675 (D.Del.2001). Further, on a motion to dismiss the court may take judicial notice of the contents of documents required by law to be filed, and actually filed, with federal or state officials. *See Oran v. Stafford,* 226 F.3d 275, 289 (3d Cir.2000); *Ieradi v. Myland Lab, Inc.,* 230 F.3d 594, 600 n. 3 (3d Cir.2000) (citing Fed.R.Evid. 201).

10. Standing under Section 16(b). Section 16(b) establishes strict liability for covered individuals who engage in the sale or purchase of a covered security. 15 U.S.C. § 78p(b). The right of recovery under § 16(b) is held, however, solely by the issuer of the security. *Id.* A shareholder may bring a derivative action "in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter." *Id.*

11. There are three requirements for shareholder standing to bring suit under § 16(b). *See Gollust v. Mendell,* 501 U.S. 116 (1991). First, the plaintiff must own a security within the meaning of the section. Second, the security held by the plaintiff must be a security of the issuer of the security traded by the covered individual. Third, the plaintiff must own a security of the issuer at the time the § 16(b) action is instituted. *Id.* at 123–24. Unlike a typical shareholder derivative action, there is not a requirement that the plaintiff maintain continual

ownership, only that he has "some continuing financial stake in the litigation" so as to satisfy minimum standing requirements imposed by the jurisdictional limitations of Article III. *See id.* at 125.

**\*3** 12. In the present case, plaintiff's complaint alleges that he owned shares of stock issued by dELiA\*s at the time he filed the present action. Consequently, plaintiff satisfied the statutory requirements for standing at the time the suit was instituted. Defendants contend, however, that plaintiff is no longer a shareholder and lacks the requisite standing to maintain the suit. Plaintiff argues that his ownership of shares in Alloy provide a basis for his continuing financial interest in the outcome of the litigation.

13. In *Gollust,* the Supreme Court considered the effect of a stock-exchange merger upon the plaintiff's previously filed § 16(b) action. The unanimous Court concluded that although plaintiff was no longer a shareholder of the issuer, as his stock was exchanged for stock in the new corporation, he nonetheless had the minimal financial interest in the outcome of the litigation to satisfy constitutional concerns. *Id.* at 126–28. Consequently, under *Gollust,* where a plaintiff has standing at the commencement of the suit, an involuntary change in his status as a security holder resulting from a restructuring will not affect his standing to maintain the suit so long as minimal constitutional requirements are satisfied through the presence of some financial interest in the outcome of the litigation.

14. In the present case, the major distinguishing factor is the form of restructuring. Instead of a stock-exchange merger, dELiA\*s effectuated a cash-out merger. The court concludes that § 16(b)'s remedial purpose should not be truncated by the legal nuances of the corporate restructuring. A shareholder of a parent corporation has a financial interest, albeit tenuous, in the disgorgement of profits obtained by insiders of a corporate subsidiary. Although Congress did not provide statutory standing for such a party to institute a § 16(b) suit, [1] a shareholder of a parent corporation has a cognizable interest for purposes of satisfying constitutional requirements. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). Consequently, the court concludes that plaintiff satisfies the constitutional requirements to maintain the suit.

DiLorenzo v. Edgar, Not Reported in F.Supp.2d (2004)

2004 WL 609374

1    Where a shareholder of a parent corporation brings a suit against a subsidiary of the parent under a derivative theory, the suit is referred to as double derivative in nature. Section 16(b) suits premised upon double derivative standing have been rejected by a majority of courts. *See Lewis v. McAdam,* 762 F.2d 800, 804 (9th Cir.1985) (concluding that standing does not exist in a cash-stock merger); *Untermeyer v. Valhil, Inc.,* 665 F.Supp. 297, 300–01 (S.D.N.Y.1987) (concluding that standing does not exist in a cash-out merger). These cases are distinguished, however, because the Supreme Court in *Gollust* differentiated between standing to institute suit and a sufficient interest to maintain suit. *See Gollust,* 501 U.S. at 123–24.

15. Demand. Defendants also contend that plaintiff does not have standing for failure to satisfy Fed.R.Civ.P. 23.1's requirements for demand. It is clear, however, that Rule 23.1 does not apply to actions brought pursuant to § 16(b). For example, unlike typical derivative actions, the decision to bring a § 16(b) enforcement action does not enjoy protection of the business judgment rule. *See Cramer v. General Telephone & Elec. Corp.,* 582 F.2d 259, 276 (3d Cir.1978). Similarly, as discussed above, there are no requirements of continuous ownership. *See Gollust,* 501 U.S. at 124–25.

16. Where demand would have been futile, courts have excused the requirement under § 16(b). *See Berkwich v. Mencher,* 239 F.Supp. 792, 793–94 (S.D.N.Y.1965); *Grossman v. Young,* 72 F.Supp. 375 (S.D.N.Y.1947). On a motion to dismiss for failure to state a claim, the court must accept as true plaintiff's allegations of demand futility. *Id.* at 380.

*4 17. In the present case, plaintiff pleads demand futility stating that he "has not made demand on dELiA*s Board of Directors because such demand would be futile in view of Alloy's acquisition of the company and defendants' control of dELiA*s Board." (D.I.1, ¶ 28) Plaintiff's allegations of control are supported by those documents submitted by defendants in support of their motion to dismiss. 2 (D.I.12) Further, had plaintiff made a demand, § 16(b) would preclude him from filing suit until either sixty days had passed or the board had rejected his demand. Due to the short timing of the merger, plaintiff's shares would be canceled before he would have been permitted to bring suit. The failure of the dELiA*s board to bring suit on its own behalf after becoming aware of plaintiff's suit also supports his futility allegations. *See Berkwich,* 239 F.Supp. at 794. Consequently, for purposes of resolving the pending motion to dismiss the court finds that plaintiff has sufficiently alleged the existence of demand futility.

2    For example, the Former Director defendants represent four of the eleven members of the former dELiA*s and include three of the four former officers. (D.I. 12, ex. 2 at B–3) Collectively, the Former Director defendants owned 37.8% of the dELiA*s stock.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 609374

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

EDIX Media Group, Inc. v. Mahani, Not Reported in A.2d (2006)

2006 WL 3742595

2006 WL 3742595
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

EDIX MEDIA GROUP, INC., a
Delaware corporation, Plaintiff,
v.
Parham MAHANI, Defendant.

No. Civ.A. 2186-N.
|
Submitted Nov. 27, 2006.
|
Decided Dec. 12, 2006.

**Attorneys and Law Firms**

Matthew F. Boyer and Timothy M. Holly, of Connolly Bove Lodge & Hutz, LLP, Wilmington, Delaware, for Plaintiff.

Joseph M. Bernstein, Wilmington, Delaware, for Defendant.

*MEMORANDUM OPINION*

CHANDLER, J.

**\*1** Before me is a seemingly ordinary dispute in an unusual industry. Plaintiff EDIX Media Group and defendant Parham Mahani both operate within a multi-billion dollar "niche" industry concerning after-market modifications to the vehicles of automotive enthusiasts. These hobbyists spend great amounts of time, effort, and money "pimping their rides" or "tricking out" their cars through such alterations as vertically-opening doors, bass-heavy audio systems, or highly-customized paint work. Like any group of aficionados, custom car fans employ their own colorful argot, gather to compete or display their achievements, seek the newest, greatest or most stylish customizations in order to stand out, and most importantly pay attention to events and people active in their hobby. The world of "whips" is a small one in which reputation matters greatly.[1]

---

[1]    "Whip," as used in the name of defendant's company SponsoredWhips, is a slang term for an automobile.

*See, e.g.,* 50 Cent, *Poor Lil Rich,* on Get Rich or Die Tryin' (Shady Records/Aftermath Records/Interscope Records, 2003) ("I let my watch talk for me, my whip talk for me, my gat [gun] talk for me, BOW!").

Personal reputation plays a significant role in this dispute. Plaintiff hired defendant first as an employee and then as an independent contractor to sell advertising space in its magazine and on its website. After two years of working together, the relationship between the parties began to deteriorate, and plaintiff terminated defendant's contract. From that moment starts a story of recriminations and revenge, accusation and counter-accusation, and pointed language hurled back and forth in a very public manner.

Plaintiff comes before this Court seeking both damages and injunctive relief, listing ten different theories under which defendant has violated his duties as an employee or independent contractor, breached his contractual obligations of confidentiality and non-competition, or otherwise revealed EDIX's secrets and caused it to lose face in the community. Plaintiff asks this Court to enjoin defendant from working with plaintiff's clients or customers within its territory, from revealing any further confidential information, and from making any further damaging statements.

The parties disagree upon both legal and factual issues. The provenance of three anonymous emails, two of them sent from accounts controlled by EDIX, remains contested. The parties dispute plaintiff's motivation in terminating defendant's relationship. Over three days of trial testimony, it became clear that plaintiff and defendant even disagree upon the factual scope of plaintiff's operations within the industry, let alone what activities constitute competition with EDIX's business.

Before I may address the legal issues, I must pull from the evidence submitted by both parties a set of facts to which I may apply the law. In disputes such as this, in which passions run high and there is no particular concealment of the parties' distaste for one another, a finder of fact is challenged to separate reliable testimony from inevitable overstatement. This case presents no exception. The two chief witnesses-Lance Burris, the CEO of EDIX, and the defendant himself-both provided testimony that concerns this Court and raises questions as to their credibility. The evidence overwhelmingly indicates that defendant accessed plaintiff's computer systems and fraudulently contacted dozens, if not hundreds, of customers while purporting to be an "insider" still employed by the firm. On the other hand, evidence

strongly suggests that plaintiff recharacterized defendant's employment relationship as one of an independent contractor not because his duties and activities fairly merited the description but in order to avoid withholding taxes and providing other benefits. Further, some of Burris's testimony, both on the stand and in depositions, seemed overly cunning and calculated, designed to obfuscate rather than enlighten. Such responses, whatever their intended purpose, do not provide comfort to a finder of fact in considering other testimony from the same witness.

*2  For this reason, I rely very heavily upon the paper record in my findings of fact, and assign little weight to the testimonial evidence of either Mahani or Burris. Where I credit the testimony of one party or another, I make specific mention of it, bearing in mind the burdens of proof and production borne by each party.

## I. FINDINGS OF FACT

### A. EDIX employs Mahani

Plaintiff is a Delaware corporation that serves a demographic, mostly consisting of young men, who enjoy modifying and tuning automobiles. Plaintiff describes its business in the broadest possible manner, but evidence presented at trial suggests that the bulk of EDIX operations involve selling memberships to automotive enthusiasts and advertising space to industry players. Members receive certain exclusive discounts on parts and accessories and a one-year subscription to *StreetTrenz,* EDIX's glossy magazine full of the latest news on car shows, how-to modification guides, comely female models, and ever-present advertisements. Manufacturers, resellers, and car shows provide the bulk of EDIX's revenue by paying for placement in either *StreetTrenz* magazine or on its accompanying website. [2] While plaintiff's internet presence theoretically gives it world-wide reach, its main business markets are eastern Pennsylvania, Delaware, Maryland, and southern New Jersey. Lance Burris is EDIX's majority owner and President.

[2]    Two websites, http://www.streettrenz.com and http:// www.myspace .com/streettrenz, were mentioned at trial as belonging to plaintiff. The latter website, hosted on the community portal MySpace.com, provided an additional channel for EDIX to market to enthusiasts, many of whom were also MySpace users.

Burris hired defendant Parham Mahani, a Delaware resident, in the summer of 2004 primarily to sell advertising for

*StreetTrenz* magazine and banner advertisements on related websites, although testimony suggested that his duties occasionally extended beyond these two roles. As a condition of his employment, defendant executed a non-competition and confidentiality agreement, pursuant to which he would: keep confidential any non-public information provided to him during his period of employment; refrain from soliciting "any Customer for the purpose of transacting business with [EDIX's] Customers in the products or services provided by [EDIX];" make no attempt to interfere with any contractual relationship between EDIX and any independent contractor or employee; and enter into no business relationship with an entity "conducting any business which is in competition with respect to [EDIX's] Business or is substantially similar to Corporation's Business" within the same territory. [3] The agreement also specified that defendant would indemnify plaintiff for any attorney's fees arising from enforcement of the agreement.

[3]        Pl.Ex. 2. The agreement defines Customer as "those readers of [EDIX's] publications, vendors, advertisers, and/or show facility owners and operators who have contracted with the Corporation at any time before or during the term of [Mahani's] engagement, or who have contacted [EDIX] or be contacted or solicited by [EDIX] with respect to [EDIX's] Business during the 24 months before or at any time during the term of [Mahani's] employment or engagement, as well as any such person's or entity's subsidiaries and affiliates."

By all accounts, defendant enjoys modifying cars, attends car shows regularly, and is well-connected with other enthusiasts. Plaintiff credits him with developing the *StreetTrenz* web-presence on MySpace.com, a strategy that led to several new memberships, and plaintiff raises no doubts as to defendant's enthusiasm for or experience with the after-market modification industry. Indeed, Mahani brought more to the table than merely marketing expertise and technical acumen. His family had a long-standing and personal friendship with one of EDIX's customers, a friendship that Mahani quickly put to use. His personal relationship with model Kerry Acteson allowed him to introduce to EDIX several models who could grace the pages of *StreetTrenz* magazine or distribute literature at car shows for EDIX or their clients.

*3  Nevertheless, the relationship began to sour in early 2006, although the parties disagree as to the sources of discontent. [4]  On May 14, plaintiff terminated its relationship with its "independent contractor," [5] and although it did listen

to an appeal, eventually told defendant that its decision was final.

[4]       According to plaintiff, Mahani contacted Sony Electronic, Inc. in April 2006, requesting a digital camera and various accessories in order to write a product review. The next month, EDIX learned that Sony had received an empty box instead of its camera and had been told by defendant that they should file an insurance claim for the missing item. EDIX conducted an investigation and concluded that digital photos taken by Mahani after the return date on the box contained digital imprints matching the missing equipment. On May 14, after confronting defendant with this evidence, plaintiff terminated his contract. Mahani requested reinstatement and wrote a letter asking for forgiveness from EDIX's partners, but they denied him any leniency and refused to reconsider.

At trial, Mahani disavowed his letter and protested his innocence in the Sony matter, suggesting a different motive for his termination. On April 3, 2005, EDIX required Mahani-who at that point was working as an independent contractor-to submit to a new commission structure. Purportedly addressing a problem with rising receivables, the new structure provides for a sliding commission based upon collected revenue and penalizes Mahani if Burris "writes" one of his accounts. This agreement provided plaintiff with the potential for a substantial windfall if defendant were to be terminated, as no commission would be required on revenues that had been booked but not collected.

No legal action requires me to make a factual finding as to the actual motivation behind Mahani's dismissal, nor are the two alternatives mutually exclusive: EDIX may have been quite pleased to be free of a duplicitous "contractor" while happily pocketing the resulting profits. I describe the dispute in detail to highlight the degree to which the parties differ as to each other's motivations.

[5]       Although plaintiff insists upon characterizing its relationship with defendant in its legal filings as one of contractor/customer, the April 3, 2006 agreement renegotiating defendant's commissions certainly seems inconsistent with this assertion. The document, a letter from Burris with a signature by Mahani to show his consent, states, "You [Mahani] have presented some very good ideas and I do like where *we* are going *as a company and a team."* (Emphasis added). Mahani's title and company affiliation are given as "Account Executive"

and "StreetTrenz Magazine," respectively, as opposed to any reference to a position in an external entity.

*B. Mahani's campaign to discredit EDIX*

Mahani did not go quietly. By May 19, plaintiff had already heard from customers that Mahani was contacting them in efforts to solicit business for a competing magazine,[6] and instructed its attorneys to issue Mahani a shot across the bow in the form of a cease and desist letter. Rather than complying, Mahani took this as a sign that he should resort to skullduggery.

[6]       Mr. Alfred Vega, owner of a customization business that advertises with EDIX, testified that Mahani offered him a quarter page advertisement in a to-be-published magazine on May 17. Plaintiff offered no evidence, however, that plans for such a magazine ever left the drawing board.

Shortly after 6:00 a.m. on May 21, Mahani entered a copy center in Wilmington, Delaware and rented time on a computer terminal connected to the internet. From here he gained access to EDIX's mail server using a username and password he had acquired during his employment. Within the next hour, over sixty of plaintiff's largest customers received an email, claiming to be from an insider in the *StreetTrenz* billing department, that contained allegations of inflated membership numbers and web traffic statistics. The letter provided details of advertising rates paid by various customers, information which EDIX obviously would not wish other advertisers to know. Even worse, a second email followed only a few minutes later, supposedly releasing all advertisers from their contracts and any payments still due on their accounts.[7] Almost immediately after receiving these emails, customers began to call and email plaintiff and defendant asking for explanations. Advertisers began cancelling their contracts.

[7]       Mahani seems to have been unaware that the server logs on computers at EDIX and the copy center could be used to verify the location from which he sent the email, or that the video cameras at the copy center would capture him at the scene.

From this point onward, Mahani began a continual and underhanded campaign to discredit EDIX, refusing to cease his activities even after agreeing to a stipulated restraining order entered by this Court.[8] In emails carrying his own name, Mahani's temperate prose merely referred customers to Burris for further information. He reserved his venom for

A111

EDIX Media Group, Inc. v. Mahani, Not Reported in A.2d (2006)

2006 WL 3742595

messages sent under various aliases. Advertisers received at least one anonymous email from "Tuner Mag Fan" encouraging them to "get the diverted dollars" back from EDIX and to contact defendant directly. On June 6, Mahani donned yet another mask, and as *"StreetTrenz"* Insider" distributed a mass mailing from a computer at his local YMCA.[9] This last email not only disparaged *StreetTrenz*'s ability to provide value for an advertising dollar and revealed rates that EDIX supposedly had charged to different customers, but also described the membership program as a "scam" and made various none-too-veiled insinuations about Burris's private life. To distract attention from himself, Mahani left as a signature only the initials "JB."

[8]   On June 1, 2006, this Court issued a Stipulated Temporary Restraining Order supposedly acceptable to both parties. I enjoined Mahani from making any further disclosures of confidential information, from operating a business that competes with EDIX, from working with or for EDIX customers, and from engaging in certain specific communications.

[9]   Analysis of server logs demonstrates that the message was sent from a YMCA where Mahani is a member. Membership records show that Mahani entered the YMCA shortly before the June 6 email was distributed. Nevertheless, Mahani denied having written the email at a hearing to show cause why he should not be found in contempt of the temporary restraining order.

> While it is not entirely impossible that the protestations of innocence in defendant's deposition are sincere, and that his presence at the YMCA that morning is an incredibly unfortunate coincidence, the strong preponderance of the evidence suggests that he is the author of the June 6 email. He has certainly presented nothing credible to suggest otherwise.

Shortly after the June 6 email, Burris notified EDIX customers that Delaware State Police were investigating defendant. Mahani then distributed a response, entitled "My Side," to those same customers. (Mahani considered this to be a merely "technical violation" of the restraining order issued by this Court.) For this infraction, as well as for posting the question "Did you get screwed, or scammed, by 'Sport Compact Pro', *'StreetTrenz'* or 'CarSponsorship.com'?" on a website under his control, Mahani was found in contempt on June 27, 2006 and ordered to pay plaintiff $5,000.

*C. SponsoredWhips*

**\*4**   Disparaging a former employer, however satisfying it may have been for Mahani, does not pay the bills. While keeping the pressure on EDIX in his spare time, Mahani sought a way to make money within the industry. He kept his contacts current: when Shawn Ramsey of TunerAction asked if he knew someone who could sit at a car show booth for him, Mahani recommended a personal friend.[10] When he heard that Sound of Tri-State or other firms might need models, he suggested that his girlfriend and her associates work for them. And on June 14, he registered SponsoredWhips.com, a website he would use to pursue his own business.[11]

[10]   An unclear relationship exists between plaintiff, defendant and TunerAction, a company owned by Shawn Ramsey. Ramsey's deposition testimony suggests, as an initial matter, that TunerAction exists as little more than a website with a few members that never grew into a business. Plaintiff accuses Mahani of helping Ramsey start a membership program in competition with EDIX, while Ramsey suggests that the program was his own idea. Similarly, Ramsey accuses Mahani of starting a MySpace.com site for TunerAction without his authorization and stealing from him the idea to start a company that writes sponsorship proposals.

[11]   Mahani also registered a MySpace account for SponsoredWhips.com.

The parties dispute whether SponsoredWhips competes with EDIX and whether Mahani's business violates the terms of the restraining order. Both companies seek to attract the same types of auto enthusiasts wishing to improve their vehicles. SponsoredWhips' principle customers and main source of revenue, however, are enthusiasts who want free (or heavily discounted) parts from major manufacturers in exchange for displaying products (and "vinyls")[12] at car shows. Mahani's firm offers to evaluate a prospective owner's case for sponsorship and write proposals that can be sent to manufacturers. SponsoredWhips receives no revenue from manufacturers themselves. EDIX, on the other hand, receives most of its revenue from advertisers-who may be manufacturers, resellers, car shows, or other industry players-in order to put their message before members of EDIX's car club.

[12]   A vinyl is a sticker that may be affixed to an automobile, often displaying a company's logo. Vinyls are particularly useful to manufacturers or retailers whose products are installed in places where their logos

are otherwise hidden, *e.g.,* a subwoofer mounted in a trunk.

EDIX does offer "a sponsorship" to one member per year. This member is chosen by the EDIX editorial staff and receives free parts from EDIX advertisers. Plaintiff spent considerable time at trial attempting to convince this Court that SponsoredWhips assistance as a scrivener was "substantially similar" to EDIX's offer of what is, essentially, a membership prize. [13] I cannot agree.

[13]    Burris also testified that he had made several "verbal" offers to help with sponsorships, but EDIX provided no evidence that it had ever offered such a service commercially or that writing sponsorship proposals was a regular part of EDIX's business. Nor was any written evidence presented to suggest that EDIX had ever consummated such an offer.

Although both businesses appeal to the same automotive enthusiasts, manufacturers and trade shows, they do so in very different ways. Only in an attenuated sense does SponsoredWhips provide advertising services for manufacturers. This is at best a tertiary part of its business, from which it derives no revenue. Plaintiff also complains that SponsoredWhips competes by "advertising" for car shows, in that it lists dates for events on a specific web page. This stretches the concept of advertising beyond its logical limit: defendant has placed a calendar of events useful to its members on a website, having received no compensation from the organizers themselves. This is a far cry from the promotions for which EDIX is paid.

## II. CONTENTIONS

Although plaintiff's complaint weighs in with ten distinct legal theories, they can be usefully grouped into three categories. The first category involves disclosures of plaintiff's proprietary information that constitute violations of defendant's contract (Count I), the unlawful use of plaintiff's trade secrets (Count V), and the breach of common law duties to an employer (Count VI). The second category focuses on breaches of the covenant not to compete with EDIX, including unlawful competition (Count II), unlawful solicitation of customers (Count III), and unlawful solicitation of workers (Count IV). The last category encompasses three common law claims, unfair competition (Count VII), tortious interference with business relationships (Count VIII), and defamation (Count IX), and a statutory cause of action under

the Deceptive Trade Practices Act (Count X). In addition to denying all allegations, defendant requests that this Court determine SponsoredWhips to be outside the reach of the parties' non-competition agreement.

## III. ANALYSIS

*A. Claims involving breaches of confidentiality, non-disclosure and trade secrets*

 **\*5**  Counts I, V and VI all turn upon defendant's unlawful disclosure of information belonging to EDIX. Given the facts recited above, there can be no doubt that defendant violated both his contractual duties and the common law through his series of antagonistic messages. Indeed, the addresses contained in the May 21 and June 6 emails themselves revealed confidential information. When EDIX sent emails to multiple customers, its general practice was to hide the list of distributees using a 'blind carbon copy' function, both to safeguard the privacy of individual recipients' email addresses and to keep the list from falling into competitor's hands. Mahani made no attempt to follow standard corporate practice, thus exposing this list to the world.

Even had Mahani concealed the address list, his emails flagrantly violated his duty to keep information confidential. To the extent that the information therein was true, both messages purported to disclose membership numbers, employee salaries, rates charged for advertising, in-kind deals and other information never given to the general public. [14] Mahani's liability for these actions is certain. It remains necessary to consider plaintiff's three counts only because they differ in appropriate legal and equitable remedies available to plaintiff.

[14]    To attempt to weave a list of truths and untruths from the snarled allegations penned by defendant would be inappropriate. If the emails damaged EDIX's reputation among its customers, no good can come from this Court affirming their content. Thankfully, I need make no determination as to their truth. To the extent that any statement in the May 21 or June 6 emails were confidential and true, Mahani's liability devolves from his breach of duties of confidentiality. To the extent that they were false and misleading, he is similarly liable for defamation under Count IX.

The breach of contract claim contained in Count I presents the most straightforward issue. Plaintiff has proven that defendant breached his agreement and that the breach led to

damages. Mahani agreed to keep confidential "information not in the public domain ... including ... financial statements, ... invoices and other financial statements, ... any and all information concerning Customers, Corporation employee salaries, ... names, addresses or any other compilation of information, written or unwritten, which is used in the Corporation's business." [15] His emails contained information concerning all of these. To the extent that such revelations damaged plaintiff, defendant stands responsible for the harm.

[15]   Pl.Ex. 1.

Count V, involving the unlawful use of trade secrets, requires more consideration. To prove the misappropriation of a trade secret, plaintiff must show first that a trade secret actually existed; second, that it was communicated by plaintiff to defendant; third, that it was accompanied by an express or implied understanding that secrecy would be respected; and fourth, that the secret has been improperly used or disclosed by plaintiff to defendant's injury. [16] Plaintiff has met the last three of these four requirements, but it remains to be determined which, if any, disclosures qualify as a trade secret.

[16]   *Delaware Express Shuttle, Inc. v. Older,* 2002 WL 31458243, at \*16 (Del. Ch. Oct. 23, 2002).

Not all confidential information is a trade secret. The Delaware Trade Secrets Act provides three prerequisites for trade secret protection. [17] First, the Act protects only information, including but not limited to formulae, compilations, patterns, programs, devices, methods, techniques, and processes. Second, this information must derive independent economic value from not generally being known or readily accessible by proper means by other people. Third, reasonable steps must be taken to protect the information. Of the data revealed in the May 21 and June 6 emails, only the customer list and listing of prices could colorably constitute trade secrets as opposed to simply confidential information. [18]

[17]   6 *Del. C.* § 2001(4).

[18]   The distribution numbers mentioned in the email might arguably constitute trade secrets were they true. Plaintiff attests that the numbers are false, however, and if false they would not constitute information *given* to the defendant.

**\*6** In determining whether a customer list qualifies as a trade secret, this Court places great weight upon whether

competitors could assemble a similar list through information in the public domain without a similar expenditure of time and money. Where such assembly would be difficult or impossible, trade secret protection may be appropriate, but "[w]here customers in a particular industry can be easily identified, their identity is less likely to be a trade secret...." [19] The May 21 and June 6 emails were sent primarily to advertisers, and the bulk of the list could be compiled simply by paging through an issue of *StreetTrenz* magazine and listing the customers found there. To the extent that the list contained addresses from advertising agencies, rather than advertisers themselves, I am not convinced by plaintiff's assertion that compiling this list would require considerable efforts on the part of a determined competitor. Nor does the fact that the list contained personal email addresses of account representatives elevate it to the status of a trade secret. [20] The information may be personal, but marketing executives by their very nature want to be in contact with potential advertising services. Given the small market plaintiff described at trial, it seems unlikely that considerable expenditure would be necessary to compile plaintiff's list from public sources. [21] Nor did plaintiff convincingly demonstrate that the list has independent economic value. It is doubtful, for instance, that EDIX's competitors would pay for a copy.

[19]   *Delaware Express Shuttle, Inc.,* 2002 WL 31458243, at \*18 (quoting *Franklin Fibre-Lamitex Corp. v. Marvec Mfg., Inc.,* 1997 WL 153825, at \*2 (Del. Ch. Mar. 26, 1997)).

[20]   Mahani used some personal addresses containing the name of specific customer contacts in his mailing lists, but he also included several generic mailboxes (akin to "billing@streettrenz.com," the supposed sender). Such addresses are often listed on company websites.

[21]   A list of subscribers to StreetTrenz, on the other hand, might qualify for trade secret protection. To the extent that EDIX has alleged that Mahani took such a list, it has not proven that Mahani used it to either his advantage or the detriment of EDIX.

On the other hand, the rates that advertisers pay to EDIX would constitute a trade secret. A magazine such as *StreetTrenz* derives substantial value by concealing any deviations from published rates given to large or favored advertisers, as this secrecy helps them to enforce the rate card with respect to other firms. Mahani willfully and maliciously revealed this information to the world, and as such must

pay EDIX any actual damages arising from his conduct and exemplary damages up to twice that value.[22]

22    6 Del. C. § 2003.

Finally, Count VI, concerning Mahani's breach of common law duties of confidentiality to an employer, either fails to state a claim or is wholly redundant and need not be considered. To the extent that plaintiff complains that defendant disclosed trade secrets, the Uniform Trade Secrets Act bars any common law claim.[23] Plaintiff makes no attempt to identify confidential information disclosed by defendant not covered by the breach of his confidentiality agreement. Thus, even if Count VI somehow states a claim, its damages are entirely coterminous with those of Count I.

23    6 Del. C. § 2007(a) (displacing conflicting common or
      statutory law involving trade secrets).

*B. Claims involving the agreement not to compete with EDIX*

Plaintiff's reliance upon its covenant not to compete presents two difficult issues. As an initial matter, I must determine to what degree and in what manner a covenant not to compete is enforceable. Only then should I decide the extent to which Mahani's actions breached the enforceable aspects of the covenant.

 **\*7** Covenants not to compete are not subject to mechanical enforcement.[24] As a policy matter, such covenants concern both the legitimate interests of commercial enterprises and restrictions on the ability of individuals to support themselves and their families. When considering such agreements, the Court must carefully consider the factual circumstances surrounding both the contract and the parties.[25] The analysis requires two steps. This Court must determine whether the contract may be enforced at all, taking into account both standard concerns of contract formation such as consideration, agreement, or excuse of performance, and two specific limitations on covenants not to compete. First, a covenant must be reasonably limited in geography and time. Second, the covenant must advance a legitimate interest of the employer.[26] This Court traditionally exercises discretion in specifically enforcing a covenant's terms, balancing the equities and refusing enforcement where the benefit to the employer is ephemeral or the harm to the employee would be grave.[27] This Court does not enforce an agreement "that is

more restrictive than an employer's legitimate interests justify or that is oppressive to an employee."[28]

24    *Delaware Express Shuttle, Inc.,* 2002 WL 31458243, at
      *11 (quoting *McCann Surveyors Inc. v. Evans,* 611 A.2d
      1, 3 (Del. Ch.1987)).

25    *Id.*

26    *Id.*

27    *Id.*

28    See *Elite Cleaning Co., Inc. v. Capel,* 2006 WL 1565161,
      at *8 (Del. Ch. June 2, 2006) (quoting *RHIS, Inc. v.
      Boyce,* 2001 WL 1192203, at *6-7 (Del. Ch. Sept. 26,
      2001)).

*1. May the covenant not to compete be enforced as written?*

Defendant fails to show a breach of plaintiff's own contractual duties that might excuse performance. At trial, defendant suggested that plaintiff failed to pay commissions due to him during his last period of employment. Although both parties' testimony raises suspicions that Mahani should have received some payment in May, such doubts do not constitute a preponderance of the evidence demonstrating a prior material breach on the part of plaintiff.[29] Nor are there any concerns that the covenant is overbroad in time or geography: the text of the agreement limits its scope to plaintiff's primary operating areas for a period of two years.

29    Plaintiff's estimate of damages discloses significant
      revenue billed in the month of May, and suggests that
      many of the clients who cancelled their advertising
      were similarly billed in the months of March and April.
      Plaintiff explained that Mahani did not receive a draw for
      his commissions within his terminal period because of
      low call volume. Given this fact, plaintiff would seem to
      owe defendant commissions unless (a) draws from prior
      months had not been earned by defendant or (b) plaintiff
      collected absolutely no revenue on defendant's accounts
      during that time or (c) none of these accounts were, in
      fact, Mahani's.

          Defendant did not present any documentary evidence
          to suggest that plaintiff in fact collected revenues on
          these accounts in April or May, and plaintiff's damages
          claim alone is insufficient to prove the existence of
          such revenues. Thus, defendant does not meet the
          burden required to show a breach of contract. On
          the other hand, plaintiff's assertion that Mahani was
          owed no money under his April 31, 2006 commission

EDIX Media Group, Inc. v. Mahani, Not Reported in A.2d (2006)

2006 WL 3742595

agreement casts great suspicion upon the plaintiff's claims for damages, a matter that I will revisit in my discussion of remedies.

Nevertheless, the covenant not to compete may not be enforced against defendant as rigidly as plaintiff desires because it exceeds EDIX's legitimate interests in restricting the "substantially similar" operations of an independent contractor. On its face, the Non-Compete and Confidentiality Agreement applies equally to employees and independent contractors, but courts traditionally treat the two relationships distinctly.[30] Although the Court is unaware of a prior Delaware decision directly addressing covenants not to compete in the context of employees and independent contractors, there are strong reasons to recognize the distinction.[31]

[30]   *See, e.g., Rypac Packaging Mach. Inc. v. Coakley,* 2000 WL 567895, at *13 (Del. Ch. May 1, 2000) (differentiating between employees and contractors for purposes of Wage Act); *In re McKelvey v. Manley,* 1997 WL 528001, at *2-3 (Del.Super.Feb. 20, 1997) (describing the difference between employee and contractor as a matter for the fact-finder, undecided by parties' own self-description); RESTATEMENT (SECOND) OF AGENCY § 220(2) (providing factors for consideration in determining whether one acting for another is a servant or an independent contractor, including extent to which the master may oversee details of the work and extent to which one is engaged in a distinct occupation or business).

[31]   Few jurisdictions have directly addressed the effect of independent contracting status on the enforceability of covenants not to compete. Most jurisdictions allow such agreements with an independent contractor, subject to limitations similar to those on employees. *See, e.g., Eichmann v. Nat'l Hosp. and Health Care Services, Inc.,* 719 N.E.2d 1141, 1146 (Ill.App.1999) (finding no less scrutiny appropriate to covenants of independent contractors than employees); *Bristol Window and Door, Inc. v. Hoogenstyn,* 650 N.W.2d 670 (Mich.App.2002); *Quaker City Engine Rebuilders, Inc. v. Toscano,* 535 A.2d 1083, 1087-9 (Pa.Super.1987). Other jurisdictions have taken this Court's position that the nature of the relationship constitutes one factor in considering the enforceable scope of a non-compete agreement. *See, e.g., Hope Found., Inc., v. Edwards,* 2006 WL 3247141, at *9 (S.D.Ind. Apr. 12, 2006) ("If a person is an independent contractor, that fact may signal a greater likelihood that he has brought his own strengths and abilities to the joint enterprise, such that the party seeking

to enforce a covenant not to compete may have a more limited protectable interest."); *Starkings Court Reporting Services, Inc. v. Collins,* 313 S.E.2d 614 (N.C.App.1984) (finding covenant not to compete to exceed legitimate interests of employer where employee was independent contractor).

The traditional employee/employer relationship usually involves a much more intimate relationship than that of an independent contractor. Independent contractors maintain a greater degree of control over how they accomplish tasks; remain engaged to a much greater extent in a distinct occupation or business (as opposed to an employee, who may be asked to perform other reasonable tasks as required); and traditionally work with a lesser degree of supervision.[32] Independent contractors are not protected under the Wage Act[33] (and thus accept a greater risk of non-payment) and are responsible for paying their own income taxes. Both the traditional and statutory relationships between employers and employees reflect a closer bond: the employer pays a percentage of the employee's social cost (through tax contributions or social security payments), must accept greater legal duties, and is responsible for the employees' torts in negligence.[34] Firms will in general invest a greater amount of firm-specific know-how in employees than in contractors who are engaged in a "distinct occupation."[35]

[32]   RESTATEMENT (SECOND) OF AGENCY § 220(c).

[33]   *See Rypac Packaging Mach. Inc.,* 2000 WL 567895, at *13.

[34]   *See Fisher v. Townsend,* 695 A.2d 53, 58 (Del.1997).

[35]   RESTATEMENT (SECOND) OF AGENCY § 220(2)(b).

**\*8**   The legitimate economic interests of an employer in restricting the substantially similar activities of an independent contractor will be more limited than they would be with respect to an employee. A firm like EDIX that hires a salesman as an independent contractor may very well have a legitimate interest in preventing the contractor from engaging in activities that "directly compete" with the firm after the contract is terminated. Preventing such a contractor from engaging in any activities "substantially similar" to plaintiff's activities, however, raises the risk that a contractor in an independent business may be forced entirely from employment in a given industry. This implicates the traditional concern of this Court for the preservation of competition, and suggests strongly that enforcement of

EDIX Media Group, Inc. v. Mahani, Not Reported in A.2d (2006)

2006 WL 3742595

"substantially similar" provisions in non-competition clauses will be both inequitable to the contractor and against public policy. [36]

[36] To the extent that plaintiff relies upon *Delaware Express Shuttle, Inc. v. Older,* 2002 WL 31458243 (Del. Ch. Apr. 20, 2002), the distinction between competing with a former employer and being involved in a substantially similar business should be familiar. When interpreting a non-competition clause without a geographic limitation in *Delaware Express,* this Court declined to enforce the "substantially similar" clause on the grounds that no workable geographic limitation emerged from the text, but held that a defendant could be prevented from "competing with" his former firm because the phrase was self-limiting geographically. *Id.* at 13.

This case presents just such an injustice. Defendant's relationship to the after-market modification industry is more than ephemeral: he is romantically attached to an industry model, has personal friendships with industry participants, and is himself an auto enthusiast. Plaintiff insists that its non-compete agreement can be read so broadly that defendant breaches it by publishing a calendar of upcoming automotive events, merely because *some* of those car shows advertise in their magazine, or that a collage of logos on a webpage, only *some* of which include EDIX advertisers, compete with advertisements in their magazine, despite a lack of evidence to suggest that the manufacturers ever paid anything to SponsoredWhips, or indeed were aware of the use of their trademarks. [37] Indeed, plaintiff suggests that Mahani would violate his non-compete agreement by the simple act of showing up at a car show in his truck, opening the tailgate, and revealing the manufacturer's vinyl for the speakers in his own car. Certainly EDIX's interests in an independent contractor cannot be so broad as to drive defendant not only from his livelihood, but also from his hobbies. Plaintiff asks this Court to deny Mr. Mahani-supposedly an independent contractor-virtually any opportunity to work in his chosen industry in the area in which he lives. [38] This requested relief is unenforceable as a matter of policy.

[37] The idea that the logo collage is competitive flies in the face of common sense. Given SponsoredWhips' size and customer base, the logo collage exists to provide credibility to Mahani's company, not as promotional advertising for manufacturers.

[38] All evidence before the Court suggests that plaintiff converted Mahani from employee to independent

contractor status solely because EDIX desired to avoid withholding taxes on Mahani's income. Whether this recharacterization of Mahani's role would survive scrutiny by the Internal Revenue Service is beyond the jurisdiction of this Court. Certainly the expectation that Mahani would work fixed hours, meet a particular target for daily phone calls (irrespective of whether he felt this technique would in fact earn him fees), and was given the title "Account Executive," leaves this Court unconvinced that for any other purpose it would actually consider Mahani to be a contractor rather than an employee. Plaintiff has insisted upon the form of the relationship, however, and should be estopped from considering defendant an employee for purposes of its non-compete agreement.

The non-competiton agreement is therefore limited to actions that are the same as, and compete directly with, EDIX's own business activities. There is evidence that such competition did occur. EDIX provides models for its advertisers, and Mahani connected EDIX advertisers with the modeling services of his girlfriend and their associates. Similarly, defendant used pictures paid for by EDIX as images on his own websites. If not enjoined, SponsoredWhips could, in the future, feature paid-for banner advertisements on its website, and this too would constitute a competing service. Plaintiff's claims of unlawful competition, however, must be constrained to this *limited* scope. I evaluate each Count in turn.

### 2. Count II: Breach of contract resulting from unlawful competition

**\*9** Neither SponsoredWhips nor TunerAction engage primarily in activities directly in competition with EDIX's business. First, according to Shawn Ramsey's deposition testimony, TunerAction is barely a going concern, at most operating a website and having no paid-for members at present. Its business model is entirely different, deriving what profits it may eventually achieve by forwarding customers to a single automotive reseller. Overall, however, TunerAction appears to be a shell company waiting for a purpose.

I find Shawn Ramsey's deposition testimony claiming to have written the advertising copy for TunerAction's membership plan to be credible. The appearance of this text on TunerAction's website cannot be attributed to Mahani and, thus, does not violate his covenant. Though Mahani may have engaged in unlawful competition by collaborating with TunerAction in other ways, I do not find the evidence before

me sufficient to conclude that either plaintiff suffered damage or defendant received profits that he might disgorge . [39]

[39]    I do find that defendant unlawfully solicited customers from EDIX, as discussed in Count III below.

Nor does SponsoredWhips, for the most part, directly compete with EDIX. Plaintiff has not shown that the *writing* of sponsorship proposals is a significant part of its business, nor has it shown revenues or activities undertaken by SponsoredWhips that directly compete with EDIX. It is not enough that the same customers might seek out both firms for different purposes, even though ultimately the customer's goal is to receive parts. Nor is it enough, as plaintiff alleges, that an enthusiast who gains a sponsorship through the assistance of defendant will be less likely to buy parts through EDIX in the future. [40]  Such activities may be substantially similar to EDIX business, but they are not directly competitive.

[40]    Plaintiff's repeated assertion that selling parts at a discount to their members constituted the same act of "sponsorship" as would be undertaken by a company solicited by SponsoredWhips strikes this Court as particularly fanciful. Plaintiff insists that the term "sponsorship" or "partial sponsorship" is used in the industry to describe what in ordinary language would be considered a membership discount. Whatever the industry terminology, however, this Court looks to the substance of the transaction, not its label. SponsoredWhips does not offer memberships, let alone membership discounts, while EDIX does not write proposals.

EDIX also compares its sponsorship of a vehicle with defendant's business activities. When EDIX "sponsors" a car they are determining which end user will receive free or discounted goods, essentially *providing* a sponsorship. SponsoredWhips does no such thing, but rather helps customers *solicit*. Far from being competitors, these services compliment each other. In an ideal world, EDIX might even accept sponsorship proposals from their former employee.

SponsoredWhips might eventually compete with EDIX in the area of paid-for banner advertisements, or by expanding into provision of modeling services. To avoid this risk, Mahani shall for an appropriate time be enjoined as I describe below. Under Count II, EDIX failed to prove that Mahani has engaged in unfair competition within the enforceable scope of his contract and, thus, states no claim for damages.

3. *Count III: Breach of contract arising from unlawful solicitation of customers*

Plaintiff presented testimony clearly showing that Mahani unlawfully solicited customers in two ways. First, he contacted a *StreetTrenz* customer and offered him a TunerAction membership as a replacement for *StreetTrenz* services. This customer, however, remains a *StreetTrenz* customer, and it is not clear that he ever actually joined TunerAction. [41]  More importantly, Mr. Ramsey no longer seems to be running TunerAction as a going concern. To the extent that this was a violation, plaintiff has proven very little in the way of damages.

[41]    According to Shawn Ramsey's deposition, TunerAction has eight or nine members, and although there is a nominal membership fee of $99 that would entitle these individuals to additional benefits, no member has actually paid.

Second, Mahani also unlawfully solicited customers by greeting visitors to the SponsoredWhips website with the question, "Did you get screwed, or scammed, by ... *'StreetTrenz'* ... ?" Such a question is always rhetorical, asserting that a scam exists. Once again, however, plaintiff has failed to show any particularly concrete damages arising from the incident. Nor has it shown that these statements-a few lines on a website-motivated customers to leave EDIX, unsubscribe from *StreetTrenz,* or even request a sponsorship proposal. Without such evidence, Mahani should not be required to disgorge any profits he may have made from his otherwise non-competing enterprise.

**\*10**  Finally, plaintiff suggests that Mahani solicited customers by offering them the use of models for the Ocean City car show. The evidence consists of a single email to an EDIX customer (who is also a close personal friend of the Mahani family), reading almost in its entirety: "[Acteson and Kirchman] used to work for me at [*StreetTrenz* ], but don't want to if I am not there. [Another EDIX Customer] was going to hire them, now isn't sure. I didn't want to wait for his answer. They really love the OC show and they def. want to come, do you think [you] can use them?" [42]

[42]    On its own, the email is subject to two interpretations. It might represent an attempt by defendant to intrude upon plaintiff's activities as a provider of models. On the other hand, it may simply be read as a recommendation letter for two models searching for work. While it would no doubt have been better for the two models to contact

EDIX Media Group, Inc. v. Mahani, Not Reported in A.2d (2006)

2006 WL 3742595

a potential employer directly, there is no indication that defendant was paid for any services rendered by the models. Nor is there any indication that Sponsored Whips gained any customer goodwill by providing a model, as its customers are end users, not retailers.

It is likely that defendant breached his contract through his email. On the other hand, plaintiff's only suggestion that its customer actually *did* use either model is Burris's belief that they worked the Ocean City show. And even if the models did work, there is no testimony that allows me to conclude that (a) plaintiff would have been paid by their advertiser in the absence of the offer, or (b) that this client didn't desire the services of Acteson or Kirchman in particular.

I find that plaintiff has failed to show any actual damages arose with respect to TunerAction and *StreetTrenz,* or in solicitation for the use of models. Some of these actions were breaches of the covenant not to compete, however, and I award plaintiff nominal damages in an amount in accordance with our common law tradition, six cents. [43] Additionally, Mr. Mahani will be enjoined from similar activities for the remaining duration of the non-competition agreement.

[43]    *See Standard Distrib. Co. v. NKS Distribs., Inc.,* 1996 WL 944898, at *11 (Del.Super.Jan. 3, 1996).

### 4. Count IV: Breach of contract by unlawfully soliciting workers

The complaint alleges that defendant urged three individuals to cease working with plaintiff: Kelly Acteson, Jessie Kirchman and Mark Hernandez. I must consider whether, in violation of his agreement, Mahani induced or attempted to induce any employee or contractor to quit "employment or any contractual relationship." The trial transcript says remarkably little about Hernandez's role at EDIX, and only one series of emails suggests a contract ever existed. [44] In this document, Mr. Hernandez first agrees to participate in the OC Car show on May 29, and subsequently backs down from his agreement on June 1. He gives as one reason among many the fact that he has been talking to TunerAction, and specifically Mahani, about a car sponsorship. Phone records indicate that defendant spoke to Hernandez on May 30. Plaintiff wishes me to infer from this that Hernandez's change of heart stemmed from his conversation with defendant. Defendant, on the other hand, denies knowing that Hernandez had ever been paid or employed by plaintiff prior to his dismissal. Plaintiff submits not a single cancelled check to that effect.

[44]    Plaintiff wishes me to find that the following conversation via email constitutes a contractual relationship frustrated by defendant:

BURRIS: "Please let me know which shows you can attend and I will let you know how much space we have."

HERNANDEZ: "You can for sure put me down for the OC Car Show. I know, I really want to go to that and I will be up there.... The OC Car Show is a go for me."

BURRIS: "OK, we will be getting down there on Friday and staying thru Sunday."

The bare bones of a contractual relationship can be inferred from this conversation: an offer ("You can for sure put me down for the OC Car Show"); an acceptance ("OK"); and through prior relationships, the implication of consideration (a percentage of any sponsorships sold).

Burris at trial described Hernandez as a contractor, not an employee, whose job was to speak to potential members at car shows and try to sell memberships. Plaintiff has presented no evidence that Hernandez had an ongoing contractual relationship with EDIX. Even assuming the existence of a contract, plaintiff's only admissible evidence suggesting Mahani's interference is a phone call between defendant and a personal friend. [45] This is thin soup indeed.

[45]    Plaintiff also relies upon a portion of the June 1, 2006 email exchange between Burris and Hernandez, where in response to Burris's question, "Who have you been talking to over there?" Hernandez replies, "I am pretty sure it has been [Mahani] and [Acteson]." I allowed, over defendant's objection, emails from third parties not present to be admitted into evidence *solely* for the purpose of proving the motivation of those parties. Del. R. Evid. 803(3). Mahani testified that he did not recall speaking to Hernandez about TunerAction. If plaintiff wished to rebut that statement with Hernandez's words, then he should have been put on the stand, where defendant would have had an opportunity for cross-examination. To prove that Hernandez *thought* he was speaking to defendant, the email suffices. To prove that a prohibited conversation actually took place, or that Mahani actually made an offer of sponsorship, such evidence is hearsay.

 **11**   It is clear from the evidence that Mahani did solicit work for his girlfriend and some of her friends. Plaintiff does not suggest that either model was under an exclusive contract, nor that they were contracted to work at the Ocean City show. Further, plaintiff strains the imagination of the Court in

A119

EDIX Media Group, Inc. v. Mahani, Not Reported in A.2d (2006)

2006 WL 3742595

asking me to believe that after firing Ms. Acteson's boyfriend and proceeding into a very acrimonious lawsuit, it is in any way likely that the models were going to work for EDIX in the future, whether or not Mahani attempted to induce such refusal. In the absence of such evidence, it is difficult to see how plaintiff has established a contractual relationship with which defendant interfered, let alone what damages might plausibly be considered.

### C. Common law and statutory claims not concerning confidentiality or non-competition

Plaintiff also demands compensation for three claims at common law and one statutory violation. Two of the three common law claims are redundant and need be given only cursory consideration. Plaintiff's allegations of defamation require slightly more discussion, particularly as to appropriate damages. Finally, plaintiff requests treble damages for violation of the Deceptive Trade Practices Act.

#### 1. Count VII: Unfair competition and Count VIII: Tortious interference with business relationships

Plaintiff maintains that defendant has engaged in and will continue to engage in unfair competition. The complaint provides no detail as to precisely what actions constitute unfair competition, and I note as an initial matter that Delaware courts have struggled to precisely define the boundaries of the common law in this area.[46] The essential element separating unfair competition from legitimate market participation, however, is an unfair action on the part of defendant by which he prevents plaintiff from legitimately earning revenue.[47]

[46] See, e.g., State ex rel. Brady v. Wellington Homes, Inc., 2003 WL 22048231 (Del.Super.Aug. 20, 2003) ("Deceptive conduct constituting unreasonable interference with another's promotion and conduct of business is part of a heterogeneous collection of legal wrongs known as 'unfair trade practices.' This type of conduct is notoriously undefined. Commonly referred to as 'unfair competition,' its metes and bounds have not been charted.")

[47] In Total Care Physicians, P.A. v. O'Hara, the Superior Court held that to succeed in a claim for unfair competition, a plaintiff must show (a) a reasonable expectancy of entering into a valid business relationship, (b) interference with that relationship by defendant, and (c) consequent defeat of plaintiff's legitimate expectancy.

Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043, 1057 (Del.Super.2001). There are other definitions used in differing factual situations, as befits this rather amorphous cause of action. See, e.g., State ex rel. Brady v. Wellington Homes, Inc., 2003 WL 22048231, at *2 ("The essence of unfair competition is the fraudulently seeking to sell one's goods for those of another, and the true test is whether the defendant's acts are reasonably calculated to deceive the average buyer under the ordinary conditions prevailing in the particular trade." (quoting Coca-Cola Co. v. Nehi Corp., 36 A.2d 156, 165 (Del.1944))).

Count VII thus becomes completely redundant in light of plaintiff's other claims. Unfair competition affords plaintiff no relief at common law from breaches of confidentiality that its claim in contract does not. Nor does it expand upon damages derived from the non-competition agreement: if defendant's post-employment activities do not breach his contractual duties, they are not in some other way wrongful. No additional damages may stem from this Count.

Likewise, plaintiff's claim for tortious interference with business relationships makes no case for any additional liability. Tortious interference requires that plaintiff demonstrate that (1) a contract existed, (2) the defendant knew of the contract, (3) defendant's intentional actions played a significant role in causing the breach of such contract, (4) defendant acted without justification, and (5) the breach caused injury.[48] Mahani's emails no doubt qualify as a tortious interference in EDIX contractual relationships, being intentional, unexcused and the cause of cancellation for some contracts. The scope of Count VII compliments that of Count I in only one respect: where a customer cancelled their contract with EDIX on the basis of information in Mahani's emails, their motivation becomes irrelevant. If the customer reacted to information that was not confidential but otherwise wrongful, damages are appropriate under Count VII but not necessarily Count I.[49] I find, however, that where EDIX suffered damages from lost contracts, such damages arose primarily on the basis of confidential disclosure of information and, thus, Count VII does little additional work. Unfair competition and tortious interference are thus almost entirely redundant, and need not be considered in calculating damages.

[48] Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983 (Del. Ch.1987).

[49] For instance, a hypothetical customer might have cancelled his contract because of defamatory statements

EDIX Media Group, Inc. v. Mahani, Not Reported in A.2d (2006)

2006 WL 3742595

concerning Burris, but not because of confidential disclosures.

### 2. Count IX: Defamation

**\*12**   In Delaware, defamation requires (a) a defamatory communication, (b) publication, (c) communication that refers to the plaintiff, such that (d) a third party understands the communication's defamatory character, and (e) there is an injury.[50]   Four types of defamatory statement do not require plaintiff to show any special damages: maligning a person in his trade or business, imputing a crime of moral turpitude, implying a person suffers from a loathsome disease, or imputing the unchastity of a woman.[51]   Additionally, for the letter to be defamatory to plaintiff, as opposed to plaintiff's employees, it must contain statements that "reflect discredit upon the method by which the corporation conducts its business."[52]

[50]   *Delaware Express Shuttle,* 2002 WL 31458243, at \*21.

[51]   *Id.*

[52]   *Id.*

There can be no doubt that defendant defamed EDIX in his June 6 email, to say nothing of any other communication. Plaintiff deserves nominal damages in the amount of six cents, as well as compensatory damages. Once again, however, compensatory damages will be largely the same as those implicated by Count I.

### 3. Count X: Deceptive Trade Practices

Finally, plaintiff seeks the protection of 6 *Del. C.* § 2532(a), which forbids deceptive trade practices, in order to justify an award of treble damages and attorney's fees. The facts proven at trial do not justify such relief.

The Deceptive Trade Practices Act forbids "disparage[ment] of the goods, services or business of another by false or misleading representations of fact,"[53] acts that defendant committed, but requires such activity to be conducted "in the course of a business, vocation, or occupation."[54] The DTPA was designed to prevent "patterns of deceptive conduct," not isolated incidents.[55]

[53]   6 *Del. C.* § 2532(a)(8).

[54]   6 *Del. C.* § 2532(a).

[55]   *Grand Ventures, Inc. v. Whaley,* 622 A.2d 655 (Del.Super.1992).   ("Treble damages are available only in conjunction with injunctive relief under 6 *Del. C.* § 2533(a). The association of the treble damage remedy with injunctive relief indicates that the Act is directed at patterns of deceptive conduct, not isolated incidents of consumer fraud.")

Mahani's deceptive acts were the emails of May 21 and June 6, both of which made disparaging accusations about EDIX. I am not convinced that defendant wrote these emails, as suggested in plaintiff's complaint, in an effort to "destroy and eliminate competition from EDIX."[56] At the point that Mahani wrote these emails, he had neither a magazine nor an auto club with which he might benefit were EDIX to go out of business, and to the extent that he might have plans for such an operation in mind, there is no evidence that he had the financing, experience or other required wherewithal to start one. Mahani's motivation for writing the emails was almost certainly the simplest and most old-fashioned of all: revenge. For this he is liable under both defamation and breach of contract theories, and in addition will quite possibly suffer criminal penalties. But I do not believe that the Legislature adopted the Deceptive Trade Practices Act in order to convert acts of passion into acts of corporate malfeasance resulting in treble damages.

[56]   Supplemental Verified Compl. at 17.

### IV. DAMAGES AND INJUNCTIVE RELIEF

#### A. Compensatory damages

Having woven a path through plaintiff's various theories, it remains only to determine the amount of damages to which plaintiff is entitled. Compensatory damages, arising primarily from breaches of the confidentiality agreement, are warranted by Counts I, III, V, and IX. Both parties have briefed this issue, debating in detail each and every contested and cancelled contract.

**\*13**   The law "does not require certainty in the award of damages where a wrong has been proven and injury established."[57]   Nevertheless, the law does require that plaintiff show not only an injury, but also that the injury was caused by defendant. I am not convinced that Mahani's actions were the root cause of each and every cancelled payment that EDIX suffered. After all, plaintiff itself forced a revision in the payment structure for independent contractors in part to encourage collection of a mountain of over $60,000 worth of

EDIX Media Group, Inc. v. Mahani, Not Reported in A.2d (2006)

2006 WL 3742595

uncollected receivables that had accrued over a month before any conflict arose. This suggests considerable uncertainty as to whether some of these revenues were ever to be collected. Mahani should pay for his sins, but not the obstinacy of others.

57   *Total Care Physicians,* 2003 WL 21733023, at \*3 n. 16 (citing *Delaware Express Shuttle,* 2002 WL 31458243, at \*13).

In making a client-by-client listing of damages, plaintiff has presented a mélange of differing agreements (including signed contracts, unsigned contracts, and testimony involving verbal contracts) and various proofs of cancellation. As already mentioned, I have given considerable weight to documentary evidence provided by third parties. Having found the testimony of Burris to be not much more credible than that of defendant, I do not consider plaintiff to have proven causation by a preponderance of the evidence when the sole sign that a contract existed is trial testimony. On the other hand, I do not believe (as defendant suggests) that plaintiff must put forward a signed contract in order to prove that a contractual relationship existed. Where plaintiff has shown that a client placed advertisements in the magazine consistent with the claimed contract, and defendant has put forth no evidence to rebut the existence of a contract, plaintiff has met its burden.

The same general rule applies to causation. Plaintiff and defendant both spoke at trial regarding reasons that advertisers *might* have cancelled contracts, and not all evidence points towards defendant. Plaintiff's own evidence suggests that some customers were irregular in their payments. There are indications in the record that some customers' loyalty was to Mahani, and that they would have withdrawn their support after his firing without further provocation. [58] It is not unusual for clients to leave when a favored salesperson is dismissed. In order to provide a preponderance of evidence, plaintiff needs to produce some non-hearsay evidence in addition to Burris's testimony to indicate that a customer ceased their relationship due to defendant's actions. [59] Where no such evidence is available, and there are many possible reasons the contract might have been cancelled, plaintiff has not shown that it is more likely than not that the cancellation was caused by Mahani. With these rules in mind, it is easy to identify several categories of advertisers.

58   The one advertiser upon which both parties agree that defendant is liable, Aamp of America, actually gives the

Court considerable pause. Aamp's detailed explanation of their reasons for canceling their contract includes confusion as to the reasons behind the dismissal of Mahani. Other advertisers may have felt the same way, irrespective of Mahani's emails.

59   I allowed considerable testimony by Burris, over defendant's objections, as to the motivations of EDIX advertisers. As I explained at trial, the testimony was properly admitted as it was offered to show motivation rather than truth of the statements themselves. In the absence of other evidence, however, I have given this little weight.

The first category consists of advertisers for which plaintiff has provided either no independent proof of motive or causation, or where that proof is insufficient to show that Mahani's emails led to plaintiff's loss. I have only conflicting trial testimony with regard to the motivations of Texas Heat Wave, Mobil Spec, the Installer Institute or Apollo America in cancelling their contracts. For some advertisers, the emails introduced by plaintiff as evidence of motive simply do not allow me to make a confident inference as to the advertiser's state of mind. For instance, JGY Customs simply notes that there was a "lot of drama" after Mahani was fired. Elevation Audio gripes that "this is getting to be a nonsense situation," and asks for a phone call from Burris, but gives no indication that Mahani's emails provide the impetus for cancelling their advertisements. Finally, plaintiff complains that Absolute USA refused to pay for advertisements run in April, May, and June, although two months of bills would have been payable *before* Mahani sent any messages. It is possible that they refused to pay at defendant's urging, but it is equally possible that they simply continued in their delinquency. Plaintiff has failed to meet the burden of proof necessary to show damages with regard to any of these accounts.

 **\*14** Two other accounts merit special consideration: O2 and Dual Electronics. Plaintiff presents no signed contract with O2, nor any non-testimonial evidence that they ever intended to renew their contract. [60] As for Dual Electronics, plaintiff submits a written contract and evidence that Dual advertised for their first month as planned and, thus, it is reasonable to conclude that a contract existed. On the other hand, the email submitted by plaintiff to show Dual's motivation in cancelling their advertisements lists a number of concerns, some of which implicate Mahani's actions and some of which do not.

60   Defendant, on the other hand, submits an email from O2 stating that the company cancelled its contract due

to the receipt of a better offer for advertising from an EDIX competitor. Once again, the letter is inadmissible for purposes of proving the truth of the matter-that an offer was received-but is admissible as evidence of O2's motivation.

I conclude that no damages can be awarded with regard to O2, as plaintiff has not shown the existence of a contract. Dual Electronics is a more difficult matter. The email provided by plaintiff shows that Dual was motivated in part by Mahani's actions, and in part by other concerns. For this reason, I find that plaintiff should be awarded nothing for this claim. Because of the mixture of motives underlying Dual's decision to end its advertising relationship with EDIX, I cannot find that plaintiff has proved any damages attributable to Mahani.

Defendant's liability for the other customers is hardly in doubt. Plaintiff has presented either written contracts or shown that advertisers actually ran advertisements. Emails plaintiff has submitted from these advertisers unambiguously indicate that Mahani's actions motivated their cancellations or non-payments. Therefore, plaintiff is awarded the full amount requested with regards to HD Wheels ($5,000), Metra ($3,600), Monkey Video ($2,400), and Aamp of America ($3,500), for actual damages arising from lost advertisers in the amount of $14,500.

*B. Plaintiffs' motions for contempt of court and leave to file lis pendens*

Plaintiff also asks that I award damages for defendant's alleged violations of the stipulated restraining order. Penalties for civil contempt of a restraining order are appropriate when the Court seeks to achieve compliance with its order and preserve the rights of an aggrieved party.[61] Even an imperfect or erroneous order of this Court must still be followed, and a court may punish disobedience with penalties for contempt so long as the order was not issued in excess of the Court's jurisdiction.[62] Nevertheless, I find that further damages for contempt would be inappropriate.

[61]    See *City of Wilmington v. Gen. Teamsters Local Union 326,* 321 A.2d 123, 125 (Del.1974). The Court of Chancery possesses both common law and statutory contempt powers that may be used to enforce its judgments. See *id.;* 10 Del. C. §§ 370-71.

[62]    See *Mayer v. Mayer,* 132 A.2d 617, 621 (Del.1957).

First, the damages delineated above are adequate recompense for the actual harm suffered by plaintiff, especially when coupled with the $5,000 already paid by defendant as a result of plaintiff's first motion for contempt. Second, evidence offered at trial has convinced me that the initial temporary restraining order, despite having been stipulated to by both parties, was nonetheless more expansive than appropriate, preventing defendant from many reasonable and appropriate activities. Although plaintiff complains of several violations, most of them are either *de minimus* or not matters for which damages are awarded in this final judgment. Nor is the final permanent injunction to be as broad as the temporary restraining order. Thus damages for these infractions seem neither equitable nor necessary.

**\*15** On the other hand, given defendant's less than exemplary record in following orders of this Court, I note here that failure to abide by any further orders will be met with punitive sanctions. Further, plaintiff's leave to file *lis pendens* on property purportedly transferred from Mahani to his father is granted pending either satisfaction of this judgment in full or plaintiff's prosecution of a fraudulent conveyance action.

*C. Other damages*

Besides compensatory damages arising from plaintiff's claims or from contempt of court, plaintiff is also entitled to exemplary damages for willful and malicious misappropriation of trade secrets, and nominal damages for breach of contract arising from unlawful solicitation and defamation. Nominal damages on all counts that merit them are awarded in the amount of six cents. In addition, I find that $2,000 should be awarded to plaintiff in exemplary damages under the Delaware Trade Secrets Act.[63]

[63]    6 Del. C. § 2003(b) (exemplary damages not to exceed twice any award made for compensatory damages). It is difficult to divine with precision how much of the $14,500 in compensatory damages derive from defendant's misappropriation of advertising rates, but $1,000 would be a reasonable, if conservative, estimate.

*D. Attorney's fees, costs of litigation, and other costs*

As part of the Non-Compete and Confidentiality Agreement, defendant agreed to indemnify plaintiff for any legal fees incurred by plaintiff in attempting to enforce this agreement, and such agreements are enforceable.[64] I do not hesitate to award fees in this case, as defendant has done very little at any stage of this litigation to mitigate plaintiff's costs in pursuing its rights under the employment agreement. Plaintiff is also entitled to reasonable reimbursement of expenses paid

EDIX Media Group, Inc. v. Mahani, Not Reported in A.2d (2006)

2006 WL 3742595

to third parties in investigating the source of defendant's malicious emails. Plaintiff shall submit affidavits detailing these expenses for reimbursement.

64   *Delaware Express Shuttle,* 2002 WL 31458243, at *23.

*E. Injunctive relief*

Finally, plaintiff should enjoy the protection of both the confidentiality agreement and, to the degree it is enforceable, the non-competition agreement. Therefore, defendant shall be enjoined from the following activities until May 13, 2008:(a) directly or indirectly using or disclosing to any person or other entity any of plaintiff's confidential or proprietary information; (b) directly or indirectly owning, managing, operating, joining, being employed by, controlling or managing any automotive club or other membership-based subscription business involving the after-market automotive parts industry; (c) directly or indirectly providing paid-for or otherwise compensated advertising, either in print or online, for any EDIX advertiser, as limited by the non-competition

agreement; or (d) directly or indirectly providing modeling services.

V. CONCLUSION

Plaintiff is awarded monetary damages in the amount of $16,500.06, the total of $14,500 in compensatory damages, $2,000 in exemplary damages and six cents in nominal damages. Defendant shall be enjoined from revealing confidential information and engaging in activities that directly compete with EDIX operations as defined above.

Counsel shall confer and submit within twenty days a proposed form of final order to implement this Memorandum Opinion. The order shall make provision for attorney's fees and costs, as described herein.

**All Citations**

Not Reported in A.2d, 2006 WL 3742595

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Ninespot, Inc. v. Jupai Holdings Limited, Not Reported in Fed. Supp. (2018)

2018 WL 3626325

2018 WL 3626325
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

NINESPOT, INC., Plaintiff,

v.

JUPAI HOLDINGS LIMITED, Puji Media Holdings
Limited, Puji Jupai Asset Management, Defendants.

Civil Action No. 18-144-RGA
|
Signed 07/30/2018

**Attorneys and Law Firms**

Christopher Page Simon, Cross & Simon, LLC, Wilmington,
DE, Jonathan Sablone, Pro Hac Vice, Kacey H. Walker, Pro
Hac Vice, for Plaintiff.

Michael A. Barlow, Andrew John Peach, Abrams & Bayliss
LLP, Adam V. Orlacchio, David A. Dorey, Blank Rome
LLP, Thomas G. Macauley, Macauley LLC, Wilmington, DE,
Kevin M. Askew, Pro Hac Vice, Michael C. Tu, Pro Hac
Vice, Sunny Hwang, Pro Hac Vice, Jeffrey Rosenfeld, Pro
Hac Vice, Mike Margolis, Pro Hac Vice, Ping Zhang, Pro
Hac Vice, Jonathan P. Hersey, Pro Hac Vice, Junyong Huang-
Stowers, Pro Hac Vice, for Defendants.

MEMORANDUM ORDER

Richard G. Andrews, United States District Judge

**\*1** Presently before this Court are motions to dismiss filed
by Defendants Jupai Holdings Limited ("Jupai") (D.I. 80),
Puji Media Holdings Limited ("Puji") (D.I. 79), and Puji Jupai
Asset Management ("PJ") (D.I. 77). The motions to dismiss
are based on Federal Rules of Civil Procedure 12(b)(2), 12(b)
(6), and 9(b). The matter is fully briefed. (D.I. 78, 81, 82, 88,
90, 91, 94). The Court heard oral argument on June 28, 2018.
(D.I. 101).

For the reasons set forth herein, Defendants' motions are
granted in part and denied in part.

**I. BACKGROUND**
On October 10, 2017, Plaintiff Ninespot filed this action
against Jupai, Puji, and PJ for breach of contract and related
claims in connection with a potential investment by Jupai

in Ninespot. (D.I. 1). Plaintiff was an online and livestream
video platform creator, incorporated in Delaware with its
principal place of business in California. (*Id.* at 3). In
2015, Plaintiff's Chief Executive Officer and Chairman met
with the Vice President of Puji in California to discuss a
collaboration between the two parties. (*Id.* ¶ 18). After months
of communication, Plaintiff and Puji executed a Business
Collaboration Agreement that laid out terms discussing
Puji's proposed assistance to Plaintiff in creating strategic
partnerships, expanding Plaintiff's products, and securing
investment capital in the Asian market. (*Id.* ¶¶ 24-26). Puji
then introduced Jupai to Plaintiff as a potential investor
in Plaintiff's business, relying on Puji's close working
relationship with Jupai to assist with the proposed investment.
(*Id.* ¶¶ 30-31). Executives from both Puji and Jupai negotiated
terms for the proposed investment in Plaintiff in exchange for
a number of shares of stock from Plaintiff, executed in a non-
binding term sheet, signed by Plaintiff and stamped by Jupai.
(*Id.* ¶¶ 53-54). [1]

---

[1] Gordon Chu, Vice President at Puji, served as the
contact to Plaintiff on behalf of Jupai and Puji in all
communications regarding formation and negotiation of
the various agreements prepared for execution of the
proposed investment. (D.I. 1).

---

Further negotiations were conducted by Puji, on behalf of
Jupai, regarding additional equity structured into the proposed
investment deal. (*Id.* ¶¶ 55-56). In December 2016, a draft
of a Series B Stock Purchase Agreement was sent from
Plaintiff to Puji, incorporating the terms by which Plaintiff
and Jupai agreed to execute the planned investment. (*Id.* ¶
58). Puji continued to request changes to the draft of the
Stock Purchase Agreement and in April, 2017, Plaintiff and
PJ executed the Series B Stock Purchase Agreement, with
terms including the number of shares to be purchased by
PJ for its investment of $18 million in Plaintiff. (*Id.* ¶¶
92-93). Up until approximately May, 2017, Puji, on behalf of
Jupai's designated offshore investing entity, PJ, represented
to Plaintiff that Jupai was prepared to make the investment.
(*Id.* ¶ 98). [2] By June of 2017, the investment had not
been received, and Plaintiff sent a demand letter through its
counsel to Jupai seeking assurance that Jupai had attempted
in good faith to fund the first installment of the investment.
(*Id.* ¶ 105). Plaintiff received a response from PJ, which
disclaimed all contractual obligations from any agreement
formed in connection with the proposed investment, stated the
Chinese government's tightened restrictions on the outbound
flow of investment capital from China prevented PJ from

wiring the money, which constituted an unforeseeable and uncontrollable *force majeure*, and declared PJ would cease all efforts on the investment. (*Id.* ¶¶ 107-08). [3]

[2]    One of Plaintiff's claims, Count Six, is filed against Puji for intentional interference with prospective economic relations. It is based on allegations that when Puji represented to Plaintiff that Jupai was willing to move forward with the investment in Plaintiff, Puji represented to a potential acquisition target of Plaintiff that the investment was moving slowly and that business agreements with Plaintiff may not be fruitful. (*Id.* ¶ 48).

[3]    The demand letter sent from Plaintiff was addressed to Jupai, and Oreans Yuan, Puji's Chief Financial Officer, sent the response to Plaintiff, responding in his capacity as Director of PJ. (*Id.* ¶ 107).

**\*2**  Plaintiff's complaint alleges the failure to invest and related claims have effectively rendered Plaintiff's business worthless. Plaintiff seeks to recover damages accordingly. (*Id.* ¶ 118).

## II. LEGAL STANDARDS

### a. Rule 12(b)(2)

When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003). "Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction." *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, the plaintiff must produce "sworn affidavits or other competent evidence," since a Rule 12(b)(2) motion "requires resolution of factual issues outside of the pleadings." *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984).

The personal jurisdiction analysis involves both a statutory and constitutional inquiry. *Shoemaker v. McConnell*, 556 F.Supp.2d 351, 354 (D. Del. 2008). First, the court must consider whether a defendant's actions come within any of the provisions of the state long-arm statute. *See Intel v. Broadcom*, 167 F.Supp.2d 692, 700 (D. Del. 2001). Second, the court must determine whether exercising jurisdiction over the defendant in the forum comports with the Due Process Clause of the Constitution. *Id.*

The court applies the law of the state in which, the district court is located. *See id.* Delaware's long-arm statute authorizes jurisdiction over a nonresident when, among other things, that party or its agent:

> (1) Transacts any business or performs any character of work or service in the State; (2) Contracts to supply services or things in this State; (3) Causes tortious injury in the State by an act or omission in this State; (4) Causes tortious injury in the State or outside the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State....

10 Del. C. § 3104(c)(1)–(4). "With the exception of (c)(4), the long-arm statute requires a showing of specific jurisdiction." *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F.Supp.3d 613, 622 (D. Del. 2015). Subsection (c)(4), on the other hand, confers general jurisdiction, such that while a general presence in Delaware is necessary to assert jurisdiction, the contacts of the nonresident (or its agent) need not relate to the instant litigation. *See Reach & Assocs., P.C. v. Dencer*, 269 F.Supp.2d 497, 505 (D. Del. 2003). The court should interpret the language of these provisions liberally, as "conferring jurisdiction to the maximum extent of the Due Process clause." *Jeffreys v. Exten*, 784 F.Supp. 146, 151 (D. Del. 1992). Further, the Delaware long-arm statute is a "single act" statute, whereby even one transaction engaged in by the nonresident in Delaware establishes jurisdiction. *Eudaily v. Harmon*, 420 A.2d 1175, 1180 (Del. 1980).

**\*3**  Due Process is satisfied if the court finds the existence of "minimum contacts" between the nonresident defendant and the forum state, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316,

Ninespot, Inc. v. Jupai Holdings Limited, Not Reported in Fed. Supp. (2018)

2018 WL 3626325

66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotation marks omitted).

#### b. Rules 12(b)(6) and 9(b)

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the complaint's factual allegations as true.[4] See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. at 555, 127 S.Ct. 1955. The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. Id. ("Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted) ).

[4]   There is no question that I can consider, in addition to the complaint, the various purported contracts and agreements that form the basis for the claims. See Lum v. Bank of America, 361 F.3d 217, 221 n. 3 (3d Cir. 2004).

Federal Rule of Civil Procedure 9(b) requires that a complaint must state with particularity the circumstances constituting fraud or mistake. Conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b). Complaints that fail to plead fraud or false claims grounded in fraud with the requisite particularity are dismissed in the same manner as a dismissal under rule 12(b)(6). Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1107 (9th Cir. 2003).

### III. DISCUSSION

Jupai makes two principal arguments in its motion to dismiss. First, it argues Delaware courts lack personal jurisdiction over Jupai because it was not a signatory to the agreement that contained a Delaware forum selection clause. (D.I. 81 at 3).

Second, it argues Plaintiff has failed to state a claim in the five counts in which it is a defendant. (Id. at 1). Puji and PJ, in their motions to dismiss, argue the counts in which they are defendants fail to state a claim. (D.I. 77, 79). Puji also relies on Rule 9(b) for its argument. (D.I. 79).

#### a. Jupai's 12(b)(2) motion to dismiss

Jupai moves the Court to dismiss it for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). The case was filed in California. The District Court there transferred the case here on motion of the other two defendants. Plaintiff argues that this Court can exercise jurisdiction over Jupai based on the California court's decision in its grant of the motion to transfer. That court held that Jupai consented to jurisdiction in Delaware because it was "closely related" to the Stock Purchase Agreement that contained the Delaware forum selection clause. (D.I. 88 at 4).

**\*4** In order to determine if Jupai is subject to personal jurisdiction in Delaware, the main issue is whether Jupai is bound by the Delaware forum selection clause. When a party is bound by a forum selection clause, the party consents to personal jurisdiction. Hadley v. Shaffer, 2003 WL 21960406, at \*3 (D. Del. Aug. 12, 2003); Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc., 42 F.Supp.2d 423, 431 (D. Del. 1999) ). Further, express consent to jurisdiction, like that found from a party bound by a forum selection clause, satisfies the requirement of due process owed in a personal jurisdiction inquiry, and thus the minimum contacts analysis becomes superfluous. Hadley, 2003 WL 21960406, at \*3 (finding "[s]uch consent is deemed to be a waiver of any objection on Due Process grounds and an analysis of minimum contacts becomes unnecessary.").

In accordance with Delaware law, a three-part test is used to determine if a non-signatory party is bound by a forum selection clause. First, is the forum selection clause valid? Second, is the challenging party a third-party beneficiary or "closely related" to the agreement? Third, do the claims at issue arise from the non-signatory's standing relative to the agreement? Hadley, 2003 WL 21960406, at \*4; Aviation West Charters, LLC v. Freer, 2015 WL 5138285, at \*4 (Del. Super. Ct. July 2, 2015). If each of the answers to the three-part test is affirmative, then the party is bound by the forum selection clause. Aviation West Charters, LLC, 2015 WL 5138285, at \*4.

Forum selection clauses carry a high degree of presumed validity. Jupai has not challenged the validity of the forum

Ninespot, Inc. v. Jupai Holdings Limited, Not Reported in Fed. Supp. (2018)

2018 WL 3626325

selection clause in its motion to dismiss. (D.I. 81 at 16-20). Thus, the forum selection clause in the Stock Purchase Agreement is presumed valid.

Jupai challenges the last two prongs of the forum selection clause test, by arguing it is not closely related to the Stock Purchase Agreement such that it could be bound by the forum selection clause. (*Id.*). Specifically, Jupai argues the transferring court made a factual error when it found Jupai was closely related to the agreement. (*Id.* at 17.) Second, Jupai argues that Plaintiff's claims against it do not arise out of the Stock Purchase Agreement, but from a different agreement, the Term Sheet. (*Id.*; *see* D.I. 1 ¶¶ 131-36). The Term Sheet does not contain a Delaware forum selection clause. (D.I. 31, Exh. 1).

I disagree with Jupai on both points. In order to be considered "closely related" to an agreement as a non-signatory, a party "must receive a direct monetary or non-monetary benefit from the agreement." *Phunware, Inc. v. Excelmind Group Ltd.,* 117 F.Supp.3d 613, 630 (D. Del. 2015) (emphasis omitted); *Capital Group Co. Inc. v. Armour,* 2004 WL 2521295, at *6 n. 40 (Del. Ch. Oct. 29, 2004). In addition, Delaware Courts also consider whether it was foreseeable to the party that it would be bound by the agreement. *Aviation West Charters, LLC,* 2015 WL5138285, at *4.

First, Jupai argues the California court read the Side Letter Agreement (D.I. 1-3, Exh. C) to bind Jupai to the agreement as the Letter states, "Jupai and its Affiliates shall purchase additional Shares of Series B Preferred Stock ... in accordance with Section 1.1(c) of the Stock Purchase Agreement." (*Id.*) Jupai argues this reading of the letter is incorrect, because the Stock Purchase Agreement defines "Jupai" to mean "Puji Jupai Asset Management," or PJ. (D.I. 1-2, Exh. B). Jupai argues the California court "relied heavily on the Side Letter Agreement" to find that Jupai is bound to the Stock Purchase Agreement. (D.I. 81 at 17). But the Side Letter Agreement was only part of the analysis. The California court's order first specifies that Jupai is closely related to the Stock Purchase agreement because Jupai was party to the Term Sheet. (D.I. 52 at 5). The relevant provision of the Term Sheet provided that Jupai itself would invest in Plaintiff pursuant to the terms of the Stock Purchase Agreement. (D.I. 31, Exh. 1 at 2). Second, the California court premised its decision on the fact that Jupai "negotiated the specific terms of the [Stock Purchase Agreement], including that the investment be structured in tranches to accommodate Jupai's concerns about capital outflow." (*Id.*) Third, the California court decided

Jupai was closely related based on its involvement in the Side Letter Agreement. (*Id.*) Thus, even if the California court did mistakenly interpret "Jupai" in the Side Letter Agreement to signify "Jupai Holdings Ltd." rather than PJ, Jupai can still be found to be closely related through the two other above-mentioned connections to the Stock Purchase Agreement. [5]

[5]   I do not think the California court was wrong. The Side Letter Agreement says "Jupai and its Affiliates." "Affiliates" is a defined term in the Stock Purchase Agreement. (D.I. 1-2, Exh. B, 31, 4(a) ). Thus, even if Defendant Jupai is not the "Jupai" of the Side Letter Agreement, it is an affiliate of the "Jupai" of the Side Letter Agreement.

**\*5**   While Jupai was not a named party nor signatory to the Stock Purchase Agreement, Jupai was involved in the planning and negotiation of the Stock Purchase Agreement to such a degree that it could expect to be bound by the agreement. It was Jupai's deal.

Throughout the negotiations and up until the last minute before the execution of the Stock Purchase Agreement, communicating through Puji, Jupai requested changes be made to the terms of the Stock Purchase Agreement, such as the structuring of tranche investments, and the inclusion of a liability disclaimer clause. (D.I. 1 ¶¶ 80, 89). One month before the Stock Purchase Agreement was executed, Plaintiff and a Jupai attorney, Jinchang Wang (sometimes referred to as "Augusto"), directly communicated via email regarding the logistics of the investment. The Jupai attorney referred to the investment as "our preliminary agreement." The Jupai attorney advised Plaintiff to reach out to Puji or "myself with any questions." (D.I. 41, Exh. 1).

PJ was the designated entity to deliver the investment to Plaintiff in exchange for shares in Plaintiff. But it was Jupai who raised the capital for the investment. It was Jupai who agreed to fund the investment. It was Jupai who requested allocation of additional shares of Plaintiff to be given to Probanca Advisory Limited, a British Virgins Island corporation, which would then be distributed between Jupai and Puji to cover fees associated with the investment. (D.I. 1 ¶¶ 55, 80). Though Jupai was not set to receive Plaintiff's shares directly from Plaintiff from the execution of the Stock Purchase Agreement, Jupai's request to have Plaintiff allocate shares to Probanca, to then be distributed to Jupai and Puji, was functionally identical because Jupai was still set to receive a benefit from the execution of the Stock Purchase Agreement. (D.I. 1 ¶ 55; D.I. 101 at 23-24).

Ninespot, Inc. v. Jupai Holdings Limited, Not Reported in Fed. Supp. (2018)

2018 WL 3626325

Thus, in accordance with the court's reasoning in *Hadley* and *Aviation West*, Jupai stood to receive the direct benefit of shares in Plaintiff from the completion of the Stock Purchase Agreement. (D.I. 1). The receipt of a direct benefit makes Jupai "closely related" to the Stock Purchase Agreement. *Hadley*, 2003 WL 21960406, at *5; *Aviation West*, 2015 WL 5138285, at *4.

Jupai argues its separate corporate existence from PJ, the signatory on the Stock Purchase Agreement, and its inaction after the execution of the Stock Purchase Agreement preclude it from being closely related to the agreement. *CompuCom Sys., Inc. v. Getronics Fin. Holdings B.V.*, 2012 WL 4963308, at *2 (D. Del. Oct. 16, 2012) (noting that principle that non-signatories that maintain separate corporate existence throughout the course of the transaction are not closely related to the agreement); *Phunware*, 117 F.Supp.3d at 629 (holding that "the evaluation of when a party is 'closely related' to a contract turns on the party's actions after the contract was executed...."). I find both of these arguments unpersuasive.

First, *CompuCom* found a non-signatory party that maintained the formality of separate corporate existence but was a "driving force" behind the transaction in suit, to be "closely related" to an agreement. *CompuCom*, 2012 WL 4963308, at *4. Rather than Jupai and PJ being two entirely separate and independent corporate entities, as Jupai argues, the relationship between Jupai and PJ was similar to that of the parties in *CompuCom*. In communications between Plaintiff and PJ, officials from Jupai were often copied on emails or communicated directly with Plaintiff. (D.I. 1 ¶¶ 78, 107). Jupai, through Puji's point person, was the party that made all the requests for changes to the Stock Purchase Agreement. (D.I. 1 ¶ 89). Jupai could fairly be considered a "driving force" behind the execution of the Stock Purchase Agreement.

*6 Second, while Delaware case law provides that whether a non-signatory is closely related to an agreement depends on the non-signatory's actions after the execution of the agreement, this does not allow Jupai to deny the close relationship. One month after the execution of the Stock Purchase Agreement, Puji's point person represented to Plaintiff that Jupai's first attempt to wire the money was rejected, and that Jupai and Puji both were seeking alternate routes to fund the investment. (D.I. 1 ¶ 98). Regardless of whether Jupai attempted to wire the money at all or Jupai requested the representation be made, it is evident all parties

understood the completion of the terms of the Stock Purchase Agreement to depend on Jupai wiring the money to Plaintiff.

Finally, some of Plaintiff's claims against Jupai are based on Jupai's involvement in the Stock Purchase Agreement. Plaintiff alleges that "Jupai's conduct, as set forth herein, prevented [PJ] from performing its obligations under the [Stock Purchase Agreement]." (D.I. 1 ¶ 146). Plaintiff further alleges "each of the Defendants made false representations ... concerning ... the status of the investment into [Plaintiff] and Jupai's and/or [PJ]'s willingness and ability to fund the investment." (D.I. 1 ¶ 162). Of the five claims against Jupai, three claims, Counts Five, Eight, and Nine, are based on the Stock Purchase Agreement.

Plaintiff orally raised the additional argument that Jupai is subject to personal jurisdiction in Delaware on the basis of Counts Three and Four, relating to breach of the Term Sheet. (D.I. 101 at 28). Plaintiff argues Jupai is subject to jurisdiction here because Jupai entered into a contract with Plaintiff, a Delaware corporation, and subsequently harmed the Delaware corporation by breaching the contract. *Id.* Plaintiff did not cite to the Delaware Long-Arm Statute. I reject this argument as a basis for personal jurisdiction because the Delaware Long-Arm Statute does not provide for jurisdiction over defendants who enter into a contract with a Delaware corporation and subsequently cause harm by breaching the contract, when the harm does not occur in the state. 10 Del.C. § 3104(c)(2).

Thus, it is my opinion that Jupai is bound by the Delaware forum selection clause in the Stock Purchase Agreement, and therefore is subject to personal jurisdiction in the State of Delaware. I will deny Jupai's motion to dismiss pursuant to Rule 12(b)(2).

**b. Defendants' Rule 12(b)(6) motions to dismiss**

Puji, Jupai, and PJ all move to dismiss each of Plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim. I will analyze each count in order to determine whether Plaintiff has sufficiently stated a claim.

**A. Count One against Puji for breach of contract**

Count One is based on Puji's breach of the Business Collaboration Agreement, (D.I. 1-1, Exh. A). The Business Collaboration Agreement is governed by California law. (D.I. 1-1, Exh. A at 4). Puji moves to dismiss, arguing the

Ninespot, Inc. v. Jupai Holdings Limited, Not Reported in Fed. Supp. (2018)

2018 WL 3626325

Business Collaboration Agreement does not form a binding or enforceable contract and thus cannot be breached. (*Id.*)

Puji argues there is no consideration in the Business Collaboration Agreement, or, alternatively, any consideration is illusory. (*Id.*) The terms of the Business Collaboration Agreement provide that in exchange for Puji's assistance and advice in connection with expanding Plaintiff's business in China, Puji would be compensated with a number of shares of Plaintiff's common stock. (D.I. 1-1, Exh. 1 at 2-3). Puji points, however, to provisions in the agreement that specify that the issuance of stock to Puji is subject to. approval from Plaintiff's Board of Directors and the execution of a Restricted Stock Award Agreement. (*Id.*) The agreement further expressly bars any claim by Puji to any equity if the Restricted Stock Award Agreement is not executed. (*Id.*) Under California law, Puji argues there are two theories under which there is a lack of consideration in the Business Collaboration Agreement. First, two conditions precedent, the Board's approval and the execution of the Restricted Stock Award Agreement, were not met, and therefore the contract never became enforceable. (D.I. 82 at 5). Second, the equity compensation offered by Plaintiff was an illusory promise, because Plaintiff could choose not to seek the Board's approval or not to execute the Restricted Stock Award Agreement. (*Id.*)

**\*7** Here, the two conditions precedent were not performed. Puji argues that the failure to meet two conditions precedent to the formation of the contract renders the agreement unenforceable. (D.I. 82 at 5). Plaintiff argues that these two conditions were conditions to the issuance of stock to Puji, not conditions to the formation of the contract. (D.I. 88 at 13). Plaintiff cites to California case law that supports the reasoning it argues here. In *Jacobs v. Freeman*, the California Court of Appeals found conditions of board approval to release the escrow from a property sale were intended to be conditions precedent to the "seller's duty to convey the title to the land rather than a condition precedent to the formation of a contract." 104 Cal. App. 3d 177, 189, 163 Cal.Rptr. 680 (1980). Plaintiff has plausibly alleged similar facts to those in *Jacobs*. Thus, at this pleading stage, Plaintiff's claim can move forward.

Turning to the argument of an illusory promise, Puji argues Plaintiff's ability to choose to not seek approval from the Board or to not execute the Restricted Stock Award Agreement renders the agreement "devoid of all mutuality, for it would be leaving the existence of the contract to the will of

one of the parties, which would be to say there was no contract at all." *Shortell v. Evans-Ferguson Corp.*, 98 Cal. App. 650, 660, 277 P. 519 (1929). At this stage, however, Plaintiff has alleged a claim that satisfies the pleading requirements. Plaintiff points to the California Civil Code, which provides that, "a written instrument is presumptive evidence of a consideration." CAL. CIV. CODE § 1614. Further, California courts have found that consideration to be paid at one party's discretion is enough to establish mutuality of obligation, based on the duty of good faith. *Larwin-S. Cal., Inc. v. JGB Inv. Co.*, 101 Cal. App. 3d 626, 640, 162 Cal.Rptr. 52 (1979). As the Business Collaboration Agreement is governed by California law, Plaintiff's claims may not be dismissed.

Puji also argues that, even if the Business Collaboration Agreement is found to be an enforceable contract, Plaintiff failed to plead its own performance or excuse, breach of the agreement by Puji, and the existence of damages proximately caused by the breach. (D.I. 82 at 7). Puji's position that Plaintiff did not perform does not defeat Plaintiff's claims at this stage. Plaintiff claims it was "prepared to perform [the obligations] in due course," (D.I. 1 ¶ 123) and though Puji argues this statement is conclusory, Plaintiff has alleged the timing of these actions remained at its discretion, without rendering that choice illusory. (D.I. 88 at 14).

Plaintiff also alleges Puji breached the Business Collaboration Agreement by failing to facilitate the launch of Plaintiff's product in China and the investment into Plaintiff from Jupai. (D.I. 1 ¶ 124). Puji argues the language of the Business Collaboration Agreement does not impose the specific duties Plaintiff alleges. (D.I. 82 at 7). But at this stage, Plaintiff's factual allegations are plausible, when considering the statement of facts contained in the complaint that recount the discussions and other communications surrounding the execution of the Business Collaboration Agreement. Finally, Puji argues Plaintiff cannot plead for damages caused by the breach because California law does not typically allow a new business to claim lost prospective profits due to uncertainty and lack of proof. (D.I. 82 at 7; citing *Macmorris Sales Corp. v. Kozak*, 263 Cal. App. 2d 430, 442-43, 69 Cal.Rptr. 719 (1968) ). Plaintiff does not request damages for lost profits in its Prayer for Relief, but compensatory damages, and those damages available pursuant to 6 Del. C. § 2533(c). (D.I. 1 at 31). While it may be that a new business cannot receive damages for lost profits that is not a reason to dismiss the claim.

Thus, I deny Puji's motion to dismiss as to Count One.

### B. Count Two against PJ for breach of contract

**\*8** Count Two is based on PJ's breach of the Stock Purchase Agreement, which is governed by Delaware law. (D.I. 1-2, Exh. B). The Stock Purchase Agreement provides the terms of the investment and exchange of the stock issuance to PJ. (*Id.*) The parties dispute whether the agreement formed an enforceable contract, due to the lack of an initial closing date specified in the document. (D.I. 78 at 5). PJ argues that the missing initial closing date, to which the execution of all terms are subject, indicates the agreement is missing essential terms, and therefore cannot be considered a binding enforceable contract. (*Id.*) Accordingly, PJ argues the claim of breach of contract should be dismissed. (*Id.*) Alternatively, PJ argues that even if the Stock Purchase Agreement is found to be an enforceable contract, the inclusion of an "exculpatory clause" in the agreement prevents Plaintiff from imposing liability on PJ for not completing the investment. (*Id.*) [6] By contrast, Plaintiff argues that the lack of a specified initial closing date does not render the contract unenforceable, because the agreement was executed in April of 2017 with the intent of both parties to execute the terms of the agreement. (D.I. 88 at 22). Alternatively, Plaintiff argues the "exculpatory clause" only bars liability if PJ were not able to purchase the "full amount" of the total shares, not if PJ fails to purchase any at all. (*Id.*) I think the allegations in the complaint, taken as true, are sufficient at this stage to overcome PJ's argument for dismissal. Both cases PJ cites to as support for its motion, *Leonard v. University of Delaware*, 204 F.Supp.2d 784, 787-88 (D. Del. 2002) (settlement agreement) and *In re Frederick's of Hollywood*, 2000 WL130630, at \*6-7 (Del. Ch. Jan. 31, 2000) (exculpatory clause), are not on point. The Stock Purchase Agreement is quite different from the agreements in the above-mentioned cases. In *Eagle Force Holdings, LLC v. Campbell*, the Delaware Supreme Court found that an agreement with an execution date left blank was sufficiently definite to state a claim. *Eagle Force Holdings, LLC v. Campbell*, 2018 WL 2351326, at \*18, 187 A.3d 1209 (Del. May 24, 2018). *Eagle Force* is much more relevant authority. Thus, I will deny PJ's motion to dismiss as to Count Two.

---

[6]    The clause in question reads: "Notwithstanding anything to the contrary set forth herein, no Initial Purchaser shall have any liability to the Company or any third party for its failure to purchase the full amount of its Total Share Commitment by the Outside Funding Date for any reason." (D.I. 1-2, Exh. B at 2).

### C. Count Three against Jupai for breach of contract

Count Three is based on breach of the Term Sheet, which is governed by California law. (D.I. 31, Exh. 1). Jupai argues the Term Sheet does not form a binding or enforceable contract and thus cannot be breached. (D.I. 81 at 5-6). The Term Sheet provided the proposed terms for Jupai's investment into Plaintiff. (D.I. 1 ¶ 132). The document was signed by Plaintiff and "stamped" by Jupai. (*Id.*) Plaintiff claims the Term Sheet constituted a binding promise from Jupai to invest in Plaintiff, and that Jupai breached the contract when it failed to fund the investment. (*Id.*) Accordingly, Plaintiff argues the agreement provides that the terms would be memorialized in a formal binding writing, the Stock Purchase Agreement. (D.I. 88 at 17). Plaintiff points to California contract law, which states that "negotiations [oral or written terms] ordinarily result in a binding contract when all of the terms are definitely understood, even though the parties intend that a formal writing embodying these terms shall be executed later." *Pac. Grove-Asilomar Operating Corp. v. County of Monterey*, 43 Cal. App. 3d 675, 686, 117 Cal.Rptr. 874 (1974). The Term Sheet, however, in the introductory paragraph, states it "constitutes a non-binding obligation or commitment ..." and that the "definitive terms and obligations between parties are subject to executed investment agreements." (D.I. 31, Exh. 1 at 4). California law holds that if the language of the agreement is clear, the language must govern the interpretation of the agreement. *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 662 (9th Cir. 2012). The non-obligation clause and the postponement of binding terms to future agreements means that the Term Sheet cannot be considered a binding agreement.

Thus, I grant Jupai's motion to dismiss as to Count Three.

### D. Count Four against all Defendants for breach of implied covenant of good faith and fair dealing

All Defendants move to dismiss Count Four, for breach of the implied covenant of good faith and fair dealing. Plaintiff's claims against each Defendant are based on each of their respective agreements. Under California law, which governs the Term Sheet agreement between Jupai and Plaintiff, the covenant of good faith is "an implied term of a contract, [and thus] the existence of a contractual relationship is prerequisite for any action for breach of contract." *Scott v. Solano County Health & Social Services Dept.*, 459 F.Supp.2d 959, 967 (E.D. Cal. 2006); *Smith v. City and County of San Francisco*, 225 Cal.App.3d 38, 49, 275 Cal.Rptr. 17 (1990). Because I find the Term Sheet agreement between Jupai and Plaintiff is not

Ninespot, Inc. v. Jupai Holdings Limited, Not Reported in Fed. Supp. (2018)

2018 WL 3626325

a binding agreement, I will grant Jupai's motion to dismiss as to Count Four.

**\*9** In the claim against Puji based on the Business Collaboration Agreement, Puji argues primarily that there is no contractual relationship with Plaintiff. Because I have denied Puji's motion to dismiss for breach of the Business Collaboration Agreement, I will analyze this claim assuming that there is a contractual relationship between the two parties.

The complaint alleges that Puji breached the implied covenant by making false statements and frustrating Plaintiff's right to receive the benefits of the agreement, specifically by the intentional interference into Plaintiff's business relationship with OurCam. (D.I. 1 ¶ 141; D.I. 88 at 24). As will be discussed in the following sections, Plaintiff's claim in Count Six against Puji for interference with OurCam will be dismissed. Thus, the interference theory is not grounds for alleging breach of the implied covenant. Plaintiff also argues that Puji's false representations about the status of the investment constitute a breach of the implied covenant. Under California law, which governs the Business Collaboration Agreement, allegations of the breach of the implied covenant may not stand alone as independent claims if they are duplicative of the breach of contract claim. *Shaterian v. Wells Fargo Bank, N.A.*, 829 F.Supp.2d 873, 884 (N.D. Cal. 2011). As an exception to this principle, claims of breach of the implied covenant may be considered valid claims if the allegations plead the "defendant acted in bad faith to frustrate the contract's actual benefits." *Id.* Because I think Plaintiff has alleged sufficient facts about Puji's false representations to Plaintiff about the status of the investment, I will deny Puji's motion to dismiss as to Count Four.

Finally, Plaintiff's claim against PJ is based on the Stock Purchase Agreement, which is governed by Delaware law. PJ argues the complaint's allegations of breach of the implied covenant go no further than the allegations of breach of contract. (D.I. 78 at 11). Delaware courts have found that allegations of breach of the implied covenant do not apply when the conduct is also addressed by breach of contract allegations. *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 83 R.I. 58, 112 A.2d 878, 896 (Del. 2015). While Plaintiff attempts to assert the complaint falls in the small window of opportunity that allows breach of the implied covenant claims where the conduct "frustrate[d] the overarching purpose of the contract," I think the allegations fall short. *See Gerbitz v. ING Bank, FSB*, 967 F.Supp.2d 1072, 1081 (D. Del. 2013). Plaintiff contends

that PJ's email to Plaintiff disclaiming liability to fulfill the terms of the investment in response to Plaintiff's demand letter is a breach of the implied covenant. But that contention is the same as the breach of contract claim that PJ did not make the investment. In addition, the email response was the last course of conduct taken by either party immediately before Plaintiff filed this action. It makes no sense to say that a communication sent in response to Plaintiff's letter threatening legal action, denying liability, constitutes conduct done to frustrate the overall purpose of the contract. Thus, I will grant PJ's motion to dismiss as to Count Four.

### E. Count Five against Puji and Jupai for intentional interference with contractual relations

Plaintiff claims Puji and Jupai were aware of the contractual obligations contained in the Stock Purchase Agreement between Plaintiff and PJ, and took intentional steps to prevent Plaintiff from receiving the benefits of the contract and/ or PJ from fulfilling its obligations. (D.I. 1 ¶¶ 146-47). In order to successfully prove an intentional interference with contractual relations, a plaintiff must prove: 1) a valid contract existed, 2) defendant had knowledge of the contract, 3) defendant acted intentionally in a manner that was a significant part of the breach, 4) actual breach occurred without justification, and 5) plaintiff was injured by the defendant's actions. *Beard Research, Inc. v. Kates*, 8 A.3d 573, 605 (Del. Ch. 2010); *Tenneco Automotive, Inc. v. El Paso Corp.*, 2007 WL 92621, at \*5 (Del. Ch. Jan. 8, 2007); *United Nat'l Maint., Inc. v. San Diego Convention Center, Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014).

**\*10** Both Puji and Jupai argue they are exempt from liability because they are not strangers to the contract. They argue they are affiliates to the contract, and thus shielded from liability by the affiliate privilege doctrine. I agree with Puji and Jupai here.

Delaware law protects parties or enterprises from liability for tortious interference if they are affiliated with the contract and/or the contracting parties by common ownership or shared economic interests. *AM General Holdings LLC v. Renco Group, Inc.*, 2013 WL 5863010, at \*12 (Del. Ch. Oct. 21, 2013). Only where the affiliate party acts in accordance with the "stringent bad faith standard" can liability for this tort be established. *Id.* Plaintiff argues that Puji and Jupai are strangers to the contract for purposes of this Count, but considering that the complaint as a whole is premised on the closeness of the relationship between all three entities, that argument cannot hold up.

Alternatively, under California law, it may be that the stranger requirement is not as strict. (D.I. 101 at 77). California courts have held that "liability for this tort [intentional interference with economic relations] exists to protect the parties to that relationship from 'interference by a stranger to the agreement." *United Nat'l Maint., Inc.*, 766 F.3d at 1007. Further explanation of this doctrine was provided by the California Supreme Court, however, when that Court held that a plaintiff must prove not only intentional interference, but "conduct that was wrongful by some legal measure other than the fact of interference itself as well. *Delia Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995). Plaintiff states its claim for intentional interference "does not rely on allegations of fraud." (D.I. 88 at 30). Because Plaintiff does not allege that Puji and Jupai's actions were wrongful on some other basis, Plaintiff's allegations are not sufficient to claim intentional interference.

Because Puji and Jupai are affiliates to PJ and the contract, and because Plaintiff does not allege Puji and Jupai acted in accordance with the stringent bad faith standard, I will grant Puji and Jupai's motion to dismiss as to Count Five.

### F. Count Six against Puji for intentional interference with prospective economic relations

Plaintiff also brings a claim against Puji for intentional interference with prospective economic relations based on Puji's communications with Plaintiff's potential acquisition target, OurCam. (D.I. 1 ¶ 152). Plaintiff contends Puji, while aware of the potential partnership and/or acquisition between Plaintiff and OurCam, represented to OurCam that the investment from Jupai into Plaintiff was moving slowly. (*Id.* ¶ 50). Further, Puji told OurCam that it should "give up" on a partnership with Plaintiff. (*Id.*). Plaintiff alleges these representations were wrongfully and intentionally false. (*Id.* ¶ 152).

In order for Plaintiff to prove Puji intentionally interfered in this regard, Plaintiff must first allege: 1) an economic relationship between Plaintiff and OurCam with the probability of future economic benefit to Plaintiff, 2) Puji's knowledge of the relationship, 3) intentional acts by Puji designed to disrupt the relationship, 4) actual disruption of the relationship, and 5) economic harm done to Plaintiff, proximately caused by Puji's acts. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003).

**\*11** More importantly, however, Plaintiff must allege the independent act of making these representations to OurCam was wrongful or unlawful, in other words, that the independent act was "proscribed by some constitutional, statutory, regulatory, common law, or other determinable standard." *Id.* at 1159, 131 Cal.Rptr.2d 29, 63 P.3d 937. Plaintiff claims that at the same time Puji communicated with OurCam, Puji communicated to Plaintiff that the investment was still on track. (D.I. 88 at 35). Based on the facts contained in the complaint, it appears that the investment was in fact moving slowly. (D.I. 1). However, assuming the representations were false at the time they were made, Plaintiff points to no standard or law that prohibits the nature of the communication from Puji to OurCam. It may be alleged to be false, but there is no allegation it was unlawful. Therefore I will grant Puji's motion to dismiss as to Count Six.

### G. Count Seven against Puji for breach of fiduciary duty

Plaintiff claims Puji breached a fiduciary duty owed to Plaintiff, based on Plaintiff and Puji's business relationship, summarized in the Business Collaboration Agreement. (D.I. 1 ¶ 157). Plaintiff argues the nature of the relationship between Plaintiff and Puji, as well as its reliance on Puji's "advice and guidance on key business matters," formed a fiduciary relationship that was breached when Puji failed to deliver on its promises. (*Id.*) The Business Collaboration Agreement is governed by California law. The elements for breach of fiduciary duty under California law are as follows: 1) fiduciary duty exists, 2) breach of that duty, and 3) damage to the plaintiff resulting from the breach. *Pellegrini v. Weiss*, 165 Cal. App. 4th 515, 524, 81 Cal.Rptr.3d 387 (2015).

Plaintiff argues a special relationship exists with Puji based on the terms summarized in the Business Collaboration Agreement. (D.I. 1 ¶ 157). Although Plaintiff received guidance and advice from Puji, I do not find this creates a fiduciary duty.

California case law states that an agreement between two parties, where one party may have superior knowledge and expertise relative to the subject of the agreement, does not create a fiduciary duty. *City of Hope National Medical Center v. Genentech*, 43 Cal. 4th 375, 389, 75 Cal.Rptr.3d 333, 181 P.3d 142 (2008). Further, it is not "unusual for a party to enter into a contract for the very purpose of obtaining the superior knowledge or expertise of the other party." *Id.* That is what Plaintiff was doing in this case. The Business Collaboration

Ninespot, Inc. v. Jupai Holdings Limited, Not Reported in Fed. Supp. (2018)
2018 WL 3626325

Agreement states, "The parties recognize ... there may be mutually beneficial business objectives that can be achieved through their collaboration...." (D.I. 1-1, Exh. A at 2). In this way, the relationship is similar to the contract in which the court found there was no fiduciary duty created where both parties entered into a mutually beneficial contract. *City of Hope National Medical Center*, 43 Cal. 4th at 389, 75 Cal.Rptr.3d 333, 181 P.3d 142.

Thus, for the purpose of analyzing Count Seven, the Business Collaboration Agreement documented a relationship in which each party would exchange valuable consideration. Puji is alleged to have been in a position of superior knowledge, but this fact alone cannot make Puji a fiduciary to Plaintiff. Therefore, I will grant Puji's motion to dismiss as to Count Seven.

### H. Count Eight against all Defendants for intentional misrepresentation

Plaintiff alleges all Defendants made false and intentional misrepresentations on which Plaintiff reasonably relied, and thus suffered substantial harms as a result. (D.I. 1 ¶¶ 161-65). In order to claim intentional misrepresentation, Plaintiff must plead these elements of fraud with particularity: 1) misrepresentation, 2) knowledge of the misrepresentation, 3) intent to defraud or induce Plaintiff to act or refrain from acting, 4) Plaintiff's justifiable reliance upon the representation, and 5) resulting damages. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990, 22 Cal.Rptr.3d 352, 102 P.3d 268 (2004); *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586-87 (Del. 2008).

**\*12** In response to the claim against it and for the purposes of this motion, Puji concedes that the complaint does allege a list of statements and/or communications made to Plaintiff on behalf of Puji. (D.I. 82 at 16). But, Puji argues that there are no particular facts alleged that indicate Puji was aware the statements were false, or that Puji had an intent to defraud Plaintiff. (*Id.*) Puji points to two instances where it claims Plaintiff chose to ignore Puji's advice to avoid focusing all of its resources on one potential investment source, and to seek additional funding elsewhere. (*Id.*). Moreover, Puji argues Plaintiff does not allege its scienter with enough specificity, but as Plaintiff notes, Rule 9(b) only requires the factual circumstances of the fraud be alleged with particularity; the mental state may be alleged generally. Fed. R. Civ. P. 9(b).

Plaintiff argues that Puji admitted the falsity of some of the representations it made in the email response to

Plaintiff's demand letter. (D.I. 88 at 25; D.I. 1-5, Exh. E). This includes the statement in the email that neither Jupai nor PJ raised money in connection with the proposed investment. (*Id.*) While Plaintiff admits the email does not substantiate all of the false representations it claims Puji made, Plaintiff here pleads with enough breadth that at least some of the statements Puji made were false. Plaintiff also sufficiently pleads that it reasonably relied on Puji's statements by choosing to pursue this investment with Jupai based on arguably credible statements about the status of the investment at the time the statements were made. At this pleading stage, Plaintiff does not have to allege how Puji knew its representations were false, only that Puji made representations to Plaintiff that were factually different than what Puji knew to be true. Because Plaintiff satisfies that pleading requirement, I will deny Puji's motion to dismiss as to Count Eight.

Against Jupai and PJ however, Plaintiff's claim of intentional misrepresentation falls short. Even viewed in the light most favorable to the Plaintiff, Plaintiff does not argue Jupai or PJ made representations about the status of the investment prior to or immediately following the execution of the Stock Purchase Agreement. (D.I. 88 at 26-28). Both Jupai and PJ contend that Plaintiff has not pled specific allegations of fraud against each defendant with the requisite particularity.

(*Id.*).[7] Plaintiff primarily relies on representations made by Puji about PJ and Jupai's involvement. The only specific allegation involving PJ and Jupai is PJ's email response to the demand letter, which happened after Plaintiff threatened legal action.[8] Neither PJ nor Jupai made earlier representations about the status of the investment that Plaintiff has alleged with specific facts were false at the time the statements were made.[9] For the purposes of this opinion, I assume without deciding that the demand letter sent from Plaintiff to Jupai (D.I. 1-4, Exh. D) and the email response to the demand letter sent from PJ (D.I. 1-5, Exh. E), are not made inadmissible by Rule 408 of the Federal Rules of Evidence.

---

[7]   Jupai specifically points to both Delaware and California case law that finds plaintiff's must plead, with the required particularity, allegations of fraud against each individual defendant. *Sandvik AB v. Advent Int'l Corp.*, 83 F.Supp.2d 442, 448 (D. Del. 1999); *Kronk v. Landwin Grp., LLC*, 2011 WL 13143096, at *6 (CD. Cal. June 7, 2011).

[8]   The email response letter from Oreans Yuan, acting on behalf of PJ, was the last communication between

A134

Ninespot, Inc. v. Jupai Holdings Limited, Not Reported in Fed. Supp. (2018)

2018 WL 3626325

Plaintiff and any of Defendants before the complaint was filed. Thus, Plaintiff cannot claim it reasonably relied on this email response in any of the choices it made with regards to its decision to pursue the Jupai investment. (D.I. 78 at 13).

9        It is not surprising that Plaintiff has not made such allegations. As Plaintiff candidly stated at oral argument, Plaintiff's theory is that Defendants intended to make the investment until some point in time when Defendants changed their mind.

**\*13** Thus, I will grant Jupai and PJ's respective motions to dismiss as to Count Eight. I will deny Puji's motion to dismiss as to Count Eight.

### I. Count Nine against all Defendants for violation of the Delaware Deceptive Trade Practices Act

In its final claim, Plaintiff alleges all three Defendants violated the Delaware Deceptive Trade Practice Act, 6 Del.C. § 2532. (D.I. 1 ¶¶ 167-68). Because the claims against Defendants are all based on the same allegations, I will analyze the argument against each as a whole. Plaintiff, Jupai, and Puji argue in their briefing about whether the Deceptive Trade Practices Act can apply to injurious conduct that does not physically take place in the state of Delaware. (D.I. 81, 82, 88). There is some case support offered by Defendants that the Deceptive Trade Practices Act is not available to litigants who cannot show any evidence of wrongful conduct or injury taking place in Delaware. *See Guidance Endodontics, LLC v. Dentsply Int'l, Inc.,* 663 F.Supp.2d 1138, 1155 (D.N.M. 2009). Plaintiff points out that *Guidance Endodontics* dealt with a party incorporated in Delaware. (D.I. 88 at 37). Here, as Plaintiff argues, there is a lack of Delaware case law regarding this specific issue.

However, I do not need to decide whether the Act can apply if the actions and injury did not take place in Delaware, because Plaintiff is unable to meet one of the other requirements for standing under the Act. Though Plaintiff cites to language in the statute that reads, "[in] order to prevail in an action under this chapter, a complainant need not prove competition between the parties...." 6 Del. § 2532(b), Delaware courts have consistently held that the purpose of the DTPA is to protect horizontal relationships. The Delaware Supreme

Court, based on their "review of the statute, legislative intent, and context of the Deceptive Trade Practices Act with regard to its sister provision, the Consumer Fraud Act," held that a litigant only has standing to bring a claim under this law if it has a horizontal relationship with the other party. *Grand Ventures, Inc. v. Whaley,* 632 A.2d 63, 70 (Del. 1993). In short, Delaware courts have defined horizontal relationships as ones where the two parties are in direct competition with each other. *Livery Coach Solutions, LLC v. Music Express/ East, Inc.,* 245 F.Supp.3d 639, 648 (D. Del. 2017). [10]

10       More specifically, the court in *Livery Coach Solutions* adopted the definition of horizontal relationships from *Chase Bank USA, N.A. v. Hess,* 2013 WL 5314706, at \*5 (D. Del. Sep. 20, 2013), which held that a horizontal relationship "exists between at least two businesses on the same market level, because they manufacture similar products in the same geographic region, or are direct competitors." *Livery Coach Solutions,* 245 F.Supp.3d at 648.

The nature of the relationship between Plaintiff and all three Defendants is not one of competition, but consists of advising, facilitating, and supporting an investment in exchange for shares. There is no horizontal relationship between Plaintiff and any of the three Defendants. Thus I will grant Puji, Jupai and PJ's respective motions to dismiss as to Count Nine.

### IV. CONCLUSION

**\*14** For the reasons stated above, Jupai's motion to dismiss, pursuant to Rule 12(b)(2) for lack of personal jurisdiction (D.I. 80), is **DENIED**. Puji's motion to dismiss, pursuant to Rule 12(b)(6) (D.I. 79) as to Counts One, Four, and Eight, is **DENIED**. PJ's motion to dismiss, pursuant to Rule 12(b)(6) (D.I. 77) as to Count Two, is **DENIED**. Except as just noted, the remaining motions to dismiss, pursuant to Rule 12(b)(6) (D.I. 77, 79, 80), are otherwise **GRANTED**.

As requested (D.I. 88 at 53), Plaintiff is **GRANTED** leave to amend its complaint within two weeks.

### All Citations

Not Reported in Fed. Supp., 2018 WL 3626325

UbiquiTel Inc. v. Sprint Corp., Not Reported in A.2d (2005)

2005 WL 3533697

2005 WL 3533697
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

UBIQUITEL INC. and Ubiquitel
Operating Company, Plaintiffs,
v.
SPRINT CORPORATION, Sprint Spectrum
L.P., Wirelessco, L.P., Sprint Communications
Company L.P., Sprint Telephony PCS,
L.P., Sprint PCS License, L.L.C., and
Nextel Communications, Inc., Defendants.

No. Civ.A. 1489-N.
|
Submitted Aug. 26, 2005.
|
Decided Dec. 14, 2005.
|
Revised Dec. 19, 2005.

**Attorneys and Law Firms**

Kurt M. Heyman, Patricia L. Enerio, Linda E. Beebe, The
Bayard Firm, Wilmington, Delaware; Emily Nicklin, Barry
E. Fields, Gabor Balassa, Kirkland & Ellis LLP, Chicago,
Illinois, for Plaintiffs UbiquiTel Inc. and UbiquiTel Operating
Company.

Michael D. Goldman, Stephen C. Norman, Brian C. Ralston,
Potter Anderson & Corroon LLP, Wilmington, Delaware;
Robert C. Weber, Dennis L. Murphy, Geoffrey J. Ritts,
Melissa J. Nandi, Jones Day, Cleveland, Ohio, for Defendant
Nextel Communications, Inc.

MEMORANDUM OPINION

PARSONS, Vice Chancellor.

**\*1** Plaintiffs UbiquiTel Inc. and UbiquiTel Operating Co.
("UbiquiTel" or "Plaintiffs") have asserted against Sprint
Corp. ("Sprint"), Sprint Spectrum L.P., WirelessCo, L.P.,
Sprint Communications Co. L.P., Sprint Telephony PCS,
L.P., Sprint PCS License, L.L.C. (collectively, the "Sprint

entities"), and Nextel Communications, Inc. ("Nextel")
various claims arising out of the merger of Sprint and Nextel.
Among other things, UbiquiTel has asserted claims of tortious
interference with contract and civil conspiracy against Nextel.
Nextel has moved to dismiss these two claims for failure to
state a claim under Court of Chancery Rule 12(b)(6). For the
reasons set forth below, Nextel's motion is denied.

I. FACTS [1]

[1]     The facts set forth herein are taken from the Complaint
        and accepted as true for purposes of Nextel's Motion to
        Dismiss.

A. The Parties

UbiquiTel is a Delaware corporation with its principal place
of business in Conshohocken, Pennsylvania.

Sprint, a Kansas corporation with its principal place of
business in Kansas, offers a range of communications
products nationwide. Sprint Spectrum L.P., WirelessCo, L.P.,
Sprint Communications Company L.P. and Sprint Telephony
PCS, L.P. are Delaware partnerships with their principal
places of business in Kansas; each is a directly or indirectly
owned subsidiary of Sprint. Sprint PCS License, L.L.C. is
a Delaware limited liability company with its principal place
of business in Kansas; it, too, is an indirectly owned subsidiary
of Sprint. Together, Sprint and several of the Sprint entities
hold and control personal communications services ("PCS")
licenses to provide voice and data services using wireless
technology in a nationwide network (the "PCS Network").

Nextel, a Delaware corporation with its principal place of
business in Virginia, also offers a variety of communications
products nationwide.

B. The Management Agreement

When Sprint obtained its PCS licenses from the Federal
Communications Commission ("FCC"), it agreed to construct
a percentage of its nationwide wireless services network
within five years. In furtherance of its agreement, Sprint
contracted with various "Affiliates" to finance, construct,
operate, manage, maintain and upgrade the PCS Network in
certain smaller markets. In October 1998, UbiquiTel became

UbiquiTel Inc. v. Sprint Corp., Not Reported in A.2d (2005)

2005 WL 3533697

a Sprint Affiliate and entered into a PCS Management Agreement ("Management Agreement") with several of the Sprint entities. As of the filing of its Complaint, UbiquiTel was responsible for the PCS Network in certain parts of nine states-California, Nevada, Washington, Idaho, Wyoming, Utah, Indiana, Kentucky and Tennessee.

The Management Agreement governs the relationship between Sprint and UbiquiTel. It provides, *inter alia,* that UbiquiTel

> will be the only person or entity that is a manager or operator for Sprint PCS with respect to the Service Area and neither Sprint PCS nor any of its Related Parties will own, operate, build or manage another Wireless Mobility Communications Network in the Service Area so long as this agreement remains in full force and effect....[2]

[2]       Compl. ¶ 27.

**\*2**  Wireless Mobility Communications Network is defined in the Management Agreement as "a radio communications system operating in the 1900 MHZ spectrum range under the rules designated as Subpart E of Part 24 of the FCC's rules."[3]

[3]       *Id.* Ex. E at 77.

The Management Agreement also requires that UbiquiTel regularly provide Sprint with "competitively sensitive and highly confidential information concerning nearly every aspect of UbiquiTel's operations," including, for example, pricing and billing information, build-out and other business plans and details about every UbiquiTel customer.[4] Pursuant to the Management Agreement, Sprint must " 'keep confidential, not disclose to others and use only for the purposes authorized in this agreement, all Confidential Information disclosed by the other party to the party in connection with this agreement....' '[5]

[4]       *Id.* ¶¶ 35-36.

[5]       *Id.* ¶ 41 (quoting *id.* Ex. A (Management Agreement § 12.2(a)).

### C. The Sprint-Nextel Merger

On December 15, 2004, Sprint announced that it intended to merge with Nextel. In a conference call to UbiquiTel and the other Affiliates that same day, Sprint acknowledged that post-merger integration with Nextel would conflict with Sprint's obligations to the Affiliates.[6] Similarly, in their joint proxy solicitation materials seeking shareholder approval of the merger, Sprint and Nextel acknowledged that the former's arrangements with the Affiliates "may limit the ability to fully integrate the operations of Sprint and Nextel in areas managed by the [Affiliates]"[7] and "restrict Sprint's and its affiliates' ability to own, operate, build or manage wireless communications networks or to sell Sprint's wireless services within specified geographic areas."[8]

[6]       *Id.* ¶ 42.

[7]       *Id.* ¶ 43.

[8]       *Id.* ¶ 44.

UbiquiTel filed its Complaint on July 12, 2005. The Complaint alleges that when the merger is completed, Nextel will merge with and into a wholly owned subsidiary of Sprint and Sprint will change its name to Sprint Nextel. The combined entity will continue to be bound by the Management Agreement with UbiquiTel.[9]

[9]       *Id.* ¶ 48. The merger closed after the filing of the Complaint. *See* Form 8-A/A of Sprint Nextel Corp. (Aug. 12, 2005), *available at* http://www.sec.gov/edgar/shtml.

### II. ANALYSIS

In Counts III and IV of the Complaint, UbiquiTel alleges that Nextel tortiously interfered with the Management Agreement, a contract between UbiquiTel and various Sprint entities, and conspired with Sprint and the Sprint entities to so interfere.[10] Nextel seeks dismissal of both counts under Rule 12(b)(6) for failure to state a claim.

[10]       Compl. ¶¶ 91-102.

A. Standard for Dismissal under Rule 12(b)(6)

The standard for dismissal pursuant to Rule 12(b)(6) is well settled. A court will grant the motion only if a "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof." [11] "In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint." [12] "[N]either inferences nor conclusions of fact unsupported by allegations of specific facts are accepted as true. That is, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiffs' favor unless they are reasonable inferences." [13]

11    *Precision Air, Inc. v. Standard Chlorine of Del., Inc.,* 654 A.2d 403, 406 (Del.1995) (internal citations omitted).

12    *Albert v. Alex. Brown Mgmt. Servs., Inc.,* 2005 WL 1594085, at *11 (Del. Ch. June 29, 2005) (internal citations omitted).

13    *Id.*

**\*3**  Finally, Delaware is a notice pleading state. [14] Thus, Plaintiffs "need not plead *evidence.* Rather, the [P]laintiff[s] need only allege *facts,* that, if true, state a claim upon which relief can be granted." [15]

14    Ct. Ch. R. 8(a); *VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 611 (Del.2003).

15    *VLIW Tech.,* 840 A.2d at 611 (emphasis added).

B. Choice of Law

Before applying the 12(b)(6) standard, the Court must determine which state's substantive law governs Plaintiffs' claims. Plaintiffs argue Delaware law governs, while Nextel contends Pennsylvania law applies.

Delaware has adopted the most significant relationship test from the Restatement (Second) of Conflicts of Laws (the "Conflicts Restatement"). [16] Thus, seven broad policy considerations inform all choice of law decisions: 1) the needs of the interstate and international systems; 2) the relevant policies of the forum; 3) the relevant policies of other interested states; 4) the protection of justified expectations;

5) the basic policies underlying the particular field of law; 6) certainty, predictability and uniformity of result; and 7) ease in the determination and application of the law to be applied. [17] In a tort action, the Court considers four specific contacts in applying these broad policy considerations to the choice of law determination: 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship, if any, between the parties is centered. [18] "These contacts are to be evaluated according to their relative importance with respect to the particular issue." [19]

16    *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 47 (Del.1991). "As the forum state, Delaware must apply its own choice of law rule ." *Nat'l Acceptance Co. of Cal. v. Mark S. Hurm, M.D., P.A.,* 1989 WL 70953, at *2 (Del.Super. June 16, 1989); *VantagePoint Venture Partners 1996 v. Examen, Inc.,* 871 A.2d 1108, 1116 (Del.2005) ("[Plaintiff] acknowledges that the courts of Delaware, as the forum state, may apply Delaware's own substantive choice of law rules.") (citing *Allstate Ins. Co. v. Hague,* 449 U.S. 302 (1981)).

17    Restatement (Second) of Conflicts of Laws § 145(1) (1971) (citing Restatement (Second) of Conflicts of Laws § 6 (1971)).

18    *Id.* § 145(2).

19    *Id.; see also Travelers Indem.,* 594 A.2d at 48 ("[T]he Restatement test does not authorize a court to simply add up the interests on both sides of the equation and automatically apply the law of the jurisdiction meeting the highest number of contacts listed in Sections 145 and 6. Section 145 has a qualitative aspect.").

1. Place of injury

UbiquiTel alleges that, as a result of Nextel's conduct, both its competitive position in the marketplace and the goodwill it enjoys from customers as a result of its exclusive arrangement with Sprint will be injured and its opportunity to market a unique product will be destroyed. [20] In other words, the injuries UbiquiTel complains of are usurpation of business opportunities and loss of customers and trade. The place of injury is thus the nine states where UbiquiTel has cellular operations. [21] It is, of course, impossible to apply the law of nine states to the instant dispute.

UbiquiTel Inc. v. Sprint Corp., Not Reported in A.2d (2005)

2005 WL 3533697

20    Compl. ¶ 74.

21    *Integral Res. (PVT) Ltd. v. ISTIL Group, Inc.,* 2004 WL 2758672, at *3 (D.Del. Dec. 2, 2004) ("The complaint alleges that [defendant] ... orchestrated a scheme to usurp from [plaintiff] the economic benefits of the [ ] Contract and its business relationships with [a third party]. The [ ] Contract that is the subject of [defendant's] unlawful conduct was negotiated and performed in Ukraine and Pakistan. The places of injury are, therefore, Ukraine and Pakistan."); *M.M. Global Servs. Inc v. Dow Chem. Co.,* 283 F.Supp.2d 689, 703-04 (D.Conn.2003) (holding that place of injury is where business would be usurped by alleged interference with contractual relations).

After acknowledging that "[s]uch customers or trade will frequently be lost in two or more states," the Conflicts Restatement observes that where, as here, the injury complained of is the loss of customers or trade, "[t]he effect of the loss, which is pecuniary in its nature, will normally be felt most severely at the plaintiff's headquarters or principal place of business." [22] "But," the Conflicts Restatement continues, "this place may have only a slight relationship to the defendant's activities and to the plaintiff's loss of customers or trade." [23]

22    Restatement (Second) of Conflicts of Laws § 145(2) cmt. f (1971); *see also id.* § 148(2) cmt. i (stating, in the context of choice of law for fraud and misrepresentation claims, that "[t]he plaintiff's ... principal place of business, if plaintiff is a corporation, [is a] contact of substantial significance when the loss is pecuniary in nature.... This is so because a financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship.").

23    Restatement (Second) of Conflicts of Laws § 145(2) cmt. f (1971).

Nextel's relevant activities are its competition with UbiquiTel and its negotiations with Sprint. Nextel competes with UbiquiTel in nine states that do not include Delaware or Pennsylvania; the record is silent as to where Nextel's negotiations with Sprint occurred. [24] UbiquiTel does have its "principal executive offices in Conshohocken, Pennsylvania," [25] but the record before the Court contains no other information regarding UbiquiTel's relationship to Pennsylvania. As such, it appears that Pennsylvania has little, if any, relationship with Nextel's activities, but some relationship with UbiquiTel's loss of customers and trade.

24    It is unlikely the negotiations occurred in Delaware or Pennsylvania. *See infra* at II.B.2.

25    Compl. ¶ 3.

**\*4** The place of injury factor thus favors application of Pennsylvania law. [26]

26    *Cf. Brown v. SAP Am., Inc.,* 1999 WL 803888, at *6-8 (Del. Ct. Sept. 13, 1999) (observing that the principal place of business of the injured party is of "substantial importance" for choice of law determination in a misrepresentation case and holding that that state's law applied where the injured party relied on misrepresentations in that state, received the misrepresentations in that state and was to render performance in that state).

### 2. Place of injury causing conduct

Where, as here, the injury will occur in more than one state, "the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law." [27] Two courses of conduct are relevant to this factor because both are required to give rise to a claim for tortious interference with contract. These courses of conduct are those involving interference and those causing injury. [28]

27    *Int'l Bus. Machs. Corp. v. Comdisco, Inc.,* 1991 WL 269965, at *8 & n. 7 (Del.Super.Dec. 4, 1991) (citing Restatement (Second) of Conflicts of Laws § 145(2) cmt. e) (assigning the place of injury little weight because it was impossible to pinpoint).

28    A claim for tortious interference with contract under Pennsylvania law requires 1) a contract, 2) purposeful action by the defendant, 3) absence of privilege or justification and 4) actual legal damage. *Pelgatti v. Cohen,* 536 A.2d 1337, 1343 (Pa.Super.Ct.1987) (internal citations omitted). Under Delaware law, the claim requires 1) a contract, 2) of which the defendant was aware, 3) an intentional act by the defendant, 4) without justification and 5) injury. *Griffin Corp. Servs., LLC v. Jacobs,* 2005 WL 2000775, at *4 (Del. Ch. Aug. 11, 2005) (citing *Irwin & Leighton, Inc. v. W .M. Anderson Co.,* 532 A.2d 983, 992 (Del. Ch.1987) (internal citations omitted)).

The first course of conduct consists of the negotiations and closing of the merger and the filing of the Certificate of

UbiquiTel Inc. v. Sprint Corp., Not Reported in A.2d (2005)

2005 WL 3533697

Merger with the Delaware Secretary of State. The Complaint does not indicate where the negotiations occurred.[29] Sprint is headquartered in Kansas, while Nextel is headquartered in Virginia. Presumably, the negotiations took place in one of those two states or even somewhere in between. Either way, UbiquiTel has not pled that the negotiations took place in Delaware.

[29]  The Complaint also does not indicate where the closing occurred. (The closing did not occur until after the filing of the Complaint.) It is logical to infer it did not take place in Delaware for the same reasons that the negotiations likely did not take place in Delaware.

The filing of the Certificate of Merger with the Delaware Secretary of State did, of course, happen in Delaware. Indeed, Plaintiffs make much of the facts that the merger of Sprint and Nextel is a merger of two Delaware corporations, *i.e.,* Sprint's merger subsidiary and Nextel, and that the merger becomes effective only upon the filing of the Certificate of Merger.[30] These technical facts, secondary as they are to the substantive conduct at issue, only weigh slightly in favor of Delaware because the tortious conduct complained of is not the merger itself, but rather includes things such as Nextel's actions in inducing Sprint to enter into the merger.[31] Moreover, the merger is a mere precursor to the conduct that allegedly will injure UbiquiTel.

[30]  Pls.' Mem. in Opp. to Nextel Commc'ns' Mot. to Dismiss ("POB") at 8-9.

[31]  Plaintiffs' counsel conceded as much at argument. Tr. at 39 ("I don't think the place of execution of the contract is the magic. The tort in this case is not about a piece of paper signed.")

The second course of conduct is that which allegedly will injure UbiquiTel. To wit, post-merger competition by the combined Sprint Nextel entity in UbiquiTel's territory and Sprint's sharing of UbiquiTel's confidential information with Nextel.[32] UbiquiTel does not allege that the merger of the two Delaware corporations involved here and the filing of the Certificate of Merger with the Delaware Secretary of State actually will injure UbiquiTel.[33] Instead, the injury-causing conduct will occur in the nine states where UbiquiTel and Nextel compete and wherever Sprint allegedly will share UbiquiTel's confidential information with Nextel, which also is likely to occur in Kansas or Virginia. It is unlikely any of this conduct will occur in Delaware or Pennsylvania.

[32]  *See* Compl. ¶¶ 70-71.

[33]  *See, e.g., id.* ¶ 52 ("Sprint and Nextel plan to breach this exclusivity provision after consummating the merger."); *id.* ¶ 64 ("After the merger" Sprint Nextel will compete in the 1900 MHz band.).

The place of injury causing conduct thus favors application of Delaware law, but only very slightly.

#### 3. Domicile, residence, nationality, place of incorporation and place of business of the parties

Although both UbiquiTel and Nextel are incorporated in Delaware, "a corporation's principal place of business is a more important contact than the place of incorporation."[34] This is particularly true where, as here, the corporation does little or no business in the state of incorporation.[35] Further, where the injury occurs in two or more states, the plaintiff's principal place of business "is the single most important contact for determining the state of the applicable law as to most issues in situations involving ... financial [or economic] injury...."[36] UbiquiTel's principal place of business is in Pennsylvania; thus this factor favors application of Pennsylvania law.[37]

[34]  Restatement (Second) of Conflicts of Laws § 145(2) cmt. e (1971); *id.* (place of business most important contact when "the interest is a business or financial one, such as in the case of unfair competition [or] interference with contractual relations").

[35]  *Id.* The Conflicts Restatement is silent on whether the fact that Plaintiffs also do "little or no business" in the state of their principal place of business affects the analysis. That fact would seem to weaken the case for application of Pennsylvania law.

[36]  Restatement (Second) of Conflicts of Laws § 145(2) cmt. e (1971); *see also Pittway Corp. v. Lockheed Aircraft Corp.,* 641 F .2d 524, 528 (7th Cir.1981) ("The harm that [plaintiff] suffered and for which it seeks to be compensated was purely economic and as such was sustained in Illinois, where [plaintiff's] principal place of business is located....").

[37]  The nationality of the parties is irrelevant because both are United States corporations. The domicile of the parties-Pennsylvania and Virginia-adds some weight in favor of application of Pennsylvania law.

UbiquiTel Inc. v. Sprint Corp., Not Reported in A.2d (2005)

2005 WL 3533697

#### 4. Relationship between UbiquiTel and Nextel

**\*5** UbiquiTel and Nextel's relationship is one of competitors in the nine states where UbiquiTel has cellular operations.[38] The companies have no relationship in Delaware or Pennsylvania. In addition, the pre-merger actions complained of do not arise out of any relationship between UbiquiTel and Nextel, while the post-merger actions arise out of their relationship as competitors in nine states. Accordingly, this factor is neutral as between application of Delaware and Pennsylvania law.[39]

[38]   Compl. ¶¶ 2, 10; POB at 9 (stating that UbiquiTel and Nextel's relationship "is entirely that of competitors in the nine states where UbiquiTel operates").

[39]   Plaintiffs argue that the Court should consider the relationship between Nextel and the Sprint entities. POB at 9. The Conflicts Restatement, however, indicates that the relevant relationship is that between the plaintiff (UbiquiTel) and the defendant (Nextel). *See* Restatement (Second) of Conflicts of Laws § 145(2) cmt. e (1971) ("When there is a relationship between the plaintiff and the defendant and when the injury was caused by an act done in the course of the relationship, the place where the relationship is centered is another contact to be considered."). Even assuming for purposes of argument that the relationship between Nextel and the Sprint entities is relevant to this factor, it still may not weigh in favor of applying Delaware law because, on the current record, the location of the relationship between the Sprint entities and Nextel is indeterminate. As discussed in the context of the place of injury causing conduct, it is not the filing of the Certificate of Merger in Delaware that will injure UbiquiTel. *See supra* II.A.2. Rather, it is the pre-merger conduct of Nextel that gives rise to UbiquiTel's alleged tortious interference with contract claim and the post-merger conduct of the combined entity that allegedly will injure UbiquiTel.

#### 5. Policy considerations

An evaluation of the seven broad policy considerations set out in the Conflicts Restatement weighs slightly in favor of applying Delaware law.[40] Both Delaware and Pennsylvania have an interest in deterring tortious interference with contract and punishing those who do so interfere. Pennsylvania also has an interest in protecting its residents from, and compensating them for, tortious interference with contract,

but Delaware has a similar interest in protecting its corporate citizens from such interference.

[40]   The following factors are irrelevant here: 1) the needs of the interstate and international systems and 7) ease in the determination and application of the law to be applied. Although this Court is more familiar with Delaware law, it can ascertain the law of Pennsylvania with relative ease.

It is the sixth consideration-certainty, predictability, and uniformity of result-that weighs in favor of applying Delaware law. This action is one of two currently before this Court with virtually identical causes of action and virtually identical facts giving rise to those causes of action.[41] It would be somewhat inefficient if this Court applied Pennsylvania law in this case, but Delaware, or even another state's law, in the *Horizon* case. However, UbiquiTel cannot reasonably argue that it has some justified expectation in the application of Delaware law to the tort claims it asserted against Nextel when UbiquiTel's principal place of business is in Pennsylvania and its operations are dispersed among nine other states.

[41]   *See* Complaint, *Horizon Pers. Commc'ns, Inc., et al. v. Sprint Corp., et al.,* C.A. No. 1518-N (asserting, *inter alia,* claims for tortious interference with contract and civil conspiracy against Nextel).

The broad policy considerations that inform choice of law decisions thus weigh slightly in favor of applying Delaware law.

#### 6. Choice of law conclusion

At this stage in the proceedings, it appears as if Pennsylvania has the most significant relationship to UbiquiTel's tort claims. UbiquiTel's principal place of business is in Pennsylvania and it will, in a financial and economic sense, be injured in Pennsylvania by the loss of customers and trade. Thus, for purposes of the instant motion, the Court will apply the substantive law of Pennsylvania.[42]

[42]   Based on the undeveloped state of the record with respect to many of the factors relevant to the choice of law analysis, this conclusion is preliminary only. As such, it is possible that a more fully developed factual record combined with the policy considerations that favor application of Delaware law will cause this Court

UbiquiTi Inc. v. Sprint Corp., Not Reported in A.2d (2005)

2005 WL 3533697

to conclude after trial that it should apply the substantive law of Delaware to the tort claims in Counts III and IV of the Complaint.

### C. Intentional Interference with Contract Claim [43]

[43]     In Pennsylvania, the tort complained of here is referred to as *"intentional* interference with contract," while in Delaware it is referred to as *"tortious* interference with contract." The parties have used those terms interchangeably and so, too, will the Court.

To set forth a legally sufficient cause of action for intentional interference with contractual relations, UbiquiTel must plead four elements:

(1) the existence of a contractual ... relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation ...;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct. [44]

[44]     *Pelgatti,* 536 A.2d at 1343 (internal citations omitted).

Failure to plead any one of the elements adequately will result in dismissal of UbiquiTel's claim.

**\*6** The Court finds that UbiquiTel has adequately pled the existence of a contract between it and Sprint, [45] the absence of a privilege or justification on the part of Nextel [46] and actual legal damage that will result from Nextel's conduct. [47] Thus, the dispositive question for purposes of the pending motion is whether UbiquiTel has alleged that Nextel acted with the requisite intent.

[45]     Compl. ¶ 17 & Ex. A.

[46]     *Id.* ¶ 95.

[47]     *Id.* ¶¶ 51-71, 83, 96.

Nextel argues that the requisite intent is an act taken "with the *specific intent* to harm UbiquiTel's contractual relations with Sprint." [48] Nextel overstates the required intent. To plead this element, UbiquiTel need only allege that Nextel knew

"an injury [was] certain or substantially certain to occur as a result of his action." [49] This level of intent comports with that evinced in the Restatement (Second) of Torts (the "Torts Restatement"), whose formulation of this cause of action the Pennsylvania Supreme Court has adopted. [50]

[48]     Def.'s Opening Br. in Support of its Motion to Dismiss ("DOB") at 8-9 (citing *Glenn v. Point Park Coll.,* 272 A.2d 895, 899 (Pa.1971)).

[49]     *Leonard A. Feinberg, Inc. v. Cent. Asia Capital Corp.,* 974 F.Supp. 822, 846 (E.D.Pa.1997) (internal citations omitted); *Total Care Sys., Inc. v. Coons,* 860 F.Supp. 236, 241 (E.D.Pa.1994) ("[I]ntent in this [tortious interference with contract] case may be shown where the actor knows an injury is certain or substantially certain to occur as a result of his action.") (internal citation omitted).

[50]     *Alder, Barish, Daniels, Levin & Creskoff v. Epstein,* 393 A.2d 1175, 1183 (Pa.1978); *accord Thompson Coal Co. v. Pike Coal Co .,* 412 A.2d 466, 470 (Pa.1979).

In Comment j to Section 766 (Intentional Interference with Performance of Contract by Third Person), the Torts Restatement states that the cause of action "is broader ... in its application than to cases in which the defendant has acted with [the] purpose or desire" of interference with a contract. [51] The cause of action also includes

[51]     Restatement (Second) of Torts § 766 cmt. j (1979).

intentional interference, as that term is defined in § 8A, in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action. [52]

[52]     *Id.*

Section 8A defines "intent" for purposes of the Torts Restatement. It provides that "[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." [53]

[53]     Restatement (Second) of Torts § 8A (1979). Nextel's citation to *Glenn* in support of its argument that

UbiquiTel Inc. v. Sprint Corp., Not Reported in A.2d (2005)

2005 WL 3533697

UbiquiTel must plead that it acted purposefully to harm UbiquiTel is unavailing. *Glenn* set out this more particularized intent for cases of alleged intentional interference with *prospective* contractual relations. 272 A.2d 895, 899; *see also Thompson Coal,* 412 A.2d at 466 (acknowledging "a trend to separate those instances in which there has been an alleged interference with an existing contract right from instances in which the interference is charged with affecting prospective contractual relations."). Further, the Court has found no case in which a Pennsylvania court has applied *Glenn's* particularized intent standard in the context of a claim for intentional interference with contractual relations.

UbiquiTel has pled, at least, that Nextel knew that its actions would cause Sprint to breach its contract with UbiquiTel. In its Complaint, UbiquiTel quotes from Sprint and Nextel's joint proxy statement. There, Nextel acknowledged that "[a]ll of these [Affiliate] arrangements restrict Sprint's and its affiliates' ability to own, operate, build or manage wireless communications networks or to sell Sprint's wireless services within specified geographic areas." [54] Nextel also acknowledged that the arrangements with the Affiliates subject Sprint to "other restrictions" [55] besides the exclusivity provisions like, for example, the provisions concerning the protection of the Affiliates' confidential information. UbiquiTel alleges that Nextel "was aware of UbiquiTel's exclusive rights under Section 2.3 of the Management Agreement and aware that if Sprint merged with Nextel, then Sprint, or its successor in interest, would breach that contractual obligation to UbiquiTel." [56] Finally, UbiquiTel alleges that "Nextel intentionally caused Sprint to execute the merger agreement-a significant factor giving rise to the imminent breach of the Management Agreement." [57] UbiquiTel thus has adequately alleged the four elements of a claim for intentional interference with contract under Pennsylvania law. [58]

[54]    Compl. ¶ 44.

[55]    *Id.* ¶ 43.

[56]    *Id.* ¶ 93.

[57]    *Id.* ¶ 94.

[58]    The Court finds that UbiquiTel also has adequately alleged a claim for tortious interference with contract under Delaware law. *See* Compl. ¶¶ 17 & Ex. A (contract), 44 (Nextel's awareness of the contract), 93, 94 (an intentional act by Nextel that is a significant factor

in bringing about the breach of the contract), 95 (the act was without justification), 51-71, 83, 96 (injury).

### D. Temporal Considerations

**\*7** Nextel argues, in the alternative, that it cannot be liable for tortious interference with contract as a matter of law because " '[i]t is hornbook law that a party or successor party to a contract cannot tortiously interfere with its own contracts." ' [59] In Nextel's view, the tort of intentional interference with contract is not complete until the party subject to the inducement-here, Sprint-breaches the contract and injures the other party, UbiquiTel. [60] Thus, according to Nextel, by the time the combined entity completes the tort, Nextel will be a party to the contract. The combined entity may be liable for breach, but not for tortious interference with contract.

[59]    DOB at 10-11 (quoting *First & First, Inc. v. Dunkin' Donuts, Inc.,* 1990 WL 36139 (E.D.Pa. Mar. 27, 1990)); Def.'s Reply Brief Br. in Support of its Mot. to Dismiss ("DRB") at 8-10.

[60]    DOB at 11 & n. 6; DRB at 8.

Nextel's argument ignores the doctrine of anticipatory breach. "Pennsylvania law has long recognized that an anticipatory repudiation by an obligor to a contract gives the obligee the immediate right to sue for breach of contract...." [61] "[T]o constitute anticipatory breach under Pennsylvania law there must be an *absolute and unequivocal* refusal to perform or a distinct and positive inability to do so." [62] Whether in this case there has been an absolute and unequivocal refusal or there was a distinct and positive inability to perform constitutes a mixed question of fact and law inappropriate for resolution now. [63] To survive a motion to dismiss, UbiquiTel must allege facts that, if proven true, could allow the trier of fact to find anticipatory breach. This it has done. In the Complaint, UbiquiTel alleges that Sprint thrice indicated that merging with Nextel "would conflict with Sprint's obligations to the Affiliates." [64] The fact that Sprint went ahead with the merger without resolving these issues with the Affiliates through negotiation, as it allegedly told the Affiliates it would attempt to do, [65] may support a finding of an anticipatory breach. [66]

[61]    *2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies of Greater Phila.,* 489 A.2d 733, 742 (Pa.1985) (Larsen,

UbiquiTel Inc. v. Sprint Corp., Not Reported in A.2d (2005)

2005 WL 3533697

J., dissenting) (citing *McClelland v. New Amsterdam Cas. Co.*, 185 A. 198 (Pa.1938); *Weinglass v. Gibson*, 155 A. 439 (Pa.1931); *Cameron v. Eynon*, 3 A.2d 423 (Pa.1939)); *see also* Restatement (Second) of Contracts § 250 (1981) ("A repudiation is (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach...."). Delaware law recognizes the same principle: "[T]he law generally has acknowledged for more than one hundred years that an unequivocal statement by a promisor that he will not perform his promise gives the injured party an immediate claim to damages for total breach, in addition to discharging his remaining duties of performance." *Carteret Bancorp, Inc. v. Home Group, Inc .*, 1988 WL 3010, at *5 (Del. Ch. Jan. 13, 1988); *see also Wells v. Lee Builders, Inc.*, 99 A.2d 620, 622 (Del.1953) (acknowledging doctrine of anticipatory breach).

62    *Edwards v. Wyatt*, 2005 WL 1349531, at *1 (3d Cir. June 8, 2005) (internal citation omitted) (emphasis in original).

63    *2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies of Greater Phila.*, 466 A.2d 132, 136 (Pa.Super.1983) ("The first question raised is whether the preceding set of facts is sufficient, as a matter of law, to support the finding of an anticipatory breach ...."), *aff'd*, 489 A.2d 733 (Pa.1985); *2401 Pa. Ave. Corp.*, 489 A.2d at 736 (majority opinion) (concluding that "[t]he *facts* of this case indicate no statement or action which constituted an absolute or unequivocal refusal to perform or a distinct and positive statement of an inability to do so.") (emphasis added).

64    Compl. ¶¶ 42-44.

65    *Id.* ¶ 42.

66    *Cf. 2401 Pa. Ave. Corp.*, 489 A.2d at 737 (majority opinion) (noting that party's continued negotiations support the conclusion that it's words and conduct did not constitute an unequivocal refusal to perform).

Nextel argues that the portions of it and Sprint's public disclosures cited by UbiquiTel do not show an immediate intention of the combined entity to breach the Management Agreements and thus UbiquiTel has not pled breach, whether actual or anticipatory. [67] Underlying Nextel's argument is the possibility that the combined entity will abide by the provisions the Management Agreement to the detriment of the financial and economic success of the combined entity. Nextel may be right with respect to the exclusivity provisions of the Management Agreement, but, at least with respect

to the confidential information provisions, UbiquiTel has pled facts that if proven true could give rise to a finding of anticipatory breach. To wit, UbiquiTel alleges that 1) Sprint possesses UbiquiTel's confidential information, [68] 2) "[d]isclosure of this information to UbiquiTel's competitors would irreparably harm UbiquiTel," [69] 3) Nextel is a competitor of UbiquiTel, [70] 4) Nextel will continue to sell Nextel products after the merger, [71] and 5) Nextel will have access to the confidential information by virtue of the merger with and into Sprint. [72] The merger of Sprint and Nextel while Sprint possesses UbiquiTel's confidential information and is obligated not to use such information to compete with UbiquiTel conceivably could evidence, at least at the pleading stage, a distinct and positive inability to perform under the contract.

67    *See* Tr. at 60-61 (counsel for Nextel arguing that "those quoted sections of the proxy complaint simply won't bear that weight, because ... they say that the intention is to follow the agreements and pointing out, as a matter of risk disclosure, that a dispute over those agreements might arise and ... might impose burdens on Sprint-Nextel.").

68    Compl. ¶ 35-37.

69    *Id.* ¶ 39.

70    *Id.* ¶ 10.

71    *Id.* ¶ 54.

72    *Id.* ¶ 69.

**\*8** Whether an anticipatory breach of contract completes the tort of intentional interference with contract appears to be a matter of first impression in Pennsylvania. [73] At least one court, however, has ruled on this issue. In *Hawkinson v. Bennett*, the Supreme Court of Kansas held that anticipatory breach is sufficient to satisfy the breach element of a claim for tortious interference with contract. [74]

73    *Cf. First & First*, 1990 WL 36139, at *93 (declining to grant preliminary injunction on tortious interference with business relations claim because defendants said they would honor all of third party's contractual commitments and because it is hornbook law that a party cannot tortiously interfere with a contract to which it is a party, but not addressing the question of whether an anticipatory breach, which was not present in that case, could give rise to a claim of tortious interference with

**A144**

UbiquiTel Inc. v. Sprint Corp., Not Reported in A.2d (2005)

2005 WL 3533697

contract). It also appears to be a matter of first impression in Delaware. In *Universal Studios, Inc. v. Viacom, Inc.,* then Vice Chancellor (now Chief Justice) Steele confronted a very similar factual scenario: MCA and Paramount were parties to a contract that prohibited them from owning or operating a competing cable television station. Viacom, an operator of competing television stations, merged with Paramount and MCA sued. The Court concluded that "MCA ha[d] not carried its burden of proof on the required element of an intent to interfere in the performance of the parties' obligations under this joint venture agreement," but observed, in dicta, that there "can be no tortious interference by Viacom because the act complained of is the merger. But the merger, in and of itself, is not violative of Paramount's obligations under the Guarantee or the Agreement." 705 A.2d 579, 593 (Del. Ch.1997). Chief Justice Steele thus did not address the question of whether there had been an anticipatory breach of the agreement and, if there was, whether that would have been sufficient to satisfy the injury requirement for a claim of tortious interference with contract.

74      962 P.2d 445, 471-72 (Kan.1998).

At this stage in the proceeding, where the Court has made only a tentative decision as to which state's substantive law applies and where the parties have not fully briefed the issue, the Court is inclined to agree with the reasoning of the Kansas court that anticipatory breach is sufficient to satisfy the breach element for tortious interference with contract. If the Court were to hold otherwise, it might allow a party to a merger to tortiously interfere with a contract but then avoid tort liability for such interference by consummating the merger. Such a result arguably would be inequitable because it would permit a party to commit a wrong in tort without being exposed to liability for a tort-based remedy. [75] Although the injured party still would have an action sounding in contract, *i.e.,* for breach of contract, situations may exist where the injured party would prefer to bring an action sounding in tort. For example, the damages flowing from a contract cause of action may be more limited than from a tort cause of action.

75      *See Agostino v. Hicks,* 2004 WL 443987, at *9 (Del. Ch. Mar. 11, 2004) ("[E]quity will not suffer a wrong without a remedy...."); *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical,* 2004 WL 415251, at *2 n. 12 (same).

E. Civil Conspiracy Claim

"[T]o state a cause of action for civil conspiracy, a plaintiff must show that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, *i.e.,* an intent to injure, is essential in proof of conspiracy." [76] The Court already has found that UbiquiTel has alleged that two persons (Sprint and Nextel) agreed to do an unlawful act (intentionally interfere with UbiquiTel and Sprint's contract). Thus, the dispositive question is whether UbiquiTel has pled that Nextel acted with an intent to cause injury.

76      *Skipworth by Williams v. Lead Indus. Assoc.,* 690 A.2d 169, 174 (Pa.1997) (internal citation omitted).

Court of Chancery Rule 9(b) provides that "[m]alice, intent, knowledge and other conditions of mind of a person may be averred generally." UbiquiTel has pled that Nextel had knowledge of the Management Agreement before consummating the merger [77] and was "aware that if Sprint merged with Nextel, then Sprint, or its successor in interest, would breach that contractual obligation to UbiquiTel." [78] UbiquiTel also has pled that Nextel announced plans to compete with UbiquiTel in the 1900 MHz band "immediately." [79] Assuming these facts are true, as the Court must do on a motion to dismiss under Rule 12(b)(6), they are sufficient to suggest an inference that Nextel intended to cause injury. Whether Nextel's intent rises to the level of actual malice is a question of fact for trial. [80]

77      Compl. ¶¶ 44, 92-93.

78      *Id.* ¶ 93.

79      *Id.* ¶ 66.

80      The Court finds that UbiquiTel has adequately alleged a cause of action for civil conspiracy under Delaware law. To state a claim for civil conspiracy under Delaware law, a plaintiff must allege "(i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties." *Albert,* 2005 WL 2130607, at *10. See Compl. ¶¶ 2 (confederation), 44, 93-94 (unlawful act), 51-71, 83, 96 (injury/damages).

Nextel denies having had any intent to compete unfairly against UbiquiTel, arguing that it has a different competitive focus than UbiquiTel. [81] Nextel relies on a document attached to the Complaint to support its allegation that it has a different

UbiquiTel Inc. v. Sprint Corp., Not Reported in A.2d (2005)

2005 WL 3533697

competitive focus from UbiquiTel.[82] The Complaint, however, specifically alleged that Nextel has announced an intent to compete with UbiquiTel.[83] On a motion to dismiss, the Court "cannot choose between two differing reasonable interpretations of ambiguous provisions."[84] "Dismissal ... is proper only if the defendant's interpretation is the *only* reasonable construction as a matter of law."[85] Nextel's argument that it and Sprint cannot have conspired to harm UbiquiTel because they do not compete is not the only reasonable inference that the Court can draw from the Complaint and its attached documents.[86] It is also reasonable to infer, for example, that Sprint and Nextel, when were negotiating the merger, intended to begin competing with UbiquiTel. Because the Complaint supports a reasonable inference sufficient to state a claim for civil conspiracy to tortiously interference with contract, the Court cannot dismiss UbiquiTel's claim.

81    DRB at 11; *see also* DOB at 13 ("UbiquiTel's pleaded facts cannot support an inference that Nextel is improperly using confidential information to compete with UbiquiTel.").

82    Compl. Ex. D. at 79.

83    *Id.* ¶ 66.

84    *VLIW Tech.,* 840 A.2d at 615 (internal citation omitted); *see also Orman v. Cullen,* 794 A.2d 5, 16 n. 9 (Del. Ch.2002) (" 'On a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents." ') (quoting *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,* 691 A.2d 609, 613 (Del.1996)).

85    *VLIW Tech.,* 840 A.2d at 615 (internal citation omitted).

86    Furthermore, at the pleading stage the Court does not consider itself bound to accept the truth of all matters set forth in documents attached to the Complaint, such as Exhibit D.

### III. CONCLUSION

**\*9** For all of the reasons stated herein, Nextel's motion to dismiss UbiquiTel's tortious interference with contract and civil conspiracy claims is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in A.2d, 2005 WL 3533697

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

2020 WL 586978
United States District Court, E.D. Pennsylvania.

STURGEON, et al., Plaintiff,
v.
PHARMERICA CORP., Defendant.

CIVIL ACTION NO. 15-6829
|
Filed 02/05/2020

**Synopsis**
**Background:** Relators brought qui tam action against long-term care pharmacy for violations of federal False Claims Act and false claims statutes of 26 states, alleging that pharmacy submitted false claims for government reimbursement for prescriptions it illegally altered without physician consent. Individual relator also alleged that pharmacy retaliated against her after she attempted to bring to its attention alleged instances of fraudulent activity. Pharmacy moved to dismiss and requested judicial notice of a number of documents.

**Holdings:** The District Court, Cynthia M. Rufe, J., held that:

[1] allegations against pharmacy in prior False Claims Act action were not substantially similar to relators' allegations, and thus allegations were not precluded by public disclosure bar;

[2] relator's allegations were not based on same underlying facts as those in prior action, nor did allegations have qualities of host/parasite relationship, and thus allegations were not precluded by government action bar;

[3] allegations that pharmacy substituted different form or dosage of non-controlled substance than one prescribed alleged particular details of scheme to submit false claims paired with reliable indicia leading to strong inference that claims were actually submitted, as required to state claims for violations of False Claims Act;

[4] allegations that pharmacy systematically altered essential elements of prescriptions for controlled substances so as to substitute more profitable alternatives alleged particular details of scheme to submit false claims paired with reliable indicia leading to strong inference that claims were actually

submitted, as required to state claims for violations of False Claims Act;

[5] allegations that pharmacy substituted brand-name drugs in violation of applicable federal and state law alleged particular details of scheme to submit false claims paired with reliable indicia leading to strong inference that claims were actually submitted, as required to state claims for violations of False Claims Act;

[6] relators failed to allege that Department of Health and Human Services had exercised its discretion to demand payment from pharmacy under corporate integrity agreement, as required to state claim under reverse false claims provision of the False Claims Act; and

[7] relator alleged that she engaged in protected conduct, as required to state claim against long-term care pharmacy under False Claims Act's retaliation provision.

Motion granted in part and denied in part.

West Headnotes (45)

**[1]**   **Evidence** 🔑 Official proceedings and acts
   **Federal Civil Procedure** 🔑 Matters considered in general
   Courts will take judicial notice of certain matters of public record on a motion to dismiss; examples of matters of public record include Securities and Exchange Commission filings, court-filed documents, and Federal Drug Administration reports published on the FDA website. Fed. R. Evid. 201.

**[2]**   **Evidence** 🔑 Judicial Proceedings and Records
   **Evidence** 🔑 Official proceedings and acts
   Courts may take judicial notice of public records, including publicly available records and transcripts from judicial proceedings. Fed. R. Evid. 201.

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

**[3]**  **Evidence** 🗝 Records and decisions in other
actions or proceedings

**Federal Civil Procedure** 🗝 Matters
considered in general

Publicly available records from other judicial
proceedings may be judicially noticed in the
context of a motion to dismiss. Fed. R. Evid. 201.

**[4]**  **Evidence** 🗝 Records and decisions in other
actions or proceedings

**Evidence** 🗝 Effect of judicial notice

Publicly available records from other judicial
proceedings may only be judicially noticed to
show what was in the public realm at the time,
not whether the contents of those documents are
true. Fed. R. Evid. 201.

**[5]**  **Evidence** 🗝 Records and decisions in other
actions or proceedings

**Evidence** 🗝 Effect of judicial notice

**Federal Civil Procedure** 🗝 Matters
considered in general

On a motion to dismiss, a court may take judicial
notice of another court's opinion—not for the
truth of the facts recited therein, but for the
existence of the opinion, which is not subject to
reasonable dispute over its authenticity. Fed. R.
Evid. 201.

**[6]**  **Evidence** 🗝 Official proceedings and acts

Courts may take judicial notice of records and
reports of administrative bodies. Fed. R. Evid.
201.

**[7]**  **Evidence** 🗝 Official proceedings and acts

Court would take judicial notice of
administrative guidance manuals issued by
Centers for Medicare and Medicaid Services
(CMS) and report on standard practices within
long-term care pharmacy industry commissioned
by CMS and prepared by consultant, in qui
tam action against long-term care pharmacy

alleging pharmacy violated False Claims Act
by submitting false claims for reimbursement,
although manuals and report would be judicially
noticed only for their existence and not for their
truth, where manuals and report were not just
information on government website, but were
published reports of federal agency that happen
to be available online. 31 U.S.C.A. § 3729(a)(1)
(A), (B), (G); Fed. R. Evid. 201.

**[8]**  **Federal Civil Procedure** 🗝 Matters
considered in general

**Federal Civil Procedure** 🗝 Motion

Courts may consider documents integral to or
explicitly relied upon in the complaint without
converting a motion to dismiss into one for
summary judgment.

**[9]**  **Federal Civil Procedure** 🗝 Matters
considered in general

Although generally courts avoid looking at
evidence outside the complaint at the motion-to-
dismiss stage, an exception can be made where
a plaintiff would be able to maintain a claim of
fraud by extracting an isolated statement from a
document and placing it in the complaint, even
though if the statement were examined in the
full context of the document, it would be clear
that the statement was not fraudulent; in that
case, fairness would require examining the whole
document, even if the plaintiff did not attach it as
an exhibit to the complaint.

1 Cases that cite this headnote

**[10]**  **Federal Civil Procedure** 🗝 Matters
considered in general

The narrow exception allowing a court to, at
the motion-to-dismiss stage, look at evidence
outside the complaint where the plaintiff would
be able to maintain a claim of fraud by extracting
an isolated statement from a document and
placing it in the complaint is limited to cases
where the claims in the complaint are based on an
extrinsic document, and does not apply where the
complaint merely cites an extrinsic document.

*Sturgeon v. Pharmerica Corp.*, --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

**[11]** **Evidence** 🔑 Historical facts

**Federal Civil Procedure** 🔑 Matters considered in general

In resolving motion to dismiss, court would not take judicial notice of promotional brochures from website of provider of nursing home prescription submission platform that explained how platform worked, in qui tam action against long-term care pharmacy alleging pharmacy violated False Claims Act by submitting false claims for reimbursement, where relators did not cite brochures in complaint, nor could relators' claims be said to be based on brochures, and, further, brochures were promotional business materials from provider's corporate website and thus were not sort of source whose accuracy could not reasonably be questioned. 31 U.S.C.A. § 3729(a)(1)(A), (B), (G); Fed. R. Evid. 201.

**[12]** **United States** 🔑 Who May Bring Action for False Claims

**United States** 🔑 Plaintiff's right to share of award

The False Claims Act empowers a person, or relator, to sue on behalf of the United States those who defraud the government, and to share in any ultimate recovery. 31 U.S.C.A. § 3729 et seq.

**[13]** **United States** 🔑 Other particular bars

The government action bar prevents suits under the False Claims Act based upon allegations or transactions which are the subject of a civil suit in which the Government is already a party. 31 U.S.C.A. § 3730(e)(3).

**[14]** **United States** 🔑 Original source exception

The public disclosure bar prevents suits under the False Claims Act when the alleged fraud has been publicly disclosed in at least one of several enumerated sources, unless the relator is an original source of certain information underlying the action. 31 U.S.C.A. § 3730(e)(4).

**[15]** **United States** 🔑 Other particular bars

A host/parasite relationship exists, as will support a finding that an action is based upon the same allegations or transactions as an action to which the government was a party, for purposes of the False Claims Act's government action bar, if the relator's case is receiving support, advantage, or the like from the host case, in which the government is a party, without giving any useful or proper return to the government, or at least having the potential to do so. 31 U.S.C.A. § 3730(e)(3).

**[16]** **United States** 🔑 Other particular bars

The government action inquiry for determining whether an action is based upon the same allegations or transactions as an action to which the government was a party, for purposes of the False Claims Act's government action bar, is essentially a test of factual similarity; if a relator's allegations are the same as allegations already made by the government, or are similar enough to be characterized as feeding off of the government's allegations, the government action bar applies, but if a relator's case is seeking to remedy fraud that the government has not yet attempted to remedy, the government action bar does not apply. 31 U.S.C.A. § 3730(e)(3).

**[17]** **United States** 🔑 Public Disclosure Bar

The False Claims Act's public disclosure bar applies when there has been (1) a public disclosure (2) in one of the statute's specified fora (3) of allegations or transactions of fraud (4) that are substantially the same as those alleged by the relator. 31 U.S.C.A. § 3730(e)(4)(A).

**[18]** **United States** 🔑 Original source exception

An "original source" of information, for purposes of the False Claims Act's public disclosure bar, is one who has voluntarily disclosed information to the government or one who has knowledge that is independent

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

of and materially adds to information already publicly disclosed. 31 U.S.C.A. §§ 3730(e)(4)(A), 3730(e)(4)(B).

**[19]**   **United States** 🔑 **Public Disclosure Bar**

Courts examine the similarity of the allegations on a claim-by-claim basis when determining whether the False Claims Act's public disclosure bar applies. 31 U.S.C.A. § 3730(e)(4)(A).

**[20]**   **United States** 🔑 **Public Disclosure Bar**

Allegations against long-term care pharmacy in prior False Claims Act action were not substantially similar to relators' allegations in subsequent False Claims Act action against pharmacy, and thus subsequent case was not precluded by public disclosure bar, where each of three prescription-related schemes disclosed in prior action concerned dispensations of medication in the absence of any prescription by a variety of means, while relators in subsequent action alleged scheme to alter valid prescriptions so as to maximize reimbursements. 31 U.S.C.A. § 3730(e)(4)(A).

**[21]**   **United States** 🔑 **Other particular bars**

Relator's allegations in False Claims Act action against long-term care pharmacy were not based on same underlying facts as those in prior False Claims Act action against pharmacy, nor did allegations have qualities of host/parasite relationship, and thus allegations were not precluded by government action bar, where each of three prescription-related schemes disclosed in prior action concerned dispensations of medication in the absence of any prescription by a variety of means, while relators alleged scheme to alter valid prescriptions so as to maximize reimbursements. 31 U.S.C.A. § 3730(e)(3).

**[22]**   **Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

Claims under the False Claims Act are subject to the heightened pleading standard of the rule concerning pleading of special matters. 31 U.S.C.A. § 3729 et seq.; Fed. R. Civ. P. 9(b).

**[23]**   **Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

To satisfy the heightened pleading standard of the rule concerning pleading of special matters, a relator alleging claims under the False Claims Act must plead particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted. 31 U.S.C.A. § 3729 et seq.; Fed. R. Civ. P. 9(b).

**[24]**   **Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

A relator alleging claims under the False Claims Act can satisfy the heightened pleading standard of the rule concerning pleading of special matters in two ways: either by pleading the date, place, or time of the fraud, or by using an alternative means of injecting precision and some measure of substantiation into their allegations of fraud. 31 U.S.C.A. § 3729 et seq.; Fed. R. Civ. P. 9(b).

**[25]**   **United States** 🔑 **Pleading; complaint filed under seal**

A relator alleging claims under the False Claims Act need not present specific fraudulent claims for payment at the pleading stage; indeed, this is not necessarily required to prevail even at trial. 31 U.S.C.A. § 3729 et seq.

**[26]**   **Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

In an action under the False Claims Act, it is the underlying scheme that must be pled with particularity to give defendants fair notice of the claims against them, protect defendants from reputational harm, and prevent the filing of baseless suits that amount to fishing expeditions. 31 U.S.C.A. § 3729 et seq.; Fed. R. Civ. P. 9(b).

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)
Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

**[27]    United States ⚷ Elements**

To establish a violation of the provision of the False Claims Act concerning presentment of a false or fraudulent claim for payment or approval, a relator must show that (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent. 31 U.S.C.A. § 3729(a)(1)(A).

**[28]    United States ⚷ Elements**

To establish a violation of the provision of the False Claims Act imposing liability for making or using a false record or statement material to a false or fraudulent claim, a relator must show that the defendant (1) made, used, or caused to be made or used, a false record or statement; (2) the defendant knew the statement to be false; and (3) the statement was material to a false or fraudulent claim. 31 U.S.C.A. § 3729(a)(1)(B).

**[29]    United States ⚷ False claim**

**United States ⚷ False certification**

A claim is "factually false," for purposes of False Claims Act, when the claimant misrepresents what goods or services it provided to the government; by contrast, a claim is "legally false" when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for government payment. 31 U.S.C.A. §§ 3729(a)(1)(A), 3729(a)(1)(B).

**[30]    Federal Civil Procedure ⚷ Fraud, mistake and condition of mind**

Allegations that long-term care pharmacy submitted false claims for payment for filling prescription orders that were altered by substituting different form or dosage of non-controlled substance than one prescribed alleged particular details of scheme to submit false claims paired with reliable indicia leading to strong inference that claims were actually submitted, as required to state claims for violations of False Claims Act, where relators alleged not only that pharmacy altered drug form on prescriptions for non-controlled substances, but also that pharmacy altered dosage and quantity, which were undisputedly required elements of valid prescription, and relators identified example of prescription whose dosage was allegedly altered without consent of prescribing physician. 31 U.S.C.A. §§ 3729(a)(1)(A), 3729(a)(1)(B); Fed. R. Civ. P. 9(b).

**[31]    Federal Civil Procedure ⚷ Fraud, mistake and condition of mind**

Allegations that long-term care pharmacy violated federal and state laws requiring that pharmacists first obtain approval from prescribing medical practitioner before deviating from prescription alleged particular details of scheme to submit false claims paired with reliable indicia leading to strong inference that claims were actually submitted, as required to state claims for violations of False Claims Act. 31 U.S.C.A. §§ 3729(a)(1)(A), 3729(a)(1)(B); Fed. R. Civ. P. 9(b).

**[32]    Federal Civil Procedure ⚷ Fraud, mistake and condition of mind**

Allegations that long-term care pharmacy's proprietary medicine dispensing system was designed to prompt clerks to fill prescriptions in most profitable way and that pharmacy instructed clerical personnel to physically alter prescriptions to make it appear as though physician had prescribed drug in different form, quantity and/or dosage alleged particular details of scheme to submit false claims paired with reliable indicia leading to strong inference that claims were actually submitted, as required to state claims for violations of False Claims Act, although relators' complaint omitted details like names of individuals who designed dispensing system or altered prescriptions, where complaint described alleged scheme in adequate detail, explaining mechanism of alleged fraud and generic identities of those involved. 31 U.S.C.A.

Case 1:20-cv-00857-CFC   Document 18   Filed 07/15/20   Page 154 of 181 PageID #: 553

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

§§ 3729(a)(1)(A), 3729(a)(1)(B); Fed. R. Civ. P. 9(b).

**[33]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

A relator alleging violations of the False Claims Act must do more than identify a general sort of fraudulent conduct while specifying no particular circumstances of any discrete fraudulent statement. 31 U.S.C.A. § 3729 et seq.; Fed. R. Civ. P. 9(b).

**[34]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Allegations that long-term care pharmacy systematically altered essential elements of prescriptions for controlled substances, such as form or dosage specified, so as to substitute more profitable alternative and that each time pharmacy submitted claim for reimbursement for dispensation pursuant to altered prescription it falsely certified that dispensation complied with all applicable laws and regulations alleged particular details of scheme to submit false claims paired with reliable indicia leading to strong inference that claims were actually submitted, as required to state claims for violations of False Claims Act, where relators identified specific time frame of alleged fraudulent claims and definite number of claims allegedly submitted. 31 U.S.C.A. §§ 3729(a)(1)(A), 3729(a)(1)(B); Fed. R. Civ. P. 9(b).

**[35]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Allegations that long-term care pharmacy substituted brand-name drugs in violation of applicable federal and state law and that each time pharmacy submitted claim for reimbursement for dispensation pursuant to altered prescription it falsely certified that dispensation complied with all applicable laws and regulations alleged particular details of scheme to submit false claims paired with reliable indicia leading to strong inference that

claims were actually submitted, as required to state claims for violations of False Claims Act, where relators identified two particular substitutions that were allegedly made and alleged that brand-name drugs pharmacy dispensed were more expensive than their available generic equivalents. 31 U.S.C.A. §§ 3729(a)(1)(A), 3729(a)(1)(B); Fed. R. Civ. P. 9(b).

**[36]    United States** 🔑 Reverse false claims

Relators failed to allege that Department of Health and Human Services had exercised its discretion to demand payment from long-term care pharmacy under corporate integrity agreement between Department and pharmacy, as required to state claim under reverse false claims provision of the False Claims Act; terms of agreement did not describe established duty to pay money to government at time agreement was breached, but instead described possible future duty, and because there was no established duty until Department exercised its discretion to demand payment, agreement's stipulated penalties were not obligations for purposes of reverse false claims provision. 31 U.S.C.A. § 3729(a)(1)(G); Fed. R. Civ. P. 9(b).

**[37]    Labor and Employment** 🔑 Reporting or Opposing Wrongdoing;  Criticism and "Whistleblowing"

To state a claim under the False Claims Act's retaliation provision, a relator must allege (1) that she engaged in "protected conduct," that is, acts done in furtherance of a False Claims action, and (2) that she was discriminated against because of that protected conduct. 31 U.S.C.A. § 3730(h)(1).

**[38]    Labor and Employment** 🔑 Protected activities

"Protected conduct," for purposes of the False Claims Act's retaliation provision, includes investigation for, initiating of, testimony for, or

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

assistance in a qui tam action. 31 U.S.C.A. § 3730(h)(1).

**[39]**    **Labor and Employment** 🔑 What Constitutes Adverse Action

"Discrimination," for purposes of the False Claims Act's retaliation provision, includes actions that might have dissuaded a reasonable worker from engaging in the protected conduct, and the cumulative impact of retaliatory acts may become actionable even though the actions would be de minimis if considered in isolation. 31 U.S.C.A. § 3730(h)(1).

**[40]**    **Labor and Employment** 🔑 Protected activities

**Labor and Employment** 🔑 What Constitutes Adverse Action

In assessing a claim under the False Claims Act's retaliation provision, both the protected conduct inquiry and the discrimination inquiry are fact specific and context dependent. 31 U.S.C.A. § 3730(h)(1).

**[41]**    **Labor and Employment** 🔑 Protected activities

Relator alleged that she engaged in protected conduct, as required to state claim against long-term care pharmacy under False Claims Act's retaliation provision, where relator alleged that she conducted internal investigation into potential false claims while working at pharmacy, during which she discovered violations she alleged in qui tam action, and that she reported her findings to superiors at pharmacy at least four times during that period. 31 U.S.C.A. § 3730(h)(1).

**[42]**    **Labor and Employment** 🔑 Other particular actions

Relator alleged that long-term care pharmacy discriminated against her for engaging in protected conduct while she worked at pharmacy, including investigating and reporting potential false claims, as required to state claim against pharmacy under False Claims Act's retaliation provision, where relator alleged that when she brought results of her investigation to attention of senior vice president for sales and marketing, he shut down meeting and ordered relator to stop her investigation and demanded that she stop conferring with management about issues that she had identified, and that when she persisted, management sought to conceal her findings by discrediting her work, limiting her authority, redefining her role, and narrowing her responsibilities. 31 U.S.C.A. § 3730(h)(1).

**[43]**    **Judgment** 🔑 What constitutes diversity of issues

**Judgment** 🔑 Facts Necessary to Sustain Judgment

Relator's claim against long-term care pharmacy under False Claims Act's retaliation provision, in which relator alleged that pharmacy materially diminished her duties in relation for investigating and reporting pharmacy's alleged violations of Act, was not collaterally estopped by jury verdict in relator's prior action against pharmacy for breach of her employment agreement and violation of Pennsylvania Wage Payment and Collection Law, where question posed to jury in prior action was why relator resigned her position, not whether relator experienced material diminution in her duties, and thus jury's determination that relator did not experience material diminution in her duties was not essential to jury's verdict. 31 U.S.C.A. § 3730(h)(1).

**[44]**    **Judgment** 🔑 Nature and requisites of former adjudication as ground of estoppel in general

Collateral estoppel applies when (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment.

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

[45]  **Judgment** 🔑 Essentials of Adjudication

A determination ranks as "necessary" or "essential" for collateral-estoppel purposes only when the final outcome hinges on it.

**Attorneys and Law Firms**

Catherine Pratsinakis, Jesse N. Silverman, Jessica L. Titler-Lingle, Joshua D. Wolson, Marie-Theres Difillippo, Mark A. Schiavo, Dilworth Paxson LLP, Philadelphia, PA, Teresa N. Cavenagh, Duane Morris LLP, Philadelphia, PA, Michael M. Mustokoff, Duane Morris LLP, Phila, PA, for Plaintiff.

Carolyn P. Short, Michael R. Manthei, William F. Pezzolo, Holland & Knight LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION

Rufe, J.

**\*1** Relators Lena Sturgeon, Anthony Ferrante, Anthony Sciole, and Nathan Niles bring this *qui tam* action against PharMerica Corporation alleging violations of the federal False Claims Act [1] and the false claims statutes of twenty-six states. [2] Relators allege that PharMerica, a long-term care pharmacy, submitted false claims for government reimbursement for prescriptions it illegally altered without physician consent. Relator Sturgeon also alleges that PharMerica retaliated against her after she attempted to bring to its attention alleged instances of fraudulent activity. The state and federal governments declined to intervene and PharMerica has moved to dismiss the Amended Complaint.

[1]  31 U.S.C. §§ 3729(a)(1)(A), (B), (G).

[2]  Cal. Gov't Code §§ 12650–56 (West 2019); Colo. Rev. Stat. §§ 25.5-4-303.5 to -310 (West 2019); Conn. Gen. Stat. §§ 4-274 to -289 (West 2019); Del. Code Ann. tit. 6, §§ 1201–11 (West 2019); Fla. Stat. Ann. §§ 68.081–.092 (West 2019); Ga. Code Ann. §§ 49-4-168 to -168.6 (West 2019); Haw. Rev. Stat. Ann. §§ 661-21 to -31 (West 2019); 740 Ill. Comp. Stat. Ann. 175/1–175/8 (West 2019); Ind. Code Ann. §§ 5-11-5.5-1 to 5-11-5.5-18 (West 2019); Iowa Code Ann. §§ 685.1–.7 (West 2019); La. Stat. Ann. §§ 46:437.1–440.16 (2019); Mass. Gen. Laws Ann. ch. 12, §§ 5A–5O (West 2019); Mich. Comp.

Laws Ann. §§ 400.601–.615 (West 2019); Minn. Stat. Ann. §§ 15C.01–.16 (West 2019); Mont. Code Ann. §§ 17-8-401 to -416 (West 2019); Nev. Rev. Stat. Ann. §§ 357.010– .250 (West 2019); N.H. Rev. Stat. Ann. §§ 167:61-A to -E (2019); N.J. Stat. Ann. §§ 2A:32C-1 to -18 (West 2019); N.M. Stat. Ann. §§ 44-9-1 to -14 (West 2019); N.C. Gen. Stat. Ann. §§ 1-605 to -618 (West 2019); Okla. Stat. Ann. tit. 63, §§ 5053– 54 (West 2019); 9 R.I. Gen. Laws Ann. §§ 9-1.1-1 to -1.1-9 (West 2019); Tenn. Code Ann. §§ 4-18- 101 to -108, 71-5-181 to -185 (West 2019); Tex. Hum. Res. Code Ann. §§ 36.001-.132 (West 2019); Va. Code Ann. § 8.01-216.1 to -216.19 (West 2019); Wash. Rev. Code Ann. § 74.66.005–.130 (West 2019). Relators also brought claims under the Maryland False Claims Act. Md. Code Ann., Health–Gen. § 2-601 to -611 (West 2019). That statute requires that claims be dismissed if the state does not elect to intervene. *See* Doc. No. 81. Accordingly, Relators' claims under Maryland's false claims statute were dismissed by stipulation of the parties. *See* Doc. No. 82.

## I. BACKGROUND [3]

[3]  The facts set forth below are drawn from the Amended Complaint and assumed true for purposes of resolving this Motion to Dismiss.

### A. PharMerica Is a Long-Term Care Pharmacy

PharMerica is the second largest institutional pharmacy in the United States. [4] It fills prescription orders only for nursing homes and other long-term care facilities and is not open to the general public. [5]

[4]  *See* Amend. Compl. ¶ 38.

[5]  *See id.* ¶ 37; *see* PharMerica Mem. Supp. Mot. to Dismiss [Doc. No. 51-1] at 2.

Nursing home physicians submit prescriptions to PharMerica electronically through a "widely-used nursing home platform" called PointClickCare. [6] PharMerica also uses its own "proprietary medicine dispensing system known as the LTC400" to fill prescriptions received through PointClickCare. [7] Prescription data transmitted via PointClickCare is not migrated automatically to the LTC400 to create an order for filling a prescription. Instead, when a prescription is received through the PointClickCare system, a pharmacy technician or data entry clerk at

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

PharMerica manually inputs the prescription information into the LTC400.[8]

[6]    Amend. Compl. ¶ 46.

[7]    *Id.* ¶ 48.

[8]    *Id.* ¶¶ 48–49.

### B. Overview of Medicare Part D

*\*2*  "Medicare is a federally funded and administered health insurance program for certain groups, primarily elderly and disabled persons."[9] "The Department of Health and Human Services ('HHS') administers the Medicare program through the Centers for Medicare and Medicaid Services ('CMS')."[10] Relevant here are two components of the Medicare program: Part A, the hospital insurance benefits program,[11] and Part D, the voluntary prescription drug benefit program.[12]

[9]    *See United States ex rel. Spay v. CVS Caremark Corp.,* 913 F. Supp. 2d 125, 131 (E.D. Pa. 2012).

[10]    *Id.*

[11]    42 U.S.C. §§ 1395c, 1395d; *see* Amend. Compl. ¶¶ 138, 141.

[12]    42 U.S.C. § 1395w-101 et seq.; *see* Amend. Compl. ¶¶ 138–42.

"Medicare Part D is based on a private market model, wherein Medicare contracts with private entities, known as Part D 'sponsors,' to administer prescription drug plans."[13] "Part D [p]lan sponsors subcontract with many entities to provide drugs to the Medicare Part D beneficiaries enrolled in their plans."[14] PharMerica is one such subcontractor.[15] Its contracts with Part D plan sponsors "require PharMerica to comply with applicable federal laws, regulations, and CMS instructions."[16] This is also true of PharMerica's contracts under the analogous state Medicaid programs.[17]

[13]    *Spay,* 913 F. Supp. 2d at 132.

[14]    *Id.* at 133.

[15]    Amend. Compl. ¶¶ 138–40.

[16]    *Id.* ¶ 138.

[17]    *Id.* ¶ 144.

PharMerica certifies its compliance with applicable laws and regulations each time it submits a claim for reimbursement. When a pharmacy like PharMerica "dispenses drugs to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D plan and receives reimbursement from the plan sponsor for the costs not paid by the beneficiary."[18] That claim submission must be accompanied by a certification of compliance with applicable laws and regulations,[19] including compliance with the requirement that drugs be dispensed only pursuant to a valid prescription.[20] This is also true of PharMerica's claims under the analogous state Medicaid programs.[21] PharMerica also receives direct payments from nursing home facilities using Medicare Part A funds with analogous requirements.[22]

[18]    *Spay,* 913 F. Supp. 2d at 132.

[19]    Amend. Compl. ¶ 141.

[20]    *Id.* ¶ 142.

[21]    *Id.* ¶ 144.

[22]    *Id.* ¶¶ 138, 141.

### C. Relator Sturgeon's Investigation

Reliant Health Management Services is the owner and operator of more than twenty nursing homes in Pennsylvania.[23] In June 2013, Reliant began using PharMerica as its institutional pharmacy.[24] Soon after Reliant switched to PharMerica, it noticed that its "nursing home facilities experienced a significant increase in pharmacy costs ranging from $2.00-$3.00 per patient per day."[25] Reliant complained.[26] PharMerica's Senior Vice President for Sales and Marketing Mark Lindemoen asked Sturgeon, who by that time was working at PharMerica as its Executive Vice President, to review the issue.[27]

[23]    *Id.* ¶¶ 24, 33.

[24]    *Id.* ¶ 33.

[25]    *Id.* ¶ 67.

[26]    *Id.*

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

27    *Id.* ¶¶ 29, 67.

As she reviewed Reliant's complaint, Sturgeon began to notice "significant discrepancies" between prescription order data received via PointClickCare and prescription fill data in the LTC400. [28] That is, it appeared to Sturgeon that on some occasions PharMerica had dispensed medications different from those prescribed. These discrepancies "consistently favored PharMerica's bottom line." [29] Sturgeon brought her findings to Lindemoen, who "refused to acknowledge the problems" or investigate further. [30] When Sturgeon raised the issue with him again after returning from a brief medical leave, Lindemoen "shut down the meeting and ordered Sturgeon to stop her investigation." [31] Other senior-level management executives responded similarly. [32]

28    *Id.* ¶¶ 68–69.

29    *Id.* ¶ 68.

30    *Id.* ¶¶ 70–71.

31    *Id.* ¶¶ 72–74.

32    *Id.* ¶¶ 75–76, 80–81.

**\*3**  After Sturgeon reported her findings to management, "there was an unexplained and sudden diminution of Sturgeon's duties and responsibilities." [33] Sturgeon was "removed from the Mid-Atlantic region sales and marketing strategies and development initiatives" and stripped of her authority to negotiate and terminate contracts and to review and approve capital expenditures and development projects and of her responsibility for "all customer relationships in Florida." [34] This diminution in her job responsibilities was "retaliatory." [35] Sturgeon resigned her position. [36]

33    *Id.* ¶ 83.

34    *Id.* ¶ 86.

35    *Id.* ¶ 89.

36    *Id.* ¶¶ 85, 87–88.

After leaving PharMerica, Sturgeon began working as a consultant in the nursing home and pharmacy industries. [37] Reliant retained her to audit its relationship with PharMerica. [38] Relators Ferrante, Sciole, and Niles are corporate officers at Reliant and appear to have been involved in the audit. [39] In conducting the audit, Sturgeon confirmed the discrepancies she had identified while employed at PharMerica and discovered the source of those discrepancies: an alleged scheme to alter prescriptions systematically so as to increase reimbursements. [40]

37    *Id.* ¶ 100.

38    *Id.*

39    *Id.* ¶¶ 33, 101.

40    *Id.* ¶ 101.

### D. Alleged Prescription Alteration Scheme

Relators' audit revealed that PharMerica systematically altered prescriptions "and did so to enhance its profit margins and increase its rebates from manufacturers and suppliers." [41] The use of both the PointClickCare system and the LTC400 made this possible in two ways. First, the system of manually entering prescription data received via PointClickCare allowed PharMerica to direct its clerks to alter the data intentionally. [42] That is, in some instances, the data as originally entered in the LTC400 did not match the prescription data received via PointClickCare. Second, the LTC400 itself was programmed so that whenever an ordered drug was out of stock, the platform would prompt clerks to replace it with the most profitable alternative, even if the data was correctly transcribed. [43] In either case, PharMerica did not comply with applicable laws and regulations requiring that pharmacists get the prescribing physician's consent before altering any essential element of a prescription. [44]

41    *Id.*

42    *Id.* ¶ 59.

43    *Id.* ¶¶ 54–56.

44    *Id.* ¶¶ 150–53; *see, e.g.*, 55 Pa. Code § 1121.52(c).

Relators allege that PharMerica illegally altered prescriptions in this manner for both controlled and non-controlled substances, sometimes altering the drug's dosage and other times altering its form (i.e., tablet vs. capsule) or the drug itself (i.e., brand name vs. generic). [45] Specifically, Relators allege that their audit turned up at least 5,687 instances of PharMerica altering dosages without notice to the prescribing physician; [46] 10,540 instances of PharMerica

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

altering drug forms without notice;[47] and an unspecified number of instances of PharMerica dispensing a brand-name drug instead of the prescribed generic drug.[48]

[45]   Amend. Compl. ¶ 101–03, 110, 118, 127.

[46]   *Id.* ¶ 106.

[47]   *See id.* ¶ 119.

[48]   *Id.* ¶ 127.

### E. Procedural Background

Relators filed this *qui tam* action in 2015. The case was voluntarily dismissed in 2018 after Relators' attorney informed them that the United States had declined to intervene, but Relators then moved for relief pursuant to Federal Rule of Civil Procedure 60(b), arguing that their counsel never informed them that he was filing a notice of dismissal.[49] Indeed, when the notice of dismissal was filed, Relators were in the process of seeking replacement counsel, as their counsel would no longer represent them after the United States declined to intervene.[50] The Court granted the motion and reopened the case.[51]

[49]   Doc. No. 39 at 1–2.

[50]   *Id.*

[51]   *Id.* at 3–4.

**\*4**   After the case was reopened, Relators filed the First Amended Complaint, which is the operative pleading here.[52] PharMerica moved to dismiss the First Amended Complaint and requested judicial notice of a number of documents in support of its Motion to Dismiss.[53] The Court held oral argument limited to three disputed issues related to the Motion to Dismiss.[54]

[52]   Doc. No. 43.

[53]   Doc. Nos. 51, 52.

[54]   Doc. Nos. 74, 80.

### II. MOTION FOR JUDICIAL NOTICE

PharMerica requests judicial notice of a number of documents to support its motion to dismiss. A court may take judicial notice of facts that are not subject to reasonable dispute because they are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[55] A court "must" take judicial notice if a party requests it and supplies the court with the necessary information.[56]

[55]   Fed. R. Evid. 201(b)(2).

[56]   Fed. R. Evid. 201(c)(2).

**[1]**   The Third Circuit has cautioned that taking judicial notice "should be done sparingly at the pleadings stage. Only in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point."[57] Courts will, however, take judicial notice of certain matters of public record on a motion to dismiss; examples of matters of public record include "Securities and Exchange Commission filings, court-filed documents, and Federal Drug Administration reports published on the FDA website."[58]

[57]   *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007).

[58]   *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 139 (internal citations omitted) (quoting *McGehean v. AF & L Ins. Co.*, No. 09-1792, 2009 WL 3172763, at *2 (E.D. Pa. Oct. 2, 2009)).

### A. Materials from Prior Judicial Proceedings

**[2]**   **[3]**   **[4]**   **[5]**   Courts may take judicial notice of public records, including "publicly available records and transcripts from judicial proceedings."[59] In particular, publicly available records from other judicial proceedings may be judicially noticed in the context of a motion to dismiss.[60] Such records may only be judicially noticed to show "what was in the public realm at the time, not whether the contents of those documents are true."[61] Thus, "on a motion to dismiss, [a court] may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity."[62]

[59]   *Golden v. Cook*, 293 F. Supp. 2d 546, 551 (W.D. Pa. 2003); *see Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007).

[60]   *Spay*, 913 F. Supp. 2d at 139–40.

**Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)**

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

61    *Id.* (citing *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt., L.P.,* 435 F.3d 396, 401 n.15 (3d Cir. 2006).

62    *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.,* 181 F.3d 410, 426 (3d Cir. 1999).

PharMerica requests judicial notice of four filings from a prior False Claims Act case, *United States ex rel. Denk v. PharMerica,* which it argues precludes Relators' claims as discussed below.[63] Those filings are: Relator Denk's original Complaint; Relator Denk's First Amended Complaint; the Government's Notice of Election to Intervene in Part and Decline to Intervene in Part; and the Government's Complaint. Copies of all four filings are included as exhibits to the Motion for Judicial Notice, and all are unsealed and publicly available. The Court can—in fact, it must—evaluate the content of these records in assessing whether the public disclosure bar applies.[64] Judicial notice, however, extends only as far as recognizing what the parties in *Denk* pled and argued—in other words, what was publicly disclosed—and not to the truth of the judicially noticed records. Relators do not object to the Court taking notice of these documents for this purpose.[65]

63    Civil Action No. 09-720 (E.D. Wis. filed July 23, 2009).

64    *United States ex rel. Kraxberger v. Kan. City Power & Light Co.,* 756 F.3d 1075, 1083 (8th Cir. 2014).

65    Relators' Reply Mem. Opp. Mot. for Judicial Notice [Doc. No. 58] at 2–3.

*5 PharMerica also requests judicial notice of four filings from Relator Sturgeon's prior employment action against PharMerica, which it argues preclude her retaliation claims here. Those filings are: the Complaint; the First Amended Complaint; the Verdict Slip; and the Judgment. Copies of all four filings are included as exhibits to the Motion for Judicial Notice, and all four are publicly available. The Court must consider these documents in determining whether Relator Sturgeon's retaliation claim is precluded by the jury verdict in her prior employment action.[66] They may only be judicially noticed, however, to establish their existence, "and not for the truth of the facts asserted" in those filings.[67] Relators do not object to the Court taking notice of these documents for this purpose.[68] Accordingly, the Court will take judicial notice of these eight documents.

66    *M & M Stone Co. v. Pennsylvania,* 388 F. App'x 156, 162 (3d Cir. 2010) ("In the context of deciding a Rule 12(b)(6) motion that raises issue preclusion concerns, and where a plaintiff has not included the existence or substance of the prior adjudications in the body of, or attachments to, its complaint, it is axiomatic that a court must still consider the prior adjudication in order to determine whether issue preclusion bars that plaintiff's claims.").

67    *Id.*

68    Relators' Reply Mem. Opp. Mot. for Judicial Notice [Doc. No. 58] at 2–3.

### B. Administrative Reports

**[6]    [7]** Courts may also take judicial notice of "records and reports of administrative bodies."[69] PharMerica requests judicial notice of three documents in this category. Two are administrative guidance manuals issued by CMS.[70] The third is a report on standard practices within the long-term care pharmacy industry, which appears to have been commissioned by CMS and prepared by a consultant, the Lewin Group.[71]

69    *Golden,* 293 F. Supp. 2d at 551; *see Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1197 (3d Cir. 1993).

70    Doc. No. 77, Ex. I (U.S. Dep't of Health & Human Servs., CMS, Pub. No. 100-07, State Operations Manual: Appendix PP – Guidance to Surveyors for Long-Term Care Facilities (Rev. 173, Nov. 22, 2017)); *id.,* Ex. J (U.S. Dep't of Health & Human Servs., CMS, Pub. No. 100-07, State Operations Manual: Chapter 7 – Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities (Rev. 185, Nov. 16, 2018)).

71    *Id.,* Ex. K (The Lewin Group, CMS Review of Current Standards of Practice for Long-Term Care Pharmacy Services (Dec. 30, 2004)).

Relators argue that the Court should decline to take judicial notice of these reports because they are not authenticated.[72] PharMerica responds that information found on government websites is considered authenticated, and that these three reports are reliable in that they are not subject to change at any time, like most websites, because they are either archived or contain a "change log that tracks all revisions."[73]

A158

Case 1:20-cv-00857-CFC   Document 18   Filed 07/15/20   Page 161 of 181 PageID #: 560

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)
Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

72    Relators' Mem. Opp. Mot. for Judicial Notice [Doc.
No. 58] at 4–6. Relators also objected that PharMerica
had provided only hyperlinks to the reports online
but had not attached copies of the documents. It
is obviously problematic to take judicial notice of
materials found online based only on hyperlinks. After
all, one of the hyperlinks PharMerica provided in its
Memorandum stopped working after PharMerica filed
its Motion on July 22, 2019, and another hyperlink in
its Reply Memorandum stopped working sometime after
September 26, 2019. The Court assumes, of course,
that both hyperlinks worked when PharMerica filed its
briefs. The concern is not so much that the documents
themselves might change, but that their location on
the internet might change—as it apparently has here—
leaving unclear to future readers what was in the record
before the court. The best practice would be for a party
seeking judicial notice to both attach copies as exhibits
to the motion for judicial notice and hyperlink to the
website where the material can be found. Since that was
not done here, the Court ordered PharMerica to provide
copies of the documents for which it sought judicial
notice and PharMerica did so. Doc. No. 74; Doc. Nos.
77, 78.

73    PharMerica's Reply Mem. Supp. Mot. for Judicial Notice
[Doc. No. 61] at 1–2.

**\*6**  PharMerica is correct that information found on
government websites is widely considered both self-
authenticating and subject to judicial notice. [74] Indeed, these
CMS reports are not just information on a government
website—they are published reports of a federal agency
that happen to be available online. [75] The question remains,
however, whether to take judicial notice of these reports only
for their existence, or also for the truth of their contents.
PharMerica cites these three reports in its briefs to support
factual assertions about the business model of the long-
term care pharmacy industry and the regulatory environment
in which long-term care pharmacies operate, [76] based on
which it argues that pharmacy fraud is inherently implausible
because the pharmacy industry is so closely regulated. [77]

74    See Gregory P. Joseph, *Judicial Notice of Internet
Evidence*, 82 U.S. Law Week No. 34, at 2 (Mar. 11, 2014)
(collecting cases); *see also United States v. Allergan*, 746
F. App'x 101, 108 (3d Cir. 2018) (taking judicial notice
of CMS administrative guidance); *Spay*, 913 F. Supp. 2d
at 139–40 (same).

75    See *In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F.
Supp. 2d 751, 754 n.2 (E.D. Pa. 2003) ("The fact that an
agency report is 'published' on the world wide web does
not affect the Court's ability to take judicial notice of the
contents of that report.").

76    See PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No.
51] at 2–4, 28–29.

77    *Id.* at 28–29.

It would be one thing to rely on the CMS manuals as showing
what was publicly known at a given time in order to prove, for
example, that the defendants were not on notice that certain
conduct was fraudulent. [78] But PharMerica seeks to rely on
them as substantive evidence that comprehensive regulations
governing the pharmacy industry make pharmacy fraud
categorically implausible. The Court declines to foreclose
all proof on such a central question by looking outside the
record at the motion-to-dismiss stage, so these materials will
be judicially noticed only for their existence and not for their
truth.

78    See *Allergan*, 746 F. App'x at 108 (taking judicial notice
of CMS guidance manuals in a False Claims Act case
in order to determine whether available guidance put
the defendants on inquiry notice that their conduct was
unlawful).

### C. Materials from the PointClickCare Website

**[8]**  **[9]**   **[10]**  Courts may consider documents " 'integral
to or explicitly relied upon in the complaint'...'without
converting the motion [to dismiss] into one for summary
judgment.' " [79]  Although generally courts avoid looking
at evidence outside the complaint at the motion-to-dismiss
stage, an exception can be made where a plaintiff would be
"able to maintain a claim of fraud by extracting an isolated
statement from a document and placing it in the complaint,
even though if the statement were examined in the full context
of the document, it would be clear that the statement was not
fraudulent." [80]  In that case, fairness would require examining
the whole document, even if the plaintiff did not attach it
as an exhibit to the complaint. This narrow exception is
limited, however, to cases where "the claims in the complaint
are '*based*' on an extrinsic document," and does not apply
where the complaint merely *cites* an extrinsic document. [81]
For example, in *In re Burlington Coat Factory Securities
Litigation*, the plaintiffs alleged that the company had omitted

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

material information from its annual financial report. [82] Even though the plaintiffs had not attached the report to the complaint or explicitly cited it, the report could be considered in ruling on a motion to dismiss because the claims in the complaint were necessarily based on the report. [83]

79    *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (quoting *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

80    *Id.*

81    *Id.* (emphasis added).

82    *Id.* at 1415.

83    *Id.* at 1426.

**\*7** **[11]** PharMerica requests judicial notice of three documents it argues fall into this category. [84] The three documents appear to be promotional brochures from the PointClickCare website that explain how the PointClickCare platform works. PharMerica argues that these brochures are "integral" to Relators' claims, which are "premised on their analysis of information contained in" the PointClickCare platform. [85] As PharMerica acknowledges, however, Relators do not cite these (or any) PointClickCare brochures in the Amended Complaint. [86] Nor can Relators' claims be said to be "based on" the brochures. This is unlike *Burlington*, where the court looked to the document that constituted the alleged fraud in order to place the statements quoted in the complaint in their proper context. Of course, the existence of the PointClickCare system and the way it functions are relevant to Relators' claims—but Relators base their allegations on their first-hand knowledge of the platform, not on PointClickCare's promotional brochures.

84    *See* PharMerica's Mem. Supp. Mot. for Judicial Notice [Doc. No. 52] at 3–4. As noted above, PharMerica provided only hyperlinks to online PDFs of these documents and the Court ordered it to provide copies filed as exhibits.

85    *Id.* at 7–8.

86    *Id.* at 7.

Moreover, the Third Circuit warned in *Victaulic* against taking judicial notice of exactly this kind of information. [87] There, the court held that it was improper for the district court to take judicial notice of facts found on a company's website for several reasons. First, "[a]nyone may purchase an internet address," so authentication of internet materials was particularly important. [88] Second, "a company's website is a marketing tool" and the information found therein might well be "full of imprecise puffery that no one should take at face value." [89] Finally, the court was particularly troubled that such materials were judicially noticed at the motion-to-dismiss stage. [90]

87    *Victaulic*, 499 F.3d at 236.

88    *Id.*

89    *Id.*

90    *Id.* at 236–37. It is certainly true that taking judicial notice of internet materials has become vastly more common and more accepted over the years, and even since the Third Circuit decided *Victaulic* in 2007. *See* Joseph, *supra* note 74, at 1–2. But concerns about puffery in promotional business materials remain valid, and courts are just as cautious now as they were in 2007 about looking to materials outside the complaint in deciding a motion to dismiss.

These concerns apply squarely to the PointClickCare brochures, which are promotional business materials from PointClickCare's corporate website. Such "private corporate websites, particularly when describing their own business, generally are not the sorts of 'sources whose accuracy cannot reasonably be questioned' that our judicial notice rule contemplates." [91] This is especially true when a party seeks to use promotional materials found online for their truth, as PharMerica does here. [92] Accordingly, the Court will not take judicial notice of the PointClickCare website materials.

91    *Victaulic*, 499 F.3d at 236 (internal citation omitted) (citing Fed. R. Evid. 201(b)).

92    *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 28–29 & n.14 (citing pamphlets from PointClickCare website as evidence that the PointClickCare platform "is specifically designed to assist the nursing home in complying with [regulatory] requirements"); *cf.* Joseph, *supra* note 74, at 3 ("Pages of a corporate website offered by the corporation to prove the truth of self-serving advertising claims are inherently dubious, but the same pages may be appropriate for judicial notice when offered or used to show that the claims were made....").

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

## III. MOTION TO DISMISS

### A. Motion to Dismiss Pursuant to 31 U.S.C. § 3730(e)

 **[12]**   **[13]**   **[14]** The False Claims Act "empowers a person, or 'relator,' to sue on behalf of the United States those who defraud the government, and to share in any ultimate recovery."[93] That financial incentive, of course, creates the risk that individuals without knowledge of new, unremedied frauds might piggy-back on others' discoveries, earning a payout for themselves without contributing any information of real value.[94] The Act's design therefore aims at "promot[ing] private citizen involvement in exposing fraud against the government, while at the same time prevent[ing] parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud."[95] To that end, the Act bars *qui tam* actions in two circumstances relevant here.[96] First, the "government action bar" prevents suits "based upon allegations or transactions which are the subject of a civil suit...in which the Government is already a party."[97] Second, the "public disclosure bar" prevents suits "when the alleged fraud has been publicly disclosed in at least one of several enumerated sources—*unless* the relator is an original source of certain information underlying the action."[98] PharMerica argues that both the government action bar and public disclosure bar preclude this action because an earlier *qui tam* suit against PharMerica, in which the Government intervened, alleged substantially the same fraudulent scheme.

[93]  *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 296 (3d Cir. 2016).

[94]  *See United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31, 33 (1st Cir. 2013).

[95]  *United States ex rel. Int'l Bhd. of Elec. Workers v. Farfield Co.*, No. 09-4230, 2013 WL 3327505, at *10 (E.D. Pa. July 2, 2013) (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 675–76 (8th Cir. 1998)); *see also United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994) (Wald, J.) ("The history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior....They must be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own.").

[96]  The public disclosure bar originally imposed jurisdictional limitations on False Claims Act cases. *See Moore*, 812 F.3d at 297. Congress amended the bar in 2010 as part of the Affordable Care Act, altering the language so as to make the bar nonjurisdictional. *Id.* at 297–300. By contrast, the language of the government action bar was never explicitly jurisdictional. *See* 31 U.S.C. § 3730(e)(3). Nevertheless, perhaps because it was interpreted in tandem with the pre-ACA public disclosure bar, the government action bar has sometimes been described as jurisdictional. *See Farfield*, 2013 WL 3327505, at *9–10. The statutory language strongly suggests, however, that the government action bar is not jurisdictional. *Cf. United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 120 (D.C. Cir. 2015) (holding that the FCA's first-to-file bar is not jurisdictional because that provision, like the government action bar, lacks the express jurisdictional language of other statutory bars to FCA actions).

[97]  31 U.S.C. § 3730(e)(3); *see Farfield*, 2013 WL 3327505, at *11.

[98]  *Moore*, 812 F.3d at 297; *see* 31 U.S.C. § 3730(e)(4).

### 1. Legal Standard: Government Action Bar

 **\*8** Section 3730(e)(3) bars *qui tam* suits "based upon allegations or transactions which are the subject of a civil suit...in which the Government is already a party." But "the breadth with which we should read the phrase 'allegations or transactions which are *the subject of* a civil suit' is not readily apparent from the text of the statute."[99]

[99]  *United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine*, 24 F.3d 320, 326 (1st Cir. 1994).

 **[15]**   **[16]** To determine whether an action is "based upon" the same allegations or transactions as an action to which the government was a party, many courts have followed the First Circuit in looking for signs of a "host/parasite relationship."[100] Such a relationship exists if the relator's case is "receiving 'support, advantage, or the like' from the 'host' case (in which the government is a party) 'without giving any useful or proper return' to the government (or at least having the potential to do so)."[101] Similarly, the Ninth Circuit has described the bar as preventing *qui tam* suits "based on the same underlying facts" as a government

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

action. [102] Thus, the government action inquiry is essentially a test of factual similarity. If a relator's allegations are the same as allegations already made by the government, or are similar enough to be characterized as feeding off of the government's allegations, the government action bar applies. By contrast, if a relator's case "is seeking to remedy fraud that the government has not yet attempted to remedy," the government action bar does not apply. [103]

100    *E.g.*, *Farfield*, 2013 WL 3327505, at *11 (quoting *Prawer*, 24 F.3d at 327); *see also* Claire M. Sylvia, The False Claims Act: Fraud Against the Government § 11:32 *Allegations already the subject of Government litigation: 31 U.S.C.A. § 3730(e)(3) —Allegations or transactions*.

101    *Prawer*, 24 F.3d at 327–28 (quoting *Parasite*, Random House Dictionary of the English Language 1409 (2d ed. Unabridged 1987).

102    *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 746 (9th Cir. 1993).

103    *Prawer*, 24 F.3d at 328; *see also Costner*, 153 F.3d at 676.

PharMerica argues that an earlier *qui tam* suit against it brought by another relator, *United States ex rel. Denk v. PharMerica*, [104] bars this action because the government intervened in that case. There is no dispute that the government was a party to *Denk*. [105] Thus, the question is whether the allegations in this case are sufficiently similar to those in *Denk* to conclude that Relators are receiving support or advantage from *Denk*.

104    Civil Action No. 09-720 (E.D. Wis. filed July 23, 2009).

105    Relators' Mem. Opp. Mot. to Dismiss [Doc. No. 57] at 13 n.2.

### 2. Legal Standard: Public Disclosure Bar

**[17]    [18]** Section 3730(e)(4)(A) provides that a court "shall dismiss" a *qui tam* suit "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in any of several sources, including federal civil proceedings. In other words, the public disclosure bar applies when there has been (1) a public disclosure (2) in one of the statute's specified fora (3) of allegations or transactions of fraud (4) that are substantially the same as those alleged by the relator. [106] When the public disclosure bar is triggered, however, the action can nonetheless proceed if the relator

is an "original source of the information." [107] An "original source" is one who "has voluntarily disclosed information to the Government or one 'who has knowledge that is independent of and materially adds to' information already publicly disclosed." [108]

106    *See United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 235 (3d Cir. 2013). As noted above, the public disclosure bar was amended in 2010. *Zizic* defined the fourth element of the test as requiring "that the relator's action be 'based upon'" the public disclosures. *Id.* That comported with the pre-2010 version of the statute. The amended version, which applies to this case, provides that "the relator's fraud need only be 'substantially the same' as, rather than 'based on,' the publicly disclosed allegations or transactions in order to trigger the public disclosure bar." *United States ex rel. Silver v. Omnicare*, 903 F.3d 78, 85 n.6 (3d Cir. 2018), *cert. denied sub nom. PharMerica Corp. v. United States ex rel. Silver*, —— U.S. ——, 140 S. Ct. 202, 205 L.Ed.2d 195 (2019). That change, the Third Circuit has observed, "merely codified the law as it already existed in this Circuit," since "based upon" had been interpreted to mean "supported by" or "substantially similar to." *Id.* (citing *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 519 (3d Cir. 2007)). For clarity, the Court has used the updated "substantially the same" language.

107    31 U.S.C. § 3730(e)(4)(A).

108    *United States v. Premier Educ. Grp., L.P.*, No. 11-3523, 2016 WL 2747195, at *6 (D.N.J. May 11, 2016) (quoting 31 U.S.C. § 3730(e)(4)(B)); *see Moore*, 812 F.3d at 298–99.

**\*9**    The public disclosure bar is relevant here because both the Relator's Complaint and the Government Complaint in *Denk* were (1) public disclosures (2) in a federal civil proceeding. [109] There can be no question that the public disclosures in *Denk* consisted of (3) "allegations or transactions" of fraud—in this case, allegations—as opposed to more general information. [110] "An allegation of fraud is an explicit accusation of wrongdoing." [111] The *Denk* disclosures were allegations of fraud in the most literal sense—explicit accusations of fraud, itemized and filed in federal court.

109    Relators' Mem. Opp. Mot. to Dismiss [Doc. No. 57] at 17 n.4; *see* 31 U.S.C. § 3730(e)(4)(A)(i); *Atkinson*, 473 F.3d at 519.

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

110  *Zizic,* 728 F.3d at 235 n.6 ("The FCA 'bars suits based on publicly disclosed "allegations or transactions," not information.' " (quoting *United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 740 (3d Cir. 1997), *abrogated on other grounds by Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,* 559 U.S. 280, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010))); Sylvia, *supra* note 100, § 11:52, *Allegations publicly disclosed in certain hearings, reports or the news media: 31 U.S.C.A. § 3730(e)(4)—Allegations or transactions underlying the complaint.*

111  *Zizic,* 728 F.3d at 235–36.

[19]  The question here, then, is whether Relators' claims are substantially the same as the allegations of fraud made public in *Denk.* [112] Courts examine the similarity of the allegations on a claim-by-claim basis. [113] "Where some, but not all, allegations in a complaint have been publicly disclosed, [the public disclosure bar] does not prohibit the remaining allegations from proceeding." [114]

112  *See Omnicare,* 903 F.3d at 83.

113  *See, e.g., Atkinson,* 473 F.3d at 520–31 (proceeding claim by claim); *Premier,* 2016 WL 2747195, at *9–10 (citing *United States ex rel. Merena v. SmithKline Beecham Corp.,* 205 F.3d 97, 102 (3d Cir. 2000)). PharMerica argues based on the Third Circuit's decision in *Zizic* that if Relators' allegations are "even partly based upon" the *Denk* allegations, they should be dismissed. PharMerica's Mem. Supp. Mot. to Dismiss at 18 (quoting *Zizic,* 728 F.3d at 238). But that observation in *Zizic* referred to relators who allege the same scheme as one previously disclosed, while merely adding undisclosed factual details. *Zizic* did not hold that a complaint alleging two schemes—one previously disclosed and one never before disclosed—should be dismissed in its entirety. *See also United States ex rel. Winkelman v. CVS Caremark Corp.,* 827 F.3d 201, 210 (1st Cir. 2016) ("[A] complaint that targets a scheme previously revealed through public disclosures is barred even if it offers greater detail about the underlying conduct.").

114  Sylvia, *supra* note 100, § 11:54, *Allegations publicly disclosed in certain hearings, reports or the news media: 31 U.S.C.A. § 3730(e)(4) —Allegations or transactions underlying the complaint—Which allegations in the complaint are barred.*

Several courts have cautioned against conducting the substantial similarity inquiry at too high a level of generality. [115] After all, cast in unduly general terms, any

two fraud allegations against the same defendant begin to sound similar. Although two complaints might seem similar "at first blush," courts must nevertheless take a careful look at the details of each alleged fraud. [116] For example, in *Leveski v. ITT Educational Services,* the Seventh Circuit noted the superficial similarities between the relator's claims and an earlier False Claims Act case alleging violations of the Higher Education Act ("HEA"). Both relators were "former employees of [the defendant]—and even held the same job title," and both alleged that the defendant "violated the incentive compensation provision of the HEA." [117] Nevertheless, the court held that "the details of *how* [the defendant] allegedly violated the HEA [were] quite different in Leveski's case" than in the earlier one. [118] Because Leveski had alleged "a more sophisticated, second-generation method of violating the HEA," the court concluded that the district court had "view[ed] the allegations at too high a level of generality" when it dismissed the complaint. [119]

115  *United States ex rel. Mateski v. Raytheon Co.,* 816 F.3d 565, 577 (9th Cir. 2016); *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.,* 680 F.3d 933, 935–36 (7th Cir. 2012) ("[B]oosting the level of generality in order to wipe out *qui tam* suits that rest on genuinely new and material information is not sound."); *United States ex rel. Baltazar v. Warden,* 635 F.3d 866, 868–69 (7th Cir. 2011).

116  *Leveski v. ITT Educ. Servs.,* 719 F.3d 818, 832 (7th Cir. 2013).

117  *Id.*

118  *Id.* (emphasis added).

119  *Id.*

*10  The Third Circuit endorsed this particularized, fact-specific approach to the substantial similarity inquiry in both *Zizic* and *United States v. Omnicare.* [120] By requiring courts to look carefully at the factual similarity between a relator's allegations and a public disclosure, this approach strikes the proper balance between "encouraging private persons to root out fraud and stifling parasitic lawsuits." [121]

120  *See Omnicare,* 903 F.3d at 89–90 (citing with approval the Seventh Circuit's approach in *Baltazar* and *United States ex rel. Gear v. Emergency Medical Associates of Illinois, Inc.,* 436 F.3d 726 (7th Cir. 2006), and relying on *Mateski,* 816 F.3d 565, which adopted the Seventh Circuit's approach); *Zizic,* 728 F.3d at 237–38

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

(analogizing to *Gear* and *Baltazar* to determine whether relator's allegations were substantially similar to public disclosures).

121   *Schindler Elevator Corp. v. United States ex rel. Kirk, 563 U.S. 401, 413, 131 S.Ct. 1885, 179 L.Ed.2d 825 (2011)* (quoting *Graham Cty.*, 559 U.S. at 295, 130 S.Ct. 1396).

Based on these cases, the Court is not persuaded by PharMerica's argument that disclosures that merely "set government investigators on the trail of fraud" are enough to bar subsequent *qui tam* suits. [122] That kind of superficial similarity is contrary to the statutory language, which bars suits that allege "*substantially* the same" fraud as the public disclosure in question. [123] Allowing any tip, however factually different, to preclude subsequent *qui tam* suits would not accord with the careful approach of *Zizic* and *Omnicare*, nor with the heightened particularity requirements that apply to False Claims Act cases. [124]

122   *Quinn, 14 F.3d at 655*; *see* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 19 (citing *Dingle v. Bioport Corp.*, 388 F.3d 209, 214 & n.3 (6th Cir. 2004)). PharMerica has argued that a public disclosure that merely puts the government on notice of the possibility of fraud and allows it to investigate could bar any subsequent *qui tam* suits (within a certain time frame, presumably) regarding any fraudulent scheme, because once the government was on the case, it had the opportunity to investigate any and all potential frauds that might be afoot. This is a misconception. The "on the trail of fraud" concept is part of the third element (allegations or transactions) of the public disclosure bar analysis, not the fourth element (substantial similarity). *See Quinn, 14 F.3d at 655; Dingle,* 388 F.3d at 212–14. Publicly disclosed information is enough to constitute an "allegation" if it gave adequate notice to set the government on the trail of fraud. But a relator's allegations are not substantially similar to a public disclosure merely because the disclosure could have set the government on the trail of the separate fraud alleged by the relator. *See also* Sylvia, *supra* note 100, § 11:52, *Allegations publicly disclosed in certain hearings, reports or the news media: 31 U.S.C.A. § 3730(e)(4)— Allegations or transactions underlying complaint.*

123   31 U.S.C. § 3730(e)(4)(A).

124   *See Omnicare*, 903 F.3d at 91 ("Finally, our refusal to afford preclusive effect to information that discloses merely a potential or possibility of fraud, without any indication of who is perpetrating it or how they are doing

so, accords with the heightened showing required by Federal Rule of Civil Procedure 9(b) when pleading a claim of fraud in FCA actions.").

### 3. The *Denk* Allegations

***11** As noted above, PharMerica argues that an earlier *qui tam* suit against it, *United States ex rel. Denk v. PharMerica*, [125] concerned essentially the same alleged fraudulent scheme. As PharMerica characterizes them, both actions relate a scheme to submit false claims for Medicare and Medicaid reimbursement for medications that were dispensed in the absence of a legally valid prescription in violation of state and federal law. [126] As a result, it contends, Relators' suit is precluded under either the government action bar, the public disclosure bar, or both.

125   Civil Action No. 09-720 (E.D. Wis. July 23, 2009).

126   PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 18.

A careful review of both Relator Denk's Complaint and the Government's Complaint in *Denk* reveals that *Denk* disclosed a number of allegations of fraud unrelated to invalid prescriptions and therefore irrelevant here. [127] Relator Denk's Complaint also, however, disclosed two alleged fraudulent schemes that do implicate prescription validity.

127   *See* Denk Compl. ¶¶ 99–123 (alleging scheme of unlawful kickbacks); *id.* ¶¶ 125–37 (alleging retaliation against Relator Denk); *id.* ¶¶ 46, 81–90 (alleging that PharMerica failed to credit the United States for drugs returned unused and that PharMerica sometimes re-billed the United States for those unused drugs).

*The Emergency Scheme*

Denk alleged that PharMerica submitted false claims for reimbursement in situations where it had violated federal regulations governing dispensation of Schedule II–V narcotics in emergencies. PharMerica was alleged to have violated those emergency regulations in several different ways. Specifically, Denk alleged (1) that PharMerica relied on regulations allowing narcotics to be dispensed on only an oral prescription in emergency situations but failed to secure a written prescription within seven days thereafter as required; [128] (2) that PharMerica dispensed narcotics on an emergency basis without even an oral prescription, instead using old prescriptions and order forms; [129] and

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

(3) that PharMerica dispensed narcotics on an emergency basis without indicating the justification for an emergency dispense and/or without verifying that an emergency in fact existed. [130]

[128]   Denk Compl ¶¶ 30, 36, 46, 55, 60–65, 67.

[129]   *Id.* ¶ 56.

[130]   *Id.* ¶¶ 30, 36, 46, 54.

*The "Narc Box" Scheme*

Narcotics boxes are emergency supplies of medications kept on-site at long-term care facilities. Both Denk and the Government alleged that PharMerica "provided staff at long-term care facilities with access to narcotics boxes for emergency situations but did not ensure that the prescriber had an oral communication with a PharMerica pharmacist prior to dispensing the Schedule II drug." [131] The government also alleged that "[o]nce the drug was dispensed from a narcotics box, PharMerica routinely failed to obtain written prescriptions from the prescriber within 7 days as required under the [Controlled Substances Act]." [132]

[131]   Govt. Compl. ¶ 118; *see* Denk Compl. ¶¶ 39, 53, 112–17.

[132]   Govt. Compl. ¶ 119. Denk also alleged that "PharMerica billed the United States for one type of medication while providing the patient with a different type of medication," Denk Compl. ¶¶ 46, 94–95, and that "PharMerica billed the United States for medications allegedly administered to one patient when the medications were actually administered to other patients, including those not eligible for government payments," *id.* ¶ 46.

Further, the Government's Complaint in *Denk* also alleged a third fraudulent scheme related to prescription validity:

*The Order Form Scheme*

**\*12**  The government alleged that PharMerica dispensed medications to residents of long-term care facilities "based only on requests from the long-term care facility, rather than...upon a valid prescription from a practitioner." [133] This took different forms, including dispensing drugs based solely on "order forms"; [134] "Prescription Fax Request" sheets, "EZ Refill" forms, or "monthly physician orders from the resident's chart at the facility"; [135] or residents' hospital discharge orders or "replenishment stickers" previously provided by PharMerica, [136] as opposed to a legally valid prescription signed by a practitioner. Upon receipt of a medication order that was not a legally valid prescription, PharMerica would simultaneously dispense the drug and send a "template" to the resident's physician for signature. [137] Even if these templates had been returned signed, they would not have constituted valid prescriptions, but they often were not returned at all or were returned only after the drug was dispensed. [138]

[133]   Govt. Compl. ¶ 5.

[134]   *Id.* ¶ 5.

[135]   *Id.* ¶ 79.

[136]   *Id.* ¶ 5.

[137]   *Id.* ¶ 79.

[138]   *Id.*

After the government intervened in *Denk*, the government and PharMerica "entered into a series of settlements to resolve the entirety" of the action in 2015. [139]

[139]   PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 13.

### 4. Analysis

**[20]**  PharMerica argues that this case is barred by *Denk* under both the public disclosure bar and the government action bar. As explained, the public disclosure inquiry requires the Court to determine whether the allegations in *Denk* are substantially similar to Relators' allegations. They are not.

*Denk* disclosed allegations of several fraudulent schemes by PharMerica, each of which is factually different from the scheme Relators allege. Each of the three prescription-related schemes disclosed in *Denk* concerned dispensations of medication in the absence of any prescription by a variety of means—by using narcotics boxes without following the applicable regulations; by dispensing drugs on an emergency basis without a written follow-up prescription; and by dispensing drugs upon receipt of an order form, as opposed to a valid prescription. Here, by contrast, Relators allege a scheme to alter valid prescriptions so as to maximize reimbursements. In other words, whereas *Denk* concerned dispensing medication with no prescription at all, Relators

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

base their allegations on incidents in which PharMerica did receive a valid prescription, but altered that prescription illegally using the LTC400 so as to dispense the most profitable version of the drug in question.

This is not, therefore, a case in which a relator "makes a similar allegation [to the public disclosure], but expands on it substantially." [140] It is not, in other words, *Denk* with added details. Instead, it is a case alleging "a more sophisticated, second-generation method" of fraud, separate and apart from any existing public disclosure. [141] Both *Denk* and Relators do allege—at a high level—schemes that resulted in dispensing drugs without a valid prescription. But, of course, there are many different ways a pharmacy might accomplish that. The mode and means of the scheme alleged here make it wholly different from the ones alleged in *Denk*.

140   *Premier*, 2016 WL 2747195, at *11.

141   *Leveski*, 719 F.3d at 832.

Indeed, to find the similarities between *Denk* and this matter, PharMerica massages the facts. For example, PharMerica characterizes both *Denk* and this action as alleging that "PharMerica dispensed medications to Medicare Part D and Medicaid beneficiaries pursuant to orders that lacked an essential element of a prescription such as strength, dosage form, or quantity prescribed." [142] That is technically true: *Denk* alleged that PharMerica dispensed medications without *any* prescription; those orders lacked *all* the essential elements of a prescription in that there was, allegedly, no prescription at all. [143] Therein lies the problem—the allegations of fraud in *Denk* and those in this matter are substantially similar only after abstracting away from the facts of one or both cases to cast them in the most general possible terms. [144] At a high enough level of generality, any two False Claims Act cases against the same defendant can be said to allege substantially the same conduct. [145] *Denk* and this action may be two branches of the same family tree, but only if a vague, generic charge of "pharmacy fraud" or "Medicare fraud" is the common ancestor. Thus, the public disclosure bar does not apply.

142   PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 12 (citing Denk Compl. ¶¶ 48–51, 75–76).

143   Denk Compl. ¶¶ 48–51.

144   *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 18 ("[T]he *Denk* Action and this litigation advance substantially the same theories of fraud: PharMerica submitted claims for payment to Medicare Part D and Medicaid for medications dispensed without legally valid prescriptions and, consequently, violated the FCA because these programs only pay for medications when the dispensing pharmacy is in compliance with applicable laws requiring a valid prescription.").

145   *See Mateski*, 816 F.3d at 576 ("[W]hether [relator's] Complaint is substantially similar to prior public reports depends on the level of generality at which the comparison is made."); *United States ex rel. Dorsey v. Dr. Warren E. Smith Cmty. Mental Health/Mental Retardation & Substance Abuse Ctrs.*, No. 95-7446, 1997 WL 381761, at *4 (E.D. Pa. June 25, 1997) ("In short, the only similarities between these two actions are...that the defendant is the same...[and] that both plaintiffs have accused the defendant of submitting false claims to receive federal and state reimbursement.").

**\*13**   **[21]**   For the same reason, the government action bar does not preclude this action. Relators' allegations are not "based on the same underlying facts" as those in *Denk*. [146] Nor do they have the qualities of a "host/parasite relationship" in which one case feeds off of or draws support from another. [147] The schemes alleged in each case are distinct from each other and *Denk* therefore has no preclusive effect with respect to Relators' claims.

146   *Kelly*, 9 F.3d at 746.

147   *Prawer*, 24 F.3d at 327–28.

### B. Motion to Dismiss for Failure to State a Claim

#### 1. Legal Standard

PharMerica has also moved to dismiss the Amended Complaint for failure to state a claim under Rule 12(b)(6) and for failure to satisfy the heightened pleading standard of Rule 9(b).

Under Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint for failure to state a claim upon which relief can be granted is appropriate where a plaintiff's "plain statement" lacks enough substance to demonstrate that he is entitled to relief. [148] In determining whether a motion to dismiss should be granted, the court must consider only those

**Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)**

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the non-moving party.[149] Courts are not, however, bound to accept as true legal conclusions framed as factual allegations.[150] Something more than a mere *possibility* of a claim must be alleged; a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."[151]

[148]   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

[149]   *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *Fay v. Muhlenberg Coll.*, No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. Jan. 24, 2008).

[150]   *Twombly*, 550 U.S. at 555, 564, 127 S.Ct. 1955.

[151]   *Id.* at 570, 127 S.Ct. 1955.

[22]   [23]   [24]   Additionally, claims under the False Claims Act are subject to the heightened pleading standard of Rule 9(b).[152] To satisfy that standard in this context, a relator must plead "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."[153] This can be accomplished in two ways—either by "pleading the date, place, or time of the fraud," or by using an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."[154]

[152]   *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014).

[153]   *Id.* at 157–58 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

[154]   *United States v. Loving Care Agency*, 226 F. Supp. 3d 357, 363 (D.N.J. 2016) (quoting *Flanagan v. Bahal*, No. 12-2216, 2015 WL 9450826, at *3 (D.N.J. Dec. 22, 2015)).

[25]   [26]   A plaintiff need not present specific fraudulent claims for payment at the pleading stage; indeed, this is not necessarily required to prevail even at trial.[155] After all, "[s]tanding alone, raw bills—even with numbers, dates, and amounts—are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work."[156] It is that underlying scheme that must be pled with particularity to give defendants fair notice of the claims against them, protect defendants from reputational harm, and prevent the filing of baseless suits that amount to fishing expeditions.[157]

[155]   *Grubbs*, 565 F.3d at 190.

[156]   *Id.*

[157]   *Id.*

## 2. Analysis: Claims Under 31 U.S.C. §§ 3729(a)(1)(A) and (B)

[27]   [28]   [29]   Relators allege violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) and their state law equivalents. To establish a violation of § 3729(a)(1)(A), a relator must show that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."[158] To establish a violation of § 3729(a)(1)(B), a relator must show that the defendant "(1) made, used, or caused to be made or used, a false record or statement; (2) the defendant knew the statement to be false[;] and (3) the statement was material to a false or fraudulent claim."[159] A claim may be factually false or legally false. "A claim is factually false when the claimant misrepresents what goods or services...it provided to the Government."[160] By contrast, "a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment."[161] That latter express false certification theory is the basis of Relators' claims here, because Relators allege that PharMerica sought and received reimbursement upon falsely certifying that it had complied with the applicable laws and regulations governing its dispensation of medications.[162]

[158]   *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (quoting *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004)), *abrogated on other grounds by Universal Health Servs., Inc. v. United States & Massachusetts ex rel. Escobar*, —— U.S. ——, 136 S. Ct. 1989, 195 L.Ed.2d 348 (2016).

[159]   *United States ex rel. Zwirn v. ADT Sec. Servs., Inc.*, No. 10-2639, 2014 WL 2932846, at *5 (D.N.J. June 30, 2014).

[160]   *Wilkins*, 659 F.3d at 305.

[161]   *Id.*

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

162    Amend. Compl. ¶ 63.

**\*14**  Relators allege that PharMerica submitted false claims for payment for filling prescription orders that were altered in one of three ways: by substituting a different form or dosage of a non-controlled substance than the one prescribed; by substituting a different form or dosage of a controlled substance than the one prescribed; or by substituting a brand name drug for a generic drug. 163  By altering prescriptions in these three ways for the purpose of maximizing PharMerica's reimbursement and without consulting with the prescribing physician, Relators allege, PharMerica violated the False Claims Act. 164

163    *Id.* ¶ 103.

164    *Id.* ¶¶ 105–07.

### a. Non-Controlled Substances

Relators claim that PharMerica illegally altered the elements of prescriptions for non-controlled substances such as "stomach medication [e.g., Ranitidine] and anti-depressants [e.g., Fluoxetine]." 165  Relators allege that PharMerica systematically substituted alternative forms of the prescribed drugs (e.g., capsules instead of tablets) or alternative dosages or quantities of the prescribed drugs because those alternatives were more profitable for PharMerica to dispense. 166  Each time PharMerica submitted a claim for reimbursement for a dispensation pursuant to an altered prescription, Relators claim, PharMerica falsely certified that the dispensation complied with all applicable laws and regulations.

165    *Id.* ¶¶ 118–19.

166    *Id.* ¶¶ 119–26.

 **[30]**  PharMerica first argues that this claim should be dismissed because there is no federal law that governs the prescribing of non-controlled drugs. Rather, PharMerica argues, it is state pharmacy laws that govern the dispensing of these non-controlled substances. Since under Pennsylvania law, the form of a non-controlled drug is not an essential element of a prescription, substituting the capsule form of a non-controlled drug for the tablet form does not violate any law and therefore cannot support Relators' assertion that PharMerica submitted false claims.

PharMerica does not explain the basis for its assertion that Pennsylvania pharmacy laws and regulations apply exclusively to Relators' claims, which are based on conduct that allegedly occurred nationwide. 167  However, even if Pennsylvania law does apply, and even if under Pennsylvania law pharmacists may alter the form of a non-controlled substance at will, PharMerica has not shown that this claim should be dismissed. Relators allege not only that PharMerica altered the drug form on prescriptions for non-controlled substances, but also that PharMerica altered the dosage and quantity, which are undisputedly required elements of a valid prescription. 168  Moreover, Relators allege this conduct with adequate specificity. Although they are not required to point to specific fraudulent claims at this stage, Relators identify an example of a prescription whose dosage was allegedly altered without the consent of the prescribing physician. 169  By supplying the date and prescription number of a particular altered prescription combined with the details of the broader alleged scheme to alter prescriptions, Relators have met the pleading standards of Rule 9(b) for this category of claims.

167    *Id.* ¶ 133–35; *see* PharMerica's Reply Mem. Supp. Mot. to Dismiss [Doc. No. 59] at 5.

168    Relators' Mem. Opp. Mot. to Dismiss [Doc. No. 57] at 25–26; *see Pharmacy Liability for Punitive Damages-Pennsylvania Practice Pointers,* 71 PA. B.A. Q. 1, 3 (2000) ("A pharmacist does not prescribe medication, and thus may not amend, edit, or interpret a treating physician's prescription order.").

169    Amend. Compl. ¶ 121.

 **[31]**  PharMerica also argues that these non-controlled substances claims are based on an incorrect statement of law by Relators. According to PharMerica, the Amended Complaint inaccurately asserts that a pharmacist "must obtain a discontinue order and a new prescription from the physician before varying in any respect from the details of the original order." 170  PharMerica argues that no state or federal law or regulation requires this. Accordingly, it argues, this category of alleged false claims fails, as it was entirely permissible for PharMerica to simply alter prescriptions where necessary rather than discontinuing them and obtaining a brand-new prescription from the prescribing physician.

170    PharMerica's Reply Mem. Supp. Mot. to Dismiss [Doc. No. 59] at 4–5; *see* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 23.

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

**\*15** It is true that the Amended Complaint in several places claims that a discontinue order and new prescription are always required and that this procedure was not followed.[171] But the Amended Complaint also alleges more broadly that PharMerica's prescription alterations were unlawful in that they were made without the prescribing physician's consent.[172] Thus, even accepting PharMerica's argument that obtaining a discontinue order and new prescription is not legally required, Relators still have alleged that PharMerica violated federal and state laws requiring that pharmacists "first obtain approval from the prescribing medical practitioner" before "deviat[ing] from a prescription."[173] Indeed, even the sources on which PharMerica seeks to rely (some of which are not in the record at this stage) confirm that this is required.[174]

171   Amend. Compl. ¶¶ 51, 111–12, 120.

172   *See, e.g., id.* ¶ 121 ("PharMerica altered the prescription and dispensed Morphine 10 mg/ml without the consent of the prescribing physician."); *id.* ¶ 124 ("Instead of dispensing the exact drug prescribed by the physician, a data clerk—without medical training—entered an altered order into the LTC400 and dispense[d] a different prescription without the prescribing physician's consent.").

173   *Id.* ¶ 150.

174   *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 27 (citing 55 Pa. Code § 1121.52(c) ("For payment to be made for filling altered prescriptions, the pharmacy shall certify in writing on the prescription that the change was made by the licensed prescriber. Changes in the nature or brand of a medication, the strength of a medication, directions or quantity dispensed are acceptable only if the consent of the prescriber was obtained before dispensing. The written explanation of the pharmacy on the prescription must state that this was done and give the reasons for the change.")); PharMerica's Reply Mem Supp. Mot. to Dismiss [Doc. No. 59] at 5 (citing Joseph T. Rannazzini, U.S. Dep't of Justice, Drug Enforcement Admin., Dear Colleague Policy Letter on Permissible Changes to Controlled Substance Prescriptions (Oct. 15, 2008), https://web.archive.org/web/20110417110418/https://www.deadiversion.usdoj.gov/faq/multiple_rx_clarification_ltr_102010.pdf (describing apparent conflict between DEA regulations, which stated that a pharmacist *may not* modify the elements of a schedule II prescription on a physician's oral instruction, and the policy posted on the DEA's website, which noted that a pharmacist *may* modify a schedule II prescription "only after oral consultation with and agreement of the prescribing practitioner," and instructing pharmacists to "adhere to state regulations or policy regarding those changes that a pharmacist may make to a schedule II prescription *after oral consultation with the prescriber*" in the meantime (emphasis added))).

Finally, PharMerica argues broadly that the Amended Complaint lacks the requisite specificity throughout. As noted, Rule 9(b) may be satisfied by pleading "particular details of a scheme to submit false claims" combined with "reliable indicia that lead to a strong inference that claims were actually submitted."[175] Based on that standard, PharMerica catalogues the factual details that it believes are missing from Relators' Amended Complaint, both as to the "scheme" and as to the "reliable indicia."

175   *Foglia,* 754 F.3d at 156 (quoting *Grubbs,* 565 F.3d at 190).

 **[32]**   First, PharMerica argues that Relators fail to plead a "scheme" because the Amended Complaint makes only two conclusory allegations: that the LTC400 was designed to prompt clerks to fill prescriptions in the most profitable way and that PharMerica "instructed their clerical personnel to physically alter the prescriptions to make it appear as though the physician had prescribed the drug in a different form, quantity and/or dosage." Beyond those "cursory allegations," PharMerica suggests, the Amended Complaint omits details like the names of individuals who "concocted the alleged scheme" and "oversaw its implementation," the names of pharmacists who altered prescriptions, and the names of nursing home employees who "signed for" and administered the altered prescriptions.[176] But listing other factual details that might also have been pled is not a productive way to analyze the sufficiency of a complaint. A careful review of the Amended Complaint shows that Relators describe the alleged scheme in adequate detail, explaining the mechanism of the alleged fraud and the generic identities of those involved (i.e., data clerks, pharmacists, etc.).[177] PharMerica cites no authority for the proposition that Relators must identify by name the particular PharMerica employees who designed the LTC400 or those who allegedly altered prescriptions.

176   PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 31.

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

**177**    Amend. Compl. ¶¶ 45–65.

**\*16    [33]** Second, PharMerica argues that even if the Amended Complaint does plead a "scheme," it lacks "reliable indicia" that claims were actually submitted. It is true that a relator must do more than "identif[y] a general sort of fraudulent conduct [while] specif[ying] no particular circumstances of any discrete fraudulent statement." [178] Thus, PharMerica argues, even if the alleged scheme is adequately pled, it amounts to no more than a "mere opportunity for fraud" without specific instances of claims actually submitted to the government for reimbursement. [179]

**178**    *United States ex rel. Judd v. Quest Diagnostics, Inc.*, 638 F. App'x 162, 169 (3d Cir. 2015) (quoting *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011)).

**179**    *See Foglia*, 754 F.3d at 158.

To support this argument, PharMerica cites *United States ex rel. Schmidt v. Zimmer, Inc.* [180] There, the court found fault with the complaint for not including "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, [or] the amount of money they charged to the government," among other things. [181] But *Schmidt* explicitly relied on the rigid interpretation of Rule 9(b)'s particularity requirement then adhered to by the First Circuit, the same rigid interpretation rejected by the Third Circuit in *Foglia v. Renal Ventures Management, LLC.* [182] On this point, therefore, *Schmidt* does not reflect the current state of the law.

**180**    No. 00-1044, 2005 WL 1806502 (E.D. Pa. July 29, 2005).

**181**    *Id.* at \*2 n.2 (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 233 (1st Cir. 2004)).

**182**    *Id.*; *see Foglia*, 754 F.3d at 156 n.3 (identifying *Karvelas* as an example of the rigid "representative samples" requirement employed by several other Circuits and noting that the First Circuit later overruled *Karvelas* and adopted the same "nuanced" understanding of Rule 9(b) embraced by the Third Circuit).

Rather, *Foglia* is controlling. There, the relator alleged that the defendant, Renal Ventures Management, submitted false claims for reimbursement for vials of the medication Zemplar. Renal's inventory logs showed that it was using fewer vials

of Zemplar per day than it would need to had it been using a single vial per patient. Therefore, the relator concluded, Renal must have been harvesting the leftover Zemplar from partially used vials and administering it to other patients. This presented a profitable opportunity for fraud, since "Medicare will reimburse for the full vial of Zemplar, regardless of whether all of the Zemplar is used." [183] That is, Renal could have submitted a claim for a full vial of Zemplar for each patient while purchasing fewer vials, reusing the leftovers, and pocketing the difference. By itself, however, this was not enough to create a "strong inference" that Renal had submitted false claims, because harvesting extra Zemplar was permitted so long as certain guidelines were followed. But the relator had also alleged that Renal was not complying with those guidelines. Taking that as true, the court found that the complaint met the requirements of Rule 9(b) and adequately alleged that Renal was fraudulently submitting claims as if it had used exactly one vial per patient. [184]

**183**    *Foglia*, 754 F.3d at 158.

**184**    *Id.*

Notably, like the Amended Complaint here, the *Foglia* complaint did not identify particular claims for payment by the government. Instead, it identified "particular details of a scheme to submit false claims"—there, a scheme to reuse vials of Zemplar while submitting claims for payment as if a new vial were used for each patient—combined with "reliable indicia that lead to a strong inference that claims were actually submitted"—there, the inventory logs and the allegation that Renal had not complied with the guidelines for reusing Zemplar vials.

**\*17**    The allegations here are strikingly similar. Relators allege a scheme to alter prescriptions, including the specific time frame of the scheme and the number and type of alterations their audit revealed, with some specific examples identified by RX number. They also allege that PharMerica did not obtain the prescribing physician's consent before altering prescriptions. Relators here have offered at least as much as in *Foglia* and have cleared the bar of Rule 9(b). Accordingly, the non-controlled substances claims will proceed.

### b. Controlled Substances

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

[34] Relators also allege that PharMerica illegally altered prescriptions for controlled substances. They claim that PharMerica's systematic practice was to alter the essential elements of the prescription, such as the form or dosage specified, so as to substitute a more profitable alternative.[185] Each time PharMerica submitted a claim for reimbursement for a dispensation pursuant to an altered prescription, Relators claim, PharMerica falsely certified that the dispensation complied with all applicable laws and regulations.[186]

[185]  Amend. Compl. ¶¶ 110–17.

[186]  Id. ¶¶ 138–45.

In its reply memorandum, PharMerica argues for the first time that this claim should be dismissed because PharMerica has uncovered evidence that the two specific controlled-substance prescriptions Relators identify by RX number in the Amended Complaint were altered legally or not altered at all.[187] PharMerica asks the Court to consider this evidence outside the Amended Complaint at the motion-to-dismiss stage on the grounds that the prescription documents are "integral to or explicitly relied upon in the complaint."[188] Even if the Court were to consider this evidence at this stage, PharMerica's attempt to rebut Relators' two examples would not support dismissing Relators' entire category of claims based on illegally altered prescriptions for controlled substances. Relators allege that they have identified 924 instances in which PharMerica illegally altered prescriptions for Schedule II controlled substances, not just the two for which RX numbers are offered, and as already explained, Relators need not identify any specific claim for payment at the pleading stage.[189] In this category of claims, as in the preceding one, Relators have described "particular details of a scheme to submit false claims"—that is, the design of the LTC400 and the widespread practice of prompting clerks to alter prescriptions to make them more profitable[190] — and have paired that alleged scheme with "reliable indicia that lead to a strong inference that claims were actually submitted." Here, some of those "reliable indicia" include the specific time frame of the alleged fraudulent claims (March 2014 through September 2015); a definite number of claims allegedly submitted (924); and the further specification that 143 of those claims involved prescriptions for the drugs OxyContin and Morphine.[191]

[187]  See Amend. Compl. ¶¶ 111–12; See PharMerica's Reply Mem. Supp. Mot. to Dismiss [Doc. No. 59] at 6–7; Decl.

of Ahmed Aleemuddin Supp. Reply Mem. [Doc. No. 59-1].

[188]  Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (emphasis omitted) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426).

[189]  Foglia, 754 F.3d at 156–57; see United States ex rel. Budike v. PECO Energy, 897 F. Supp. 2d 300, 320 (E.D. Pa. 2012) (noting that providing a "single claim example" would not put defendants "in a better position to answer and defend against Relator's claims," especially if "[t]he fraud of the instant claims does not turn on anything unique to an individual claim or anything that would be revealed from an examination of any claim.") Indeed, to allow PharMerica to win dismissal of this entire group of Relators' claims by rebutting the two specific examples Relators offer would punish Relators for going above and beyond the pleading standards the Third Circuit has required in False Claims Act cases. This would perversely disincentivize specific, careful pleading.

[190]  Amend. Compl. ¶¶ 113–17.

[191]  Id. ¶ 110.

*18 Next, PharMerica argues that any allegation of widespread fraud in the pharmacy industry is inherently implausible under Ashcroft v. Iqbal because that industry is so closely regulated at both the federal and state level.[192] This argument is belied by the fact that False Claims Act cases against pharmacy defendants—including some against PharMerica in particular—often survive motions to dismiss.[193] Nor is it at all implausible that Reliant, the long-term care facility at which Relators worked, could have administered "thousands of incorrect doses of controlled substances to its residents without anyone noticing or taking action," as PharMerica argues.[194] Even if staff at Reliant had been careful to double-check the brand, dosage, and quantity of each medication against the original prescription information, they could very reasonably have assumed that any discrepancies were the result of PharMerica pharmacists conferring with the prescribing physician and getting his or her consent to alter the prescription. That would be noted in PharMerica's files, but not necessarily on the label of the bottle.

[192]  PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 28–30; see 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Case 1:20-cv-00857-CFC   Document 18   Filed 07/15/20   Page 174 of 181 PageID #: 573

**Sturgeon v. Pharmerica Corp.**, --- F.Supp.3d ---- (2020)
Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

193   *See United States ex rel. Silver v. Omnicare, Inc. et al.*, No. 11-1326, 2014 WL 4827410, at *1 (D.N.J. Sept. 29, 2014) (denying Defendant PharMerica's motion to dismiss except as to statute-of-limitations grounds); *United States ex rel. Denk v. PharMerica Corp.*, No. 09-720, 2014 WL 4355342 (E.D. Wis. Sept. 3, 2014); *see also, e.g., United States ex rel. Garbe v. Kmart Corp.*, 968 F. Supp. 2d 978 (S.D. Ill. 2013); *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012).

194   PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 29.

PharMerica's argument that these claims broadly do not meet the particularity requirement of Rule 9(b) fails for the same reasons explained above. [195] Accordingly, the controlled substances claims will proceed.

195   PharMerica's argument that the controlled substances claims must be dismissed because PointClickCare orders are not prescriptions and therefore are not a valid point of comparison for the actual dispensation is too clever by half. *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 27. As Relators point out, the allegations in the Amended Complaint—including the allegation that PointClickCare is the system by which long-term care facilities transmit prescriptions to PharMerica—must be taken as true at this stage. Even to meet the heightened pleading standard of Rule 9(b), Relators need not allege that prescriptions in the PointClickCare system meet all the legal requirements to be called a "prescription" or that no other, more legally valid prescription exists elsewhere in the world. Such ticky-tack—indeed, logically impossible—pleading standards have been rejected by the Third Circuit, which cautioned against requiring complaints to offer "a level of proof not demanded to win at trial." *Foglia*, 754 F.3d at 156. Likewise, undue skepticism of the statistical validity of Relators' audit is "misplaced at the Rule 12(b)(6) stage." *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Company*, 839 F.3d 242, 257 (3rd Cir. 2016); *see* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 35.

### c. Brand Names vs. Generics

[35]   Finally, Relators allege that PharMerica illegally altered prescriptions for generic drugs, substituting brand-name drugs in violation of applicable federal and state law. [196] This was a widespread practice at PharMerica,

Relators claim; indeed, PharMerica's computerized drug dispensing system was allegedly designed to prompt clerks to make profitable substitutions even though pharmacists are supposed to consult with the prescribing physician before altering certain elements of a prescription. [197] Each time PharMerica submitted a claim for reimbursement for a dispensation pursuant to an altered prescription, Relators allege, PharMerica falsely certified that the dispensation complied with all applicable laws and regulations.

196   Amend. Compl. ¶¶ 127–30, 152.

197   *See id.* ¶¶ 53–62, 150–53.

Relators support this claim with two main factual allegations. First, Relators claim that PharMerica "routinely altered and dispensed brand name drugs in lieu of the generic drugs ordered and already on the market." [198] Second, they claim that these alterations were made "without a legal prescription." [199] Relators also identify two particular substitutions that were allegedly made—the brand-name drug Abilify for the generic Aripiprazole, and the brand-name drug Namenda XR for regular Namenda. [200]

198   *Id.* ¶ 127 (emphasis omitted).

199   *Id.*

200   Namenda and Namenda XR both appear to be brand-name drugs; the Court understands Relators' allegation to mean that shortly before Namenda's generic equivalent was released, PharMerica began substituting Namenda XR, which had no generic equivalent, for Namenda in order to avoid the requirement that a cheaper generic be substituted. *See* Amend. Compl. ¶ 129.

**\*19**   This kind of substitution—a brand name for a generic—might be unlawful for two reasons. First, to be eligible for government reimbursement, federal and state regulations require that pharmacies dispense generic drugs that are therapeutically equivalent to brand-name drugs when the generic is cheaper. [201] If a pharmacy were intentionally dispensing more expensive brand-name drugs to maximize its reimbursements, that would constitute a false claim. Second, as discussed in more detail below, pharmacists are generally not permitted to alter prescriptions without the consent of the prescribing physician. [202] If a pharmacy substituted alternative drugs without the physician's consent, the dispensation would not be pursuant to a valid prescription

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

and the pharmacy could not legally seek reimbursement from Medicare or Medicaid.

[201]  Amend. Compl. ¶¶ 146–53.

[202]  *Id.*

To state a claim for this alleged scheme of swapping brands for generics, then Relators must allege either (1) that the generic equivalent prescribed was cheaper than the brand dispensed, so that the substitution violated the requirement to dispense cheaper equivalents,[203] or (2) that the generic dispensed was not a therapeutic equivalent so that substitution required the prescribing physician's consent, which was not obtained.[204] Although this portion of the Amended Complaint is sparser than the controlled substances and non-controlled substances allegations, discussed below, Relators do allege that the brand-name drugs PharMerica dispensed were more expensive than their available generic equivalents.[205] This allegation serves the same purpose as the allegation of non-compliance with the Zemplar reuse guidelines in *Foglia*: It elevates an opportunity for fraud into an allegation of fraud.[206] Accordingly, these claims will also proceed.

[203]  PharMerica points out that the costs of a drug to any given Part D sponsor depend on its own formulary development process. *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 25–26. It may well turn out that under the relevant formulary, the brand-name drugs dispensed were no more expensive than the generics allegedly prescribed, in which case PharMerica could be entitled to summary judgment on those claims. But Relators have alleged that the generics were in fact cheaper, which the Court must accept as true at this stage.

[204]  *Cf. United States ex rel. Gohil v. Sanofi-Aventis U.S. Inc.,* 96 F. Supp. 3d 504, 519 (E.D. Pa. 2015) (noting that while relators were not required to plead specific false claims, in order to prove fraud based on promoting drugs for unapproved uses, relator was required to "plead for what unaccepted medical indications Aventis promoted Taxotere").

[205]  Relators allege this in two places. First, they allege that "PharMerica also made it its practice of dispensing brand name drugs, including Abilify, Namenda, and Cymbalta, in lieu of their cheaper generic drug equivalent for many months after the generic-equivalents had entered the market." Amend. Compl. ¶ 5. Second, the heading above paragraph 127 of the Amended Complaint

reads: "PharMerica Systematically and Illegally Altered Prescriptions by Filling Generic Drug Prescriptions with the More Expensive and Profitable Brand Name Drug."

[206]  *Foglia,* 754 F.3d at 158.

### 3. Analysis: Claims under 31 U.S.C. § 3729(a)(1)(G)

Relators also allege violations of 31 U.S.C. § 3729(a)(1)(G), the so-called reverse false claims provision of the False Claims Act. Whereas §§ 3729(a)(1)(A) and (B) are violated when a person fraudulently requests payment *from* the government, § 3729(a)(1)(G) is violated when a person withholds payment that is owed *to* the government:

> [A]ny person who...knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government....[207]

[207]  31 U.S.C. § 3729(a)(1); *see Victaulic,* 839 F.3d at 247 ("In this case, by contrast, the allegation is not that Victaulic is obtaining monies from the government to which it is not entitled, but rather that it is retaining money it should have paid the government in the form of marking duties. Wrongful retention cases such as these are known as 'reverse false claims' actions.").

*\*20  Based on the same alleged prescription alteration scheme that forms the basis of the claims already discussed, Relators allege two separate violations of § 3729(a)(1)(G) here. First, they allege that PharMerica violated the Corporate Integrity Agreement ("CIA") it entered into as a result of *Denk* and failed to pay the ensuing penalties to the government. Second, they allege that PharMerica improperly retained the same payments it received as a result of the prescription alteration scheme. In one sense, both of these are based on the same alleged conduct—illegally altering prescriptions. Each alleged violation, however, rests on a separate financial obligation that was allegedly owed to the government— first, the penalties under the CIA, and second, the general

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

obligation to return to the government money it paid out based on fraud or in error. Since the "obligation" is the touchstone of the reverse false claims provision,[208] these two alleged violations are considered separately.

[208]   *See* *United States ex rel. Boise v. Cephalon, Inc.*, No. 08-287, 2015 WL 4461793, at *2 (E.D. Pa. July 21, 2015) (" 'A prerequisite for liability under [a reverse false claim] theory is a legal obligation' to pay or credit the government." (quoting *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 444 (3d Cir. 2004))).

### a. Obligations Under the Corporate Integrity Agreement

**[36]**   As part of the resolution of *Denk*, PharMerica entered into a CIA with the Office of the Inspector General ("OIG") of the Department of Health and Human Services.[209] That CIA required, among other things, that PharMerica bring itself into compliance with the Controlled Substances Act and related regulations.[210] Instead, Relators allege, PharMerica embarked on a new scheme to handle prescriptions illegally, this time by altering them without physician consent so as to maximize reimbursements. That conduct, Relators argue, not only violated §§ 3729(a)(1)(A) and (B) of the False Claims Act, but also violated the CIA, subjecting PharMerica to an obligation to pay penalties to the government.[211] By concealing that it had violated the CIA and incurred an obligation to pay, PharMerica thus violated § 3729(a)(1)(G) as well, according to Relators. PharMerica argues that this claim must be dismissed for two reasons: first, because the stipulated penalties in the CIA are contingent obligations that cannot be the basis of a claim under § 3729(a)(1)(G), and second, because the Amended Complaint "does not identify any failure of compliance" with the CIA.

[209]   Amend. Compl. ¶ 93.

[210]   *Id.* ¶ 94.

[211]   Relators' Mem. Opp. Mot. to Dismiss [Doc. No. 57] at 32; *see* Amend. Compl. ¶¶ 96–98, 178.

As noted, the reverse false claims provision hinges on the "obligation" to pay money to the government. In 2009, Congress passed the Fraud Enforcement and Recovery Act ("FERA"),[212] which amended the False Claims Act and supplied a definition of the term "obligation":

> [T]he term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment....[213]

That definition expanded the meaning of "obligation" beyond the limited construction some courts had given it.[214] In particular, it included "established dut[ies], whether or not fixed," in contrast to the Sixth Circuit's decision in *American Textile Manufacturers Institute, Inc. v. The Limited, Inc.*, which had restricted the meaning of "obligation" to the kinds of duties "that gave rise to actions of debt at common law"[215] —that is to say, fixed obligations. The Senate Judiciary Committee Report on the FERA amendments explained that this definition was framed so as to include "contingent, non-fixed obligations" spanning a "spectrum" from "the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that 'results in a duty to pay the Government money, whether or not the amount owed is yet fixed.' "[216] At least some contingent, non-fixed obligations are now, therefore, actionable under the reverse false claims provision of the FCA.[217]

[212]   Pub. L. No. 111-21, 123 Stat. 1617 (2009).

[213]   31 U.S.C. § 3729(b)(3).

[214]   *See Victaulic*, 839 F.3d at 253.

[215]   190 F.3d 729, 736 (6th Cir. 1999).

[216]   S. Rep. No. 111-10, at 14 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 441; *see United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 505 (3d Cir. 2017) (explaining that the phrases "established duty" and "whether or not fixed" are ambiguous, so the provision's legislative history may be considered).

[217]   *Victaulic*, 839 F.3d at 253–54.

**\*21**   Contingent obligations are only actionable within reason, however—future duties to pay that are too speculative may not be a valid basis for claims under § 3729(a)(1)(G).

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

The Third Circuit explained this limitation in *United States ex rel. Petras v. Simparel, Inc.*[218] There, the relator was the chief financial officer of a software company in which the Small Business Administration, a federal agency, became a preferred shareholder. Under the company's certificate of incorporation, it was required to pay accrued dividends to preferred shareholders under two specified conditions. The relator alleged that the company "engaged in certain fraudulent conduct—to which he objected—in order to avoid paying the SBA these contingent dividends."[219] He did not, however, allege that either of the two conditions had occurred.[220] In considering the statutory language, the court concluded that the phrase "an established duty, whether or not fixed" excluded "obligation[s that] did not exist when the defendants' alleged misconduct occurred."[221] In other words, the obligation to pay must have existed at the time of the misconduct—that is, it was "established"—but the *amount* need not have been fixed.

[218]   857 F.3d 497.

[219]   *Id.* at 500.

[220]   *Id.*

[221]   *Id.* at 504–06.

Since FERA's enactment, courts have split on the question whether stipulated penalty provisions of a CIA are "obligations" for reverse false claims purposes. All agree that that "a breach of [a government] contract can give rise to an 'obligation' " under the reverse false claims provision.[222] Further, CIAs are contracts with the government. Beyond that, the cases diverge. A few cases have concluded that the contractual nature of the stipulated penalties by itself makes them "obligations."[223] Most, however, have looked beyond the fact of the contract to its terms, concluding that where stipulated penalties are contingent on the exercise of governmental discretion, they are not "obligations."[224]

[222]   *Ruscher v. Omnicare, Inc.*, No. 08-3396, 2014 WL 4388726, at *5 (S.D. Tex. Sept. 5, 2014).

[223]   *See Boise*, 2015 WL 4461793, at *3–7; *Ruscher*, 2014 WL 4388726, at *5.

[224]   *See United States ex rel. Keen v. Teva Pharmaceuticals USA Inc.*, No. 15-2309, 2017 WL 36447, at *5–6 (N.D. Ill. Jan. 4, 2017);*United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 268–72 (D.D.C.

2016); *United States ex rel. Booker v. Pfizer Inc.*, 9 F. Supp. 3d 34, 49–50 (D. Mass. 2014), *aff'd on other grounds*, *United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 55–56 (1st Cir. 2017); *see also United States ex rel. Niazi v. CVS Pharmacy, Inc.*, No. 15-5518, 2018 WL 654289, at *6 (C.D. Cal. Jan. 31, 2018);*United States ex rel. Zayas v. Astrazeneca Biopharmaceuticals, Inc.*, 2017 WL 1378128, at *3 (E.D.N.Y. Apr. 17, 2017).

The majority position is more persuasive. It is true that ordinarily, a contract with a standard liquidated damages clause creates a present obligation to pay upon breach, whether the nonbreaching party exercises its discretion to sue for enforcement or not. The minority position holds by analogy that even if a CIA conditions the payment of penalties on OIG's exercise of discretion—that is, even if the penalties become due only after OIG determines that they are appropriate—an obligation exists. The minority position, however, is "insufficiently attentive to the language" that is typical of CIAs.[225] Unlike a standard liquidated damages clause, the CIA between PharMerica and the government provides that failure to comply with the CIA "*may* lead to the imposition of...monetary penalties."[226] Similarly, it provides that "[u]pon a finding that PharMerica has failed to comply" with any term of the CIA "*and after determining that Stipulated Penalties are appropriate*," OIG will notify PharMerica of "OIG's exercise of its contractual right to demand payment of the Stipulated Penalties."[227] These terms do not describe an "established duty" to pay money to the government—at the time of breach, the penalties are not yet due. Instead, these contract provisions describe a possible future duty. Despite the contractual relationship between PharMerica and the government, therefore, these stipulated penalties are more akin to regulatory fines than to typical contractual liquidated damages.[228] Because there is no "established duty" until the government exercises its discretion to demand payment, the stipulated penalties are not "obligations."[229]

[225]   *Keen*, 2017 WL 36447, at *6.

[226]   Doc. No. 78 at 27 (emphasis added).

[227]   *Id.* at 30 (emphasis added). Although the CIA does use the term "obligations" here, Relators conflate the two meanings of that word. As the CIA uses it, "obligations" refers to PharMerica's substantive duties under the CIA— for example, to appoint a compliance officer and to submit implementation reports. These are not

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

"obligations" under § 3729(a)(1)(G), which speaks only of obligations to pay money to the government.

228    *Cf. United States ex rel. Marcy v. Rowan Companies, Inc.*, 520 F.3d 384, 391 (5th Cir. 2008) (noting that "the government still must choose whether to impose a penalty" after a regulatory violation and that "[o]ther courts have held that when potential fines depend on intervening discretionary governmental acts, they are not sufficient to create 'obligations to pay' under the False Claims Act").

229    At oral argument, counsel for Relators emphasized the stipulated penalty provisions themselves, which state that they "*shall* begin to accrue on the day after the date the obligation became due." Doc. No. 78 at 28–29. While "shall" is mandatory, this does not suggest that the stipulated penalties are obligations. Rather, it merely supplies a rule for determining the amount of the penalties—once OIG exercises its discretion to impose the penalties, the amount due is calculated from the day after the date of the compliance failure.

**\*22**   The Court recognizes the unfortunate implications of so holding. When it enters into a CIA like this one, the Government cannot enforce any stipulated penalties without notice that the CIA was violated. Where a party to a CIA fails to give notice voluntarily, it may be that a *qui tam* action under the reverse false claims provision is the only mechanism for recovering the stipulated penalties due. Shielding alleged recidivist fraudsters from *qui tam* liability for "improperly avoid[ing]" the stipulated penalties of a CIA may not be desirable as a matter of policy. This outcome, however, could easily be avoided if CIAs were structured so that stipulated penalties would become due upon breach, not merely upon the exercise of discretion by OIG, like most liquidated damages. For whatever reason, the Government has chosen to make these stipulated penalties contingent. As a result, no "obligation" can exist for § 3729(a)(1)(G) purposes until OIG exercises its discretion to demand payment. Because Relators have not alleged that such an exercise of discretion occurred, they have not stated a claim under this provision based on the CIA.

### b. Retention of Payments for Claims Based on Altered Prescriptions

Relators also allege that PharMerica violated § 3729(a)(1)(G) by retaining the fraudulently obtained payments that form the basis of Relators' claims under §§ 3729(a)(1)(A) and (B). PharMerica argues that this alleged conduct does not support

a claim under § 3729(a)(1)(G) because it merely duplicates the same alleged conduct that formed the basis of Relators' claims under §§ 3729(a)(1)(A) and (B).

The established rule prior to the 2009 FERA amendments was that a claim for mere retention of government payments that were fraudulently obtained in the first place did not state a claim under § 3729(a)(1)(G). 230 In other words, relators were barred from asserting that the same fraudulent claim for payment constituted both a "false claim" under § 3729(a)(1)(A) or (B), in the first instance, and a "reverse false claim" under § 3729(a)(1)(G), once a defendant received and retained payment on that claim. As explained above, however, in 2009 Congress added to the statute a definition of the term "obligation":

> [T]he term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or from the retention of any overpayment....* 231

The Patient Protection and Affordable Care Act then defined "overpayment" as "any funds that a person receives or retains under subchapter XVIII [Medicare] or XIX [Medicaid] of this chapter to which the person, after applicable reconciliation, is not entitled under such subchapter." 232 The ACA also clarified that a "repayment retained by a person after the deadline for reporting and returning the overpayment" is an "obligation" for False Claims Act purposes. 233 The parties dispute whether the anti-duplication rule survived these developments.

230    *See United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514–15 (E.D. Pa. 2010).

231    31 U.S.C. § 3729(b)(3) (emphasis added).

232    Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111–148, § 6402, 124 Stat. 119, 753 (2010) (codified at 42 U.S.C. § 1320a-7k(d)(4)(B)); *see United States ex rel. Taul v. Nagel Enterprises, Inc.*, No. 14-061, 2017 WL 432460, at \*10 (N.D. Ala. Feb. 1, 2017).

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

233  42 U.S.C. § 1320a-7k(d)(3); *see Taul*, 2017 WL 432460, at \*10.

Every case the Court is aware of that expressly considered this issue concluded that the rule still applies [234] —relators may not use § 3729(a)(1)(G) as a "redundant basis" for liability. [235] The Court agrees that the logic of that rule still obtains. Rather than permitting a double recovery for conduct already covered by other provisions of the False Claims Act, the "retention of overpayments" language seems to impose liability in at least two situations not clearly covered before the FERA amendments. First, it allows for liability when a party unknowingly presents a false claim, realizes its mistake, and knowingly retains the resulting overpayment. Second, it allows for liability when a government contractor "receive[s] money from the government incrementally based upon cost estimates" and retains "money that is overpaid during the estimate process." [236] Recognizing that both these situations are "different from fraudulently obtaining the payment in the first place," [237] this sensible interpretation gives independent meaning to each provision of the statute. [238]

234  *United States v. Berkeley Heartlab, Inc.*, 247 F. Supp. 3d 724, 732–33 (D.S.C. 2017); *United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 965–66 (D. Minn. 2015); *United States ex rel. Myers v. America's Disabled Homebound, Inc.*, No. 14-8525, 2018 WL 1427171, at \*3 (N.D. Ill. Mar. 22, 2018); *United States ex rel. Laporte v. Premier Educ. Grp., L.P.*, No. 11-3523, 2016 WL 2747195, at \*18 (D.N.J. May 11, 2016); *cf. Taul*, 2017 WL 432460, at \*10–11 (holding that retention of Medicare overpayments could be pled as a § 3729(a)(1)(G) claim but not as a § 3729(a)(1)(A) or (B) claim).

235  *Thomas*, 708 F. Supp. 2d at 514.

236  S. Rep. No. 111-10, at 15 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 442.

237  *Scharber*, 135 F. Supp. 3d at 966.

238  *See Setser v. United States*, 566 U.S. 231, 239, 132 S.Ct. 1463, 182 L.Ed.2d 455 (2012) (explaining that courts should "give effect...to every clause and word" of a statute (quoting *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955))).

**\*23**  Because this subset of Relators' claims merely recasts their §§ 3729(a)(1)(A) and (B) claims, these claims will also be dismissed. [239]

239  Relators argue that they are permitted to plead two alternative allegations: one in which PharMerica knowingly made false claims for payment in the first instance, and another in which PharMerica accidentally made false claims for payment, but became liable under § 3729(a)(1)(G) when it knowingly retained those overpayments. But the latter claim is raised for the first time in Relators' briefing on the Motion to Dismiss; it was not pled in the First Amended Complaint at all.

## C. Relator Sturgeon's Retaliation Claim

Relator Sturgeon finally alleges retaliation against her in violation of the False Claims Act for investigating and reporting PharMerica's alleged violations. PharMerica argues that Sturgeon has not stated a claim for retaliation, or, alternatively, that her retaliation claim is collaterally estopped.

### 1. Sufficiency of Pleadings

**[37] [38] [39] [40]**  To state a claim under the False Claims Act's retaliation provision, [240] a relator must allege (1) that she engaged in "protected conduct," that is, acts done "in furtherance of" a False Claims action, and (2) that she was "discriminated against because of" that protected conduct. [241] "Protected conduct" includes "investigation for, initiating of, testimony for, or assistance in" a *qui tam* action. [242] "Discrimination" includes actions "that might have dissuaded a reasonable worker from engaging in the protected conduct," [243] and "[t]he cumulative impact of retaliatory acts may become actionable even though the actions would be *de minimis* if considered in isolation." [244] Both the "protected conduct" inquiry and the "discrimination" inquiry are fact specific and context dependent. [245]

240  31 U.S.C. § 3730(h)(1).

241  *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001).

242  *Id.*

243  *Difiore v. CSL Behring, U.S., LLC*, 171 F. Supp. 3d 383, 393 (E.D. Pa. 2016).

244  *Brennan v. Norton*, 350 F.3d 399, 422 n.17 (3d Cir. 2003).

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

245    *Hutchins*, 253 F.3d at 187; *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

[41]   Sturgeon has sufficiently alleged that she engaged in "protected conduct." The Amended Complaint recounts Sturgeon's internal investigation into potential false claims while working at PharMerica, during which she discovered the violations she alleges in this *qui tam* action. 246 Sturgeon reported her findings to superiors at PharMerica at least four times during that period. 247 This kind of "internal reporting and investigation of an employer's false or fraudulent claims" is undoubtedly protected conduct under the retaliation statute. 248

246    Amend. Compl. ¶¶ 67–81.

247    *Id.* ¶¶ 70–71, 73–74, 75, 80–81.

248    *Hutchins*, 253 F.3d at 187.

[42]   Sturgeon has also sufficiently alleged that PharMerica "discriminated" against her for that protected conduct. PharMerica attempts to characterize the Amended Complaint as alleging a workplace that was merely unpleasant but not discriminatory, picking out phrases like "discrediting [Sturgeon's] work" and "deliberately embarrassing [Sturgeon]." Fairly read, however, the Amended Complaint alleges a coordinated campaign to diminish Sturgeon's job responsibilities in response to her whistleblowing activity. It alleges that when Sturgeon brought the results of her review to the attention of Senior Vice President for Sales and Marketing Mark Lindemoen, he "shut down the meeting and ordered Sturgeon to stop her investigation," and "demanded that she stop conferring with management" about the "issues that she had identified." 249 When she persisted, management "sought to conceal her findings by discrediting her work, limiting her authority, redefining her role, [and] narrowing her responsibilities." 250 She experienced an "unexplained and sudden diminution" of her "duties and responsibilities." 251 Even more specifically, she alleges that the "diminishing of her job duties and responsibilities" was "retaliatory" and that it "created an intolerable work environment." 252

249    Amend. Compl. ¶ 74.

250    *Id.* ¶ 78.

251    *Id.* ¶ 83.

252    *Id.* ¶ 89.

**\*24**   A direct order from a superior to stop investigating potential fraud would certainly dissuade "a reasonable worker from engaging in [that] protected conduct." 253 So would an otherwise unjustified decision to diminish her job responsibilities. 254 Accordingly, Sturgeon has adequately alleged both elements of a retaliation claim.

253    *Difiore*, 171 F. Supp.3d at 393.

254    *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (holding that "reassignment with significantly different responsibilities" can constitute adverse employment action); *Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 22 (D.D.C. 2015) (reassignment to position with "significantly diminished responsibilities" can constitute action in retaliation for protected conduct under False Claims Act retaliation provision). Mere alteration of job responsibilities might not be discrimination, *see Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004) (analogous Title VII context), but Sturgeon alleges that the curtailment of her responsibilities was "significant[ ]," Amend. Compl. ¶ 86.

## 2. Collateral Estoppel

[43]   PharMerica next argues that Sturgeon's retaliation claim is collaterally estopped because it was adjudicated in an earlier action. Sturgeon previously sued PharMerica for breach of her employment agreement as well as violation of the Pennsylvania Wage Payment and Collection Law. 255 That employment action was resolved by jury trial, at which the sole question the jury answered was:

> Do you find that Lena Sturgeon resigned her position with PharMerica for "Good Reason," that is because of a material diminution in her authority, duties or responsibilities?

The jury answered "no." 256 PharMerica argues that that jury verdict precludes Sturgeon from asserting a diminution of her job responsibilities in this action.

Sturgeon v. Pharmerica Corp., --- F.Supp.3d ---- (2020)

Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

255   *See Sturgeon v. Millennium Pharmacy Sys., LLC et al.,* No. 16-375, 2016 WL 11576043 (W.D. Pa. Mar. 31, 2016).

256   PharMerica's Mot. for Judicial Notice [Doc. No. 52-1], Ex. G.

**[44]  [45]**  Collateral estoppel applies when "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." [257] "A determination ranks as necessary or essential only when the final outcome hinges on it." [258]

257   *United States ex rel. Doe v. Heart Solution, PC,* 923 F.3d 308, 316 (3d Cir. 2019).

258   *Bobby v. Bies,* 556 U.S. 825, 835, 129 S.Ct. 2145, 173 L.Ed.2d 1173 (2009) (citing 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4421 (2d ed. 2002)).

The question posed to the jury in the Employment Action was not whether Sturgeon experienced a material diminution in her duties. Rather, the question was why she resigned her position. The phrasing of the question permitted the jury to conclude that, while Sturgeon did experience a material diminution in her duties, that diminution was not the reason she resigned. Therefore, based on the information available to the Court, the determination that Sturgeon did not experience a material diminution in her duties was not "essential" to the jury's verdict, and Sturgeon is not precluded from litigating that issue here. Accordingly, Sturgeon's retaliation claims can proceed.

## IV. CONCLUSION

Relators' claims under the reverse false claims provision will be dismissed without prejudice. Relators' remaining claims are adequately pled and are not precluded, so they may proceed. An appropriate order follows.

## All Citations

--- F.Supp.3d ----, 2020 WL 586978, Med & Med GD (CCH) P 306,709, 111 Fed. R. Evid. Serv. 585

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.